## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, <br><br> *Plaintiff*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> *Defendant*. | Civil Action No.  1:25-cv-1660 |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Computer & Communications Industry Association ("CCIA") brings this civil action against Defendant for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.      The Texas App Store Accountability Act, Tex. Bus. & Com. Code §§ 121.001 *et seq.*, ("S.B. 2420" or the "Act") (Ex. A), imposes a broad censorship regime on the entire universe of mobile apps. In a misguided attempt to protect minors, Texas has decided to require proof of age before anyone with a smartphone or tablet can download an app. Anyone under 18 must obtain parental consent for every app and in-app purchase they try to download—from ebooks to email to entertainment. At the same time, Texas seeks to compel app developers to rate the age-appropriateness of their own apps and the millions of pieces of content available for in-app purchase according to Texas' vague and unworkable set of age categories.

2.      Our Constitution forbids this. None of our laws require businesses to "card" people before they can enter bookstores and shopping malls. The First Amendment prohibits such oppressive laws as much in cyberspace as it does in the physical world. *Packingham v. North*

*Carolina*, 582 U.S. 98, 104 (2017). The Act is both fatally overbroad and underinclusive to achieve its limited ends. It is also unnecessary: app stores and app developers already provide parents with tools to help them control what their children can access on their mobile devices. The Act's predominant effect is therefore to *remove* parental choice by imposing a one-size-fits-all, paternalistic restriction on the many millions of app store offerings (including books, movies, and games) and app store users, regardless of age and user preference.

3.    CCIA is a leading trade organization representing internet, technology, and communications companies. CCIA's members include operators of app stores (like Google, Apple, and Amazon) and developers of mobile apps (like YouTube, Audible, Apple TV, IMDb, and Goodreads), all covered by the Act. CCIA members' app stores curate and publish apps that distribute and facilitate the exchange of vast amounts of protected speech for both minors and adults, along with countless, life-enhancing tools and access to the world's knowledge, all through a mobile device. And CCIA members' apps collectively offer services for users to read, view, and create speech and information. The Act would prohibit all mobile app stores and app developers from disseminating all but a very select few apps without first complying with onerous age-verification, parental-verification, and parental-consent restrictions that burden the speech rights of the app stores, app developers, and their users.

4.    These verification and consent mandates are the core features of the Act and impose burdens on accessing speech on mobile apps at three key chokepoints: (1) at account creation, (2) prior to downloading an app, and (3) on an ongoing basis for in-app purchases and when an app significantly changes its policies.

    a.    *First*, all users who wish to access apps on a mobile app store must submit to a
        burdensome and privacy-invasive age-verification process designed to sort users

into one of several age-based categories. If a user cannot sufficiently demonstrate they are over 18 years old, the user must link their account to that of a parent or guardian, but only after the parent or guardian can prove both that they are over 18 and also that they have "legal authority" to make decisions on behalf of the minor user. Tex. Bus. & Com. Code § 121.022(a), (b).[1]

b.  *Second*, any user determined to be a minor is forbidden from downloading any mobile app—including mobile newspapers, biblical study apps, the vast majority of educational apps, messaging apps, or games—without first obtaining parental consent for that download, subject to two content-based exceptions. Those exceptions from the parental-consent requirement allow downloads only of (1) apps operated by certain government or nonprofit entities that provide access to emergency services (e.g., a crisis hotline); and (2) apps operated by nonprofits that develop, sponsor, or administer postsecondary educational testing. § 121.022(d), (h).

c.  *Third*, a verified parent must affirmatively consent to ***all*** purchases within each app (including books, music, TV shows, movies, games, and concert tickets), each of the minor's subsequent downloads of any mobile apps, as well as vaguely defined "significant changes" to apps. §§ 121.022(d), (g), 121.053(a), (b).

5.    These requirements have vast and troubling implications on protected speech. Under S.B. 2420, if a 14-year-old wants to download the Libby app to borrow an e-book from the Austin Public Library, she would first have to establish her own age; then she'd have to tether her account to a parent's, who would then need to establish their identity and relationship to the minor

---

[1] References to "§" are to sections of the Texas Business and Commerce Code.

and provide consent; finally, she'd have to wait for the parent to provide consent for the app. Similarly, a 17-year-old who wants to purchase a new book to read on his Kindle app would need to jump through all the same hoops and then ask a parent to review and approve his choice first. The same is true for apps like ESPN, Wikipedia, Spotify, Audible, Substack, Duolingo, Goodreads, Bible Project, Atheism Pocket Debater, TED, Bandcamp, Khan Academy Kids, and on and on. Even worse, minors who do not have a parent or legal guardian able to provide consent under the Act will be entirely shut out of mobile app stores and the thousands of speech-enabling apps and the speech and information apps provide. Even minors who can successfully link a verified parent account are burdened when their parents are (understandably) too busy to approve each request as it is made.

6.      The law is not tailored to its goal of shielding children from accessing speech that they do not have a First Amendment right to access. Instead, Texas has walled off virtually all mobile apps behind a series of verification and consent gates. Indeed, S.B. 2420 does nothing to exempt apps that facilitate core political or educational speech; creative or artistic expression; religious instruction and information; or the exchange of ideas, information, and culture. Texas has "burn[ed] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

7.      These provisions impermissibly burden app stores and developers in exercising their rights to distribute speech; they burden adults in their right to access and create speech; and they burden the rights of minors to access and create speech without parental approval. For these reasons, the Act is subject to and fails strict scrutiny. But even if the court were to apply intermediate scrutiny, the Act could not withstand constitutional muster, because it is not at all tailored to serve the State's purported interest in protecting minors online.

8.     The Act's verification and consent provisions are fatally overbroad and restrict both adults' and minors' access to core protected speech disseminated through apps like the NYTimes app, Bible Project, and Audible.

9.     The Act's verification and consent provisions are also woefully underinclusive. They target only apps available on mobile devices but do nothing to prevent minors from accessing the same exact content, pursuant to the same terms of service, on a web browser, desktop computer, smart TV, or from offline sources. The sole effect of the law is to make speech more fragmented and burden its distribution.

10.     The verification and consent provisions are far from the least restrictive alternative to achieve the State's goal, given that app stores already provide tools to allow parents to restrict what their children access on their devices, and many apps already include verification and consent tools tailored to particular services offered through those apps. Moreover, Texas already has a law designed to prevent minors from accessing online content that is obscene as to minors, *see* H.B. 1181, Tex. Civ. Prac. & Rem. Code Ann § 129B.001 – .004 (West 2025), which is a less restrictive alternative to the sweeping S.B. 2420. *Cf. Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 499 (2025).

11.     In concert with the verification and consent requirements, the Act's age-rating and display provisions impermissibly compel app developers to opine as to the appropriate age rating of their content and share that rating with app stores, who then must display the rating for users. The age-rating and display requirements subject both app developers and app stores to liability for duties that are standardless, unclear, and undercut existing rating frameworks that already provide an industry standard for app ratings. These provisions are independently unconstitutional and cannot survive any form of heightened scrutiny.

12.     The Act also violates the Commerce Clause by excessively burdening interstate commerce in relation to the purported local benefit conferred on the State of Texas.

13.     The Court should declare S.B. 2420 facially unlawful and enjoin its enforcement as to CCIA's app store and developer members.

## PARTIES

14.     Plaintiff CCIA is an international, non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code incorporated in the Commonwealth of Virginia. For more than 50 years, CCIA has promoted open markets, open systems, and open networks.

15.     Based on S.B. 2420's definitions, the Act regulates and significantly burdens CCIA's members both in their capacity as app store owners and app developers, including: (1) Google, which owns and/or operates the Google Play Store, Google Search, Gmail, and Google Maps, among others; (2) Amazon, which owns and/or operates the Amazon Appstore, Audible, IMDb, and Goodreads, among others; and (3) Apple, which owns and/or operates the Apple App Store, Apple TV, Apple News, and Apple Music, among others. Google, Apple, and Amazon own and operate "app store[s]," defined as "publicly available . . . software applications . . . . that distribute[] software applications from the owner or developer of a software application to the user of a mobile device." *See* S.B. 2420 §§ 121.002(2), 121.021. They are also "developer[s] of . . . software application[s] that [they] make[] available to users in [Texas] through an app store." § 121.051. Numerous other CCIA members develop mobile apps that are regulated by the Act.

16.     Defendant Ken Paxton, the Texas Attorney General, is a resident of Texas and is sued in his official capacity. By classifying violations of S.B. 2420 as "deceptive trade practice[s]," the Act delegates enforcement authority to the Consumer Protection Division of the Attorney General's office. S.B. 2420 § 121.101; Tex. Bus. & Com. Code §§ 17.45(8), 17.46 (West 2025).

## STANDING

17.    CCIA has standing to challenge S.B. 2420 on multiple grounds.

18.    CCIA has associational standing because (1) some of CCIA's members have standing, as those members are "the object" of S.B. 2420's regulation and face substantial liability, *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019), *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025); (2) challenging S.B. 2420 is germane to CCIA's mission; and (3) CCIA members' individual participation is unnecessary in this purely legal challenge. *NetChoice v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025); *see also CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1029 (W.D. Tex. 2024) (finding CCIA had associational standing to assert claims challenging a similar Texas statute), *appeal filed*, No. 24-50721 (5th Cir. Sep. 13, 2024), and *appeal filed sub nom, Students Engaged in Advancing Tex. v. Paxton,* No. 25-50096 (5th Cir. Feb. 11, 2025).

19.    *First*, CCIA "has standing to bring a pre-enforcement facial challenge against [S.B. 2420]" because "the law is aimed directly at" CCIA's app store and developer members, "who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures" to implement S.B. 2420's onerous requirements across their technologies. *Fitch*, 134 F.4th at 804 (citation omitted). CCIA members operate app stores and develop apps, and in both capacities they engage in activity "affected with a constitutional interest." *Book People, Inc. v. Wong*, 91 F.4th 318, 329-330 & n.49 (5th Cir. 2024) ("*Book People II*").

20.    *Second*, in challenging S.B. 2420, CCIA "seeks to vindicate interests germane to its purpose." *Fitch*, 134 F.4th at 804. S.B. 2420 imposes unconstitutional restrictions on CCIA members' ability to speak and facilitate speech through mobile apps. Those constraints directly confront CCIA's mission to promote open markets, open systems, and open networks, and advocate for the interests of the world's leading providers of technology products and services.

21.     *Third*, CCIA's members do not need to participate in this suit as parties because "no claim asserted nor relief requested requires the participation of each member." *Id.* at 805. For example, because the verification and consent requirements affect all covered app stores equally, their claims "can be proven by evidence from representative injured members" like Google, as is the case here. *Id.* (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010)).

22.     CCIA, through its app-store and app-developer members, also has prudential standing to assert the First Amendment rights of its members' users—both current and prospective (including, for app stores, the app developers who list apps within the stores). "[I]n First Amendment facial challenges, federal courts relax the prudential limitations and allow yet-unharmed litigants to attack potentially overbroad statutes to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Fitch*, 134 F.4th at 806 (finding NetChoice satisfied the prudential standing requirement). S.B. 2420's violation of users' First Amendment rights adversely affects CCIA members who are both app stores and app developers.

## JURISDICTION & VENUE

23.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. §§ 1983 and 1988, injunctive relief under 28 U.S.C. § 1651 and *Ex parte Young*, 209 U.S. 123 (1908), and declaratory relief under 28 U.S.C. § 2201(a).

24.     This Court has personal jurisdiction over Defendant, because the Texas Attorney General resides in and/or conducts a substantial portion of his official business in Austin, Texas. Venue is proper in this district under 28 U.S.C. § 1391(b) because the only Defendant resides, and the events giving rise to this civil action occurred, in Austin, Texas.

## BACKGROUND & FACTUAL ALLEGATIONS

25.    **App Stores Are a Vibrant Forum for Speech**. App stores are digital content stores that allow users to search for, browse, discover, download, and purchase mobile apps and other content. In providing this service, app stores publish and facilitate secure, privacy-protective access to vast quantities of expressive content in every digital media format; they directly facilitate some of the largest and most egalitarian fora for speech and creativity among developers and users.

26.    Apps themselves embody, create, and curate diverse fora for speech and interaction. The Internet is the predominant forum for speech, *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017), and apps facilitate that forum on mobile devices. Mobile phones, and their capacity to provide access to the speech forums of the internet through mobile applications, have become a leading vehicle for accessing the Internet, particularly among younger generations. In short, people use apps "to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Id.* at 105 (discussing social media users and websites). And app stores stand at the threshold of access to those apps.

27.    App stores embody such diverse fora for speech largely because barriers to entry are kept low. Most apps are run by small businesses, and many are run by individual developers. For instance, Apple has noted that 90% of all developers in its App Store are "small developers."[2] Thus, apps carry out the internet's promise of "relatively unlimited, low-cost capacity for communication of all kinds." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997).

28.    Apps embody expressive software design choices, and their operation and maintenance constitute speech acts. As an additional layer of expressive activity and speech, the

---

[2] *Small developers on the App Store grew revenue by 71 percent over the past two years*, Apple (May 11, 2023),
https://www.apple.com/newsroom/2023/05/small-developers-on-the-app-store-grew-revenue-by-71-percent-from-2020-2022/.

vast majority of the most-downloaded apps in member app stores either offer or facilitate free expression.[3]

29.     Examples of the vast array of apps that provide access to and fora for fully protected speech and information include:

a.  **Substack**, which allows individual writers to develop a readership and monetize their writing;

b.  **Khan Academy,** which provides educational content to assist people in learning a wide range of subjects;

c.  **YouVersion Bible App,** which allows people to read or listen to the Bible and share passages and comments with friends in their network;

d.  **InstaRabbi**, which allows Jews from across the world to ask Torah or Halachic questions and get quick answers in accordance with Orthodox Jewish observance;

e.  **Spotify,** which allows people to listen to music, podcasts, and audiobooks and share playlists with others;

f.  **NYTimes** and **WSJ Print Edition**, which provide journalism, just as they do in their print newspapers;

g.  **The Texas Longhorns app,** which lets fans of the UT Austin football team follow game coverage and news, and view exclusive content;

h.  **BusyKid,** an app that teaches kids financial literacy and independence when they earn money for completing chores;

---

[3] *See, e.g.*, *Top Charts*, Google Play, https://play.google.com/store/apps?hl=en_US (last visited Oct. 14, 2025); *Top Charts - Top Free Apps*, Apple App Store, https://apps.apple.com/us/charts/iphone/top-free-apps/36 (last visited Oct. 14, 2025); *Best Sellers in Apps & Games - Top 100 Free*, Amazon Appstore, https://www.amazon.com/gp/bestsellers/mobile-apps/ref=zg_bs?ie=UTF8&tf=1 (last visited Oct. 14, 2025).

    i. **Tankee,** a gaming and videosharing service that curates family-friendly content and helps parents ensure that their kids are not watching adult-oriented videos;

    j. **Waffle Smash,** a game originally designed to help kids with cerebral palsy develop their hand-eye coordination and dexterity;

    k. **StoryPlace**, an online community that allows writers to share original stories;

    l. **Smart Kidz Club**, an educational service that helps foster kids' love of reading and math;

    m. **Sudoku Master!**, which allows people to choose among tens of thousands of Sudoku puzzles to play.

30.    CCIA's members own and operate dozens of speech-facilitating and speech-creating apps, including Apple TV, YouTube, Goodreads, Audible, and IMDb. These apps, and numerous others, provide users with access to a vast array of protected speech, including books, movies, videos, music, reviews, and factual information, as well as the ability to create and share their own speech in various forms.

31.    Apps improve the user interface of websites on phones and tablets. But users can often access the same material available in a mobile app via other means, including web browsers and non-mobile apps. For example, a user can stream music on Spotify or read essays on Substack through their mobile apps but can also access the same content through their websites via web browser on mobile devices (or computers). Likewise, Amazon Prime Video and YouTube are available through their respective mobile apps, but also through their respective websites (primevideo.com and youtube.com) or through non-mobile apps that can be downloaded on a Smart TV. The Act's impact is thus to make accessing speech and information more difficult and disjointed.

32.    **App Stores and Apps Already Have Policies and Voluntary Tools to Help Protect Minors from Inappropriate Speech.** It is through app stores that mobile device users download the vast majority of apps. App stores curate and review the apps they offer for download, both prior to and after publication, to provide quality controls and additional services for users. For example, all CCIA's app store members require app developers to submit to a rigorous pre-publication review process, wherein the app store will evaluate the app's content, check the security of the app, and test its functionalities in an isolated environment. Part of this process involves rating the app's content to determine its age-appropriateness.

33.    Every app store, on information and belief, engages in age-rating, but each app store has a different age-rating system and different age categories. These processes and categories differ from the new age rating requirements imposed by the Act. The Google Play Store, for example, uses a separate rating authority, the International Age Rating Coalition ("IARC"), which screens the app and assigns a rating based on Entertainment Software Rating Board ("ESRB") guidelines.[4] Apple's App Store similarly requires age rating for "parental controls"[5] and uses categories 4+, 9+, 13+, 16+, and 18+.[6] The Apple App Store employs even more granular age-rating categories for apps designated in its "Kids Category," placing apps in one of three age bands based on its primary audience: "5 and under, 6 to 8, or 9 to 11."[7]

---

[4] *Requirements related to content ratings for apps, games, and the ads served on both*, Google Play, https://support.google.com/googleplay/android-developer/answer/9859655 (last visited Oct. 14, 2025)

[5] *Age ratings values and definitions*, Apple, https://developer.apple.com/help/app-store-connect/reference/age-ratings-values-and-definitions/ (last visited Oct. 14, 2025)

[6] *Id.*

[7] *Design safe and age-appropriate experiences for your apps and games,* Apple, *https://developer.apple.com/kids/* (last visited Oct. 14, 2025)..

34.    CCIA's app store members also review apps in accordance with their content policies and block or remove from their stores those that are harmful, low quality, unsafe, or otherwise inconsistent with their content policies.

35.    For apps directed towards younger audiences, CCIA's app store members also impose and enforce different and stricter content policies. Those apps generally must contain only age-appropriate content, implement parental consent gates for purchasing opportunities, and protect against disclosure of children's personal information, among other requirements.

36.    CCIA's app store members also provide ongoing monitoring and enforcement of their published content policies. Member app stores monitor apps for compliance both pre-publication and post-publication, and will suspend, reject, or bar apps that do not abide by their policies.

37.    On top of these app store monitoring and oversight activities, CCIA's app store members also provide voluntary tools for parents to control their children's exposure to apps and the content they contain. The Google Play Store allows parents to set up controls on their children's accounts.[8] These controls allow parents to, for example, restrict apps and games on an Android device by choosing categories of content allowed for download or purchase; lock their child's screen during certain hours such as bedtime; approve all purchases and new apps that the child wants to download; and more.[9] The Apple App Store similarly allows parents to set age-related restrictions for content, prevent their children from installing apps and making in-app purchases in apps, prevent children from deleting parental-monitoring apps, restrict app downloads and

---

[8] *How to Set Up Parental Controls on Google Play*, Google Play, https://support.google.com/googleplay/answer/1075738?hl=en (last visited Oct. 14, 2025)
[9] *Id.*

games, and manage their child's privacy settings.[10] Additionally, Amazon's Parent Dashboard allows parents to monitor the apps their children are interacting with, set daily limits or restrict their children's use at certain times of day, and restrict access to content that parents might find inappropriate for their child.[11] These parental controls are popular: The Google Family Link app has over 100 million downloads in the Google Play Store alone, and the Amazon Parent Dashboard has over 500 thousand downloads in the Google Play Store.

38.    By crafting, publishing, and enforcing content policies and providing tools to allow parents to limit access to app content, app stores actively engage in expressive activities, selecting which apps to publish, to whom, when, and how. This expressive conduct is protected by the First Amendment. *Moody v. NetChoice*, 603 U.S. 707, 731 (2024).

39.    Implementing age verification, parental-identity verification, parental tethering, and parental consent requires significant and unrecoverable resources—even for large app stores. And for the numerous small developers in particular, the costs of complying with S.B. 2420's requirements, paired with the threat of liability for failure to comply properly, might disincentivize those small developers from publishing speech through app stores. These costs are particularly unreasonable given that parents already have widely available tools to monitor and control what their children access online. Notably, all of CCIA's member app stores already permit parents to monitor content, restrict downloads, and disable in-app purchases.

## TEXAS S.B. 2420: RELEVANT PROVISIONS

40.    **Age Verification, Parental Tethering, and Legal Authority Verification to Enable Parental Consent ("Account Restrictions")**. Under the Act, whenever an individual

---

[10] *Use Parental Controls on Your Child's iPhone or iPad*, Apple, https://support.apple.com/en-us/105121 (last visited Aug. 6, 2025).

[11] *Amazon Parent Dashboard*, Amazon.com, https://www.amazon.com/parentdashboard/intro (last visited Oct. 14, 2025).

creates an account with an app store on a mobile device (such as a smartphone or tablet), the app store must "use a commercially reasonable method of verification to verify the individual's age category." § 121.021(a). Individuals are divided into four age categories, including those: younger than 13 ("child"); at least 13 and younger than 16 ("younger teenager"); at least 16 and younger than 18 ("older teenager"); and at least 18 ("adult"). § 121.021(b).

41.     If the user is determined to be under 18, the Act requires that the minor user tether their account to an account belonging to a parent or guardian. § 121.022. To be affiliated as a parent account, the app store must use "a commercially reasonable method" to verify that the account belongs to an "adult" who "has legal authority to make a decision on behalf of the minor whose account . . . is seeking affiliation." *Id.*

42.     App stores must then allow developers to access current age and parental consent information, § 121.024, and app developers must use this information to verify the age category assigned to each user and, for minors, whether parental consent has been obtained, § 121.054. After using this information as required by the Act, developers must ensure the data is securely deleted. § 121.055(b).

43.     The Act does not provide any guidance on how to verify age or determine whether an adult has such legal authority over the minor to be affiliated.

44.     The "commercially reasonable" requirement in the age and legal authority provisions do not alter which app stores or apps the Act covers. Nor does it alleviate the unconstitutional burdens. Rather, it only creates uncertainty for app stores without serving any purported governmental interests.

45.     Nor does the "commercially reasonable" requirement diminish the chilling effect that these verification requirements impose on users' access to protected speech.

46.     **Parental-Consent Requirement for Each App Downloaded and Its Two Content-Based Exceptions ("Download Restrictions")**. In addition to age verification, app stores must obtain consent from the parent account each time a minor seeks to download or purchase an app—*except for* apps that (1) are operated by or in partnership with a government entity, nonprofit, or authorized emergency service provider and provide direct access to emergency services, and which meet certain data collection and technical requirements; and (2) apps operated by or in partnership with a nonprofit that is subject to Chapter 32, subchapter D of the Education Code, and develops, sponsors, or administers standardized tests for postsecondary education. § 121.022(h).

47.     **Ongoing Parental-Consent Requirement for In-App Purchases and Significant Changes to App Terms ("Purchase and Renewed Access Restrictions")**. App stores must obtain consent from the parent account on an ongoing basis every time a minor wants to make an in-app purchase. § 121.022(h). Further, S.B. 2420 also requires app developers to provide notice to app stores before making any so-called "significant change[s]" to the app's terms of service or privacy policy, § 121.053(a), vaguely defined as a change that, for example, affects or changes the age rating assigned to the app or the content or elements that led to that rating, § 121.053(b)(2). When such a change is made, S.B. 2420 requires app stores to notify any individual who gave consent for a minor's use or purchase relating to a previous version of the changed app and to obtain renewed consent for minors' continued use or purchase of the app. §§ 121.053, 121.022(g).

48.     **Age Rating and Display Requirements**. The Act also compels app developers and app stores to engage in subjective and potentially controversial speech. Both groups are forced to implement an elaborate, vaguely-defined age-rating system and to display age ratings to users.

Developers are required to assign age ratings, based on four age categories, to every single app and to "each purchase that can be made through" the app, and to provide each app store with those ratings and the content or elements that led to each rating. *Id.* § 121.052(a)-(b). App stores are then compelled to display the age rating assigned by the developer, and the specific content that led to the rating.[12] *Id.* § 121.023. While there are no concrete or objective criteria defining the age-rating categories or how they should be applied, the age ratings themselves must be displayed in a "clear, accurate, and conspicuous" manner. *Id.* Both developers and app stores may be held liable for "knowingly misrepresent[ing]" the age rating assigned to an app or purchase. §§ 121.026; 121.056.

### EFFECTS OF S.B. 2420'S VERIFICATION AND CONSENT REQUIREMENTS

49.     The verification and consent requirements violate app stores', developers', and users' First Amendment rights to publish, disseminate, provide access to, and curate protected speech. Apps themselves—including, for example, books, movies, and games—are expressive, embodying expressive design decisions and providing access to a wealth of speech, information, ideas, and expression. App stores enjoy First Amendment protection both when they disseminate and make available speech, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011), and when they "present[] a curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728.

50.     The verification and consent requirements impose direct burdens on app stores' freedom to disseminate protected speech. *First*, they insert a barrier between speech disseminated through the app stores and the users entitled to receive that speech—blocking many users entirely. Unless and until a user either proves they are at least 18 years old, or a verified parent or guardian

---

[12] If the app store already has a mechanism for displaying an age rating or content notice, it must display the age rating or content notice and provide an explanation for the mechanism. § 121.023. However, in order to obtain parental consent, and in situations where the app store does not have a mechanism in place, the app store must disclose to the parent the age rating required under S.B. 2420. § 121.022(f)(1).

takes affirmative steps to permit their child to access apps for download or purchase, the Act prohibits app stores from disseminating protected speech to those users. *Second*, by exempting two categories of apps from the parental-consent requirement, Texas forces app stores to give certain government-approved apps preferential treatment based on who the speaker is and the content of their speech.

51.    The verification and consent requirements similarly burden the First Amendment rights of app developers, by imposing a "parental veto" between users' ability to access, download, and purchase developers' speech. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). For example, a 14-year-old cannot purchase the audiobook version of *To Kill a Mockingbird* from Audible until her parent or guardian approves the purchase. If her parent or guardian is too busy or refuses to approve the request, or cannot adequately prove legal authority, the minor would be blocked entirely from listening to the Pulitzer Prize-winning novel.

52.    The verification and consent requirements also burden users of mobile apps. Both app stores and app developers can assert the First Amendment rights of their users. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *Fitch*, 134 F.4th at 807. Although the Act is purportedly about protecting children, age verification burdens the rights and interests of *all* app store users, including adults. Everyone who creates an account—essentially everyone with a mobile phone—is required to have their age verified and to submit sensitive, personal documentation or biometric information before they will be allowed to access protected speech.

53.    Age verification burdens users' ability to speak and access speech. Verification methods that ask users to upload a government-issued ID, such as a driver's license or passport, or input credit card information will, at best, deter users, many of whom do not wish to disclose this type of sensitive information to app stores, from accessing the tremendous amount of

expressive and informational offerings within the app stores and from engaging in the protected speech and knowledge-seeking they facilitate. At worst, these methods will carve out substantial segments of the population from being able to comply at all. For instance, about 15 million adult U.S. citizens do not have a driver's license, while about 2.6 million do not have any form of government-issued photo ID.[13] Further, the Federal Reserve reports that, in 2023, approximately 18% of adults in the United States did not have a credit card.[14] Additionally, "[c]hildren generally don't have government IDs and often can't obtain them" before reaching a certain age, depending on the state.[15]

54.    Mandated verification also prioritizes the State's goals and subordinates users' privacy preferences. Currently, there is no technically feasible and reliable way to verify the ages or age categories of online users at account creation without processing personally identifiable information that many do not want to share. All age-verification methods also risk excluding some members of the population, e.g., those without government IDs. Ultimately, age verification requires app stores to collect more privacy-intrusive data from their users and impedes users' ability to use mobile app stores and apps anonymously.

55.    These privacy concerns are only amplified by the all-encompassing nature of S.B. 2420's verification requirements. Indeed, S.B. 2420 imposes far greater privacy invasions than a

---

[13] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement, at 2 (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[14] Report on the Economic Well-Being of U.S. Households in 2023, U.S. Federal Reserve (May 2024), www.federalreserve.gov/publications/files/2023-report-economic-well-being-us-households-202405.pdf (last visited Oct. 14, 2025).

[15] Shoshana Weissmann, *Kids Don't Have IDs and Age-Estimation Tech Is Frequently Very Wrong*, Techdirt (May 23, 2025, 11:02 AM), https://www.techdirt.com/2025/05/23/kids-dont-have-ids-and-age-estimation-tech-is-frequently-very-wrong/.

traditional age verification law, because it also requires parents to submit proof of legal authority over their children.

56.     But the crux of the Act—and the reason for imposing a universal age-verification requirement in the first place—is the requirement that any time a minor wants to download or purchase almost any mobile app, make any in-app purchase, or continue to use an app after its terms of use or privacy policy have been "significantly" changed, they must first obtain verified parental consent. This means that minors are effectively prohibited from accessing protected speech unless and until their parent or legal guardian can be verified by the app stores and then, on an app-by-app and purchase-by-purchase basis, grant access. This requirement will impose real frictions on minors' abilities to access content, even where their parents would not otherwise object.

57.     Beyond the direct burdens on users' access to speech and personal privacy interests, the verification and consent requirements of S.B. 2420 also impose immense practical and financial burdens on app stores, which in turn further burden their developers and users in accessing and participating in the stores. For instance, app stores must allow developers to access a user's age category and consent status in order to perform their own verification. That requires app stores to expose millions of users' age signals to millions of developers regardless of whether a user or parent has consented to that sharing. § 121.024. Developers are then required to ensure that data received from app stores during this process is securely deleted after verification. § 121.055(b). These burdens, plus the privacy infringements inherent to verification and the frictions imposed by the constant need to provide consent, will ultimately decrease the diversity and the totality of speech available to all people, particularly minors—but also adults.

58.     Parental identity verification poses additional practical hurdles that will bar large swathes of developers from disseminating and users from accessing speech. S.B. 2420 provides no guidance on how app stores should verify that an "adult" seeking affiliation with a minor's account is a parent or legal guardian. Parents often have different last names than their children and may have a different address; most children do not have government IDs; parents who are estranged from each other may have opposing views about what their children can and cannot have access to; children who have had the disabilities of minority removed for general purposes may be unable or unwilling to provide documentation establishing their emancipated status; and children in foster care or who are orphaned may not have a legal guardian who is able or willing to link their mobile device to the child's account. Nor does the Act appear to consider the complexities that could arise where, for example, a parent and child have mobile phones or tablets with different operating systems and, as a result, different app stores.

59.     Minors who are unable to link their device with a parent or guardian will be effectively barred from one of the most important and ubiquitous modern forums for accessing and engaging in protected speech. And even minors who are successful in linking their account with a parent or guardian will still be significantly burdened in exercising their First Amendment rights because they will be forced to wait for parental consent in order to purchase individual publications or other expressive content to read, listen to, or watch.

60.     These added difficulties are entirely superfluous to—and in fact undermine—any interest that Texas may have in empowering parents. The Act legally mandates conduct that app stores and many individual app developers *already* undertake, namely, providing parental controls that allow parents to monitor and control what their children can access on their devices. Again, by *legally requiring* parental consent—even for parents who prefer to give their children autonomy

and even for minors on the brink of adulthood—the Act imposes the State's authority over the children of Texas, not their parents'.

61.    The friction caused by the need to obtain consent for every app download, purchase, in-app purchase, or "significant change" to an app's privacy policy or terms of service will be endlessly frustrating for parents and their children alike. Under the Act, app stores are prohibited from allowing parents to provide "blanket consent" for their children to download or purchase apps, or make in-app purchases. § 121.026. In other words, if families would rather remove the Act's state-imposed friction to approve every single download, or even every single download within a selection of specific apps, the Act takes that choice away from parents. This is yet another indication that the law does not advance its purported goal of putting parents back in the "driver's seat"[16] of what their kids have access to online—rather, it imposes the State's control over what Texas children may access, "subject only to a parental veto." *NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2025 WL 978607, at *10 (W.D. Ark. Mar. 31, 2025) (emphasis added) (cleaned up) (quoting *Brown*, 564 U.S. at 795 n.3, 804), *appeal filed*, No. 25-1889 (May 2, 2025). The constant inundation with consent requests also runs the risk that parents will stop paying attention to them and simply approve the request, further undermining the purpose of the Act. Moreover, these requirements will disincentivize developers from making appropriate updates to their privacy policies and terms of use and risk triggering the Act's renewed parental consent obligation.

62.    S.B. 2420's failure to accommodate or account for existing and robust parental controls, and its unnecessary prohibition on parental choice to give their children blanket consent, underscores the Act's overbreadth and lack of narrow tailoring. By contrast, a law that allowed parents to make use of the extensive tools already available or provided for consent on an app-

---

[16] Texas Public Policy Foundation, Sen. Angela Paxton, *SB 2420 The App Store Accountability Act*, Facebook, https://www.facebook.com/reel/2108453532978972 (last visited Oct. 24, 2025).

wide or age-category-wide basis (as many parental controls currently do) would ensure a more tailored and appropriate fit between means and ends. These two far less restrictive alternatives would allow parents to decide for themselves how to oversee their children's online activity, and would allow app developers the discretion to tailor their requirements according to the rigor called for by the unique content of the app.

**EFFECTS OF S.B. 2420'S AGE-RATING AND DISPLAY REQUIREMENTS**

63.    The Act's age-rating requirement impermissibly compels app developers to create and publish opinions about the content of their apps and any third-party content offered for purchase within their apps. Similarly, the age-rating display requirement compels app stores to publish controversial third-party opinions about the content of the apps they disseminate. Both provisions infringe on app developers' and app stores' right to free expression and "offend[] the First Amendment." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023).

64.    The Act requires both app stores and developers to identify users' ages within four categories: child, younger teenager, teenager, and adult. § 121.021(b). The gradations between child and younger teenager, younger teenager and teenager, and teenager and adult require relatively high degrees of specificity, and the success of the Act is in large part dependent on accurate categorization (within the State's judgment of accuracy), because it also forces developers to rate their apps and all in-app purchases along those four arbitrary age buckets. § 121.052. These do not track the age buckets used by many leading app stores.

65.    Both developers and app stores may be liable under the Act for knowingly misrepresenting the age rating of a given app or in-app purchase, even though the Act provides no criteria for determining, for example, what type of app would be appropriate for a group of "children" versus "young teens." *See* §§ 121.026, 121.054.

66.    Age ratings in similar contexts are notoriously subjective, imperfect, and open to different interpretations. *See Book People II*, 91 F.4th at 325.

67.    S.B. 2420's age-rating and display requirements will encourage app developers to self-censor, as they will be incentivized to appeal to the largest possible audience and thus to avoid ratings that may discourage users from downloading (or consenting to their children downloading) the app. It will deter developers from making "significant changes" to the terms of service or privacy policy when those alterations would affect the app's age rating and thus trigger the requirements to notify app stores and obtain renewed consent. Finally, for apps that host third-party content, developers may be more inclined to engage in content-moderation practices designed to facilitate particular, pre-determined age ratings, as opposed to the app's independent editorial judgment about its own content guidelines.

## CLAIMS

68.    CCIA lodges the following claims:

    a.    **Counts I and II:** constitutional challenges to the verification and consent requirements and their associated violation provisions, brought facially with respect to the provisions affecting app stores, and as applied to CCIA's app store and developer members;

    b.    **Counts III and IV**: constitutional challenges to the age-rating and display requirements and associated violation provisions brought facially and as applied to CCIA members in their capacities as app developers and app stores, respectively;

    c.    **Count V:** a vagueness challenge to the age-rating and display requirements and associated violation provisions;

    d.    **Count VI:** a vagueness challenge to the notice of significant changes provision;

    e.    **Count VII:** a commerce clause challenge as to S.B. 2420 as a whole; and

f. **Counts VIII & IX:** requests for equitable and declaratory relief related to the above claims.

69. For First Amendment claims, the facial challenge standard asks whether "a substantial number of [S.B. 2420's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). S.B. 2420 has *no* constitutional applications to app stores and developers. The Act's main verification and consent provisions, "in every application to a covered [app store], raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). S.B. 2420's indiscriminate barriers to access and compelled speech mandates impose burdens that fall uniformly across all app stores and developers whose speech can no longer be freely accessed, and who are forced to engage in and communicate the State's speech.

70. For CCIA's First and Fourteenth Amendment vagueness claims, a facial vagueness challenge is proper because "there is no reason to believe one [app developer] is better suited than another to understand [the Act's] vague terms." *CCIA v. Paxton*, 747 F. Supp. 3d at 1031.

71. Each First and Fourteenth Amendment challenge raises the rights of both CCIA members and those who use or could prospectively use CCIA members' app stores or apps.

## COUNT I
### 42 U.S.C. § 1983; Ex Parte Young
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
### (App Stores: Verification and consent requirements, Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.026(a)(1), 121.026(a)(3))

72. CCIA incorporates all prior paragraphs as if fully set forth herein.

73.     **S.B. 2420 Burdens the Dissemination, Curation, and Access to Protected Speech**. The Act's main provisions—which require app stores to first verify the age of every single user before they will be permitted access to their services, and then to force any minor user to tether their account to a verified parent or guardian and obtain consent before permitting a minor to download or purchase almost any app from their service—burden app stores', app developers', and users' rights to free expression under the First Amendment. Because the Act functions as a barrier to both adults' and minors' access to protected speech and singles out certain content and speakers for exclusion from the verification and consent requirements, S.B. 2420 triggers and fails strict scrutiny.

74.     Countless apps available on CCIA members' services provide constitutionally protected speech to both adults and minors, as well as opportunities for app users to create and disseminate their own pure speech. App stores disseminate this speech, publishing a huge variety of software apps for users to browse and securely download and helping to facilitate access to the speech and other expressive content within or through those apps. In addition, app stores present a curated compilation of speech originally created by others. S.B. 2420's verification and consent requirements unequivocally regulate and burden speech, age-gating the primary gateway to the internet on mobile devices. That is—unless the individual first passes the app store's age-verification and, if the user is a minor, the parental-identity verification, parental-tethering, and parental-consent requirements imposed by the Act.

75.     For people who don't have documentation necessary to age verify, such as an ID or credit card, they are blocked entirely from receiving and producing speech on every app. Verification requirements also create risks of exposing users' sensitive personal information, and

chill speech by depriving users of anonymity they would otherwise be entitled to in connection with the many apps that permit a logged-out experience.

76.    Minors must jump through further onerous hoops imposed by the Act. First, a parent account must be linked to the minor account and somehow verify that the parent has "legal authority" over that minor. § 121.022(b)(2). Then, of course, the parent must decide whether to authorize the minor's download of the app. Finally, on an ongoing basis, parents must give further consent every time a minor wants to purchase any item through the app (for example, an audiobook purchased through Audible), § 121.022(h), and every time the app makes a so-called "significant change" to its terms of service or privacy policy, § 121.053(a). This burdens minors' speech by depriving them of their ability to speak and access speech without express parental consent. *Brown*, 564 U.S. at 804–05 (First Amendment principles apply "[e]ven where the protection of children is the object[.]").

77.    **S.B. 2420's Verification and Consent Regime is Content-Based and Operates as a Prior Restraint, Triggering Strict Scrutiny**. The Act's verification and consent regime singles out apps with certain content, that are disseminated by certain speakers, for preferential treatment. § 121.022(h) (exempting apps that provide "emergency services" and apps disseminated by nonprofits that develop, sponsor, or administer standardized tests).

78.    S.B. 2420 also operates as a prior restraint on speech by forcing private actors to interpose and enforce the State's access gates on all manner of protected speech. Such restraints burden speech on every level of the app environment, including: (1) all would-be app users' access to protected speech; (2) minors' ability to produce and receive protected speech; (3) developers' ability to create and distribute protected speech; and (4) app stores' ability to curate and publish protected speech to all audiences.

79.     S.B. 2420 impermissibly enlists app stores to carry out a vast censorship scheme on behalf of the State. *First*, app stores are forced to verify the age of every single user via invasive age verification procedures before allowing adults 18 and older access to a vast array of protected speech or, for minor, requiring minor users to tether their accounts to a "verif[ied]" parental account. *Second*, the Act forces app stores to deny access to minors under 18, "subject only to a parental veto," *Brown*, 564 U.S. at 795 n.3, by requiring parental consent before a minor may download any app. *Third*, app stores are forced to deny access without parental consent whenever a minor wants to make an in-app purchase or after a developer makes a "significant change" to the app. Such restrictions will deter adults and minors alike from accessing apps they otherwise would.

80.     In widening S.B. 2420's aperture to swallow up so much speech, the State's targeting of protected speech is not merely incidental—it is direct.

81.     **The Verification and Consent Requirements Fail Any Form of Heightened Scrutiny.** Each of these types of effects—content-based exceptions, prior restraints, and broad impacts on speech—subjects the Act to strict scrutiny. But Texas could not satisfy its burden even under intermediate scrutiny because the Act is overbroad in capturing nearly every app within an app store; it fails to account for less restrictive alternatives such as existing voluntary parental tools and more targeted laws such as Texas H.B. 1181, 88th Leg., Reg. Sess. (Sep. 1, 2023); and it is underinclusive by failing to impose any gates around web-based or non-mobile analogs. The Act makes no attempt to exempt apps that are irrelevant to the State's cognizable interest, as evidenced by its prohibition on parents deciding to provide blanket consent to their children.

82.     **The Verification and Consent Requirements Are Overbroad.** S.B. 2420 imposes verification and consent as gates that bar access to every single app within an app store, including the vast swaths of protected speech disseminated through apps dedicated to publishing

28

news, fostering creativity, encouraging religious exploration, and providing entertainment and educational resources.

83.     The statute makes no attempt whatsoever to link the state's purported interest in protecting minors to the sweeping parental control mandates it imposes.

84.     The State's prohibition of blanket parental consent underscores the tailoring problem and unnecessarily burdens parents. As written, S.B. 2420 requires app stores and parents to wade through several layers of consent on an app-by-app, and purchase-by-purchase basis. It is unclear how depriving parents of the opportunity to provide consent on an individual or blanket basis somehow furthers the government's legitimate interest in enabling parental control. *Packingham*, 582 U.S. at 106 (content-neutral regulations must not "burden substantially more speech than is necessary to further the government's legitimate interests."). Rather, the State's approach strips parents of choices that would afford them *more* control over how to implement a workable regime for protecting their children online, such as allow-listing a given app or app store, or granting blanket consent to all apps with a given age rating.

85.     **There Are Less Restrictive Alternatives to the Verification and Consent Requirements.** Insofar as the State's purported interest is in providing parental control, the State entirely disregards the pre-existing and far less-restrictive alternatives that function to achieve the same ends.

86.     All major app stores provide more robust parental control offerings than S.B. 2420 requires, should parents decide that it is best for them to employ. The Amazon Appstore's Parental Controls feature enables parents to monitor and require parental consent for their children's in-app

purchases and to restrict which apps their children have access to.[17] The Google Play Store offers parents the same functionality through its Family Link feature,[18] as does the Apple App Store through Screen Time.[19]

87. All of CCIA's member app stores enforce content policy guidelines to ensure that content is age appropriate, and to enable parents to filter their children's exposure to apps and content based on the content rating or tagged content categories. Apple, for instance, allows parents to block music, videos, or podcasts that contain explicit content and to prevent books, movies, TV shows, and apps with specific content ratings.[20] Google Play also allows parents to "choose the highest [content] rating you want to allow for rental, purchase, or playback" of apps, games, movies, and TV shows.[21] The Amazon Appstore will "reject[] or suppress[]" apps that contain content that would not be considered "family-friendly."[22]

88. Individual apps also apply and enforce their own content guidelines, as well as provide tools for parents to restrict the content their children may access, and are able to tailor their respective restrictions and other protective tools to the unique content and features available through their services.[23]

---

[17] *Set Parental Controls for In-App Purchases*, Amazon.com, https://www.amazon.com/gp/help/customer/display.html?nodeId=GB8P5MQSYFYHPCQ5 (last visited Oct. 14, 2025).

[18] *How To Set Up Parental Controls on Google Play*, Google, https://support.google.com/googleplay/answer/1075738?hl=en (last visited Oct. 14, 2025).

[19] *Use Parental Controls on Your Child's iPhone or iPad*, Apple, https://support.apple.com/en-us/105121 (last visited Oct. 14, 2025).

[20] *Id.*

[21] *How To Set Up Parental Controls on Google Play*, Google, https://support.google.com/googleplay/answer/1075738?hl=en (last visited Oct. 14, 2025).

[22] *Amazon Appstore Content Policy*, Amazon.com, https://developer.amazon.com/docs/policy-center/understanding-content-policy.htmlAmazon Appstore Content Policy (last visited Oct. 14, 2025)..

[23] *See, e.g.*, *Supervised experiences for pre-teens – Understand your choices as a family*, YouTube, https://support.google.com/youtube/answer/10315420 (last visited Oct. 14, 2025);

89.    Instead of empowering parents to use these tools where they believe them appropriate for their families, the State now seeks to force parents to use the controls that app stores have developed on a voluntary basis, and subject *all* app store users to an invasive identity verification process.

90.    That app stores are *prohibited* from accepting blanket parental consent further belies the State's purported goal to return decision-making for children's online safety back to their parents. Under S.B. 2420, the State forces every parent to review and approve every app download and every in-app transaction for every app available (except the limited content-based exceptions discussed above).

91.    Texas also has at least one existing law that is targeted to preventing minors from accessing obscenity online. *See* H.B. 1181; *Free Speech Coal.*, 606 U.S. at 466 (holding that "H.B. 1181 is a constitutionally permissible exercise of [the State's] authority" "to prevent children from accessing sexually explicit content."). In light of this robust preexisting ecosystem of regulations and voluntary protective features, S.B. 2420 goes far beyond any asserted state interest in protecting minors online.

92.    **The Act Is Also Underinclusive.** In addition to its overbreadth issues, S.B. 2420 is underinclusive. The Act targets only apps and app stores on "mobile device[s]," § 121.002(4), and does nothing whatsoever to prevent minors from accessing the exact same content via a web browser or non-mobile app—or in a brick and mortar location.

93.    Many, if not most, mobile apps have an identical web-based analogue for their content also accessible on mobile devices. Minors can therefore entirely skirt the verification and consent regime and access the content the State seeks to gatekeep from any web browser on their

---

*Parental Controls on Netflix*, Netflix, https://help.netflix.com/en/node/264 (last visited Oct. 14, 2025).

phone or other device. Moreover, many mobile apps, such as YouTube, Hulu, or Prime Video, have identical counterparts on Smart TVs—non-mobile devices that the Act also does not regulate.

94.    By overregulating mobile apps while ignoring similar or identical content available via web browsers, Smart TV apps, and other media, S.B. 2420 simultaneously imposes tremendous burdens on speech while failing to serve its own purported state interests.

## COUNT II
## 42 U.S.C. § 1983; Ex Parte Young
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
### (App Developers: Verification and consent requirements, Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.054, 121.026(a)(1), 121.026(a)(3), 121.056(a)(1))

95.    CCIA incorporates all prior paragraphs as though fully set forth herein.

96.    **The Verification and Consent Requirements Burden Speech Rights of App Developers.** CCIA members also develop and offer mobile apps that facilitate access to speech, disseminate speech, curate and compile speech, and produce speech themselves, including news, art, photographs, books, music, video, games.

97.    These apps apply and enforce their own content and policy guidelines and, in some cases, offer curated experiences for younger or more sensitive audiences.

98.    Mobile apps facilitate and "engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham*, 582 U.S. at 105 (quotation omitted). Those activities involve "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative*, 600 U.S. at 594; "creating, distributing, [and] consuming," *Brown*, 564 U.S. at 792 n.1; and "compiling and curating" protected speech. *Moody*, 603 U.S. at 731.

99.    S.B. 2420's verification and consent regime places a series of interdependent access gates between these apps and their users, creating barriers and in some cases full blocks to users' ability to access and download apps.

32

100.    Further, S.B. 2420 creates additional burdens on app developers to independently ensure that the unconstitutional gates are up and functioning. It does so by creating a separate duty on app developers to expend resources to "create and implement a system" to use the age category and parental consent information obtained by the app store to "verify (1) for each user . . . the age category assigned to that user . . . and (2) for each minor user of the software application, whether consent has been obtained . . . ." § 121.054(a). This creates yet another burden on CCIA member developers because they must first expend resources to create this system and ensure that it is in place before permitting their users to access their apps and content (including every in-app purchase), lest they face liability for violating this duty under Section 121.056.

101.    **The Verification, Consent, and Developer-Verification Requirements Trigger Strict Scrutiny.** As discussed with respect to Count I, the verification and consent regime triggers strict scrutiny in at least two ways: (1) it is content based; and (2) it constitutes a prior restraint on speech. Further, the developer-verification provision (§ 121.054) conscripts CCIA member developers into policing the app stores' compliance with the law, and presumably cutting off access to their own content if the verification and consent regime is not functioning properly at the app store level.

102.    **The Verification, Consent, and Developer-Verification Requirements Are Not Narrowly Tailored.** In subjecting all mobile apps—except its two content-based carve-outs—to S.B. 2420's verification, consent, and developer-verification requirements, the Act sweeps in huge swaths of protected speech, rather than creating a narrowly tailored solution as the First Amendment demands.

103.    The Act also disregards clear less restrictive alternatives and existing parental controls at both the app store and app level that provide the exact functionalities the law requires,

and more. There is no reason for the Act to prevent parents from providing blanket consent to certain forms of protected speech such as audiobooks, music, videos, games, or even apps writ large that meet certain age-rating criteria (e.g., age 4+). But because the law explicitly prevents that functionality, *see* § 121.026(a)(3), parental approval will be required for a minor—even a 17-year-old—to listen to *The Cat in the Hat*, and then again if the minor wants to listen to *Where the Wild Things Are*. That is both burdensome and unnecessary.

104.    The verification and consent provisions are also wildly underinclusive. For example, they heavily burden a person's ability to browse audiobooks on a mobile app (such as Audible) but do nothing to restrict their access to the same content on a website (like Audible.com).

### COUNT III
### 42 U.S.C. § 1983; Ex Parte Young
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
### (App Developers: Age-rating requirements, Tex. Bus. & Com. Code §§ 121.052, 121.053, 121.056(a)(2))

105.    CCIA incorporates all prior paragraphs as though fully set forth herein.

106.    The Act requires app developers, including CCIA members, to assign each app *and each in-app purchase* (e.g., every audiobook on Audible) an age rating based on four categories. The Act does not provide any objective criteria for determining whether an app or in-app purchase falls into a given age category—nor could it. The Act also requires app developers to inform app stores any time they change the age category of an app or the "content or elements that led to that rating." § 121.053. Developers may be held liable for knowingly misrepresenting an age rating. § 121.056.

107.    The age-rating requirement compels CCIA members as app developers to engage in speech that they do not and would not otherwise make on two levels: ratings of apps, and ratings of in-app downloads.

108.    At the level of app stores, while CCIA's app store members implement their own content-ratings at the app level, S.B. 2420 requires that the Act's content ratings, and no others, must be used for procuring parental consent for every app download and in-app purchase. § 121.022(f)(1)(B)-(C). As a result, to survive the parental consent gate that blocks all minors' abilities to download their apps, developers must re-rate their own apps (and everything on some of them) according to S.B. 2420's prescribed age categories.

109.    At the level of apps and app developers, apps that have in-app purchases must age-rate each and every one of those in-app purchases pursuant to Section 121.052(a). That forces apps to assign content-based age ratings to all manner of third-party content. An app that allows users to purchase or rent books, for example, would seemingly be required to assign individual age ratings to every single book available for sale—a monumental burden and one that serves to deter developers from making protected speech available for purchase.

110.    The age-rating requirement burdens app developers' protected speech four times over. *First*, it imposes a content-based burden on speech by "[m]andating speech that a speaker would not otherwise make[.]" *Riley v. Nat'l Fed'n of Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). *Second*, the age-rating requirement "deputizes covered businesses into serving as censors for the State." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024) (citing *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 678, 684 (1968)). *Third*, the age-rating requirement imposes yet another burden on developers ability to make their speech available, because their apps will never survive the parental consent barrier unless the app discloses a content rating pursuant to the Act's age categories. *Finally*, and relatedly, the age-rating requirement forces app developers to forego their existing rating regimes in favor of S.B. 2420's, thereby infringing upon their editorial and curatorial rights, and infringing on a developer's editorial discretion to *refrain*

from creating and providing content ratings. Through S.B. 2420, Texas seeks to overwrite the existing content rating systems used by apps that disseminate third-party speech (e.g., YouTube,[24] Prime Video) with its own state-mandated rating system.

111.    **The Age-Rating Requirement Is Subject to Strict Scrutiny.** Content-based regulations of non-commercial speech must satisfy strict scrutiny. The speech at issue is not commercial speech because it is not "related solely to the economic interests of the speaker and its audience," *Book People II*, 91 F.4th at 339 (citation omitted), and it "does [] more than propose a commercial transaction." *United States v. United Foods*, 533 U.S. 405, 409 (2001).

112.    *Second*, even a regulation compelling commercial speech receives "*at minimum*, intermediate scrutiny," and only where it "compels commercial enterprises to disclose purely factual and uncontroversial information about their services" may it receive anything less. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281, 283 (5th Cir. 2024) (emphasis in original), *aff'd*, 606 U.S. 461 (2025). But S.B. 2420's compelled age-rating requirement far exceeds the "purely factual" disclosures required by *Zauderer*. *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). Further, S.B. 2420 requires CCIA developer members to undergo a subjective analysis and determine—based on the content—which age category their app, and any in-app purchase, falls within. That task is highly subjective, and arguably impossible, for mobile apps that host a wide array of third-party content for all age groups and that allow in-app purchases of speech such as books, music, television shows, and games. *See, e.g.*, *Book People II*, 91 F.4th at 340 (holding that state-mandated content ratings for books are "neither factual nor uncontroversial").

---

[24] YouTube applies content rating labels to paid content. Those ratings are Strong Language (L), Nudity (N), Sexual Situations (S), Violence/Disturbing (V), Drug use (D), Flashing Lights (F). *YouTube content rating*, YouTube, https://support.google.com/youtube/answer/146399?hl=en (last visited Oct. 14, 2025).

113.    *Third*, the age-rating and display requirement is also unduly burdensome, *Nat'l Inst. of Fam. & Life Advoc. v. Becerra*, 585 U.S. 755, 776 (2018), because app stores and developers must categorize each app and each in-app purchase into one of four arbitrary age categories, and are held liable for their knowing misrepresentation. Not only will this take considerable time and resources to accomplish, but the Act fails to provide any criteria for making this determination. Moreover, existing industry standards, such as the ESRB guidelines, are at odds with the Act's age categories.

114.    **The Age-Rating Provisions Fail Under Any Level of Scrutiny.** The age-rating requirement is overbroad and not narrowly tailored. It encompasses nearly every app and in-app purchase regardless of whether it engages in pure speech such as numerous CCIA members' apps, or unprotected speech, *see Free Speech Coalition*, 606 U.S. at 477; regardless of whether the app hosts a wealth of third-party speech that would render the age rating meaningless or impossibly burdensome; and regardless of whether the app pertains to activities far afield from the state's purported interests.

115.    The Act also fails to recognize—and directly conflicts with—existing age-rating standards. As discussed, all app stores have elaborate content rating systems, and the vast majority of the age categories do not line up with S.B. 2420's. And, in addition to app-level content ratings, some apps—including CCIA member apps—use their own content rating systems for content published within their apps. The State has no place, and no interest, in overwriting a long-standing system of content ratings with its impermissibly vague and wholly untested age categories.

116.    The age-rating requirement also fosters self-censorship by app developers who will want to (1) achieve the lowest possible age rating to avoid discouraging users from downloading their apps and appeal to the largest possible audience; (2) refrain from making certain changes to

their apps that would trigger a change in the age rating and thus the need to notify app stores; and (3) for apps that host third-party content, engage in content-moderation practices designed to achieve the pre-determined age rating.

117.    Accordingly, the age-rating requirement impermissibly and unnecessarily compels speech. Both alone and in tandem with the verification and consent regime, it violates the First Amendment and CCIA members' First Amendment rights.

### COUNT IV
### 42 U.S.C. § 1983; Ex Parte Young
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
### (App Stores: Age-rating display requirement, Tex. Bus. & Com. Code §§ 121.022(f)(1), 121.026(a)(2))

118.    CCIA incorporates all prior paragraphs as though fully set forth herein.

119.    The Act requires app stores to display age ratings for every app available for purchase or download in their stores, § 121.023, and requires disclosing *the Act's* required age ratings in particular as a precondition to procuring parental consent for app downloads and in-app purchases, § 121.022(f) (requiring app stores to disclose "the rating *under Section 121.052* assigned to the software application or purchase," along with "the specific content or other elements that led to the rating *assigned under Section 121.052*" (emphases added)). Additionally, if an app store does not already have an age-rating display mechanism, it must create such a mechanism and display *the Act's* age rating along with a description of the specific content or elements that led to the rating. § 121.023(b).

120.    The Act further subjects app stores to liability for "knowingly misrepresent[ing]" the age rating or content elements that led to the rating. § 121.026(a)(2).

121.    **The Age-Rating Display Requirement Is Compelled Speech Subject to Strict Scrutiny.** Were it not for S.B. 2420, CCIA's app store members *would not* display S.B. 2420's

arbitrary age ratings in any context. Nor do they—on information and belief—have processes to display an age rating in the manner required by the Act for every in-app purchase or whenever developers make a significant change to their terms of service. Yet now they must create such mechanisms and display the Act's age ratings lest they render every parental consent defective.

122.    As with app developers, forcing app stores to display an age rating that they otherwise would not display and that they do not themselves necessarily condone is a content-based compulsion of speech. Because the speech that S.B. 2420 requires app stores to endorse— i.e., opinions about the age appropriateness of content—is neither factual nor uncontroversial, it is non-commercial and therefore subject to strict scrutiny. *See Free Speech Coal.*, 95 F.4th at 279; *Book People II*, 91 F.4th at 340. Further, in forcing app stores to subordinate their existing and robust age-rating regimes in favor of S.B. 2420's, the display provision also infringes upon App Stores' editorial and curatorial rights. *Moody*, 603 U.S. at 728.

123.    **The Display Requirement Fails Under Any Form of Heightened Scrutiny.** The display requirement's lack of narrow tailoring and overbreadth is immediately apparent in its direct conflict with app stores' existing age-rating structures.

124.    Not only is S.B. 2420's age-display requirement content-based compelled speech, but it is also wholly unnecessary because app stores already display age ratings for apps. There is no need for a mandate where age-rating is already done on a voluntary basis, and pursuant to age categories even more granular and informative for parents than those required under the Act. Thus, S.B. 2420's mandated display of its arbitrary and broader age-rating categories would *reduce* the information that parents receive about the age appropriateness of a given app from the status quo. The Act's rigid mandate also highlights clear less restrictive alternatives, which would, at minimum, include permitting those app stores to continue to use their systems in all contexts, or

require use of Texas' rating only for content it cares about. The age-rating display requirement stands to upend their existing and widely used age-rating infrastructure.

125.    The presence of these existing structures also highlights a clear less restrictive alternative: a law that permitted app stores to use their existing age ratings *in all contexts* in lieu of S.B. 2420's rigid and directionless regime. Such an alternative would not hamper the state's purported goal of providing parents with visibility into apps' age-appropriateness, and it would avoid burdensome compliance costs, issues of unconstitutional vagueness (discussed *infra* Count V), and encroachment on protected editorial rights.

### COUNT V
### 42 U.S.C. § 1983; Ex Parte Young
### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
### (App Developers: Age-rating and display requirements, Tex. Bus. & Com. Code §§ 121.022(f)(1), 121.023, 121.026(a)(2), 121.052, 121.053, 121.056(a)(2))

126.    CCIA incorporates all prior paragraphs as though fully set forth herein.

127.    The Act's age-rating and display requirements are unconstitutionally vague, and that vagueness will chill the publication and dissemination of protected speech.

128.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Despite this, S.B. 2420 requires app developers to assign age ratings to every app and every in-app purchase, and holds app developers (and app stores) liable for knowingly misrepresenting an age rating. Yet the Act provides *no guidance* for developers on how to set age ratings in compliance with the law beyond creating age categories that clash with other standards. *See* § 121.021(b).

129.    This amorphous standard also raises concerns about disparate enforcement, especially given that Texas has made clear that it is concerned about protecting minors from certain types of content over others.

130.    This lack of guidance, combined with the imposition of liability, threatens to undermine the age-rating and display system. Because the rating system forces the app to determine its age rating on an app-wide basis with the exception of in-app purchases, § 121.052(a), apps will be strongly incentivized to rate their apps according to the most mature content available for purchase. The perverse result is that an audiobook app with over 64,000 children's titles[25] may be rated for adults aged 18 and older. And this principle applies to any app that distributes content without in-app purchases, such as Netflix, Hulu, and the like. (Query how a news app, which often discusses or portrays violent or gruesome content, fits in.)

131.    Thus, without clear guidance, apps will not know what content they should censor, and they will likely err on the side of over-censoring, thus chilling protected speech. The incentives in favor of over-censorship will also affect the accuracy of information disclosed for parental consent, and may lead parents to deny access to apps that would otherwise be appropriate for children due to an over-inflated age rating.

132.    Under the Act, developers are not liable if they "use[] widely adopted industry standards to determine the rating and specific content" and "appl[y] those standards consistently and in good faith." § 121.056(b). But this purported safe harbor for app developers does not ameliorate the unconstitutional vagueness of the age-rating provision because the Act does not define which "industry standards" might apply. Not only that, as discussed *supra* ¶ 33, the existing, voluntary age-rating standards for apps directly conflict with the age categories mandated by S.B.

---

[25] *Children's Audiobooks*, Audible, https://www.audible.com/cat/Childrens-Audiobooks-Audiobooks/18572091011 (last visited Oct. 14, 2025).

2420. Thus, if app developers were to rely on "industry standards" for assigning age ratings, they would necessarily violate the prescribed age categories.

**COUNT VI**
**42 U.S.C. § 1983; Ex Parte Young**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(App Developers: Notice of significant changes requirement, Tex. Bus. & Com. Code**
**§ 121.053**

133.     CCIA incorporates all prior paragraphs as though fully set forth herein.

134.     The Act further requires developers to notify app stores "before making any significant change to the [app's] terms of service or privacy policy[.]" § 121.053(a). A change is significant if it alters the "category of personal data" processed by the app, "affects or changes the [app's age] rating," adds "new monetization features" such as "new opportunities to make a purchase in or using the [app]" and "new advertisements in the [app]." § 121.053(b). Notice must also be given before the app "materially changes the functionality or user experience of the software application." *Id.*

135.     These triggers are wide-ranging and unclear. The Act does not define what a "material change" might include. Nor does it explain whether a "new opportunit[y] to make a purchase" covers a category of goods or requires notice for each new song, book, movie, or item added to a repository like Apple Music, Audible, or Prime Video. Similarly, the ads presented in apps constantly change—so does each new ad trigger a notice requirement? The Act's lack of guidance on these points and others means that developers will not have "a reasonable opportunity to know what is prohibited, so that [they] may act accordingly." *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 695 (W.D. Tex. 2023) (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 548, 551 (5th Cir. 2008)), *vacated and aff'd in part on other grounds*, 91 F.4th 318, *reh'g denied*, 98 F.4th 657 (5th Cir. 2024)

136.    The law can thus be construed to require near-constant notifications from developers to app stores to parents. And because each notification requires app stores to revoke a minor's access to the app while the app store refreshes parental consent, § 121.022(g), this provision threatens to impose severe restraints on developers' and users' speech.

137.    This lack of guidance presents opportunities for arbitrary or selective enforcement, incentivizes over-censorship, and utterly fails to satisfy the heightened notice standards required of laws that "interfere[] with the right of free speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

138.    Unless declared invalid and enjoined, Tex. Bus. & Com. Code § 121.053 will for this additional reason unlawfully deprive app developers of their First Amendment and Due Process rights, causing them to suffer irreparable injuries.

### <u>COUNT VII</u>
### 42 U.S.C. § 1983; Ex Parte Young
### VIOLATION OF THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION

139.    CCIA incorporates all prior paragraphs as though fully set forth herein.

140.    S.B. 2420 violates the Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) and its progeny because it imposes an unreasonable and undue burden on interstate commerce that is clearly excessive in relation to any local benefit conferred on the State of Texas. It is also likely to subject businesses to inconsistent state regulations.

141.    S.B. 2420 burdens interstate commerce by deterring online service providers from offering services available across state lines, or else limiting the types of services available within and across the United States. This is because app stores and the apps they publish are accessible globally, and whether a covered business wishes to avoid Texas's regulations or comply with them,

doing so inherently requires both app stores and developers to degrade or withdraw their services for all users in all states.

142.     S.B. 2420 also burdens interstate commerce by forcing app stores to comply with an inconsistent patchwork of state rules.  For example, S.B. 2420 will in practice require covered businesses to adopt verification tools that might violate other states' conflicting privacy laws (such as biometric privacy laws). Similarly, the Act will require app developers to rate their apps, and all content available for purchase through those apps, in line with the age categories provided by S.B. 2420, without regard to any different or conflicting age ratings app developers have adopted or might be required to adopt in other states.

143.     The Texas Legislature has not identified any local interest sufficient to justify these onerous impositions on interstate commerce. And to the extent that it purports to protect minors, its protections are wholly ineffective because minors can access the same content that exists on apps from their website counterparts. Therefore, even if Texas's interest was deemed sufficiently local, S.B. 2420's drastic impositions on interstate and online commerce far outweigh what little the Act does to further that purpose.

144.     S.B. 2420 also violates the Commerce Clause because it regulates extraterritorially in violation of *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). For the same reasons that S.B. 2420 burdens interstate commerce by depressing or degrading the output and quality of apps available nationwide, S.B. 2420 necessarily has the practical and per se unconstitutional effect of regulating commercial and speech-related activities that occur wholly outside Texas, such as by causing an app developer based in California to withhold a product or service to users in Florida due to the costs imposed by the Texas statute.

145.    Unless declared invalid and enjoined, S.B. 2420 will operate to unconstitutionally burden interstate commerce in violation of the Commerce Clause.

## COUNT VIII
## Ex Parte Young
## EQUITABLE RELIEF

146.    CCIA incorporates all prior paragraphs as though fully set forth herein.

147.    S.B. 2420, including the challenged provisions, violates federal law both facially and as-applied, and deprives CCIA, its members, and its members' users of enforceable rights guaranteed by federal law. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015).

148.    This Court can and should exercise its equitable power to enter an injunction precluding Defendant from enforcing S.B. 2420 against CCIA's members.

## COUNT IX
## DECLARATORY RELIEF

149.    CCIA incorporates all prior paragraphs as though fully set forth herein.

150.    Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.023, 121.026(a)(1)-(3), 121.052, 121.053, 121.054, and 121.056(a)(1)-(2) violate the First Amendment of the Constitution and the Due Process Clause and thereby deprive CCIA, its members, and its members' users of enforceable rights.

151.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration[.]" 28 U.S.C. § 2201(a).

152.    This Court can and should exercise its equitable power to enter a declaration that the challenged provisions of S.B. 2420 are unconstitutional and otherwise unlawful, both facially and as-applied.

## PRAYER FOR RELIEF

CCIA respectfully requests an order and judgment:

A.  Declaring that Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.023, 121.026(a)(1)-(3), 121.052, 121.053, 121.054, and 121.056(a)(1)-(2) are unlawful;

B.  Declaring that Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.052, 121.053, and 121.054 facially violate the First Amendment to the U.S. Constitution;

C.  Declaring that Tex. Bus. & Com. Code §§ 121.021, 121.022, 121.052, 121.053, and 121.054 violate the First Amendment to the U.S. Constitution as applied to CCIA's members;

D.  Declaring that Tex. Bus. & Com. Code §§ 121.023, 121.022(f)(1)(B)-(C), 121.052, 121.053 are void for vagueness, both facially and as-applied;

E.  Declaring that the entire Act is preempted by the Commerce Clause;

F.  Enjoining Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the challenged portions of S.B. 2420 against CCIA's members;

G.  Entering judgment in favor of CCIA;

H.  Awarding CCIA its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

I.  Awarding CCIA all other such relief as the Court deems just and proper.

Respectfully submitted,

Dated: October 16, 2025

/s/    Catherine L. Robb

Brian Willen*
WILSON SONSINI GOODRICH & ROSATI
1301 6th Ave #40
New York, New York 10019
Telephone: (650) 849-3340
bwillen@wsgr.com

Lauren Gallo White*
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower #3300
San Francisco, California 94105
Telephone: (415) 947-2158
lwhite@wsgr.com

Deno Himonas*
WILSON SONSINI GOODRICH & ROSATI
95 S State St, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8520
dhimonas@wsgr.com

*Attorneys for Plaintiff Computer &
Communications Industry Association*

*pro hac vice application forthcoming

Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

HAYNES AND BOONE, LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470