# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION,

       *Plaintiff*,

       v.

KEN PAXTON, in his official capacity as
Attorney General of Texas,

       *Defendant*.

Civil Action No. 1:25-cv-01660

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

    A.    CCIA Members Create and Facilitate Protected Speech By Operating App Stores and Developing Mobile Apps ..................................... 3

           1.    Mobile Apps Offer Vast Amounts of Protected Speech and Information ................................................................ 4

           2.    Mobile App Stores Disseminate Vast Amounts Of Protected Speech ........................................................................ 5

    B.    Existing Protections for Child-Directed Apps, Including Parental Controls .......... 7

    C.    Texas Senate Bill 2420 ........................................................... 8

ARGUMENT ...................................................................................................... 12

I.    CCIA HAS STANDING TO BRING THIS CHALLENGE. ......................................... 13

II.    CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS. ........................................ 15

    A.    S.B. 2420's Verification and Consent Requirements Violate the First Amendment. ................................................................... 15

           1.    App Stores, Developers, and Users Enjoy First Amendment Protections When They Create, Access, and Disseminate Speech. .......... 15

           2.    S.B. 2420 Burdens These Rights by Restricting Speech at Three Chokepoints. ................................................................ 17

                   a)    Chokepoint 1: Age Verification and Parental Tethering at Account Creation ................................................ 18

                   b)    Chokepoint 2: Parental Consent Required for Each App Download ........................................................ 20

                   c)    Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms ......... 21

           3.    S.B. 2420's Verification and Consent Regime Triggers Strict Scrutiny. ............................................................... 23

                   a)    The Act Imposes a Content-Based Burden on Speech. ............... 23

     b)  S.B. 2420 Imposes a Direct Burden on Fully Protected Speech ........................................................................ 24

   4.  The Verification and Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny. .......... 25

     a)  The Act's Verification and Consent Regime Is Overinclusive. .............................................................. 27

     b)  Existing Parental Controls Diminish the State Interest and Further the Act's Tailoring Problem. ............................... 28

     c)  The Act Is Also Woefully Underinclusive. ................................. 30

  B.  The Age-Rating Requirement Unconstitutionally Compels Speech By App Developers and App Stores. ................................................................... 31

   1.  The Age Rating Requirement Imposes a Content-Based Burden on CCIA Members' Speech as Developers of Mobile Apps. ........................ 33

   2.  The Age Rating Display Requirement Imposes a Content-Based Burden on App Stores' Speech. ............................................................... 34

   3.  The Age Rating and Display Requirements Compel Speech That Is Neither Commercial, Factual, Nor Uncontroversial. ............................... 35

   4.  The Age Rating and Display Requirements Fail Under Any Form of Heightened Scrutiny. .......................................................... 37

  C.  The Age Rating Requirement Is Unconstitutionally Vague ................................. 40

III.  THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION. .............. 41

  A.  CCIA and Its Members Will Suffer Irreparable Harm if S.B. 2420 Is Not Enjoined. ....................................................................................... 41

IV.  THE AGE VERIFICATION, PARENTAL VERIFICATION, PARENTAL CONSENT, AND AGE RATING PROVISIONS CANNOT BE SEVERED FROM THE REST OF S.B. 2420 ....................................................................... 43

CONCLUSION ............................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)................................................................15, 16, 17

*ACLU v. Gonzales*,
   478 F. Supp. 2d 775 (E.D. Pa. 2007), *aff'd*,
   534 F.3d 181 (3d Cir. 2008)...................................................................19

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 610 (2020).................................................................................23

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001).................................................................................16

*Book People, Inc. v. Wong*,
   692 F. Supp. 3d 660 (W.D. Tex. 2023)............................................40, 41

*Book People, Inc. v. Wong*,
   91 F.4th 318 ...........................................................................32, 34, 35,
                                 36, 40, 41

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) (citation omitted).................................15, 16, 17, 20, 25,
                                 26, 27,28, 29,
                                 30, 31, 39

*Builder Recovery Servs., LLC v. Town of Westlake*,
   2023 WL 3878446 (Tex. App.—Fort Worth June 8, 2023, no pet.) ..........43, 44

*CCIA v. Paxton*,
   747 F. Supp. 3d 1011 (W.D. Tex. Aug. 30, 2024)....................12, 13, 23, 24, 28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 557 (1980).................................................................................38

*Citizens United v. FEC*,
   558 U.S. 310 (2010).................................................................................17

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   596 U.S. 61 (2022)...................................................................................26

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994)...................................................................................30

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
  2025 WL 1570007 (N.D. Fla. June 3, 2025) .............................................7, 29

*Diamond Alternative Energy, LLC v. EPA*,
  145 S. Ct. 2121 (2025) ...........................................................................13

*Duncan v. Bonta*,
  133 F.4th 852 (9th Cir. 2025) .................................................................37

*Ent. Software Ass'n v. Blagojevich*,
  469 F.3d 641 (7th Cir. 2006) ......................................................33, 36, 37

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) .....................................27, 30, 31, 32, 35,
                                                                                      36, 37, 38, 39

*Free Speech Coal. v. Paxton*,
  606 U.S. 461 (2025)......................................................2, 14, 18, 24,
                                                                                       25, 27, 28

*Genusa v. City of Peoria*,
  619 F.2d 1203 (7th Cir. 1980) .................................................................16

*Hines v. Pardue*,
  117 F.4th 769 (5th Cir. 2024) .................................................................26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995)..............................................................................31

*Little v. Llano Cnty.*,
  138 F.4th 834 (5th Cir. 2025) .................................................................17

*McClelland v. Katy Indep. Sch. Dist.*,
  63 F.4th 996 (5th Cir. 2023) ...................................................................40

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...............................................................................26

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)...............................................................................18

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ...................................................................12

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)...............................................................5, 12, 13, 16,
                                                                                       17, 35

iv

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964)..............................................................17

*Nat'l Ass'n of Wheat Growers v. Bonta,*
    85 F.4th 1263 (9th Cir. 2023) ............................................39

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott,*
    647 F.3d 202 (5th Cir. 2011) ..............................................43

*Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra,*
    585 U.S. 755 (2018)...........................................25, 32, 33, 35

*NetChoice v. Carr,*
    2025 WL 1768621 (N.D. Ga. June 26, 2025)...........7, 19, 22, 24,
                                                                28, 29, 30, 41

*NetChoice v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) .......................................13, 14

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024) ............................32, 35, 37

*NetChoice, LLC v. Bonta,*
    769 F. Supp. 3d 1164 (N.D. Cal. 2025) ..............................24

*NetChoice, LLC v. Fitch,*
    2025 WL 1709668 (S.D. Miss. June 18, 2025) ..............24, 28, 30

*NetChoice, LLC v. Griffin,*
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)..............19, 28, 29

*NetChoice, LLC v. Reyes,*
    748 F. Supp. 3d 1105 (D. Utah 2024)..................................28

*NetChoice, LLC v. Yost,*
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ..........................24, 28

*Nken v. Holder,*
    556 U.S. 418 (2009).............................................................43

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)........................................1, 6, 15, 16,
                                                                18, 23, 28

*Prison Legal News v. Livingston,*
    683 F.3d 201 (5th Cir. 2012) ..............................................14

*PSINet, Inc. v. Chapman*,
    167 F. Supp. 2d 878 (W.D. Va. 2001), *aff'd*,
    362 F.3d 227 (4th Cir. 2004) ........................................................................19

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)........................................................................................23

*Reno v. ACLU*,
    521 U.S. 844 (1997)..........................................................................................4

*Rest. L. Ctr. v. U.S. Dep't. of Lab.*,
    66 F.4th 593 (5th Cir. 2023) ..........................................................................41

*Riley v. Nat'l Fed'n of Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)..................................................................................31, 33

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 553 (5th Cir. 2008) ........................................................................40

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)........................................................................................41

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)..................................................................................16, 17

*State v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ........................................................................43

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ..................................................................12, 43

*Turner Broad Sys., Inc. v. FCC*,
    520 U.S. 180 (1997)......................................................................................26

*United States v. Perez*,
    43 F.4th 437 (5th Cir. 2022) ........................................................................12

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000)......................................................................................26

*United States v. Virginia*,
    518 U.S. 515 (1996)......................................................................................26

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)..........................................................................16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)................................................................................40, 41

*X Corp. v. Bonta,*
    116 F.4th 888 (9th Cir. 2024) ..............................................32, 35, 37

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio,*
    471 U.S. 626 (1985)................................................................32, 35, 36, 37

**STATUTES**

Tex. Bus. & Com. Code § 121.002(2) ..............................................4, 8, 30

Tex. Bus. & Com. Code § 121.021 ..........................................................12

Tex. Bus. & Com. Code § 121.021(a) .......................................................8

Tex. Bus. & Com. Code § 121.021(b) ...............................8, 10, 32, 33

Tex. Bus. & Com. Code § 121.022(b)(1) ..............................................20

Tex. Bus. & Com. Code § 121.022(b)(2) ..............................................20

Tex. Bus. & Com. Code § 121.022(e) .....................................................29

Tex. Bus. & Com. Code § 121.022(e)(1) ..............................................21

Tex. Bus. & Com. Code § 121.022(f)(1) ........................................11, 32

Tex. Bus. & Com. Code § 121.022(f)(1)(B) .........................................34

Tex. Bus. & Com. Code § 121.022(f)(1)(C) .........................................34

Tex. Bus. & Com. Code § 121.022(g) ............................................11, 21

Tex. Bus. & Com. Code § 121.022(h) ..............................................9, 24

Tex. Bus. & Com. Code § 121.023 ..................................................12, 32

Tex. Bus. & Com. Code § 121.023(a) ............................................11, 34

Tex. Bus. & Com. Code § 121.023(b) ............................................11, 34

Tex. Bus. & Com. Code § 121.025 ....................................................8, 42

Tex. Bus. & Com. Code § 121.026(3) .....................................................29

Tex. Bus. & Com. Code § 121.026(a)(1) ...............................................11

Tex. Bus. & Com. Code § 121.026(a)(2) ...............................................11

Tex. Bus. & Com. Code § 121.026(a)(3) ..........................................9, 21

Tex. Bus. & Com. Code § 121.026(a)(4) ....................................................................11

Tex. Bus. & Com. Code § 121.051 ........................................................................4, 8

Tex. Bus. & Com. Code § 121.052 ...................................................................13, 34

Tex. Bus. & Com. Code § 121.052(a) .........................................................10, 32, 33

Tex. Bus. & Com. Code § 121.052(b) ...............................................................10, 32

Tex. Bus. & Com. Code § 121.052(b)(2) ................................................................32

Tex. Bus. & Com. Code § 121.053 ...................................................................13, 21

Tex. Bus. & Com. Code § 121.053(a) .....................................................................11

Tex. Bus. & Com. Code § 121.053(a)(2) ................................................................11

Tex. Bus. & Com. Code § 121.053(b) .........................................................11, 22, 40

Tex. Bus. & Com. Code § 121.053(b)(2) ................................................................34

Tex. Bus. & Com. Code § 121.054 .........................................................................13

Tex. Bus. & Com. Code § 121.054(a) .......................................................................9

Tex. Bus. & Com. Code § 121.054(b) .......................................................................9

Tex. Bus. & Com. Code § 121.056(a)(1) ...........................................................11, 13

Tex. Bus. & Com. Code § 121.056(a)(2) .......................................................11, 13, 34

Tex. Bus. & Com. Code § 121.056(a)(3) ................................................................11

Tex. Bus. & Com. Code § 121.101 .......................................................................9, 12

Tex. Bus. & Com. Code § 121.102 .........................................................................12

Tex. Bus. & Com. Code § 122.022 ........................................................................8, 9

Texas Deceptive Trade Practices Act .....................................................................11

## RULES

*Bill Analysis*, S. Comm. Rep. on C.S.S.B. 2420 by K. Paxton, Senate Research
    Center 89R21669 MLH-F (Mar. 31, 2025) ....................................................26

Fed. R. Civ. Proc. 65 ...............................................................................................1

House & S. Comm. Rep. on S.B. 2420, 89th Leg. Reg. Sess. (2025) .........................27

**MISCELLANEOUS**

Robert Booth, *Hack of Age Verification Firm May Have Exposed 70,000 Discord Users' ID Photos*, The Guardian (Oct. 9, 2025) ...............................................................19

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Computer & Communications Industry Association ("CCIA") seeks a preliminary injunction under Federal Rule of Civil Procedure 65.

### INTRODUCTION

Imagine a state law that required every bookstore, movie theater, video rental store, record shop, symphony hall, arcade, and newsstand to verify the age of every patron at the door and then required parental consent before those under 18 could enter. Once inside, the parent would have to separately provide consent for every book, newspaper, greeting card, or board game the minor wished to buy, be it a book by Ernest Hemingway or J.K. Rowling, a Taylor Swift album, or a subscription to the Wall Street Journal. The only exception would be for SAT prep books. And the parent couldn't provide blanket consent at the door: they would have to chaperone the minor throughout the store, consenting on an item-by-item basis.

But that's not all. Imagine that the law also imposed an entirely new age rating regime where those who create or publish books, magazines, newspapers, greeting cards, games, etc. would have to "age rate," without defined criteria, each item based on its content. Bookstores would in turn have to disclose the age ratings to parents or risk liability for deceptive trade practices. The bookstore could also be sued if the age rating turned out to be inaccurate.

This law would be clearly unconstitutional, not to mention burdensome and frustrating for everyone—particularly parents and their children. And it would transgress a "fundamental principle of the First Amendment" that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

But Texas has passed such a law—S.B. 2420 (Ex. A)—that is targeted at mobile app stores and app developers. S.B. 2420 imposes a sweeping age-verification, parental-verification,

parental-consent, and compelled speech regime on services that publish and allow users to download a wide variety of software applications for mobile devices ("apps")—and on those who develop such apps.[1] S.B. 2420 violates the First Amendment several times over.

*First*, S.B. 2420's verification and consent requirements force app stores to gatekeep speech at three different chokepoints, burdening their protected right to make available and disseminate a wealth of protected speech generated by their users and developers. The law also burdens the First Amendment rights of app developers to distribute their speech and the rights of both adults and minors to access and create a wealth of protected speech as users of the regulated app stores and apps.

*Second*, the Act's content rating requirements establish an unconstitutional compelled speech regime in which app developers are forced by the state to opine on the age appropriateness of their apps and every piece of content available for in-app purchase, and app stores are forced to publish those age ratings on pain of liability for inaccuracies in the rating.

These content-based and compelled speech requirements trigger strict scrutiny, which is "fatal in fact absent truly extraordinary circumstances." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 485 (2025). But they cannot survive any level of heightened scrutiny. The burdens the law places on app stores, developers, minors, parents, and other adult users are wildly disproportionate to the harm the State seeks to remedy. Texas exacerbates this disparity by ignoring—and refusing to accommodate—the many private voluntary tools app stores already have that provide robust parental controls *and* age ratings. The Act applies its mandate indiscriminately across millions of apps, even as it imposes no obligations at all on materially identical *non-mobile* app stores or apps,

---

[1] This brief will refer to all digital services—including app stores and mobile applications—as "services" unless necessary to distinguish among different kinds of digital services.

websites accessible via web browsers, including browsers on mobile devices, and physical stores and venues.

CCIA, a trade association representing operators of mobile app stores and app developers, seeks a preliminary injunction barring the State from enforcing this unconstitutional regime against its members. CCIA is likely to succeed on the merits of its First Amendment claims. And because CCIA's app store and developer members face significant nonrecoverable compliance costs and a substantial threat of irreparable harm from the loss of their First Amendment freedoms, the balance of equities and public interest entitle CCIA to a preliminary injunction enjoining Defendant's enforcement of S.B. 2420.

**BACKGROUND**

### A. CCIA Members Create and Facilitate Protected Speech By Operating App Stores and Developing Mobile Apps

CCIA is a membership-based trade organization whose members operate some of the world's popular mobile app publishing services (which S.B. 2420 calls "App Stores"). Decl. of M. Schruers in Supp. of Pl.'s Mot. for Prelim. Inj. ("Schruers Decl.") ¶¶ 3, 5-6, 28 (Ex. B). An app store is a digital publishing service where software developers can upload apps, and users can discover and download those apps onto their devices. Decl. of M. Bye in Supp. of Pl.'s Mot. for Prelim. Inj. ("Bye Decl.") ¶ 6 (Ex. C). The app stores operated by CCIA members that are regulated by S.B. 2420 are: (1) Google Play; (2) the Amazon Appstore; and (3) the Apple App Store. Schruers Decl. ¶¶ 5, 6-27; Bye Decl. ¶ 2.

CCIA's members are also leading app developers, who create and offer popular mobile apps for download in app stores. Schruers Decl. ¶ 5. Those member-created apps include email apps like Gmail, video-viewing and sharing apps like YouTube, e-book or audiobook apps like Kindle and Audible, and apps that allow users to communicate and obtain information on a wide

variety of topics (e.g., IMDb, Goodreads, Twitch). *Id.* ¶¶ 4, 14, 21. The Act's regulatory scope encompasses both CCIA's member app stores, Tex. Bus. & Com. Code § 121.002(2),[2] and CCIA's member app developers, § 121.051, and directly burdens the First Amendment rights of CCIA members in both capacities. Schruers Decl. ¶¶ 5-28, 49-53.

    1.   <u>Mobile Apps Offer Vast Amounts of Protected Speech and Information</u>

Apps are to smartphones what websites are to computers: mediums for speech "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted). The variety of mobile apps is vast, and apps allow users to access, create, and exchange an enormous quantity of speech, including every form of protected expression: news and political material, religious material, scientific material, educational content, social media, personal writing, expressive media such as books, magazines, movies, television, short-form video, and music, as well as art, games, and much more.[3] Schruers Decl. ¶¶ 29-30; Bye Decl. ¶ 10. In many instances, of course, mobile users can access the same content on a website accessed through a browser, but apps are designed specifically to optimize the user experience on mobile devices. *See* Decl. of J. Strauser in Supp. of Pl.'s Mot. for Prelim. Inj. ("Strauser Decl.") ¶ 18 (Ex. D).

That app stores are teeming with protected speech cannot be overstated. Their most-downloaded apps offer access to vast amounts of speech, as well as tools for users to create, engage, or find speech. In the past two years, the most downloaded free apps in Apple's App

---

[2] All statutory citations, unless otherwise noted, will be to Tex. Bus. & Com. Code.
[3] While the list is endless, a snapshot of mobile apps touching on all categories includes Roblox, NYTimes, Fox News, Bible Chat, Al-Quran, Duolingo, Khan Academy, PubMed, Substack, Kindle, Vogue, Netflix, Prime Video, YouTube, Spotify, Poesie, VSCO, and Etsy.

Store,[4] Google's Play Store,[5] and Amazon's Appstore[6] included: **Threads** (online community where users "come together to discuss everything from the topics you care about today to what's trending tomorrow"); **TikTok, Instagram, and YouTube** (online services whose curatorial and speech-facilitating activities are indisputably protected speech, *see Moody v. NetChoice, LLC*, 603 U.S. 707, 716, 718 (2024)); **CapCut** ("easy-to-use video editing" and animation capabilities); **WhatsApp** (allows users to make calls, message privately, and share files with "friends, family, and colleagues"); **Google** (provides access to Google's search engine to search and access the world's information); and the video streaming services **Tubi**, **Peacock**, and **Pluto TV**. *See also* Bye Decl. ¶¶ 16-18. In addition to these large apps, small app developers also publish a wide array of educational, skill-building, and cultural apps and make up the majority of many app stores. *See id.* ¶ 18; Compl. ¶ 27, ECF No. 1 (noting that 90% of all developers in Apple's App Store are "small developers").

    2.   <u>Mobile App Stores Disseminate Vast Amounts Of Protected Speech</u>

App stores make possible the speech offered and facilitated by mobile apps. They are curated publishing services where users securely find, review, and download the mobile apps that best suit their interests. *See* Bye Decl. ¶¶ 8, 12-15. App stores also provide a gateway for millions of app developers to disseminate content to reach their users. *Id.* ¶¶ 16-20. In this way, app stores offer a "relatively unlimited, low-cost capacity for communication of all kinds . . . to users engaged

---

[4] *See* Apple App Store, https://www.apple.com/apps/ (last visited Oct. 7, 2025). The other app on this list is Temu, an online marketplace, which provides access to countless consumer products, including books and games.
[5] Google Play, https://play.google.com/store/apps?device=phone&hl=en_US (last visited Oct. 7, 2025).
[6] *Amazon Best Sellers*, Amazon.com, https://www.amazon.com/gp/bestsellers/mobile-apps/ref=zg_bs?ie=UTF8&tf=1 (last visited Oct. 7, 2025).

in a wide array of protected First Amendment activity on any number of diverse topics." *Packingham*, 582 U.S. at 98 (cleaned up); *see also* Bye Decl. ¶¶ 18-20.

CCIA members operate popular mobile app stores. Google operates Play: "a global digital content store that makes it easy for more than 2.5 billion monthly users . . . worldwide to discover millions of high-quality apps, games, books, and more." Bye Decl. ¶ 6. Amazon operates the Amazon Appstore: "an app store for Amazon Fire Tablets . . . [where] customers can discover, download, and save on new apps and games."[7] And Apple operates the App Store: "a safe and trusted place to discover and download … [n]early 2 [million] apps" and "[e]xplore in-app events like movie premieres, gaming competitions, and livestreams."[8]

These services do not allow just anyone to offer mobile apps for download. They vet developers, screen in-app content, and present only apps that satisfy their requirements. *See* Schruers Decl. ¶¶ 35-36; Bye Decl. ¶¶ 22-23, 27.

These app stores also have adopted voluntary policies to ascribe age ratings for apps based on their content. Schruers Decl. ¶ 34. Apple requires developers to fill out a questionnaire about an app's content themes, and then sets an age rating using its own rating system.[9] On Google Play, age ratings are the responsibility of the app developers and the International Age Rating Coalition (IARC). Bye Decl. ¶ 33. Amazon "assign[s] a summary maturity rating to your app" based on information provided by the developer as well as its own review.[10]

---

[7] *Amazon Appstore*, https://developer.amazon.com/apps-and-games (last visited Oct. 7, 2025).
[8] *Apple App Store*, https://www.apple.com/app-store/ (last visited Oct. 7, 2025).
[9] *Set an app age rating*, Apple, https://developer.apple.com/help/app-store-connect/manage-app-information/set-an-app-age-rating/ (last visited Oct. 7, 2025).
[10] *App Submission FAQ*, Amazon.com, https://developer.amazon.com/docs/app-submission/faq-submission.html (last visited Oct. 7, 2025).

## B. Existing Protections for Child-Directed Apps, Including Parental Controls

Parents have many ways to control their children's online experiences. They can control what devices their children have, and when; they can control the networks minors use to connect to the Internet; and they can manage, via internet service providers, which websites their children can use, and when. *See Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *18 (N.D. Fla. June 3, 2025) (describing these available alternatives); *NetChoice v. Carr*, 2025 WL 1768621, at *18 (N.D. Ga. June 26, 2025) (same).

CCIA members' app stores also provide robust protections for child-directed apps (that is, apps primarily directed to users under 13). *See generally* Schruers Decl. ¶¶ 36-37. Apple, Google, and Amazon all require child-directed apps to contain only content appropriate for that age category, impose additional protections over children's data, and implement parental gates in order to link out of the app, request permissions, or make in-app purchases. Schruers Decl. ¶ 36.

App stores also enable parents to control their children's exposure to apps and content. *See* Schruers Decl. ¶ 37. Google, Apple, and Amazon all provide parental controls that allow parents to lock their children's screens for bedtime, block unwanted apps, filter accessible content by age category, and set up an approval process for purchases and downloads, among other tools. *Id.*; Bye Decl. ¶ 31.

These parental controls are comprehensive, effective, and widely used. Indeed, Google *requires* that parents of children under the applicable age of consent in their region (13 in Texas) use its parental controls infrastructure ("Family Link") to create and monitor their child's Google Account. Bye Decl. ¶ 31. *Id.* And in addition to parental controls on the app store level, many apps themselves also often offer robust parental controls—including content filters, screen time limits, and supervised accounts. *See* Schruers Decl. ¶ 38; Strauser Decl. ¶¶ 8-12.

### C. Texas Senate Bill 2420

Despite these extensive controls and protections that empower parents to make the best choices for their families, Texas seeks to impose a broad new set of legal mandates that removes parental choice. Senate Bill 2420, the App Store Accountability Act, puts distinct but related obligations on (1) "[a]pp [s]tores," defined as "publicly available . . . software application[s] . . . that distribute[] software applications from the owner or developer of an [app] to the user of a mobile device, § 121.002(2); and (2) "software application developers" (hereafter "app developers" or "developers") defined as "developer[s] of [] software application[s] that the developer makes available to users in [Texas] through an app store," § 121.051. These mandates will profoundly affect the mobile app environment and limit its robust exchange of speech and information.

***Verification and Consent Requirements.*** Under the guise of empowering parents, S.B. 2420 requires all mobile app stores to gatekeep the millions of apps they publish by implementing an onerous state-mandated system of age verification for all users, and parental verification and ongoing consent for minor accounts (collectively, "verification and consent").

*Age verification.* Before any person, of any age, can create an account to access an app store, the app store must "use a commercially reasonable method of verification to verify the individual's age category." § 121.021(a). Covered CCIA members must sort account holders into designated "age categories," § 121.021(b), and protect the highly sensitive personal data collected through this process, *see* § 121.025.

*Parental identity verification and account tethering.* If a user is found to be under 18, app stores must then link the minor's account with an account belonging to a parent or guardian. § 122.022. To be affiliated as a parent account, the app store must use "a commercially reasonable

method" to verify that the account belongs to an "adult" who "has legal authority to make a decision on behalf of the minor." *Id.*

*Parental consent*. The verification requirements lay the foundation for ongoing mandated parental consent. For accounts belonging to minors, the app store must obtain consent from the verified parent's account *every single time* the minor wants to download *any* app or make *any* in-app purchase, and obtain consent again where the app developer makes a "significant" change to the app's terms of user or privacy policy. The Act *forbids* app stores from allowing parents to provide blanket consent for multiple purchases or downloads, § 121.026(a)(3), and any app store that provides that functionality will be held liable for "deceptive trade practice[s]." § 121.101.

*App developer confirmation*. The Act also requires app developers to "create and implement a system" to verify (1) the age category assigned to app users, and (2) for minor users, whether parental consent has been obtained. § 121.054(a)-(b). This provision necessitates the sharing of users' personal data with a wide range of app developers with varying levels of digital security and sophistication, Bye Decl. ¶ 45, and essentially demands that app developers build a mechanism to integrate with app stores and verify that consents have been obtained. Strauser Decl. ¶¶ 12, 17.

The Act provides two content-based exceptions to the parental consent requirement for certain apps favored by the State: (1) apps that "provide[] … direct access to emergency services" and that meet additional criteria, and (2) nonprofit-affiliated apps that develop, sponsor, or administer standardized testing for post-secondary education. § 121.022(h).

To contextualize these requirements, consider their effect on Audible, an app that allows listeners to access millions of audiobooks, podcasts, and original adaptations of literature via in-app download or purchase. Strauser Decl. ¶ 3. Starting on January 1, 2026, these app stores will

have to impose "commercially reasonable" age verification requirements on every accountholder. For any user who doesn't want to verify their age due to privacy concerns, or who cannot verify their age because they lack the required documentation, Texas will bar them from accessing the app store in its entirety, and that user will be unable to download Audible or any other app. For those who do age-verify, app stores cannot allow anyone under 18 to download Audible (or any other mobile app, with a few content-based exceptions) unless their account is first linked to the account of a verified parent or legal guardian and the parent has expressly consented to that specific download. And even after clearing an initial age-verification process, an account link process (which includes more age verification), and obtaining parental consent to download the app itself, the minor *still* cannot purchase an audiobook or any other content within the Audible app without an additional parental consent.

*Age rating and display requirements*. The Act imposes further duties (and costs) on app developers and app stores to implement an age rating system and display it to users. *See* Schruers Decl. ¶ 47; Strauser Decl. ¶¶ 19-31. Developers are required to assign an age rating to every app— *and every item available for in-app purchase*—based on four age categories: (1) younger than 13 ("child"); (2) at least 13 and younger than 16 ("younger teenager"); (3) at least 16 and younger than 18 ("older teenager"); and (4) at least 18 ("adult"). §§ 121.052(a), 121.021(b). No additional guidance from the State is provided. Developers must then provide app stores with their designated ratings and the "specific content or other elements that led to each rating[.]" § 121.052(b). That means, for example, that Audible seemingly would have to rate the age-appropriateness of the million-plus audiobooks available for purchase on its app, and explain its rationale for each one. And notwithstanding the absence of guidance and requirement to rate third-party content, app developers are subject to liability if they "knowingly misrepresent[] an age rating or reason for

that rating." § 121.056(a)(2). App stores are then compelled to display the age rating assigned by the developer, and the specific content that led to the rating. §§ 121.023(a)-(b); 121.022(f)(1).

*Ongoing notice and consent requirements*. The Act also imposes continuing duties on app developers. *See* Strauser Decl. ¶ 34. They must notify app stores "before making any significant change" to an app's "terms of service or privacy policy," including (1) the "type or category of personal data" the developer collects, stores, or shares; (2) changes to the app's age rating or the content or elements that led to the rating; (3) new monetization features (including "new opportunities to make a purchase" or "new advertisements" in the app); or (4) "material[] changes" to the app's "functionality or user experience." §§ 121.053(a); 121.053(b). Section 121.053(a)(2) thus requires app developers to perform continuous content and age rating assessments. Each notice from a developer requires app stores to then notify all minor users' parents and obtain consent before those users can "continue[] [to] use" the app." § 121.022(g). Thus, for example, every time Audible makes a new audiobook available for purchase, this "new opportunit[y] to make a purchase" may trigger an update an obligation to notify app stores, which in turn would have to pause minors' use of the app until consent is obtained.

*Statutory violations*. The Act forbids app stores and developers from: (1) enforcing "a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent" (§§ 121.026(a)(1) (app stores), 121.056(a)(1) (developers)); (2) knowingly misrepresenting "information disclosed" to parents and guardians regarding apps and purchases (§§ 121.026(a)(2) (app stores), 121.056(a)(2) (developers)); (3) sharing or disclosing personal data obtained for purposes of verification or consent(§§ 121.026(a)(4) (app stores), 121.056(a)(3) (developers)). Generally, a violation of S.B. 2420 constitutes "a deceptive trade practice" under the Texas Deceptive Trade Practices Act enforceable by Defendant and the

consumer protection division of the Texas Attorney General's Office in addition to "any other action or remedy provided by law." §§ 121.101-102.

**ARGUMENT**

CCIA and its members are entitled to a preliminary injunction, as they can demonstrate: (1) a "substantial likelihood of success on the merits"; (2) a "substantial threat of irreparable injury"; (3) that the equities favor an injunction; and (4) that the injunction "serve[s] the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536-37 (5th Cir. 2013) (citation omitted). These factors are balanced on a sliding scale, "which takes into account the intensity of each in a given calculus." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (citation omitted). All factors weigh in favor of a preliminary injunction here.

S.B. 2420's age verification, parental verification, parental consent, and age-rating display requirements, §§ 121.021–121.023, are unconstitutional facially and as applied to all CCIA member mobile app stores (e.g., Google Play, Amazon Appstore, and Apple App Store). "The distinction between as[-]applied and facial challenges is sometimes hazy." *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022). This is particularly so here, where CCIA's app store members comprise the key mobile app stores the law was apparently intended to regulate. Schruers Decl. ¶¶ 28-29, 31. Indeed, the March 31, 2025 Senate Committee Hearing on S.B. 2420 repeatedly referenced the Apple App Store and Google Play Store as the intended targets of the legislation. *See* Decl. of M. Lambert in Supp. of Pl.'s Mot. For Prelim. Inj. ("Lambert Decl.") (Ex E-1 at 12:10-20; 15:23 to 16:1; 64:25 to 65:2). And "[u]nlike the laws at issue in *Moody*, [S.B. 2420] imposes relatively uniform requirements on all Plaintiffs' covered members." *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1031 (W.D. Tex. Aug. 30, 2024). Accordingly, a challenge brought by CCIA on behalf of its app store members encompasses most, if not every, hypothetical application of the law as

12

applied to mobile app stores writ large. For similar reasons, S.B. 2420 is facially unconstitutional as its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

CCIA also brings an as-applied challenge to S.B. 2420's provisions that: (1) forbid developers from providing their apps (or allow the sale of any in-app content) to minors without verifying their ages and obtaining parental consent; and (2) require developers, on an ongoing basis, to age-rate their apps and the speech available for purchase within them. *See* §§ 121.052-.054, 121.056(a)(1)-(2). This challenge is asserted on behalf of CCIA member app developers in the business of facilitating access to protected speech whose First Amendment rights are burdened by the Act. Schruers Decl. ¶¶ 3, 5, 47-55; Strauser Decl. ¶¶ 2-7; 13-33.

## I. CCIA HAS STANDING TO BRING THIS CHALLENGE.

***Associational Standing.*** CCIA has associational standing to assert these claims because (1) its members have standing as "the object" of S.B. 2420's regulation and face substantial liability, *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025); (2) challenging S.B. 2420 is germane to CCIA's mission; and (3) members' individual participation is unnecessary in this purely legal challenge. Schruers Decl. ¶¶ 3, 5, 55. *See, e.g.*, *NetChoice v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025) (finding NetChoice had associational standing to challenge Mississippi law regulating its social-media members); *Paxton*, 747 F. Supp. 3d at 1029 (finding CCIA had associational standing to challenge similar Texas statute).

*First*, CCIA "has standing to bring a pre-enforcement facial challenge against [S.B. 2420]" because "the law is aimed directly at" CCIA's app store and developer members, "who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures" to implement S.B. 2420's onerous requirements across their technologies. *Fitch*, 134 F.4th at 804. Schruers Decl. ¶¶ 43-47. The statute also "interferes with [app store and developer

members'] attempts to sell or distribute" protected speech, which "unquestionably satisfies Article III's injury-in-fact requirement." *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012); Schruers Decl. ¶¶ 49-55.

*Second*, CCIA's purpose is to "promote[] open markets, open systems, and open networks, and advocate[] for the interests of the world's leading providers of technology products and services[.]" Schruers Decl. ¶¶ 3, 55. Because this lawsuit—brought to enjoin unconstitutional restrictions on access to and distribution of speech through mobile apps—"is centered on doing exactly that, [CCIA] seeks to vindicate interests germane to its purpose." *Fitch*, 134 F.4th at 804; *accord Paxton*, 747 F. Supp. at 1029.

*Third*, CCIA's members do not need to participate in this suit because "no claim asserted nor relief requested requires the participation of each member." 134 F.4th at 805. For example, because the verification and consent requirements burden speech across all covered app stores in the same ways, their claims "can be proven by evidence from representative injured members" like Google, as is the case here. *Id.* So too with the as-applied challenges for CCIA's mobile app developer members, who are equally blocked by audiences who cannot pass the verification and consent hurdles, and burdened by the compulsion to age-rate the content in their apps.

**Prudential Standing.** CCIA also has prudential standing to assert the First Amendment rights of its members' users—the people who use app stores to access the speech, ideas, and information that mobile apps offer. *Fitch*, 134 F.4th at 805-07 (holding NetChoice had prudential standing to vindicate the rights of its members' users in challenging a Mississippi law requiring verification and consent for social media services). As in *Fitch*, CCIA's members (and CCIA as an association) are permitted to assert users' First Amendment rights because "violation of those rights adversely affects the platform." *Id.*; Schruers Decl. ¶¶ 50, 52-54.

## II. CCIA IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT AND VAGUENESS CLAIMS.

### A. S.B. 2420's Verification and Consent Requirements Violate the First Amendment.

1. App Stores, Developers, and Users Enjoy First Amendment Protections When They Create, Access, and Disseminate Speech.

The basic principles of freedom of speech "do not vary when a new and different medium for communication appears." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (citation omitted). App stores and mobile apps provide users with access to spaces where they can "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (citation omitted). *See supra* at 5-6. Indeed, the apps that CCIA's members have developed are both themselves protected speech and facilitate access to broad tracts of speech. Schruers Decl. ¶¶ 29-32. For example, through CCIA members' apps, users can download ebooks on Kindle; watch movies or TV shows produced by Amazon MGM Studios on Prime Video; listen to an "Audible Original" adaptation of *Pride and Prejudice*; and view or post videos on YouTube. *Id.* ¶ 30.

These examples are just the tip of the iceberg, and all of it is speech protected by the First Amendment. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) ("All manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections; no less can hold true when it comes to speech … conveyed over the Internet.") (cleaned up); *Brown*, 564 U.S. at 790 ("Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices . . . and through features distinctive to the medium (such as the player's interaction with the virtual world)."). Likewise with apps that provide access to informational tools like maps, calculators, compasses, and reference material. "Facts, after all, are the beginning point for much of the speech that is most essential to advance

human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

App stores are unquestionably protected by the First Amendment in their role as gateways through which this vast array of speech is published and disseminated—just as bookstores are protected as avenues for dissemination of published texts. It is well settled that both "the creation and dissemination of information are speech[.]" *Sorrell*, 564 U.S. at 557. "If the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category[.]" *Bartnicki v. Vopper*, 532 U.S. 514, 521 (2001) (cleaned up); *accord Genusa v. City of Peoria*, 619 F.2d 1203, 1218 (7th Cir. 1980) ("Preservation of freedom of expression requires protection of the means of disseminating expression.").

Likewise protected are app developers, who create protected expression in the form of mobile apps—many of which further facilitate the dissemination and creation of speech and information by others. *See 303 Creative*, 600 U.S. at 600 (website design is speech); *Packingham*, 582 U.S. at 104 (online speech forums protected by First Amendment); *Moody*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447-48 (2d Cir. 2001) (computer software programs that "convey information capable of comprehension and assessment by a human being" are "speech" protected by the First Amendment). In short, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1.

Beyond this baseline protection, app stores are further protected by the First Amendment when they exercise editorial control over the apps that they publish, including by vetting, curating, and arranging third-party apps. *See* Bye Decl. ¶¶ 7, 9, 12-15; Schruers Decl. ¶¶ 35-36. "Deciding

on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 603 U.S. at 731-32; *accord Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025). Those editorial rights are compromised when "subjected to restraints on the way in which the information might be used or disseminated." *Sorrell*, 564 U.S. at 557 (citation omitted).

These First Amendment protections fully apply to the dissemination of lawful speech to minors. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown*, 564 U.S. at 794 (cleaned up). Nor does the fact that app stores and developers operate for profit, and sell rather than give away certain apps, undermine their First Amendment rights. *See id.* (striking down law limiting the sale or rental of video games); *303 Creative LLC*, 600 U. S. at 594 (2023) ("Many of the world's great works of literature and art were created with an expectation of compensation."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("That the Times was paid for publishing the advertisement is immaterial").

2. S.B. 2420 Burdens These Rights by Restricting Speech at Three Chokepoints.

"Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). S.B. 2420's central mechanism is an interlocking series of verification and consent requirements that inhibit the free flow of speech at key chokepoints: **(1) account creation** [via age verification, parental tethering]; **(2) prior to downloading each app** [parental consent]; and **(3) continually, with every in-app purchase and significant change to an app's terms of service** [parental consent]. Failure at any one of these steps will cut off users from accessing speech and app developers and app stores from being able to disseminate their own speech and third-party speech to the public.

### a) *Chokepoint 1: Age Verification and Parental Tethering at Account Creation*

Because app stores are the initial gateway to accessing any app and any speech therein, an access burden at the account-creation level operates as a barrier at the very threshold of speech disseminated via mobile apps. *See* Bye Decl. ¶¶ 10, 47-48; Schruers Decl. ¶¶ 29, 53. Yet S.B. 2420 begins by imposing onerous requirements at exactly that level.

***Step 1: Age Verification.*** S.B. 2420 prohibits anyone—be they 12, 35, or 60—from accessing any app without first clearing an invasive age verification hurdle. The Supreme Court has confirmed that submitting to age verification is a burden on "the right to access speech." *Free Speech Coal., Inc.* ("*FSC*") *v. Paxton*, 606 U.S. 461, 482 (2025). That is especially true here where, in contrast to the law at issue in *Free Speech Coalition*, the speech at issue is protected as to both adults and minors, who equally have a First Amendment right to access it.

S.B. 2420's age verification requirement will entirely bar the following users from receiving and producing speech on every single mobile app: users who (1) cannot adequately verify their age because they lack the type of age verification necessary, such as an ID or credit card, (2) do not want to submit to age verification due to concerns about privacy; and (3) are minors who lack adequate documentation or parental involvement to link a parent's account. *See* Bye Decl. ¶¶ 39, 44, 47; Schruers Decl. ¶¶ 11, 45. These restrictions cannot be reconciled with the protections afforded by the First Amendment. *See Packingham*, 582 U.S. at 108 ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.").

Age verification requirements also burden speech by making speaking and accessing speech contingent on abdicating the right to anonymity. *See* Bye Decl. ¶ 39. But anonymity too is "an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). Verifying one's age—such as by "upload[ing]

official government documents and submit[ting] to biometric scans," or linking to a credit card—forces adults to "forgo the anonymity otherwise available on the internet." *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023) (quotation omitted)).

Age verification has a further chilling effect by forcing users, as a precondition to accessing protected speech, to put their most sensitive data at risk of inadvertent disclosure, breach, or attack.[11] "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007), *aff'd*, 534 F.3d 181 (3d Cir. 2008); *accord PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas[.]'"), *aff'd*, 362 F.3d 227 (4th Cir. 2004); *Carr*, 2025 WL 1768621, at *14 (age verification and parental consent provisions "create serious data privacy vulnerabilities"). The risks of breach and misuse are compounded where, as here, app stores must share users' age category signals across millions of apps and developers, each with their own varying levels of data security. *See* Bye Decl. ¶¶ 45-46.

***Step 2: Parental Tethering and Verification.*** If, at the age verification step, a user cannot sufficiently prove that they are over 18 (or, in the case of an emancipated minor, that they have had the disabilities of minority removed for general purposes), S.B. 2420 forces the user to link their account to that of a parent or guardian. The parent or guardian must then undergo an even

---

[11] *See, e.g.*, Robert Booth, *Hack of Age Verification Firm May Have Exposed 70,000 Discord Users' ID Photos*, The Guardian (Oct. 9, 2025), https://www.theguardian.com/media/2025/oct/09/hack-age-verification-firm-discord-users-id-photos

more arduous verification process to prove that (1) they are an "adult," i.e., over 18 years old, and (2) have legal authority over a minor's account. § 121.022(b)(1)-(2).

It is not clear how app stores are supposed to verify that an "adult" seeking affiliation with a minor's account is a parent or legal guardian. *See* Bye Decl. ¶ 41. But it is clear that those who cannot meet this burden face yet another insurmountable bar from the marketplace of ideas. And it is easy to conceive of the types of people who will face extreme difficulties meeting these proof burdens. Parents often have different last names than their children and may have a different address; most children do not have government IDs; and children in foster care or nontraditional family situations may not have a legal guardian who is able or willing to be linked to the child's account. *See* Schruers Decl. ¶ 46; Bye Decl. ¶ 41. These children will be barred from speaking and accessing app-based speech, or excessively burdened by trying to fulfill alternative verification measures, should any exist. Bye Decl. ¶ 40.

### b) *Chokepoint 2: Parental Consent Required for Each App Download*

The age and parental verification requirements at the first chokepoint exist to power the Act's ongoing parental consent requirements, which are triggered each time a minor attempts to download an app. These requirements create a second chokepoint that imposes further burdens on minors and their families—and on the app stores and developers who wish to communicate speech that minors have every right to access. The Supreme Court has expressly rejected the argument that "the state has the power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. But under the Act, parents must approve a 17-year-old's download of the Audible app (which provides access to countless audiobooks and podcasts), or apps facilitating Bible study or providing political news. *See* Strauser Decl. ¶¶ 13-17. That alone creates a substantial—and in many instances complete—obstacle to the exchange of protected speech between app developers and minor users. *See* Schruers Decl. ¶¶ 50, 53.

Even where parents may have no objection to their children's downloads or purchases, the parental consent hoop seriously impedes the exercise of First Amendment rights. The process is logistically cumbersome, especially given that parents must separately authorize the download of every individual app and cannot provide blanket consent for certain categories of apps. § 121.026(a)(3). Consider how much friction just this last requirement imposes on minors and parents in everyday life. Take the 17-year-old trying to download an app or purchase an article to complete a homework assignment when their parent is at work, traveling, or otherwise not monitoring their device to provide consent. Indeed, for most teens, who aren't necessarily with a parent when they seek to download an app, there will be some delay. And that will be the case even for parents who would approve every request. *See also* Bye Decl. ¶ 44 (discussing anticipated negative impact on user experiences and ability to access speech).

> **c) *Chokepoint 3: Ongoing Parental Consent for In-App Purchases and Significant Changes to App Terms***

S.B. 2420 requires app stores to obtain ongoing parental consent for any in-app purchases. § 121.022(e)(1). Additionally, whenever an app developer makes a "significant change" to its app or to its terms of service or privacy policy, the app store must effectively pause the minor's access to the app until the parent re-ups their consent. §§ 121.022(g), 121.053.

A parental consent requirement at this chokepoint further arrests the natural flow of speech by interjecting ongoing parental consent for continued access to speech within apps to which parents already provided consent. It imposes a particularly outsized burden on apps whose models of speech dissemination rely on in-app purchases, such as Audible, Kindle, Adobe Illustrator, Prime Video, Substack, and video games such as Fortnite. *See* Strauser Decl. ¶¶ 4, 13, 18. As of January 1, 2026, minors will have to request parental consent every time they want to purchase a new audiobook on Audible or a new book from the Kindle app, rent certain movies on Prime

Video, or subscribe to certain authors on Substack—as well as make purchases within thousands of innovative apps of smaller developers that range from offering language courses to guided museum tours to instruction in guided meditation. *See* Bye Decl. ¶ 18. This added friction threatens an entire economic model for speech dissemination. It also risks disrupting parents' relationships with their children by providing a level of visibility and micromanagement into their children's lives that parents cannot opt out of. *See Carr*, 2025 WL 1768621, at *15-16. Indeed, parents will lose the ability to decide their preferred level of supervision over their teen's engagement with content, or provide consent on a blanket or category-based level—functionalities that existing parental controls provide. *See* Schruers Decl. ¶¶ 37-38.

The speech burdens of the "significant change[s]" requirement is similarly onerous. Any time "new advertisements," "new monetization features," or "new opportunities to make a purchase" are added to the app (to name just a few example triggers), the developer must notify the app store. § 121.053(b). That renders the parent's prior consent stale, and so the app store must then regain the parent's consent "for the minor's continued use" of the app. § 121.022(g)(2). But apps are constantly rolling out new features that may include new advertisements or purchase opportunities, which means the state is now regulating what is a quotidian experience on many apps. In theory, every new audiobook on Audible or movie made available for purchase on Prime Video might be considered a new purchase "opportunity" under the Act, triggering an entirely new parental consent obligation. Strauser Decl. ¶¶ 4, 32-33. Once more, the Act imposes constant interruptions on access to and dissemination of speech for apps and users, and drastically increases the barrage of consents pushed on parents. *See* Bye Decl. ¶ 43 (parental consent provisions "will exponentially expand . . . the number of approvals that must be obtained").

3. S.B. 2420's Verification and Consent Regime Triggers Strict Scrutiny.

These burdens on accessing and disseminating speech clearly trigger heightened scrutiny, *see, e.g., Packingham*, 582 U.S. at 106-07 (assuming statute barring sex offenders from accessing social media service was content neutral and applying intermediate scrutiny), but strict scrutiny is the appropriate standard for multiple reasons.

a) ***The Act Imposes a Content-Based Burden on Speech.***

"When the government favors some speakers over others for their content, the law must be subject to strict scrutiny." *Paxton*, 747 F. Supp. 3d at 1032; *accord Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020). Yet content-based favoritism (or perhaps vilification) is exactly what the legislature intended when enacting S.B. 2420. The *very first sentence* of the sponsor's statement of intent in the Senate Committee Report began by noting the "[g]rowing concerns regarding the rise of social media and its pervasiveness in the lives of children and teens." Lambert Decl. Ex E-2 at 1. Further supporting testimony at a Senate Committee Hearing stated that "[m]obile applications have become a gateway to harm, exposing minors to *inappropriate content* …." *Id.* Ex. B at 42:19-21 (emphasis added). These statements reveal that S.B. 2420 is nothing more than the newest iteration of the many social media laws that have been enjoined on First Amendment grounds over the past several years. Because, quite literally, S.B. 2420's verification and consent regime cannot be "justified without reference to the content of the regulated speech," it is therefore subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and quotation marks omitted).

S.B. 2420 also imposes clear content-based exceptions, which independently render the statute subject to strict scrutiny. *See Barr*, 591 U.S. at 618 (exemptions to general robocall prohibition rendered statute content-based). Verification and consent is required before a minor may download any app from an App Store *except for* two categories of state-favored apps defined

by their content: (1) apps operated by the government, a nonprofit, or an authorized emergency service that provide direct access to emergency services; and (2) apps operated by nonprofits that develop, sponsor, or administer standardized tests for postsecondary education. § 121.022(h). Here, as in other cases involving similar verification and consent statutes, Texas' exclusions "single[] out specific subject matter for differential treatment,' by using the 'function or purpose' of speech as a stand-in for its content," *Paxton*, 747 F. Supp. 3d at 1032, and show the State "favor[s] engagement with certain topics" and certain speakers "to the exclusion of others." *Yost*, 716 F. Supp. 3d at 558. That is "plainly a content-based exception deserving of strict scrutiny." *Id.*; *see also, e.g., NetChoice, LLC v. Bonta*, 769 F. Supp. 3d 1164 (N.D. Cal. 2025); *Carr*, 2025 WL 1768621, at *9-11 (exemptions rendered the law content-based); *Fitch*, 2025 WL 1709668, at *8 (same).

**b)  *S.B. 2420 Imposes a Direct Burden on Fully Protected Speech***

The Supreme Court's recent decision in *Free Speech Coalition* confirms that S.B. 2420 should be subject to strict scrutiny. In that case, the Supreme Court considered the level of scrutiny that applied to a Texas law imposing age verification requirements on pornographic websites. 606 U.S. at 477-95. The Court's holding that intermediate scrutiny applied was based on the fact— emphasized throughout the opinion—that the statute was limited to restricting minors' access to a narrow category of speech *that was not protected by the First Amendment* (material legally obscene as to minors). *Id.* at 480, 482, 490-92, 499. Because the law used age verification only to prevent minors from accessing material that they have no right to access, the Court reasoned, "[a]ny [First Amendment] burden experienced by adults is therefore only incidental to the statute's regulation of activity that is not protected by the First Amendment. That fact makes intermediate scrutiny the appropriate standard under our precedents." *Id.* at 483.

That rationale does not apply here. Far from targeting unprotected speech, S.B. 2420 imposes its verification and consent regime on *every* app in *every* mobile app store (subject to the content-based exceptions discussed above), including apps that offer speech on matters of public interest that is not only protected as to minors, but lies at the heart of the First Amendment for parents and minors alike. In this context, S.B. 2420 is no mere incidental burden, but a *direct* burden on protected speech.

*Free Speech Coalition* found persuasive the analogy of the online age verification restriction to its brick-and-mortar equivalent: Because access to pornography in the physical world unproblematically requires proof of age, the Court suggested, the same should be true online. 605 U.S. at 480-84. But that same principle cuts decisively *against* Texas here. The law never has (and almost certainly *could not)* required age verification, parental verification, or parental consent for the brick-and-mortar equivalent of S.B. 2420—general purpose shopping malls, movie theaters, libraries, bookstores, and museums. *Cf. Brown*, 564 U.S. at 795 n.3. (explaining that laws making it unlawful to allow minors to attend political rallies or receive religious tracts without their parents' consent would almost certainly be unconstitutional). The logic of *Free Speech Coalition* thus underscores the need for strict scrutiny here.

    4.   <u>The Verification and Consent Requirements Are Not Narrowly Tailored and Cannot Survive Any Form of Heightened Scrutiny.</u>

"Strict scrutiny . . . is 'the most demanding test known to constitutional law.'" *FSC*, 606 U.S. at 484 (citation omitted). Laws triggering strict scrutiny "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra*, 585 U.S. 755, 766 (2018) (citation omitted). "If a less restrictive alternative would serve the

Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

But even if intermediate scrutiny applied, it is also rigorous. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). "[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest." *Id.* (citation and quotation marks omitted). The statute must "advance[] important governmental interests unrelated to the suppression of free speech" and must "not burden substantially more speech than necessary to further those interests." *Turner Broad Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). Although the standard is less exacting than strict scrutiny, it is "no gimme for the government[.]" *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024). Indeed, "the burden of justification is demanding and it rests *entirely* on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (cleaned up).

Beginning with Texas' supposed governmental interest, it appears that S.B. 2420 seeks to "protect the children of Texas" from harmful online content and give parents tools to control their children's online activity.[12] But "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804–05. Thus, while states have "legitimate power to protect children from harm," the Supreme Court has made clear that this "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794-95 (cleaned up). Similarly, "the interest in protecting children . . . 'does not justify an

---

[12] *Bill Analysis*, S. Comm. Rep. on C.S.S.B. 2420 by K. Paxton, Senate Research Center 89R21669 MLH-F (Mar. 31, 2025), capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02420S.pdf.

unnecessarily broad suppression of speech addressed to adults.'" *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 273 (5th Cir. 2024).

Even if the State has a significant or compelling interest in protecting minors by forcing parents to micromanage their children's online activity, Texas cannot meet its burden of satisfying any form of heightened scrutiny. S.B. 2420's verification and consent provisions are fatally overbroad, ignore far less restrictive alternatives, and are strikingly underinclusive.

**a)  *The Act's Verification and Consent Regime Is Overinclusive.***

Both chambers of the state legislature introduced S.B. 2420 with the following analogy: "Unlike brick and mortar stores which must verify a consumer's age before the purchase of age restricted products such as alcohol and cigarettes, minors are currently able to navigate through the digital world without such parameters."[13] But S.B. 2420 did not heed its own analogy when placing its verification burdens by targeting content unprotected as to minors—the only possible online analog to alcohol and cigarettes. That, as the Supreme Court stated this year, would be an example of a narrowly-tailored age gate potentially capable of withstanding intermediate scrutiny. *FSC*, 606 U.S. at 480-82. Instead, the Act imposes verification requirements for adults and minors alike on apps that offer newspaper content, sports coverage, religious worship, basic information services such as maps and calculators, and all manner of entirely benign and unequivocally protected speech.

It is hard to conceive of a less narrowly tailored solution. Indeed, the sheer volume of protected speech subject to S.B. 2420's scheme is far greater than the restrictions on violent video games in *Brown* and the restrictions on access to social media websites enjoined by district courts

---

[13] House & S. Comm. Rep. on S.B. 2420, 89th Leg. Reg. Sess. (2025), https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=89R&Bill=SB2420 (last visited Oct. 7, 2025).

in Texas and other states,[14] and certainly distinguishes this case from the age-verification requirement tailored to pornographic websites in *Free Speech Coalition*. Texas' statute is the equivalent of forcing bookstores to "card" all customers and prohibit the sale of any books to minors without express parental permission. *See Brown*, 564 U.S. at 795 n.3. Even under intermediate scrutiny, that "burden[s] substantially more speech than is necessary to further" Texas' modest interest in providing restrictions for minors around the online analogs to alcohol and cigarettes. *FSC*, 606 U.S. at 496; *see also Packingham*, 582 U.S. at 106.

**b)** ***Existing Parental Controls Diminish the State Interest and Further the Act's Tailoring Problem.***

S.B. 2420's parental consent requirements amplify the speech burdens on minors and parents and force a government solution where meaningful private solutions are already in place. In *Brown*, the Supreme Court explained that the existing "voluntary rating system designed to inform consumers about the content of games . . . does much to ensure that minors cannot purchase seriously violent games on their own, and that parents who care about the matter can readily evaluate the games their children bring home." 564 U.S. at 803. "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.* Because "California cannot show that the Act's restrictions meet a substantial need of parents," the Act was not narrowly tailored. *Id.*

The same is true here. The mobile app stores and apps that S.B. 2420 regulates already have meaningful voluntary protections that facilitate parental control. *See* Schruers Decl. ¶¶ 33-38; Bye Decl. ¶ 30 ("Google already offers parents most of the controls the Act would make

---

[14] *See Paxton*, 747 F. Supp. 3d at 1038; *Carr*, 2025 WL 1768621, at *19 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Fitch*, 2025 WL 1709668, at *14 (S.D. Miss. June 18, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 959 (S.D. Ohio 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1131 (D. Utah 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023).

mandatory and takes additional measures to help ensure an age-appropriate experience with respect to Google Play apps."). As in *Brown*, the State has presented no evidence that its *less robust* version of controls that App Stores have already developed on a voluntary basis "meet[s] a substantial need of parents who wish to restrict their children's access to [apps] but cannot do so." *Griffin*, 2025 WL 978607, at *14 (citing *Brown*, 564 U.S. at 803); *accord Carr*, 2025 WL 1768621, at *18 (noting same); *Uthmeier*, 2025 WL 1570007 at *18.

The Act's prohibition on blanket consent further deprives parents of choice. §§ 121.022(e), 121.026(3). Bye Decl. ¶ 48. With no justification, the State precludes App Stores from allowing parents to pre-authorize app downloads or purchases—whether across the board, within a given category of app, or even within designated apps—and instead forces them to individually approve every single individual app download and purchase (and then to renew that consent on an ongoing basis), no matter how unobjectionable.

This unnecessarily onerous requirement overrides the preferences of parents who trust their children, wish to let them make their own choices, or favor a different parenting philosophy. *See Brown*, 564 U.S. at 805 (violent video game ban "seriously overinclusive because it abridge[d] the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime"). As with the law rejected in *Brown*, Texas' "purported aid to parental authority is vastly overinclusive . . . While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.* at 804; *accord Griffin*, 2025 WL 978607, at *13 (finding age verification requirement overinclusive and "maximally burdensome" because

"[r]ather than targeting content that is harmful to minors, Act 689 simply impedes access to content writ large").

### c) *The Act Is Also Woefully Underinclusive.*

S.B. 2420's large regulatory loopholes "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes[.]" *Brown*, 564 U.S. at 802; *see also FSC*, 95 F.4th at 278. A law that is underinclusive "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

Most obviously, the Act targets only *mobile* apps, § 121.002(2), and does nothing to prevent minors from accessing the same services via a web browser, even on a mobile device. For example, Wikipedia can be accessed via a mobile app or via internet browsers (www.wikipedia.org) on both mobile and non-mobile devices; the same is true for countless apps, from Substack to the New York Times to ESPN. *See also* Strauser Decl. ¶ 18. The YouTube app and other apps are also available on non-mobile devices such as internet-connected TVs. And, of course, some of the same books, movies, audiobooks, and news content are available for minors to access in physical venues.

Yet these other avenues for accessing the same speech are entirely unregulated by S.B. 2420. The Act requires nothing at all—no age verification; no parental verification; no parental consent—for minors to access the same or similar services on a website (even a mobile website), via apps on non-mobile surfaces, or in physical stores. Minors can therefore skirt the Act's age verification and parental control requirements by, for example, merely using a web browser on their mobile device, laptop or desktop computer. *See* Strauser Decl. ¶ 18; *Carr,* 2025 WL 176821, at *17 (describing "a number of loopholes that reveal [the law's] under-inclusiveness and the disparities in its requirements."); *Fitch*, 2025 WL 1709668, at *12 (same, regarding parental consent requirements). If the State's interest is in preventing minors from accessing harmful

content, S.B. 2420's underinclusivity renders it futile. The Act simultaneously imposes great burdens on speech while leaving a gaping hole that undermines the State's own purported interests. Because the Act is "wildly underinclusive when judged against its asserted justification, [that] . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802.

* * *

For these reasons, the Act's centerpiece of interlocking verification and consent gates violate the First Amendment and cannot be enforced. Even apart from these provisions, the Act's additional mandate that app developers and app stores speak in the form of mandatory age ratings independently violates the First Amendment.

### B. The Age-Rating Requirement Unconstitutionally Compels Speech By App Developers and App Stores.

The Act's age-rating requirements compel speech in violation of core First Amendment principles. The First Amendment "protects both the 'right to speak and the right to refrain from speaking.'" *FSC*, 95 F.4th at 279 (quotation omitted). "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (citing cases) (cleaned up).

Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech[,]" compelled-speech laws are considered "a content-based regulation of speech." *Riley v. Nat'l Fed'n of Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). Where the speech compelled is non-commercial speech, such laws must satisfy strict scrutiny. *See id.*; *FSC*, 95 F.4th at 279. But even regulations compelling commercial speech receive "at minimum, intermediate scrutiny," *id.* at 283, unless the regulation only "compels 'commercial enterprises to disclose purely factual and uncontroversial information about their services,'" *id.* at 281 (citation

omitted). In that narrow set of cases, courts may apply a more relaxed scrutiny under *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985), under which "such requirements should be upheld unless they are 'unjustified or unduly burdensome,'" *NIFLA*, 585 U.S. at 768 (citation omitted).

S.B. 2420 compels app developers and app stores to speak the government's message by assigning and displaying a mandatory and highly burdensome set of app ratings that override existing voluntary age rating systems for mobile apps. Schruers Decl. ¶¶ 47, 51. In service of the Act's core parental-consent regime, S.B. 2420 requires every app developer to assign "to each software application and to each purchase that can be made through the software application" an age rating based on specifically designated age categories: younger than 13 ("child"); at least 13 and younger than 16 ("younger teenager"); at least 16 and younger than 18 ("older teenager"); and at least 18 ("adult"). §§ 121.052(a); 121.021(b). The app developers must include a description of the "specific content or other elements that led to each rating." § 121.052(b)(2). But S.B. 2420 provides no guidance for what the different age categories mean or what criteria app developers should consider when reviewing apps and determining their ratings. Strauser Decl. ¶ 21. Once the ratings are determined, they must be provided to App Stores (§ 121.052(b)), who are required to display the ratings (§ 121.023) and "disclose" them to parents in advance of every consent decision (§ 121.022(f)(1)).

This is unquestionably a compelled speech mandate. *See, e.g.*, *FSC*, 95 F.4th at 284 (requirement that pornographic website post warning labels was unconstitutional compelled speech mandate); *Book People, Inc. v. Wong*, 91 F.4th 318, 338-40 (same, for requirement that booksellers issue book ratings); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024); (same, for requirement that websites prepare reports that "opine on potential harm to children"); *X*

*Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (same, for requirement that websites create reports describing content-moderation policies); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (same, for state law requiring age-labels on violent video games). And it is clearly designed to limit minors' access to protected speech, by fueling the Act's onerous parental-consent requirements for every app download or in-app purchase. These age-rating provisions are subject to strict scrutiny, but they fail any form of First Amendment review.

      1.   <u>The Age Rating Requirement Imposes a Content-Based Burden on CCIA Members' Speech as Developers of Mobile Apps.</u>

Because they compel speech on particular topics, the age-rating provisions are content-based. *NIFLA*, 585 U.S. at 766; *Riley*, 487 U.S. at 795; *see* Strauser Decl. ¶¶ 22, 25-31. That app stores and some developers, on a voluntary basis, have agreed to provide age ratings for mobile apps does not make it any less compelled speech for Texas to impose such obligations by statute. That is especially so because the Act requires ratings to be premised on four specific age categories (§121.021(b)) that differ markedly from the categories used by the two popular app stores (Apple's App Store and Google's Play Store) that happen to be the law's intended targets.[15] *See* Schruers Decl. ¶ 47; Lambert Decl. Ex. E-1 at 12:10-14. Not only that, mobile apps that have in-app purchases must age-rate each and every one of those in-app purchases pursuant to Section 121.052(a). That requires apps to assign content-based age ratings to incredibly large compendiums of third-party content. *See* Strauser Decl. ¶¶ 24-28. Here too, Texas seeks to overwrite the existing voluntary rating systems used by apps that host third-party speech with its own, far more onerous, state-mandated rating system.

---

[15] The Apple App Store categorizes apps as 4+, 9+, 12+, or 17+. There is no overlapping category with S.B. 2420. The Google Play Store uses the ESRB rating system, wherein age ranges span from 0-9, 10-12, 13-16, 17+, and 18+. The only overlap with S.B. 2420 is the 18+ category.

On top of that, CCIA's developer members are also compelled to *continue to speak* against their will, as the Act requires them to inform app stores of "significant" changes, defined in part as a change that "affects or changes . . . the content or elements that led to [the age rating]." § 121.053(b)(2); *see* Strauser Decl. ¶¶ 27, 31-33; Bye Decl. ¶ 42. And if they do not comply, or if they "knowingly misrepresent[] an age rating or reason for that rating," § 121.056(a)(2), they face legal sanctions. In short, developers must "'speak as the State demands' or suffer the consequences." *Book People*, 91 F.4th at 338 (quotation omitted).

2. The Age Rating Display Requirement Imposes a Content-Based Burden on App Stores' Speech.

The age-rating provisions also compel speech by app stores. To obtain parental consent for any app download, purchase, or in-app purchase, the app store must "disclose" to parents "the rating *under Section 121.052* assigned to the software application or purchase," along with "the specific content or other elements that led to the rating *assigned under Section 121.052*." § 121.022(f)(1)(B)-(C) (emphasis added). While app stores may theoretically display their own age ratings in certain limited contexts, *see* § 121.023(a), any parental consent will be deficient unless the parent received the S.B. 2420-mandated age ratings. And where no such age rating display mechanisms exists—for instance, when gathering consent for in-app purchases or when an app makes a "significant change"—the app store must build a system to convey *the Act's* age rating. § 121.023(b).

As with app developers, forcing app stores to disclose an age rating (which the State coerces developers into creating) is a content-based compulsion of non-commercial speech. It forces them to disclose different information from what the app stores would otherwise provide to parents and other users. This deprives app stores of their editorial right to ascribe and communicate an age rating that comports with their content and rating policies. *See* Schruers Decl. ¶ 47. "[I]n

overriding a private party's expressive choices[,] the government confronts the First Amendment." *Moody*, 603 U.S. at 731-32.

3. The Age Rating and Display Requirements Compel Speech That Is Neither Commercial, Factual, Nor Uncontroversial.

There is no basis for applying anything less than strict scrutiny to these compelled speech mandates. *Zauderer*'s narrow exception does not apply here because the age rating and display requirements regulate neither commercial, factual, nor uncontroversial speech.

Commercial speech is "[e]xpression related solely to the economic interests of the speaker and its audience . . . which does no more than propose a commercial transaction." *Book People*, 91 F.4th at 339 (quotations and citations omitted). But content-based age ratings go beyond commercial speech by compelling developers and app stores to "implicitly opin[e] on whether and how certain controversial categories of content should be moderated." *X Corp.*, 116 F.4th at 901-03 (content moderation reports constituted compelled non-commercial speech); *accord NetChoice v. Bonta*, 113 F.4th at 1119-20. And unlike *Free Speech Coalition*, which found that H.B. 1181 regulated commercial speech in part because it "regulates only commercial entities," 95 F.4th at 279–80, disclosures under S.B. 2420 are required for *all* apps, even free and non-commercial ones. Determining age appropriateness across the range of mobile apps subject to this mandate implicates core protected speech, including political, religious, and cultural expression. This is far more analogous to "a paywall on a newspaper—core protected speech" than an "entrance to a strip club—commercial activity with a speech element." *Id.* at 281.

Even if age ratings were considered commercial speech, *Zauderer* still would not apply because the ratings are not "purely factual and uncontroversial information about the terms under which . . . services will be available." *NIFLA*, 585 U.S. at 768; *accord FSC*, 95 F.4th at 281. Determining whether, for instance, the New York Times (a news app that may include graphic war

imagery or articles about murder) is appropriate for a 13- to 15-year-old, or a 16- to 17-year-old, is not a "factual" determination. Strauser Decl. ¶¶ 22-31. Indeed, a statute that requires parties to "pass judgment or express a view on the material's appropriateness for children … is anything but the mere disclosure of factual information." *Book People*, 91 F.4th at 325 (age rating requirement for books was neither factual nor uncontroversial); *accord Blagojevich*, 469 F.3d at 652 (applying strict scrutiny to statute requiring age ratings for video games).

The Fifth Circuit's decision in *Book People* is on point. That case considered a similar content-based rating statute that required book vendors to label books as "sexually explicit," "sexually relevant," or "no rating" as a precondition of selling them to Texas public school libraries. 91 F.4th at 325. The Fifth Circuit rejected Texas' argument that the ratings were "purely factual and uncontroversial" like a nutrition label. *Id.* at 340. The ratings were not factual because vendors must "pass judgment or express a view on the material's appropriateness for children" to rate each book. *Id.* Similarly here, S.B. 2420 compels developers to espouse views on the "appropriateness for children" of each app—and each in-app purchase—by assigning content-based age ratings. *Id.*

Moreover, this provision separately flunks *Zauderer* because assessing whether an app's content is appropriate for children is often anything but uncontroversial. "[A] compelled statement is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *FSC*, 95 F.4th at 281–82. App age-ratings are anything but that. *See* Strauser Decl. ¶¶ 22-31. Apps not only encompass the literature in question in *Book People* (e.g., Libby, Kindle, Audible, the Barnes & Noble app), and the video games at issue in *Blagojevich*, but also social media, videos and movies, art, political content, and graphical displays

or depictions of sex or violence across all these mediums. Under S.B. 2420, developers are conscripted into opining on the age-appropriateness of all these highly controversial topics. Again, is the New York Times appropriate for a 13- to 15-year-old, or a 16- to 17-year-old? What about a Bible study app that discusses issues like adultery (2 *Samuel* 11:1-12:9), sibling murder (*Genesis* 4:1-18), and incest (*Genesis* 38:1-26)? These questions are "subject to good-faith scientific or evidentiary dispute" and are "an integral part of a live, contentious political or moral debate." *FSC*, 95 F.4th at 281-82. The ratings required by S.B. 2420 are a far cry from factual information on nutritional labels or disclosures that contingency-fee clients may have to pay court costs. A "business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial.'" *Bonta*, 113 F.4th at 1120 (quoting *Zauderer*, 471 U.S. at 561).

4.   The Age Rating and Display Requirements Fail Under Any Form of Heightened Scrutiny.

Because S.B. 2420 regulates non-commercial speech and *Zauderer* does not apply, the compelled speech provisions must satisfy strict scrutiny. Texas cannot meet that high standard. *See, e.g.*, *X Corp.*, 116 F.4th at 899-903; *Duncan v. Bonta*, 133 F.4th 852, 1109-22 (9th Cir. 2025); *Blagojevich*, 469 F.3d at 652-53 (all applying strict scrutiny to enjoin compelled speech mandates requiring publishers or distributors to rate, classify, or provide information about the speech they distribute). But even if intermediate scrutiny applied, S.B. 2420's age rating and display requirements would still fail. These requirements are overbroad, unclear, and unnecessarily trammel the existing (voluntary) rating schemes used by app developers and app stores—which are *more* narrowly tailored and *less* burdensome than those now mandated by the State. Schruers Decl. ¶¶ 34, 47; Bye Decl. ¶ 33.

If the Court applies intermediate scrutiny (it should not), S.B. 2420 should similarly be enjoined because Texas cannot show that it survives the four-part analysis to government-compelled restrictions of commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980); *accord FSC*, 95 F.4th at 283 (articulating and applying the framework). First, the court "must determine whether the expression is protected by the First Amendment." *Cent. Hudson*, 447 U.S. at 566. Second, the court asks "whether the asserted governmental interest is substantial." *FSC*, 95 F.4th at 283 (citation omitted). "If both inquiries yield positive answers," the court "must determine whether the regulation advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*

The first prong is easily met here because the Act regulates extensive speech that "concerns lawful activity and is not misleading." *Id.* (citation omitted). As for the second prong, even if Texas has a substantial interest in helping parents control the activity of their children online, the Act's age rating and display provisions fail under the third and fourth prongs because they do not advance that interest and are far more "extensive than is necessary to serve that interest." *Id.* That is apparent upon considering those provisions' effect on CCIA member apps that rely on in-app purchases to host third-party content. Take, for example, Audible, where nearly every single audiobook represents a potential in-app purchase. Strauser Decl. ¶¶ 4, 24, 33. Audible does not currently age-rate any of its audiobooks. *Id.* ¶¶ 24, 31. Yet to comply with S.B. 2420, Audible will have to come up with an age rating for "more than 1 million titles" on its service. *Id.* ¶ 24. The same goes for apps that offer movies and TV shows for rent or purchase on its app, which must use Texas' classification standards rather than the widely established content rating systems already in place for such material.

These concerns are only amplified at the app store level. As discussed, Google and Apple employ voluntary age rating systems for all their apps and rely on entirely different age categories than S.B. 2420. Schruers Decl. ¶¶ 34, 47; Bye Decl. ¶ 33. Mandating that these services use Texas' arbitrary and broader age rating categories "do[es] not advance the governmental interest asserted" and it is far "more extensive than is necessary to serve that interest." *FSC*, 95 F.4th at 283. It merely serves to upend app stores' existing age rating infrastructure and impose significant compliance costs. Schruers Decl. ¶ 47. Moreover, Texas cannot meet its burden of showing that its goal is "substantial" and the cost is "carefully calculated," *FSC*, 95 F.4th at 283, because its blunderbuss approach largely works to displace solutions that industry has already put in place voluntarily. *Cf. Brown*, 564 U.S. at 803 ("Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest."). For example, the IARC/ESRB rating system, which Google uses to rate and display apps, *see* Bye Decl. ¶ 33, was explicitly referenced by the Supreme Court in *Brown* as "[doing] much to ensure that . . . parents who care about the matter can readily evaluate the games their children bring home." 564 U.S. at 803. Texas has no good reason for supplanting IRAC and forgoing the benefits of "standardization, simplification, and the input and oversight of age-rating experts" that IRAC and other app store rating systems provide. *Id.*

In sum, no matter what form of heightened scrutiny applies, Texas cannot meet its burden of establishing that S.B. 2420's content-rating regime is appropriately tailored to meet its objectives, without compelling far more speech in far more burdensome ways than are necessary to "directly advance the government's interest." *FSC*, 95 F.4th at 284 (quoting *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283 (9th Cir. 2023)).

### C. The Age Rating Requirement Is Unconstitutionally Vague

There is yet another reason to find the age rating requirement unconstitutional: it is "so unclear that people of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (cleaned up). "A law is unconstitutionally vague when it (1) fails to provide a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly' or (2) fails to provide 'explicit standards' for applying the law 'to avoid arbitrary and discriminatory applications.'" *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 695 (W.D. Tex. 2023) (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 553, 551 (5th Cir. 2008))), *vacated and aff'd in part*, 91 F.4th 318. If a law, like S.B. 2420, interferes with the right of free speech or of association, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Here, S.B. 2420 holds app developers (and app stores) liable for knowingly misrepresenting an age rating, but it fails to give any meaningful guidance in determining the ratings beyond creating undefined age categories that clash with other standards. Under S.B. 2420, by what metrics should developers come up with an age rating? If a developer believes nudity is appropriate for all audiences, will the developer be held liable for rating the app in the lowest category? The law is silent on these questions—and essentially any question a developer may have when trying to rate apps.

For similar reasons, the notice of "any significant change" provision is also unconstitutionally vague. The Act does not define what a "material[] change[]" might include or explain what constitutes a "new opportunit[y] to make a purchase." § 121.053(b). Thus, as the law stands, Texas could seek to hold a developer liable for failing to provide app stores with notice for each new piece of content added to a service like Apple Music or Audible, when a similarly

plausible interpretation could require notice to be provided only when a new category of content is made available. But such wide-ranging interpretive windows create opportunities for selective enforcement. *See Book People*, 692 F. Supp. 3d at 695; *Carr*, 2025 WL 1768621, at *19. They also incentivize overcensorship, which further threatens to restrain speech. Such lack of guidance in a provision that "interferes with the right of free speech" is constitutionally unacceptable and must be enjoined. *Vill. of Hoffman*, 455 U.S. at 499.

## III. THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION.

### A. CCIA and Its Members Will Suffer Irreparable Harm if S.B. 2420 Is Not Enjoined.

Because S.B. 2420 violates the First Amendment rights of CCIA and its members, they will suffer irreparable harm without a preliminary injunction. In the case of First Amendment harms, "no further showing of irreparable harm is necessary" upon establishing likelihood of success on the merits. *Book People*, 91 F.4th at 341. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted).

In addition to the loss of First Amendment freedoms, CCIA and its members will face nonrecoverable compliance costs if S.B. 2420 is not enjoined. *Rest. L. Ctr. v. U.S. Dep't. of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("Under our precedent, the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."). Schruers Decl. ¶¶ 43-47; Bye Decl. ¶¶ 38-39, 41, 43; Strauser Decl. ¶¶ 17-18, 20, 22, 24, 26, 32-33. There is no industry standard for age verification, and "every solution has serious privacy, accuracy, or security problems." Schruers Decl. ¶ 45; *see also* Bye Decl. ¶ 39. CCIA's app store members "will spend large, unrecoverable sums up front to develop the proper capabilities[]" to verify a user's age, and even more to develop parental verification procedures or expand existing parental consent infrastructure. Schruers Decl. ¶¶ 45-46; Bye Decl. ¶ 43. Even large app stores like Google will

incur "large upfront and ongoing investment of resources to, among other things, evaluate identity, verify documentation, make updates to reflect changing custodial relationships, and address inter-family disputes." Bye Decl. ¶ 41. Additionally, app stores will have to invest significant resources protecting the large amounts of sensitive personal data in accordance with the Act, both in storage and in transit to millions of app developers. *See* § 121.025 (imposing data protection requirements); Schruers Decl. ¶¶ 45-46; Bye Decl. ¶ 45.

CCIA's developer members also face unrecoverable compliance costs, all of whom must "create and implement" a system to verify a user's age category and whether parental consent has been obtained. Schruers Decl. ¶ 47. Developers will also incur additional costs in reevaluating their content to re-rate the age appropriateness of their apps according to S.B. 2420's age categories, which differ from Google's and Apple's. *Id.* Large content libraries with in-app purchases face particularly large costs. For example, Audible will be forced to "stand up, manage and monitor its age rating system and build out a comprehensive metadata catalog," potentially on a state-by-state basis, for its million-plus audiobooks and other audio content. Strauser Decl. ¶ 24. The administrative burdens "would be enormous," particularly as "new content is continually added" to catalogue offerings. *Id.* ¶ 26.

These burdens are particularly likely to deter small developers of apps that provide access to culture, speech, music, games, health, translation services, and community who, due to the additional compliance costs, will no longer find it cost-effective to publish an app at all. *See* Schruers Decl. ¶ 48; Bye Decl. ¶¶ 18, 46. This deprives app stores of content and revenue, and most importantly, it deprives all users of access to invaluable speech.

The balance of equities and public interest also favor enjoining S.B. 2420 because the First Amendment rights of CCIA and its members will be infringed if a preliminary injunction is not

granted. Schruers Decl. ¶¶ 49-55; Bye Decl. ¶¶ 9-10, 38-50; Strauser Decl. ¶¶ 13-16, 20, 31. *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (the final two factors "merge" when, like here, the government is the opposing party). Because CCIA has shown a substantial likelihood of success on the merits of its First Amendment claims, an injunction is in the public interest. *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted). By contrast, neither Texas nor the public have any interest in enforcing an unconstitutional law. *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) ("[t]here is generally no public interest in the perpetuation of unlawful agency actions.") (citation omitted).

## IV. THE AGE VERIFICATION, PARENTAL VERIFICATION, PARENTAL CONSENT, AND AGE RATING PROVISIONS CANNOT BE SEVERED FROM THE REST OF S.B. 2420.

"[A]fter the determination that the portion of a statute that a litigant has standing to challenge is unconstitutional," the court may conduct a severability analysis under the law of that state to assess whether the unconstitutional provisions are "severable from the statute as a whole[.]" *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 210-11 (5th Cir. 2011).

While S.B. 2420 has a severability provision, an express severability clause "is not conclusive on the question of severability[.]" *Builder Recovery Servs., LLC v. Town of Westlake*, 2023 WL 3878446, at *9 (Tex. App.—Fort Worth June 8, 2023, no pet.). Here, as discussed, the centerpiece of S.B. 2420 is the interlocking verification and consent scheme. *See supra* at 18-23. Because those provisions should be invalidated, the remainder of the statute falls because it is "[in]capable of being executed in accordance with the apparent legislative intent." *Builder Recovery*, 2023 WL 3878446, at *11. Indeed, the core verification and consent mandates are "so connected in meaning" to the purpose and operation of S.B. 2420 that a finding of unconstitutionality would irreparably damage the statute such that "it cannot be presumed the

legislature would have passed [S.B. 2420] without [them]." *Builder Recovery Servs.*, 650 S.W.3d 499, 507 (Tex. 2022). A determination that those provisions are unconstitutional means that the entire statute must fall.

## CONCLUSION

CCIA respectfully requests that this Court enjoin Defendant from enforcing S.B. 2420 against CCIA members until a final judgment on the merits is rendered.

Dated: October 16, 2025      /s/  Catherine L. Robb

Brian Willen*
WILSON SONSINI GOODRICH & ROSATI
1301 6th Ave #40
New York, New York 10019
Telephone: (650) 849-3340
bwillen@wsgr.com

Lauren Gallo White*
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower #3300
San Francisco, California 94105
Telephone: (415) 947-2158
lwhite@wsgr.com

Deno Himonas*
WILSON SONSINI GOODRICH & ROSATI
95 S State St, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8520
dhimonas@wsgr.com

*Attorneys for Plaintiff*

*pro hac vice application forthcoming

Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

HAYNES AND BOONE, LLP
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

## CERTIFICATE OF CONFERENCE

I certify that on October 16, 2025, counsel for CCIA conferred with counsel for Defendant by email about the relief requested in this Motion. Defendant's counsel stated that Defendant is opposed to the Motion.

/s/ *Catherine L. Robb*
Catherine L. Robb

## CERTIFICATE OF SERVICE

I certify that on October 16, 2025, a true and correct copy of the above document was filed electronically with the Court's CM/ECF system and served by electronic mail to:

Kimberly Gdula
Chief of the General Litigation Division
Office of the Texas Attorney General
300 W. 15th Street
Austin, TX 78701
Kimberly.Gdula@oag.texas.gov

*Attorney for Defendant Ken Paxton,*
*in his official capacity as Attorney General of Texas*

/s/ *Catherine L. Robb*
Catherine L. Robb