# EXHIBIT A

S.B. No. 2420

AN ACT

relating to the regulation of platforms for the sale and
distribution of software applications for mobile devices.
      BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:
      SECTION 1.  Subtitle C, Title 5, Business & Commerce Code, is
amended by adding Chapter 121 to read as follows:
                CHAPTER 121.  SOFTWARE APPLICATIONS
                SUBCHAPTER A.  GENERAL PROVISIONS
      Sec. 121.001.  SHORT TITLE.  This chapter may be cited as the
App Store Accountability Act.
      Sec. 121.002. DEFINITIONS. In this chapter:
           (1)  "Age category" means information collected by the
owner of an app store to designate a user based on the age
categories described by Section 121.021(b).
           (2)  "App store" means a publicly available Internet
website, software application, or other electronic service that
distributes software applications from the owner or developer of a
software application to the user of a mobile device.
           (3)  "Minor" means a child who is younger than 18 years
of age who has not had the disabilities of minority removed for
general purposes.
           (4)  "Mobile device" means a portable, wireless
electronic device, including a tablet or smartphone, capable of
transmitting, receiving, processing, and storing information
wirelessly that runs an operating system designed to manage
hardware resources and perform common services for software
applications on handheld electronic devices.
           (5)  "Personal data" means any information, including
sensitive data, that is linked or reasonably linkable to an
identified or identifiable individual. The term includes
pseudonymous data when the data is used by a person who processes or
determines the purpose and means of processing the data in
conjunction with additional information that reasonably links the
data to an identified or identifiable individual. The term does not
include deidentified data or publicly available information.
              SUBCHAPTER B. DUTIES OF APP STORES
      Sec. 121.021.  DUTY TO VERIFY AGE OF USER; AGE CATEGORIES.
(a)  When an individual in this state creates an account with an app
store, the owner of the app store shall use a commercially
reasonable method of verification to verify the individual's age
category under Subsection (b).
      (b)  The owner of an app store shall use the following age
categories for assigning a designation:
           (1)  an individual who is younger than 13 years of age
is considered a "child";
           (2)  an individual who is at least 13 years of age but
younger than 16 years of age is considered a "younger teenager";
           (3)  an individual who is at least 16 years of age but
younger than 18 years of age is considered an "older teenager"; and
           (4)  an individual who is at least 18 years of age is
considered an "adult."
      Sec. 121.022.  PARENTAL CONSENT REQUIRED. (a)  If the owner
of the app store determines under Section 121.021 that an
individual is a minor who belongs to an age category that is not
"adult," the owner shall require that the minor's account be
affiliated with a parent account belonging to the minor's parent or
guardian.
      (b)  For an account to be affiliated with a minor's account

as a parent account, the owner of an app store must use a
commercially reasonable method to verify that the account belongs
to an individual who:
   (1) the owner of the app store has verified belongs to
the age category of "adult" under Section 121.021; and
   (2) has legal authority to make a decision on behalf of
the minor with whose account the individual is seeking affiliation.
  (c) A parent account may be affiliated with multiple minors'
accounts.
  (d) Except as provided by this section, the owner of an app
store must obtain consent from the minor's parent or guardian
through the parent account affiliated with the minor's account
before allowing the minor to:
   (1) download a software application;
   (2) purchase a software application; or
   (3) make a purchase in or using a software
application.
  (e) The owner of an app store must:
   (1) obtain consent for each individual download or
purchase sought by the minor; and
   (2) notify the developer of each applicable software
application if a minor's parent or guardian revokes consent through
a parent account.
  (f) To obtain consent from a minor's parent or guardian
under Subsection (d), the owner of an app store may use any
reasonable means to:
   (1) disclose to the parent or guardian:
    (A) the specific software application or
purchase for which consent is sought;
    (B) the rating under Section 121.052 assigned to
the software application or purchase;
    (C) the specific content or other elements that
led to the rating assigned under Section 121.052;
    (D) the nature of any collection, use, or
distribution of personal data that would occur because of the
software application or purchase; and
    (E) any measures taken by the developer of the
software application or purchase to protect the personal data of
users;
   (2) give the parent or guardian a clear choice to give
or withhold consent for the download or purchase; and
   (3) ensure that the consent is given:
    (A) by the parent or guardian; and
    (B) through the account affiliated with a minor's
account under Subsection (a).
  (g) If a software developer provides the owner of an app
store with notice of a change under Section 121.053, the owner of
the app store shall:
   (1) notify any individual who has given consent under
this section for a minor's use or purchase relating to a previous
version of the changed software application; and
   (2) obtain consent from the individual for the minor's
continued use or purchase of the software application.
  (h) The owner of an app store is not required to obtain
consent from a minor's parent or guardian for:
   (1) the download of a software application that:
    (A) provides a user with direct access to
emergency services, including:
     (i) 9-1-1 emergency services;
     (ii) a crisis hotline; or
     (iii) an emergency assistance service that
is legally available to a minor;
    (B) limits data collection to information:
     (i) collected in compliance with the
Children's Online Privacy Protection Act of 1998 (15 U.S.C. Section

6501 et seq.); and
                        (ii)   necessary for the provision of
emergency services;
                (C)   allows a user to access and use the software
application without requiring the user to create an account with
the software application; and
                (D)   is operated by or in partnership with:
                        (i)   a governmental entity;
                        (ii)   a nonprofit organization; or
                        (iii)   an authorized emergency service
provider; or
        (2)   the purchase or download of a software application
that is operated by or in partnership with a nonprofit organization
that:
                (A)   develops, sponsors, or administers a
standardized test used for purposes of admission to or class
placement in a postsecondary educational institution or a program
within a postsecondary educational institution; and
                (B)   is subject to Subchapter D, Chapter 32,
Education Code.
        Sec. 121.023.   DISPLAY OF AGE RATING FOR SOFTWARE
APPLICATION. (a)   If the owner of an app store that operates in this
state has a mechanism for displaying an age rating or other content
notice, the owner shall:
        (1)   make available to users an explanation of the
mechanism; and
        (2)   display for each software application available
for download and purchase on the app store the age rating and other
content notice.
        (b)   If the owner of an app store that operates in this state
does not have a mechanism for displaying an age rating or other
content notice, the owner shall display for each software
application available for download and purchase on the app store:
        (1)   the rating under Section 121.052 assigned to the
software application; and
        (2)   the specific content or other elements that led to
the rating assigned under Section 121.052.
        (c)   The information displayed under this section must be
clear, accurate, and conspicuous.
        Sec. 121.024.   INFORMATION FOR SOFTWARE APPLICATION
DEVELOPERS. The owner of an app store that operates in this state
shall, using a commercially available method, allow the developer
of a software application to access current information related to:
        (1)   the age category assigned to each user under
Section 121.021(b); and
        (2)   whether consent has been obtained for each minor
user under Section 121.022.
        Sec. 121.025.   PROTECTION OF PERSONAL DATA. The owner of an
app store that operates in this state shall protect the personal
data of users by:
        (1)   limiting the collection and processing of personal
data to the minimum amount necessary for:
                (A)   verifying the age of an individual;
                (B)   obtaining consent under Section 121.022; and
                (C)   maintaining compliance records; and
        (2)   transmitting personal data using
industry-standard encryption protocols that ensure data integrity
and confidentiality.
        Sec. 121.026.   VIOLATION. (a)   The owner of an app store
that operates in this state violates this subchapter if the owner:
        (1)   enforces a contract or a provision of a terms of
service agreement against a minor that the minor entered into or
agreed to without consent under Section 121.022;
        (2)   knowingly misrepresents information disclosed
under Section 121.022(f)(1);

(3)  obtains a blanket consent to authorize multiple downloads or purchases; or

(4)  shares or discloses personal data obtained for purposes of Section 121.021, except as required by Section 121.024 or other law.

(b)  The owner of an app store is not liable for a violation of Section 121.021 or 121.022 if the owner of the app store:

(1)  uses widely adopted industry standards to:

(A)  verify the age of each user as required by Section 121.021; and

(B)  obtain parental consent as required by Section 121.022; and

(2)  applies those standards consistently and in good faith.

Sec. 121.027.  CONSTRUCTION OF SUBCHAPTER. Nothing in this subchapter may be construed to:

(1)  prevent the owner of an app store that operates in this state from taking reasonable measures to block, detect, or prevent the distribution of:

(A)  obscene material, as that term is defined by Section 43.21, Penal Code; or

(B)  other material that may be harmful to minors;

(2)  require the owner of an app store that operates in this state to disclose a user's personal data to the developer of a software application except as provided by this subchapter;

(3)  allow the owner of an app store that operates in this state to use a measure required by this chapter in a manner that is arbitrary, capricious, anticompetitive, or unlawful;

(4)  block or filter spam;

(5)  prevent criminal activity; or

(6)  protect the security of an app store or software application.

SUBCHAPTER C. DUTIES OF SOFTWARE APPLICATION DEVELOPERS

Sec. 121.051.  APPLICABILITY OF SUBCHAPTER. This subchapter applies only to the developer of a software application that the developer makes available to users in this state through an app store.

Sec. 121.052.  DESIGNATION OF AGE RATING. (a)  The developer of a software application shall assign to each software application and to each purchase that can be made through the software application an age rating based on the age categories described by Section 121.021(b).

(b)  The developer of a software application shall provide to each app store through which the developer makes the software application available:

(1)  each rating assigned under Subsection (a); and

(2)  the specific content or other elements that led to each rating provided under Subdivision (1).

Sec. 121.053.  CHANGES TO SOFTWARE APPLICATIONS. (a)  The developer of a software application shall provide notice to each app store through which the developer makes the software application available before making any significant change to the terms of service or privacy policy of the software application.

(b)  For purposes of this section, a change is significant if it:

(1)  changes the type or category of personal data collected, stored, or shared by the developer;

(2)  affects or changes the rating assigned to the software application under Section 121.052 or the content or elements that led to that rating;

(3)  adds new monetization features to the software application, including:

(A)  new opportunities to make a purchase in or using the software application; or

(B)  new advertisements in the software

application; or

(4)    materially changes the functionality or user experience of the software application.

Sec. 121.054.    AGE VERIFICATION.    (a)    The developer of a software application shall create and implement a system to use information received under Section 121.024 to verify:

(1)    for each user of the software application, the age category assigned to that user under Section 121.021(b); and

(2)    for each minor user of the software application, whether consent has been obtained under Section 121.022.

(b)    The developer of a software application shall use information received from the owner of an app store under Section 121.024 to perform the verification required by this section.

Sec. 121.055.    USE OF PERSONAL DATA. (a)    The developer of a software application may use personal data provided to the developer under Section 121.024 only to:

(1)    enforce restrictions and protections on the software application related to age;

(2)    ensure compliance with applicable laws and regulations; and

(3)    implement safety-related features and default settings.

(b)    The developer of a software application shall delete personal data provided by the owner of an app store under Section 121.024 on completion of the verification required by Section 121.054.

(c)    Notwithstanding Subsection (a), nothing in this chapter relieves a social media platform from doing age verification as required by law.

Sec. 121.056.    VIOLATION. (a)    Except as provided by this section, the developer of a software application violates this subchapter if the developer:

(1)    enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.054;

(2)    knowingly misrepresents an age rating or reason for that rating under Section 121.052; or

(3)    shares or discloses the personal data of a user that was acquired under this subchapter.

(b)    The developer of a software application is not liable for a violation of Section 121.052 if the software developer:

(1)    uses widely adopted industry standards to determine the rating and specific content required by this section; and

(2)    applies those standards consistently and in good faith.

(c)    The developer of a software application is not liable for a violation of Section 121.054 if the software developer:

(1)    relied in good faith on age category and consent information received from the owner of an app store; and

(2)    otherwise complied with the requirements of this section.

SUBCHAPTER D.    ENFORCEMENT

Sec. 121.101.    DECEPTIVE TRADE PRACTICE. A violation of this chapter constitutes a deceptive trade practice in addition to the practices described by Subchapter E, Chapter 17, and is actionable under that subchapter.

Sec. 121.102.    CUMULATIVE REMEDIES. The remedies provided by this chapter are not exclusive and are in addition to any other action or remedy provided by law.

SECTION 2.    It is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act to every person, group of persons, or circumstances, is severable from each other.  If any application of any provision in this Act to any

person, group of persons, or circumstances is found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected.

     SECTION 3.  This Act takes effect January 1, 2026.

_____          _____
  President of the Senate                                    Speaker of the House

     I hereby certify that S.B. No. 2420 passed the Senate on April 16, 2025, by the following vote: Yeas 30, Nays 1; and that the Senate concurred in House amendments on May 14, 2025, by the following vote: Yeas 30, Nays 1.

                                            _____
                                            Secretary of the Senate

     I hereby certify that S.B. No. 2420 passed the House, with amendments, on May 9, 2025, by the following vote: Yeas 120, Nays 9, three present not voting.

                                            _____
                                            Chief Clerk of the House

Approved:

_____
          Date

_____
          Governor

# EXHIBIT B

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas,<br><br>*Defendant*. | Civil Action No. <u>1:25-cv-01660</u><br><br>**DECLARATION OF MATTHEW SCHRUERS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Matthew Schruers, declare as follows:

1.      I am the President & CEO of the Computer & Communications Industry Association (CCIA). I have worked at the organization for 20 years. Upon joining CCIA, I focused on legal, legislative, and policy matters, later taking on the roles of Chief Operating Officer and President and CEO. In each of these capacities, I have worked closely and communicated often with CCIA members regarding how public policy proposals affect their businesses, operations, and relationships with their users. Through my experience, I have also gained familiarity with how such proposals affect all manner of websites, applications, and other

digital services.[1]

2.     I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.    About CCIA and CCIA's Affected Members

3.     CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries. For more than fifty years, CCIA has promoted open markets, open systems, and open networks, and advocated for the interests of the world's leading providers of technology products and services before governments and the courts.[2]

4.     CCIA's members include computer and communications companies, equipment manufacturers, software developers, service providers, re-sellers, integrators, and financial service companies.[3]

5.     Several of CCIA's members operate "app stores" and/or function as "developers" of software applications as those terms are used by Texas Senate Bill No. 2420, 89th Leg. (Tex. 2025) ("S.B. 2420") including, at a minimum: (1) Google, which owns and operates the Google Play Store and has developed various mobile apps such as Google Search, YouTube, Gmail, and

---

[1] This Declaration will refer to all digital services—including app stores and mobile applications—as "services" unless necessary to distinguish among different kinds of digital services.

[2] CCIA, Home, https://ccianet.org/ [https://perma.cc/T9EQ-5GC3].

[3] Currently, CCIA's members include: Amazon, Apple, Cloudflare, Coupang, Deliveroo, eBay, EchoStar, Google, Intel, Intuit, Meta, Nord Security, Opera, Pinterest, Shopify, Texas.net, Uber, Viagogo, Waymo, and Zebra.

Google Maps; (2) Amazon, which owns and operates the Amazon Appstore and has developed various mobile apps such as Audible, IMDb, and Goodreads; and (3) Apple, which owns and operates the Apple App Store.

6.      S.B. 2420 defines "app store" to mean a "publicly available Internet website, software application, or other electronic service that distributes software applications from the owner or developer of a software application to the user of a mobile device." *Id.* § 121.002(2).

7.      S.B. 2420 defines a "mobile device" to mean "a portable, wireless electronic device, including a tablet or smartphone, capable of transmitting, receiving, processing, and storing information wirelessly that runs an operating system designed to manage hardware resources and perform common services for software applications on handheld electronic devices." *Id.* § 121.002(4).

8.      Based on my experience in the industry, my review of the declaration submitted by Matthew Bye on behalf of Google, and information publicly available about how the Google Play Store's services operate, it is my understanding that Google owns and operates the Google Play Store, that the Google Play Store meets the criteria to constitute an "app store" under S.B. 2420, § 121.002(2), (4), and that Google is thus "the owner of the app store," *id.* § 121.021(a).

9.      The Google Play Store is "publicly available," Tex. Bus. & Com. Code § 121.002(2), as it is available to any individual in the United States who obtains a Google Account, subject to certain age restrictions.[4]

---

[4] Google Play Terms of Service (July 1, 2024),
https://play.google.com/intl/en-US_us/about/play-terms/ (last visited Oct. 14, 2025) (on file with Google).

10.    The Google Play Store is an "Internet website, software application, or other electronic service," Tex. Bus. & Com. Code § 121.002(2), as it is available in the form of an Internet website, [5] and as an "app [that] comes pre-installed on Android devices that support Google Play."[6]

11.    The Google Play Store "distributes software applications from the owner or developer of a software application[,]" Tex. Bus. & Com. Code § 121.002(2), as Google enters agreements with "Developers," meaning "[a]ny person or company who provides Products for distribution through Google Play in accordance with the terms of [the Google Play Developer Distribution] Agreement."[7]

12.    The Google Play Store "distributes software applications . . . to the user of a mobile device," Tex. Bus. & Com. Code § 121.002(2), (4), as Google Play Store users "may use Google Play to browse, locate, view, stream, or download Content for [their] mobile, computer, tv, watch, or other supported device (**"Device"**)," where "Content" is defined as "apps (including Android Instant Apps), system services, games, movies, books, magazines, or other digital content or services" available through Google Play. [8]

13.    It is my understanding that the Google Play Store has users who are under 18 years of age who are in Texas.

---

[5] Google Play, https://play.google.com/store/games (last visited Oct. 14, 2025) (on file with Google).

[6] Find the Google Play Store App, https://support.google.com/googleplay/answer/190860 (last visited Oct. 14, 2025) (on file with Google).

[7] Google Play Developer Distribute Agreement (effective as of Sept. 15, 2025), https://play.google/developer-distribution-agreement.html (last visited Oct. 14, 2025) (on file with Google).

[8] *See* supra note 4 (emphasis in original).

14.     Google is also the "owner" or "developer of a software application that the developer makes available to users in [Texas] through an app store." Tex. Bus. & Com. Code §§ 121.002(2); 121.051. Among other software applications, Google is the developer of Google Search,[9] Gmail,[10] YouTube,[11] and Google Maps.[12] These are software applications available for download on mobile devices such as phones or tablets through the Google Play Store.

15.     Based on my experience in the industry and on information publicly available about how the Amazon Appstore's services operate, it is my understanding that Amazon owns and operates the Amazon Appstore, that the Amazon Appstore meets the criteria to constitute an "app store" under S.B. 2420 § 121.002(2), (4), and that Amazon is thus "the owner of the app store," *id.* § 121.021(a).

16.     The Amazon Appstore is "publicly available," Tex. Bus. & Com. Code § 121.002(2), as it is available in over 200 countries and territories,[13] and customers from the

---

[9] Google, Google Play Store, https://play.google.com/store/apps/details?id=com.google.android.googlequicksearchbox&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[10] Gmail, Google Play Store, https://play.google.com/store/apps/details?id=com.google.android.gm&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[11] YouTube, Google Play Store, https://play.google.com/store/apps/details?id=com.google.android.youtube&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[12] Google Maps, Google Play Store, https://play.google.com/store/apps/details?id=com.google.android.apps.maps&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[13] About the Amazon Appstore, https://www.amazon.com/gp/help/customer/display.html?nodeId=GP96AU3MQ58FMV8U (last visited Oct. 14, 2025) (on file with Amazon.com).

United States are eligible to shop for apps from the Amazon Appstore on Amazon.com.[14]

17.     The Amazon Appstore is an "Internet website, software application, or other electronic service," Tex. Bus. & Com. Code § 121.002(2), as it is available in the form of an Internet website[15] and as software available on Amazon's Fire Tablet devices.[16]

18.     The Amazon Appstore "distributes software applications from the owner or developer of a software application[,]" Tex. Bus. & Com. Code § 121.002(2), as developers or owners of apps "can distribute [their] apps and games on Amazon Fire devices" and can "submit [their] app, digital software, or video game to Amazon" using the Amazon Developer Console.[17]

19.     Finally, the Amazon Appstore "distributes software applications . . . to the user of a mobile device," Tex. Bus. & Com. Code § 121.002(2), (4), as users can "browse for apps and download them to compatible devices" including Fire Tablet mobile devices.[18]

20.     It is my understanding that the Amazon Appstore has users who are under 18 years of age who are in Texas.

---

[14] Countries & Territories Eligible to Shop for Apps on Amazon.com, https://www.amazon.com/gp/help/customer/display.html?nodeId=GSXRFWKVKXYMK8GS (last visited Oct. 14, 2025) (on file with Amazon.com).

[15] Amazon Appstore Home, https://www.amazon.com/mobile-apps/b/?ie=UTF8&node=2350149011 (last visited Oct. 14, 2025) (on file with Amazon.com).

[16] Install an App on Your Fire Tablet, https://www.amazon.com/gp/help/customer/display.html?nodeId=G89P5HPD7RQFPB2A (last visited Oct. 14, 2025) (on file with Amazon.com).

[17] App Submission FAQ, Amazon Appstore General Questions, https://developer.amazon.com/docs/app-submission/faq-submission.html (last visited Oct. 14, 2025) (on file with Amazon.com).

[18] About the Amazon Appstore, https://www.amazon.com/gp/help/customer/display.html?nodeId=GP96AU3MQ58FMV8U (last visited Oct. 14, 2025) (on file with Amazon.com).

21.     Amazon is the "owner" or "developer of a software application that the developer makes available to users in [Texas] through an app store." Tex. Bus. & Com. Code §§ 121.002(2); 121.051. Those software applications Amazon owns or develops include Kindle,[19] Audible,[20] IMDb,[21] and Goodreads.[22]

22.     Finally, based on my experience in the industry and on information publicly available about how the Apple App Store's services operate, it is my understanding that Apple owns and operates the App Store, that the App Store meets the criteria to constitute an "app store" under S.B. 2420, § 121.002(2), (4), and that Apple is thus "the owner of the app store," *id.* § 121.021(a).

23.     Apple's App Store is "publicly available," Tex. Bus. & Com. Code § 121.002(2), as it is available to users with an internet connection and an Apple Account.[23] The App Store is available to individuals across the United States.[24]

---

[19] Kindle for Android, Amazon.com Appstore, https://www.amazon.com/Amazon-com-Kindle-for-Android/dp/B004DLPXAO (last visited Oct. 14, 2025) (on file with Amazon.com).

[20] Audible, Inc., Amazon.com Appstore, https://www.amazon.com/Audible-Audiobooks-Podcasts-for-Android/dp/B004GJ6BY0 (last visited Oct. 14, 2025) (on file with Amazon.com).

[21] IMDb Mobile, LLC, Amazon.com Appstore, https://www.amazon.com/IMDb-Mobile-LLC-Movies-TV/dp/B004GISARW (last visited Oct. 14, 2025) (on file with Amazon.com).

[22] Goodreads, Amazon.com Appstore, https://www.amazon.com/Goodreads/dp/B005AKD836 (last visited Oct. 14, 2025) (on file with Amazon.com).

[23] Get apps in the App Store on iPhone, https://support.apple.com/guide/iphone/get-apps-iphc90580097/18.0/ios/18.0 (last visited Oct. 14, 2025) (on file with Apple).

[24] Availability of Apple Media Services, https://support.apple.com/en-us/118205 (last visited Oct. 14, 2025) (on file with Apple).

24.     Apple's App Store is an "Internet website, software application, or other electronic service," Tex. Bus. & Com. Code § 121.002(2), as it is available in the form of an app on, for example, iPhones and iPads.[25]

25.     Apple's App Store "distributes software applications from the owner or developer of a software application[,]" Tex. Bus. & Com. Code § 121.002(2), as developers or owners of apps can use the App Store to "easily deliver apps to hundreds of millions of people around the world on their iPhone, iPad, Mac, Apple TV, Apple Watch, and Apple Vision Pro."[26]

26.     Apple's App Store "distributes software applications . . . to the user of a mobile device," Tex. Bus. & Com. Code § 121.002(2), (4), as an App Store user can "[b]rowse through the Today, Games, Apps, or Arcade tabs to find apps [he or she] like[s]" or search for specific content and download and/or purchase apps onto his or her iPhone or iPad.[27]

27.     It is my understanding that the Apple App Store has users who are under 18 years of age who are in Texas.

28.     These three S.B. 2420-covered members who operate app stores enable billions of users around the world to create and share content using their services, whether to facilitate work, study, prayer, socialization, commerce, or communication. These companies also moderate and curate what is displayed on their services as a vital part of their operations. They disseminate

---

[25] *See id.*; *see also* Get apps in the App Store on iPad, https://support.apple.com/guide/ipad/get-apps-ipad9b4cea76/18.0/ipados/18.0 (last visited Oct. 14, 2025) (on file with Apple).

[26] Apple Developer, App Store, https://developer.apple.com/distribute/ (last visited Oct. 14, 2025) (on file with Apple).

[27] Download apps on your iPhone or iPad, https://support.apple.com/en-us/102590 (last visited Oct. 14, 2025) (on file with Apple).

a massive and constantly expanding amount of content in order to provide valuable products and tools for their users.

## II.    Valuable and Protected Speech on CCIA Members' Digital Services

29.    The content on CCIA members' digital services comes from all over the world and is incredibly diverse. The services enable and provide a forum for the height of human thought and creativity: material that runs the gamut from being culturally significant, informative, educational, or politically engaging to funny and entertaining. These services are critical gateways for accessing and disseminating protected speech and expression, and millions of individuals use these services daily to engage in speech.

30.    CCIA members' services offer access to a wide array of highly valuable speech and viewpoints, and adults and minors alike benefit from access to these services. For example, member services host apps that allow users to download ebooks from their local library;[28] access and learn about the collection of the Metropolitan Museum of Art;[29] take online courses through Coursera or Khan Academy;[30] paint pictures using the apps like Sketchbook app;[31] publish or read essays on virtually any topic via apps like their own written material on Substack or

---

[28] E.g., Libby, the Library App, https://play.google.com/store/apps/details?id=com.overdrive.mobile.android.libby&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[29] TheMET, https://play.google.com/store/apps/details?id=com.museumtech.themetaudioguide (last visited Oct. 14, 2025) (on file with Google).

[30] Coursera, https://play.google.com/store/apps/details?id=org.coursera.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google); Khan Academy, https://play.google.com/store/apps/details?id=org.khanacademy.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[31] Sketchbook, https://play.google.com/store/apps/details?id=com.adsk.sketchbook&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

Reddit;[32] track politics on Politico;[33] read the news on the New York Times or Wall Street Journal;[34] download and read or listen to nearly a lifetime's supply of books via apps like Goodreads, Kindle, and Audible;[35] share photos and videos with family and friends through Flickr;[36] play crossword puzzles or other games on apps like Crossword Explorer, SudokuMagic, or Chess.com;[37] access and store recipes on apps like Paprika or NYT Cooking;[38] listen to the world's collection of music on Spotify, Amazon Music, or Tidal;[39] find new indie bands on Bandcamp;[40] and watch movies or television shows or movies on Netflix, Tubi, or YouTube.[41]

31.    Millions of Americans, and billions of people worldwide, use at least one of CCIA members' digital services. Google Play, for example, explains that it enables "more than 2.5 billion monthly users across 190+ markets worldwide to discover millions of high-quality

---

[32] Substack, https://play.google.com/store/apps/details?id=com.substack.app&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[33] Politico, https://play.google.com/store/apps/details?id=com.politico.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[34] NYTimes, https://play.google.com/store/apps/details?id=com.nytimes.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[35] E.g., Goodreads, https://play.google.com/store/apps/details?id=com.goodreads&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[36] Flickr, https://play.google.com/store/apps/details?id=com.flickr.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[37] E.g., Chess.com, https://play.google.com/store/apps/details?id=com.chess&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[38] E.g., Paprika Recipe Manager 3, https://play.google.com/store/apps/details?id=com.hindsightlabs.paprika.android.v3&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[39] E.g., Spotify, https://play.google.com/store/apps/details?id=com.spotify.music&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[40] Bandcamp, https://play.google.com/store/apps/details?id=com.bandcamp.android&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

[41] E.g., Netflix, https://play.google.com/store/apps/details?id=com.netflix.mediaclient&hl=en_US (last visited Oct. 14, 2025) (on file with Google).

apps, games, books, and more." [42] Apple's App Store connects developers "to over 1.5 billion devices in 175 regions."[43]

32.    Accordingly, CCIA's members offer their users the opportunity to (1) maintain connections with friends and family and create new connections, (2) express themselves and their creative works, (3) stay informed about current events and engage in their own political and social speech on the day's issues, (4) learn from others, whether through expressly educational content or through the ability for cross-cultural exchange, and (5) find high-quality and engaging expression.

## III. CCIA Members Offer Parents Many Voluntary Ways to Monitor Their Minor Children's Internet Use.

33.    CCIA holds a firm conviction that children are entitled to a higher level of security and privacy in their online experiences. But not only do parents already have widely available tools to monitor and control their children's online behavior, CCIA's members are already actively engaged in various initiatives to integrate new, robust, and protective design features into their digital services.

34.    For example, CCIA members that operate app stores engage in content rating for all or almost all of their apps. These processes vary across app stores, but typically involve a form of collaborative content analysis and rating to determine and display an app's age appropriateness. For Apple, apps published in the U.S. App Store are rated 4+, 9+, 13+, 16+, and

---

[42] How Google Play Works, https://play.google/howplayworks/ (last visited Oct. 14, 2025) (on file with Google).

[43] Apple, Developing for the App Store, https://www.apple.com/app-store/developing-for-the-app-store/ (last visited Oct. 14, 2025) (on file with Apple).

18+.[44] Amazon uses its own rating system, which is 0-12, 13-15, 16-17, and 18+.[45] Google, in contrast, uses the ESRB rating system—0-9, 10+, 13+, 17+, and 18+.[46]

35.    In addition to rating content for age appropriateness, all of CCIA's app store members engage in content filtering and will ban apps that do not comport with app stores' content policies. Apple, for instance, will reject apps that contain "objectionable content," defined as content that is "offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy."[47] The Google Play Store will "prohibit[] content" that "contain[s] or promote[s] sexual content or profanity," "hate speech," "violence" or "violent extremism."[48] The Play Store also bans content that facilitates bullying or dangerous products, or content that "capitalize[s] on or [is] insensitive towards" certain "sensitive event(s)" such as natural disasters, civil emergencies, deaths, "or other tragic events."[49] The Amazon Appstore will "reject[] or suppress[]" apps which contain content that would not be considered

---

[44] *See* Apple, Apple Expands Tools to Help Parents Protect Kids and Teens Online (June 11, 2025),
https://www.apple.com/newsroom/2025/06/apple-expands-tools-to-help-protect-kids-and-teens-online (last visited Oct. 14, 2025) (on file with Apple).

[45] *See* Moses Roth, Navigating App Submission and Compliance with Confidence (Feb. 25, 2025),
https://developer.amazon.com/apps-and-games/blogs/2025/02/navigating-app-submission-and-compliance (last visited Oct. 14, 2025) (on file with Amazon.com).

[46] *See* Google, Apps & Games Content Ratings on Google Play,
https://support.google.com/googleplay/answer/6209544 (last visited Oct. 14, 2025) (on file with Google).

[47] Apple, App Review Guidelines (rev. June 9, 2025),
https://developer.apple.com/app-store/review/guidelines/#safety (last visited Oct. 14, 2025) (on file with Apple).

[48] Google, Inappropriate Content,
https://support.google.com/googleplay/android-developer/answer/9878810 (last visited Oct. 14, 2025) (on file with Google).

[49] *Id.*

"family-friendly."[50] Examples of "restricted content" include "sexually explicit content," "hateful or harassing content," "inaccurate or misleading medical advice," "illegal, reckless, dangerous, or harmful content," "insensitivity towards a sensitive event," or violence and violent extremism.[51]

36.    All of CCIA's app store members use their content rating systems to flag and impose additional restrictions on apps directed towards younger audiences. Before such an app may be published in the Google Play Store, Google requires that the app comply with its Google Play Families Policies.[52] Under these policies, apps will be suspended or removed unless they contain only "content" that is "appropriate for children" and impose additional data privacy safeguards to minimize the disclosure of children's personal information.[53] Additionally, "social apps" targeted at children "must also provide a method for adults to manage social features for child users, including, but not limited to, enabling/disabling the social feature or selecting different levels of functionality."[54] Similarly, Apple tags child-directed apps and sorts them into a "Kids Category."[55] Those apps also must contain only age-appropriate content, provide additional protections over the use and disclosure of children's data, and implement "parental

---

[50] Amazon, Amazon Appstore Content Policy,
https://developer.amazon.com/docs/policy-center/understanding-content-policy.html (last visited Oct. 14, 2025) (on file with Amazon.com).

[51] Amazon, Restricted Content Policy,
https://developer.amazon.com/docs/policy-center/restricted-content.html (last visited Oct. 14, 2025) (on file with Amazon.com).

[52] Google, Google Play Families Policies,
https://support.google.com/googleplay/android-developer/answer/9893335 (last visited Oct. 14, 2025) (on file with Google).

[53] *Id.*

[54] *Id.*

[55] Apple, Building Apps for Kids,
https://developer.apple.com/kids/#:~:text=The%20Kids%20Category,in%20order%20to%20be%20displayed (last visited Oct. 14, 2025) (on file with Apple).

gates to moderate a child's ability to perform certain actions" "such as buying In-App Purchases without permission, or following link outs . . ."[56] Likewise, Amazon requires all "child-directed apps" to contain "age-appropriate content," "comply with all applicable laws, including the Children's Online Privacy Protection Act," block all advertising, and only collect limited categories of personal data.[57]

37.    On top of these *ex ante* requirements, CCIA's app store members provide additional voluntary tools for parents to control their children's exposure to apps and content. The Google Play Store allows parents to set up controls on their children's accounts.[58] These controls allow parents to, for example, restrict apps and games on an Android device by choosing categories of content allowed for download or purchase; lock their child's screen during certain hours such as bedtime; approve all purchases and new apps that the child wants to download, and more.[59] The Apple App Store similarly allows parents to set age-related restrictions for content; prevent their children from installing or deleting apps or making in-app purchases in apps; restrict app downloads and games; and manage their child's privacy settings.[60] Additionally, Amazon's Appstore Parent Dashboard allows parents to monitor the apps their

---

[56] *Id.*

[57] Amazon, Child-Directed App (COPPA) Policy (last updated Jun. 01, 2020), https://developer.amazon.com/docs/policy-center/privacy-children.html#sdks-in-apps-for-children (last visited Oct. 14, 2025) (on file with Amazon.com).

[58] Google, How to Set Up Parental Controls on Google Play, https://support.google.com/googleplay/answer/1075738 (last visited Oct. 14, 2025) (on file with Google).

[59] *Id.*

[60] Apple, Use Parental Controls on Your Child's iPhone or iPad, https://support.apple.com/en-us/105121 (last visited Oct. 14, 2025) (on file with Apple).

children are interacting with, set daily limits or restrict their children's use at certain times of day, and restrict access to certain content.[61]

38.    In addition to the parental controls at the app store level, several of CCIA's members, acting as developers of software applications, have been leading the effort to implement parental control tools within their applications to individually tailor younger users' online use to the content and services that are suited to their unique lived experience and developmental needs.[62]

## IV.    Provisions of S.B. 2420 Relevant to this Challenge

39.    S.B. 2420 requires an app store owner to use a commercially reasonable method to verify an individual's "age category," as defined by the law, when that individual creates an account with the app store. Tex. Bus. & Com. Code § 121.021. If the app store owner determines the individual is a minor, it must require that the minor's account be affiliated with a parent or guardian's account, verify the identity of the purported parent or guardian, use "reasonable means" to obtain parental consent, and make certain required disclosures before allowing the minor to download or purchase an app or make a purchase in or using an app. *Id.* § 121.022(a),

---

[61] Amazon, Amazon Parent Dashboard, https://www.amazon.com/parentdashboard/intro (last visited Oct. 14, 2025) (on file with Amazon.com).

[62] *E.g.*, Audible, With Kids Profiles, Parents Can Now Easily Share Their Love of Stories, (Sept. 17, 2024), https://www.audible.com/about/newsroom/with-kids-profiles-parents-can-now-easily-share-their -love-of-stories (last visited Oct. 14, 2025) (on file with Amazon.com); YouTube, Important info for parents about YouTube Kids, https://support.google.com/youtubekids/answer/6130561 (last visited Oct. 14, 2025) (on file with Google); YouTube, Set up a teen supervised experience, https://support.google.com/youtube/answer/15252891 (last visited Oct. 14, 2025) (on file with Google); Amazon, What Is Amazon Kids?, https://www.amazon.com/gp/help/customer/display.html?nodeId=202119910 (last visited Oct. 14, 2025) (on file with Amazon.com); Teen safety on Pinterest, https://help.pinterest.com/en/article/teen-safety-options (last visited Oct. 14, 2025) (on file with Pinterest).

(b), (d), (f). The app store owner is also required to notify the app developer if a parent or guardian revokes consent, *id.* § 121.022(e), display an age rating for every app, along with the basis of that rating, *id.* § 121.023(a)–(b), allow app developers to access the information the app store has collected about users' age categories and parental consent statuses, *id.* § 121.024, and comply with certain requirements to protect users' personal data, *id.* § 121.025.

40.    Further, under S.B. 2420 app developers are required to "create and implement a system to use" age verification and consent-related information provided by the app store "to verify" every user's age category and—if the user is a minor—whether consent has been obtained. *Id.* § 121.054. It also requires app developers to notify app store owners before making any "significant change" to their apps' terms of service or privacy policies, at which point app store owners must notify parents and obtain consent for minors' continued use of the app. *Id.* §§ 121.053, 121.022(g). Developers must also implement a system to assign age ratings, based on the four age categories required by Texas under S.B. 2420, to every app and every in-app purchase, and provide each app store with the rating and the content or elements that led to each rating. *Id.* § 121.052.

41.    S.B. 2420 holds app stores and developers liable for "enforc[ing] a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent;" "knowingly misrepresent[ing]" information related to the age rating or the parental disclosures required by the law; "shar[ing] or disclos[ing] personal data" obtained or acquired pursuant to S.B. 2420, except for as required by the law, and, for app store owners, "obtain[ing] a blanket consent to authorize multiple downloads or purchases." *Id.* §§ 121.026(a), 121.056.

42.    Violations of S.B. 2420 are designated "deceptive trade practice," and accordingly enforcement authority has been vested in the consumer protection division of the Texas Attorney General. *Id.* §§ 121.101, 121.102; *see also* Tex. Bus. & Com. Code §§ 17.60–17.63 (granting consumer protection division of the Texas Attorney General power to enforce violations of deceptive acts or practices).

## V.    The Impact of S.B. 2420 on CCIA Members and Their Users

43.    Based on my experiences working with CCIA's members and in the digital services industry generally, S.B. 2420's restrictions will require app stores, in practice, to implement complex and costly age verification, parental consent, and parental verification procedures.

44.    To comply with S.B. 2420's age verification requirements, CCIA's covered members will need to assess the age of existing account holders and implement procedures to determine the age of future account holders when they create app store accounts. Tex. Bus. & Com. Code § 121.021(a). Covered members will then need to sort account holders into specific "age categories" designated by S.B. 2420, *id.* § 121.021(b), preventing some covered members from employing the age categorizations that those members have determined to be most appropriate for purposes of curating content on their digital services.

45.    To do so, members will spend large, unrecoverable sums up front to develop the proper capabilities.[63] Despite the fact that S.B. 2420 calls for the use of "commercially

---

[63] *See* Engine, *More Than Just a Number: How Determining User Age Impacts Startups* (Feb. 2024), https://www.engine.is/news/category/engine-releases-additional-resources-on-startups-and-age-verification (last visited Oct. 14, 2025) (estimating costs of building an in-house age verification functionality at $2 million; further estimating the cost of integrating a third-party age verification service at $50,000 plus $1.50 per instance of verification). Based on these numbers, the cost of

reasonable" methods, *id.* § 121.021(a), there is currently no standard practice for online age verification.[64] Popular options typically involve document review (e.g., presenting government ID) and/or visual inspection (e.g., estimating age based on biometric scans of a user's face).[65] Yet each method "fall[s] on a spectrum of 'dangerous in one way' to 'dangerous in a different way'" because "every solution has serious privacy, accuracy, or security problems."[66] For example, "[h]ighly accurate age assurance methods may depend on collection of new personal data such as facial imagery or government-issued ID," introducing potential privacy concerns.[67] Each method also stands to block out users who, for example, lack identification or the required camera equipment,[68] and chill privacy-minded users who do not wish to subject their faces to biometric examination[69] at a time when some age assurance vendors have failed to handle individuals'

---

age verification could amount to tens or hundreds of millions of dollars for CCIA's large app store members.

[64] Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stanford Tech. L. Rev. 173, 183 (2025) (observing that "there is no 'preferred' or 'ideal' way to do online age authentication").

[65] *Id.* at 183-85.

[66] Letter from Hayley Tsukayama, Assoc. Dir. of Legis. Activism, Elec. Frontier Found. (E.F.F.), to Leticia James, N.Y. Att'y Gen., at 7 (Sept. 30, 2024) regarding Advanced Notice of Proposed Rulemaking pursuant to New York General Business Law section 1500 et seq., [https://perma.cc/7ECN-8Q8M]. *See also* Shoshanna Weissmann, *The Fundamental Problems with Social Media Age Verification Legislation*, R Street (May 16, 2023), https://www.rstreet.org/commentary/the-fundamental-problems-with-social-media-age-verification-legislation/ (last visited Oct. 14, 2025) (discussing the detrimental effects of age verification on privacy, security, and protected First Amendment right).

[67] Digital Trust & Safety Partnership, Age Assurance: Guiding Principles and Best Practices, at 10 (Sept. 2023), https://dtspartnership.org/wp-content/uploads/2023/09/DTSP_Age-Assurance-Best-Practices.pdf (last visited Oct. 14, 2025).

[68] *See PSInet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004) (noting that making the presentation of government ID a prerequisite to accessing online content acts as "a complete block to adults who wish to access adult material [online] but do not" have the necessary documents; *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003).

[69] Sarah Forland, *Exploring Privacy-Preserving Age Verification: A Close Look at Zero-Knowledge Proofs*, New America (July 17, 2025) ("[S]ubjecting people to unwarranted age

private data with sufficient care.[70] And to ensure the process continues to work effectively, members will need to engage in additional ongoing expenditures that maintain those capabilities. These costs cannot be recouped and are extremely burdensome on members.

46.    Similarly, S.B. 2420's parental consent requirement will force CCIA's members to implement mandatory parental-verification procedures and will require CCIA members to set up a process by which a minor's account can be linked to the minor's parent or guardian's account. Tex. Bus. & Com. Code § 121.022(a), (b). There is no accepted, effective, proportionate method of authenticating the parental or guardian status of an individual purporting to give consent for a minor user,[71] making it exceptionally difficult to remotely verify the existence of a relationship between two accounts as Texas requires. This is particularly so in instances where, for example, parents or legal guardians do not have the same last name as the children in question, or where a parent is not located in Texas. Further, S.B. 2420's parental consent requirements fail to provide app stores with guidance for handling non-paradigmatic parent-child relationships such as, for example, where the parents or legal guardians of a child are separated and may disagree about the desired online activity for their child, or where the child is in foster care.[72] These requirements thus create uncertainty for app stores and demand additional significant upfront and ongoing investments to implement.

---

verification can create a chilling effect on online activity, while also imposing greater personal data-sharing requirements on everyone.").

[70] *See* J. Kelley, Electronic Frontier Foundation, *Hack of Age Verification Company Shows Privacy Danger of Social Media Laws* (June 26, 2024), https://www.eff.org/deeplinks/2024/06/hack-age-verification-company-shows-privacy-danger-so cial-media-laws (last visited Oct. 14, 2025).

[71] *See* Goldman, supra note 64.

[72] *Id.*

47.    These costs will be felt by developer members as well as app store members, as S.B. 2420 requires developers to "create and implement a system" to verify, "for each user of the software application," the age category and, "for each minor user of the software application," parental consent obtained by the app store. Tex. Bus. & Com. Code § 121.054. The Act's imposition of new age rating categories—and liability for knowing misrepresentations thereof—requires developers to incur additional costs in reevaluating their content to re-rate the age appropriateness of their apps. The age rating categories prescribed by S.B. 2420 do not align with the age rating categories currently imposed by the Apple App Store and Google Play Store, thus requiring developer members to reevaluate their content according to S.B. 2420's new metrics and designate an S.B. 2420-appropriate age rating anew. This misalignment will also impose additional burdens and costs on those app stores, as the statute diverges from their own judgment about how to most appropriately classify the age-appropriateness of applications, and they will be required to determine how to integrate the new age rating system into their existing age rating and display infrastructures. These costs compound the irreparable burden S.B. 2420 will place on CCIA's members, just for the members to attempt to comply with its restrictions.

48.    Based on my years of experience and advocacy and my interactions with staff of app developers (including CCIA's members), I believe that S.B. 2420 will also impose prohibitive costs on smaller app developers that are not CCIA members. Those apps and developers may be smaller as measured in users, volume of content, number of employees, or annual revenue—or all four. What will be difficult for CCIA members will be ruinous for many more app developers. The requirements imposed by S.B. 2420 on app developers may be cost- and resource-prohibitive for smaller apps. Because all app developers must "create and implement" a system for age category and parental consent verification, and re-categorize the

age appropriateness of their apps to align with Texas's preferred groupings, some developers may be forced to entirely shut down their apps rather than shoulder these additional burdens.

49.     In addition, S.B. 2420 burdens the First Amendment rights of CCIA members who curate, disseminate, and create speech.

50.     By imposing restrictions on who may access covered members' services, including by subjecting all adult mobile app users to age verification procedures, requiring that any minor's account be affiliated with a parent account belonging to the minor's parent or guardian, and requiring parental consent before a minor can download or purchase a software application, S.B. 2420 directly abridges members' ability to curate and disseminate information to their users.

51.     S.B. 2420 also compels covered members to speak, by requiring app developers to determine, and app stores to endorse and disclose, an age rating in order to obtain parental consent for the minor to download or purchase an app, or make in-app purchases. Tex. Bus. & Com. Code §§ 121.022(f); 121.023; 121.052.

52.     Finally, CCIA's members provide vibrant communities for users to engage in vitally important forms of free expression, and S.B. 2420 will burden or eliminate their ability to engage in these various types of speech.

53.     By blocking any minor, *i.e.*, any individual *under the age of 18*, from accessing "app store[s]" unless the minor's account is affiliated with a parent account belonging to the minor's parent or guardian and requiring that minors obtain the consent of a parent or guardian before downloading or purchasing a software application or making a purchase in a software

application, Texas Bus. & Com. Code § 121.022(a), (d), S.B. 2420 restricts minors from accessing applications where they can engage in First Amendment activity.

54.    In addition, S.B. 2420's requirement that covered members verify the age of all users before deciding whether to let them create an account with an app store, *id.* § 121.021(a), would also burden the speech of adults.

55.    In short, if S.B. 2420 is not enjoined and is enforced against CCIA's members, CCIA's mission to promote open markets, open systems, and open networks would be directly, substantially, and irreparably harmed. Likewise, CCIA's covered members, as well as their users (both minor and adult account holders alike), will suffer irreparable harm.

I declare under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on this 14th day of October, 2025, in Washington, DC.

Matthew Schruers

# EXHIBIT C

**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, | |
| *Plaintiff*, | Civil Action No. <u>1:25-cv-01660</u> |
| v. | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | |
| *Defendant*. | |

**DECLARATION OF MATTHEW BYE IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Matthew Bye, declare as follows:

1.     I am the Managing Director of Android Ecosystem Strategy, which includes strategy for the Google Play store.

2.     Google Play meets the definition of an "App Store" regulated under the Texas App Store Accountability Act, S.B. 2420 (2025) (the "Act"). Google Play is "a publicly available Internet website, software application, or other electronic service that distributes software applications from the owner or developer of a software application to the user of a mobile device." Tex. Bus. & Com. Code § 121.001(2).

3.     People in Texas use Google Play.

4.     Google is a member of the Computer & Communications Industry Association.

5.     I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.    Google Play Overview

6.    Google Play is a global digital distribution platform that allows businesses to distribute—and users to find, install, and manage—software applications ("apps") and other digital content. Google Play facilitates access for billions of users worldwide—and millions of users in America—to discover millions of high-quality apps, games, books, movies, and other digital content configured for the Android ecosystem. In the context of apps and games, Google Play does this by connecting app publishers with app users and offering an array of services, tools, and features for both. (App publishers are sometimes referred to here as "developers" in line with how the Act refers to them.)

7.    On the publisher side, Google Play provides numerous tools and services to help build, test, launch, and improve apps. We also help publishers by offering educational materials on best practices for designing safer, more secure, and more privacy-protective user experiences.[1] We conduct pre-publication security checks of all apps before they are made available to users. We provide built-in software to continuously screen for malware that could compromise the security of user devices and the Google Play ecosystem. We provide publishers with tools to run experiments and beta test their apps, upload and launch their apps, retrieve information about app quality, optimize their listings, automate permissions, manage subscriptions, utilize AI-powered features, and respond to customer reviews. In addition, our data analytics tools help developers understand how their apps are being discovered by users and what features and content are most useful.[2]

---

[1] *See, e.g.*, Google Play Academy, Build Privacy-Friendly Apps (Oct. 18, 2021), https://perma.cc/B9K7-4XFH.

[2] *See, e.g.*, Google Play, Developer Reporting API, https://perma.cc/B2DT-8GKJ; Google Play, Statistics, https://perma.cc/HU7R-6KB4.

8.      On the user side, we bring together a vast offering of apps, movies, shows, books, and games so they are easily accessible for users; we organize those offerings so users can easily browse and navigate them; and we help protect users from malware, unsafe privacy and security practices, low quality apps, and abusive content and practices. Users also receive automatic updates—including critical security updates—through Google Play for apps they have already downloaded and apps pre-installed on their Android devices. Google Play thereby enables users to enjoy and focus on content and the app experience rather than needing to navigate technical and security concerns (such as malware risks) that might otherwise be associated with digital content sourced from millions of different developers.

9.      App stores like Google Play offer services that facilitate the creation of and access to significant amounts of speech. Although developers can choose to offer their apps in other ways (such as permitting them to be "side-loaded" from a separate website maintained by the publisher), many developers prefer to focus on creating new services and features rather than maintaining a separate website and running their own security checks. Many developers therefore choose not to offer their apps to the public outside of an app store. In addition, some users prefer to download apps and offerings through Google Play (or another app store) knowing the apps have been subject to standardized policies and controls. Google Play controls are only applicable to offerings accessed through Google Play.

## II.      Google Play Facilitates Access to Vast Amounts of Protected Speech and Information

10.      *Users' expressive activities.* Google Play acts as a gateway where users can view, download, and otherwise engage with expressive, communicative, and informational digital content and services. These include substantial amounts of core speech, including books, movies, TV, games, and millions of expressive, communicative, and informational apps dedicated to

(among other things) education, communication, entertainment, knowledge sharing, informational analysis, gaming, social media, research, and more. Google Play also facilitates a significant amount of valuable commercial speech.

11.     To download apps, books, games, movies and other offerings from Google Play, and to receive automatic updates for previously downloaded apps, users must have a Google Account, be signed into that account, and agree to Google Play's Terms of Service. If a user is known to be under the age of 13, they cannot create their own Google Account; instead, their parents must create a supervised Google Account on their behalf and manage those accounts through Family Link. Children age 13 or older can create their own Google Accounts and choose to have their parents help supervise their Google Accounts. Generally, users are not required to verify their identities or provide a governmental ID to have a Google Account, and many users do not wish to disclose this type of sensitive information to Google.

12.     When minors and their parents visit Google Play, they can browse among high level menu topics consisting of Games, Apps, Movies & TV, Books, and Kids content.

13.     For example, in Google Play's Books section, content is organized by medium (*e.g.*, audio books and ebooks) and topical categories, such as Arts & entertainment, Biographies & memoirs, Business & investing, Fiction & literature, and more. Users can also create wishlists and a personalized library with different "shelves" for different genres. Below is an image a user might see when browsing Books.



14.     The Movies & TV section of the store allows users to browse among movies and television shows to buy or rent. Again, Google Play categorizes this content to help users browse these materials, such as "New," "Top selling," and "Top charts" titles. Below is an image a user might see in this section of the store.



15.     The Apps section of the store similarly includes features to help users browse and search across a vast spectrum of apps. For example, users can sort apps across topical categories,

such as Communication (*e.g.*, VoIP apps, video messengers, and spam blockers), Productivity (*e.g.*, notetaking apps, Microsoft Excel and Copilot), Books & reference (*e.g.*, wildlife tracking apps, diary apps, plant and garden care, library apps, and planners and journals), Business tools (*e.g.*, voice notes, Concur, Slack, scheduling apps, and business card apps), and Art & design (*e.g.*, sketchbooks, photo editors, and drawing tutorials). We also offer curated categories and categories that might be of interest to users, such as "top free," and "top paid" apps. Below is an image reflecting what a user might see in the Google Play desktop user interface when searching apps configured for a phone.



16.    Google Play features countless apps that facilitate communication, learning, and expression across billions of users. To name just a few, WhatsApp Messenger has been

downloaded more than 10 billion times; Instagram has been downloaded more than 5 billion times; Netflix and TikTok have each been downloaded more than 1 billion times; ChatGPT has been downloaded more than 500 million times; and Hulu, Kindle, Audible, and Threads have each been downloaded more than 100 million times. The news apps ABC News, Associated Press, BBC, CBS, CNN, Fox News, Fox Business News, NBC News, NYTimes, and WSJ have collectively been downloaded roughly 100 million times.

17.    *Publishers.* All of these expressive offerings are made possible by a vibrant community of publishers, developers, and content creators (referred to collectively here as publishers). These include publishers of religious material (such as Bible Chat and Al Quran), practical instruction (such as Bilt and CDL Prep & Practice Test Genie), political opinion (such as Allsides and Sandbox), scientific research (such as PubMed and Medscape), educational content (such as Duolingo and Khan Academy), social media (such as X and Snapchat), blogging and writing tools (such as Substack and Medium), book and library apps (such as Libby), magazines (such as The New Yorker and Vogue), video streaming (such as Prime Video), television (such as Fubo and Tubi), short-form video (such as YouTube), music (such as Spotify and Amazon Music), poetry (such as Daily Poetry and Poetizer), photography (such as Lightroom and VSCO), art (such as Etsy and Behance), culture (such as Pinterest and Tumblr), and informational tools (such as calculators, rulers, compasses, and navigation apps).

18.    Although some developers who offer apps in Google Play are large corporate entities, more than half of such developers are individuals, small businesses, non-profits, and new and emerging creators attracted by Google Play's broad suite of developer tools and low burdens to access. Government agencies also offer a number of apps that facilitate access to a wide range

of public informational tools, services, and resources.  The following are just a few of the content-rich apps offered by these developers:

a. **National Park Service App** is the official app for all 420+ national parks. The app provides interactive maps, tours of park places, on-the-ground accessibility information, and more to help users make the most of their visit to national parks.

b. **Music Volume EQ** is an app developed by Dub Studio Productions, a family music business that gives people control over the music on their phone with an equalizer, bass booster, and 3D virtualizer to simulate different acoustic environments.

c. **Forest Stay Focused** is an app that helps people take a break from their smartphones and focus on other activities.

d. **Atom: Meditation for Beginners** is a meditation app that helps users build a meditation practice with guided meditations, breathing exercises, and gratitude techniques.

e. **Ridely** is an online voice and training app for the equestrian community that provides personalized training programs, a library of videos and articles, ride logging functionality, and connection with a broader community of equestrians.

f. **Yorescape** recreates historical cities and civilizations digitally for users to explore the ruins of ancient Egypt, Greece, Italy, Lebanon, and Mexico. The app eventually hopes to cover sites around the world.

g. **SHI: Language Games** is an app developed by anthropologists that uses interactive games and recorded voices to teach native Alaskan dialects.

h. **Voloco** is an app that helps aspiring singers, rappers and content creators to perfect their sound and achieve near-studio quality vocals using just their phone.

i. **Tarjimly** is a free translation app used by doctors, aid workers, and NGOs worldwide in work to support refugee communities and facilitate the provision of emergency services.

j. **Be My Eyes** uses AI to provide detailed visual descriptions of videos and photos to assist the millions of visually impaired people worldwide by giving them back a sense of independence and a connection to the world around them.

k. **Yuka** is an app that scans product labels to reveal their ingredients and health impact.

l. **Peanut** is an app designed for moms to connect, make friends, find support, and build community through all stages of motherhood.

19.    Google Play facilitates the development and distribution of these and millions of other apps that act as platforms for communication, expression, education, knowledge, and creativity. Google Play also connects the developers who create those offerings to a global audience and allows developers to learn from the feedback of that global audience to improve and refine their expressive offerings. By facilitating this expression, and connecting users to informational and expressive tools that have been vetted for security, Google Play serves as a vital conduit of information, knowledge, communication and expression.

20.    This is true for youth, just as it is for adults. Through educational apps, online libraries, news platforms, and social networks, youth can access real-time information about current events, explore academic subjects beyond their school curricula, connect with peers globally, and develop digital literacy skills essential for future success.

### III.    Privacy, Safety, and Security Are the Pillars of Google Play's Service

21.    Google Play provides a point of access to this vibrant ecosystem accompanied by thoughtfully-designed safeguards and digital literacy tools to help families critically evaluate information sources and privacy implications and navigate online spaces safely.

22.    We run more than 10,000 security checks on every app offered in our store.[3] These checks happen before an app is available in the store and before an app is updated. Our built-in malware protection, Google Play Protect, also checks both apps and devices for harmful behavior. It runs a safety check on apps from Google Play before they are downloaded, checks user devices for potentially harmful apps and malware from other sources, warns users of potentially harmful apps, deactivates and removes certain apps, and prevents installation of certain apps from unverified sources. Google Play Protect scans more than 200 billion Android apps per day.[4]

23.    App publishers must declare how they collect and handle user data for the apps they publish on Google Play and provide details about how they protect this data through security practices like encryption. This includes data collected and handled through any third-party libraries or software developer kits used in the apps. Google Play publishes this information in the Data Safety section of each Google Play listing, providing users with transparency into how each app collects, shares and protects their data before they install the app. And by reviewing these data safety reports, which are prepared and presented in a way that makes the information useful and intuitive, users can make more informed decisions about the apps they choose to download and use.[5]

24.    Google Play users have control over what data Google Play uses to generate their search results and recommendations within the store. For example, users can tell Google Play not

---

[3] Suzanne Frey, *6 Ways Google Play Helps Keep You Safe*, Google Keyword (May 6, 2025), https://perma.cc/6WVM-T45A.

[4] Google Play Help, Use Google Play Protect to Help Keep Your Apps Safe & Your Data Private, https://perma.cc/6B8V-ZXK3.

[5] Google Play Console Help, Understanding Google Play's App Account Deletion Requirements, https://perma.cc/H9UK-C8CF.

to use data associated with a particular app for personalization within the store.[6] Our data deletion policy also empowers users with greater clarity and control over their data.

25.     For in-app purchases made through Google Play Billing, Play's secure billing system, Google Play ensures users can securely purchase digital content and subscriptions. Personally identifiable information like credit card details stays between the user and Google. It is securely stored and is not shared with app publishers.

26.     For an extra level of security, users can also require purchase verification for purchases made through Google Play Billing, which ensures that each purchase made on Google Play through a user's account is first authenticated with a password or biometrics.

27.     Google Play also utilizes a number of controls to combat potentially harmful content that does not belong in the Google Play community. We remove apps that, for example, are found to promote violence, endanger children, or allow users to impersonate others. We likewise prohibit apps that are deceptive, malicious, or intended to abuse personal data. We also work to reduce low-quality apps, such as those that do not load properly or provide little value to users, thereby undermining trust in Google Play offerings. As new market risks and technology evolve, we continue to invest in machine-learning detection, enhanced app review processes, and our Google Play Developer Program Policies to stop apps with abusive or malicious content before anyone can install them.[7]

28.     For apps in select Google Play categories, we also offer badges that appear on the app description page and signal an extra layer of validation and to help users find safer and more

---

[6] Suzanne Frey, *6 Ways Google Play Helps Keep You Safe*, Google Keyword (May 6, 2025), https://perma.cc/6WVM-T45A.

[7] Google Safety Center, How We Help Keep Google Play Safe for Users and Developers, https://perma.cc/ZZ8Z-P7H2.

high-quality experiences. For instance, our "Government" badge assists users in identifying official government apps—such as the Internal Revenue Service's IRS2GO app and the U.S. Department of Veterans Affairs' Health and Benefits app.

29.    Google Play has specific policies to protect, and programs to support, our youngest users. The Google Play Families Policies apply to apps for which the target audience is children under the age of consent and require those apps to meet heightened requirements, including app content that is accessible to, and appropriate for, such children. Apps in the Google Play Families program also are eligible for inclusion in the Teacher Approved Program, through which teachers and education specialists recommend high-quality apps for kids on Google Play. Teachers and education specialists rate the apps using a globally-relevant framework that considers things like design, enrichment, and appropriateness. Apps that rate highly enough to make it into the Teacher Approved program are gathered on the Kids tab on Play, making it easy for parents and families to find high-quality kids content. And as discussed further below, for supervised minor accounts, Family Link permits parents to restrict access to specific apps.

## IV.    Google Play Offers Parental Controls and Family Friendly Features

30.    Google Play is committed to empowering parents and families to make individual choices with technology and helping them create healthy, positive digital habits. This includes supporting age-appropriate experiences with the apps, games, books, and other content offered in the Google Play store. To this end, Google already offers parents most of the controls the Act would make mandatory and takes additional measures to help ensure an age-appropriate experience with respect to Google Play apps.

31.    Parents of children under the age of 13 are required to use Family Link to create and monitor a Google Account of any child under the applicable age of consent in their region, 13 in Texas. Family Link is a parental control infrastructure that allows parents to manage and

supervise their children's Google Account and use of managed devices. For supervised children, Family Link requires parents to approve app downloads and purchases made through Google Play and sets default content filters that prevent access to content rated above the default rating. Family Link also provides tools for parents to, among other things, understand how children are spending time on managed devices, set app-specific screen time limits, block apps or websites, and manage privacy settings and permissions.[8] Family Link's controls apply across Google Play's suite of offerings, including apps, games, movies, TV, and books.[9]

32.     Families can also choose to use Family Link to supervise the Google Accounts and devices of teens who are above, as relevant in Texas, 13 years old. Google Play also enables users of all ages to set default content filters on their device.

33.     To help parents in making informed choices about whether or not their child should download specific apps and games, Google Play requires each app and game developer to obtain an age rating for the content of their offerings and indicate whether children are the target audience and if so, which age groups. Content ratings on Google Play are provided by the International Age Rating Coalition (IARC) and are designed to help publishers communicate locally relevant content ratings to users. Regional IARC authorities maintain guidelines used to determine the maturity level of the content in an app and any ads that appear. Ratings are based on a number of factors, including sexual content, violence, drugs, gambling, and profane language. We do not allow apps

---

[8] Google For Families Help, Purchase Approvals on Google Play, https://perma.cc/3QE3-TKV6; Google Guidebooks, Manage Your Child's Google Play Apps, https://perma.cc/T73Q-LKYT; Madhur Chadha, *A New Way for Families to Make Purchases on Google Play*, Google Keyword (Dec. 20, 2022), https://perma.cc/CF73-7C8J; Google for Families Help, Use a Family Payment Method on Google Play, https://perma.cc/W28C-ED3S.

[9] Google For Families Help, How to Set Up Parental Controls on Google Play, https://perma.cc/K34B-M78S.

without a content rating on Google Play.[10] If children are the target audience for an app, the Google Play Families Policies apply and impose additional restrictions on the app or game.[11]

34.　　Google Play also enables publishers to indicate that their app is not intended for users under the age of 18 and that they do not want their app to be available for such users. We recently began implementing age assurance technology designed to recognize users in the United States who are under 18 so we can provide automatic safeguards and enhanced protections. Among other protections, Google blocks users identified in our systems as under the age of 18 from downloading apps restricted to adults. This is done without sharing data with developers.[12]

35.　　Google Play further requires developers to provide their Terms of Service and Privacy Policy, which are available to supervising parents in the Family Link app approval flow, so that they can review critical documentation about the app, including any age restrictions, data privacy practices or other elements that may be important to their decision.

36.　　As noted above, Google Play also offers features to help parents find family-friendly content. In the Kids section of the store, parents can find teacher-approved apps and games rated for different age categories (such as 0-5, 6-8, and 9-12). Parents and minors can also identify this content through the "Teacher approved" badge, which signifies apps that have been reviewed and rated highly by teachers across various dimensions, such as language, vocabulary, user interface, appropriateness of visuals and content, and features that spur creativity and learning.[13]

---

[10] Google Play Console Help, Content Ratings, https://perma.cc/5TSX-KCKB.

[11] Google Play Console Help, Google Play Families Policies, https://perma.cc/89ZY-H42F.

[12] Mindy Brooks, *Ensuring a Safer Online Experience for U.S. Kids and Teens*, Google Keyword (Jul. 30, 2025), https://perma.cc/5CV6-QQ4R.

[13] Google Play, Build Teacher Approved Apps, https://perma.cc/3C5W-G5WR.

We also explain why the app received the badge, for example, whether it is good for learning, is thoughtfully designed for children, spurs creativity and imagination, and so forth.

37.    To help parents navigate the parental features and controls available for Google Play, we provide a parental guide, accessible through our Google Help pages. The Guide allows parents to explore a range of topics and obtain step-by-step instructions about, for example, how to supervise child accounts, restrictions on advertising, controls to restrict mature content, setting screen limits, and using password protection to prevent accidental purchases.

## V.    Compliance Challenges

38.    I understand the Act provides that, starting January 1, 2026, app stores must "verify" the "age category" of users who create new accounts with Google Play; link each new account of a minor to an account belonging to a verified parent or guardian; obtain parental approval for each app download and purchase made by such a minor; send age signals to each app publisher; and display age ratings and explanations for each offering listed in the store. Although Google already offers parents many of these features, the Act's mandatory nature imposes significant burdens for both Google Play and users. In particular, the mandatory age verification, parental tethering, and parental-approval requirements, combined with the requirement to send age signals to millions of app publishers without user or parental consent, create substantial compliance challenges, intrude on users' privacy, and block both minors and adults from accessing speech in or facilitated by the Google Play store.

39.    *Age verification (§ 121.021).* The Act requires Google Play to "use a commercially reasonable method of verification to identify" the age category of a user when they first create an account with Google Play. The age categories include: child (under 13), younger teenager (13-15), older teenager (16-17), and adult (18 and over). The Act does not specify what amounts to a "commercially reasonable method." Currently, there is no technically feasible and reliable way to

verify the ages or age categories of online users at account creation without processing personally identifiable information (PII) (such as government issued identification or biometric data) that many users do not want to share. All age-verification methods result in excluding some members of the population, such as those who do not have government IDs or whose facial geometry does not reliably indicate their age. As we have said, age verification "require[s] more data collection and use" from users, which can impede users' "access to important information and services." Google, Legislative Framework to Protect Children and Teens Online at 2, https://perma.cc/8U7Z-HSSV ("Google, Legislative Framework"). In other words, verifying users' age categories will require us to collect more privacy-intrusive data from our users and impede users' ability to use Google Play anonymously.

40.    Similarly, the Act's requirements for parental tethering and consent apply to users who qualify as a "minor," a defined term that means a child younger than 18 years of age "who has not had the disabilities of minority removed for general purposes." Determining whether a minor is emancipated would require the minor to provide sensitive legal documents to Google and Google to review such documentation. If this process fails at any step, the minor would have no parent or guardian to approve app downloads and could be cut off from downloading apps altogether.

41.    *Parental tethering (§ 121.022).* For new users who have been identified as a minor, the Act requires Google Play to use a "commercially reasonable" method to affiliate the minor's account with the account of a verified adult parent or guardian. But the Act does not specify what would constitute a commercially reasonable method to conduct such affiliation. Given the delicate, legally-defined, and sometimes changing nature of family relationships and guardianship, Google Play does not have the ability to verify the parent-child relationship between users without

requesting sensitive legal documents from users such as birth certificates, adoption papers, family court orders, and custody agreements. Further, developing systems to verify custodial arrangements as reflected through these documents would require a large upfront and ongoing investment of resources to, among other things, evaluate identity, verify documentation, make updates to reflect changing custodial relationships, and address inter-family disputes. Navigating these issues is outside the appropriate scope of a digital distribution platform such as Google Play, particularly given the significant potential risks to users' privacy.

42.     *Parental consent for downloads, "significant changes," and purchases (§§ 121.022, 121.023).* Once users have verified their ages and affiliated their accounts with a parental account, the Act requires Google Play to obtain parental approval for every single app downloaded from the store. Google Play must do the same for every purchase made through every app downloaded that utilizes Google Play Billing, including books, articles, videos, online tutorials, educational content, and more. Further, the Act requires Google Play to obtain parental approval for minors' use of an app *anew* (despite already obtaining consent at initial download) each time a developer alerts Google Play that it has made a so-called "significant change" to the app's terms of service or privacy policy. The Act defines a "change" as "significant" if it among other things, (i) changes the type of personal data collected, stored or shared (even more protective changes), (ii) affects or changes the app's age rating or "contents or elements that led to that rating," (iii) adds new monetization features or advertisements, or (iv) materially changes the "functionality" or "user experience" of the app.

43.     Although Google Play already offers parental-approval capability for supervised accounts, these obligations will exponentially expand the number of users covered by the

requirement and the number of approvals that must be obtained (including for apps that parents have already approved where the developer notifies Google Play of a "significant change").

44.    Compliance with the notification provisions will negatively affect users' experiences, both parents and minors. Implementing such systems would significantly restrict, if not block entirely, access to information and services online. As we have said, legislatively mandating parental approval "could unnecessarily preclude some teens from accessing the basic benefits of the online world and have unintended effects on vulnerable youth." Google, Legislative Framework at 2. Among other reasons, this is because some teens may have parents who are incapacitated, abusive, not proficient in English, not technologically savvy, or simply not available to respond to numerous requests per day (leading either to a complete cut off or delay in access).

45.    *Sharing age signals with publishers (§ 121.024).* Finally, Google Play must send signals of the age category of each minor user to the publisher of each app downloaded. Google Play must do so regardless of the developers' ability to use or need for such information and without consideration of whether the user or parent has affirmatively consented to such sharing. Such mandatory sharing of personal data across millions of apps and developers—each with varying levels of digital security and sophistication—further undermines anonymous speech and imperils the data security of all Google Play users, increasing risks of breaches and misuse.

46.    At a time when governments, citizens, and private entities share a goal in minimizing data collection and data sharing, the Act would vastly expand not only the collection of sensitive data but the universe of entities with whom it is shared. The Act requires Google Play to share this data with app publishers even if their apps do not have any content that could be considered inappropriate for children. Moreover, many app publishers are small businesses and sole proprietors who might not have the means to meet the Act's data security and encryption

standards and do not want the responsibility of storing this sensitive information. This forced sharing of sensitive data puts developers in the difficult position of managing sensitive data without clear rules and safeguards. That burden could shut some publishers out of the Google Play store altogether, regardless of whether their apps should be age-restricted.

## VI.    The Act Impedes Access to Google Play Offerings

47.    The age-verification process could discourage users from accessing the apps and offerings in Google Play. That is particularly true for users who may seek out information on sensitive or controversial topics. Other users may simply be unable to verify their age because they lack an acceptable form of ID or other reliable proof of age. These users—both adults and minors—could be shut out of the app store ecosystem altogether. Similarly, some minor users may be able to prove their ages but encounter difficulties proving their relationship with a parent, perhaps one who has a different last name. Other parents may simply not want to bother with the hassle of linking their accounts to a child's account—or they might not want a Google Play account themselves. These minors too could be effectively shut out of the app store ecosystem until they turn 18.

48.    The Act's mandatory parental-consent requirements for minors to download app store offerings, make app store purchases, and continue to use those offerings after any "significant change" imposes yet a further obstacle to accessing protected speech. Parents cannot opt out of these requirements or provide blanket authorization, so they will have to manage parental-consent requirements every time their minor child chooses to download an app, book, or game. Parents may elect to forgo the complicated process or be unable to provide immediate consent—such as because they are sleeping, working, traveling, or without their phone. The minor children of these parents will need to either wait for consent (perhaps hours or days), search out the same content from decentralized and less secure sources, or forego accessing the speech altogether. These rigid

requirements—applying across all app content, from educational to social—undermine family autonomy and ignore varying maturity levels, especially in older teens. So this restriction "could unnecessarily preclude some teens from accessing the basic benefits of the online world and have unintended effects on vulnerable youth." Google, Legislative Framework at 2.

49.     On the publisher side, the "significant" change requirements could deter app developers from appropriately updating their privacy policies or terms of service, making safety and functionality updates, design modifications, interface improvements, and new content offerings because each of these changes could require burdensome new disclosures and millions of minor users to again obtain parental consent. This could result in users missing critical security or safety updates that are typically bundled with additional updates, thereby negatively impacting the overall Google Play experience for both users and developers.

50.     Overall, the speech burdens imposed by the Act are vast. Many users will simply be less likely to use app stores at all, undermining app stores' role as a vibrant forum for speech and the safety, security and privacy benefits they create for users, publishers, and the entire ecosystem. Likewise, some publishers will choose not to list their apps in the app store at all in light of the new compliance obligations that will apply to them and burden access for their users.

51.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed on October 15, 2025, in San Francisco, CA.


Matthew Bye