UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, <br><br> Plaintiff, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> Defendant. | § § § § § § § § § § § § | Civil Action No. 1:25-cv-1660-RP |

**AMICUS BRIEF OF ACT | THE APP ASSOCIATION
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE ROBERT PITMAN:

Amicus Curiae ACT | The App Association ("ACT") files this brief in support of Plaintiff Computer & Communications Industry Association's Motion for Preliminary Injunction and would respectfully show:

**I.      Interest of the Amicus Curiae and Summary of Argument.**[1]

Plaintiff Computer & Communications Industry Association ("CCIA") is a non-profit trade association whose members operate mobile software application ("app") stores, including Google, Amazon, and Apple, that are targeted by S.B. 2420, the Texas law at issue in this case.[2] In contrast, Amicus ACT, founded in 1998, is a non-profit advocacy and education organization representing app developers, particularly the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems. The

---

[1] No party, party's counsel, or third party other than ACT and its counsel wrote or paid for this brief, in whole or in part.

[2] *See* S.B. 2420, 89th Leg., R.S. (Tex. 2025), the App Store Accountability Act, Tex. Bus. & Com. Code § 121.001 *et seq.*

software application economy ACT represents is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[3]

ACT members are dedicated to improving the safety and security of products and services in the digital economy. Protecting children from harmful material on the internet is an important government interest, but as ACT has consistently explained—including before Congress[4]—regulations like S.B. 2420 that put the onus for children's safety on app stores, app developers, and businesses with apps that are not directed to children and that do not present age-related risks do not effectively protect vulnerable internet users; they simply shift compliance costs and potential liability to the companies least able to bear the burden.

This burden shift compels ACT to support Plaintiff's motion for preliminary injunction. The heavy burdens S.B. 2420 would impose on ACT's members, particularly small app developers and the small businesses they serve, should be held at bay while the important First Amendment arguments raised by Plaintiff are resolved on the merits.

ACT writes: (1) to explain how Subchapter C of S.B. 2420, entitled "Duties of Software Application Developers,"[5] imposes direct and onerous obligations on *all* Texas companies, schools, non-profits, and individuals that have a mobile app available in Texas, as well as all developers distributing apps in Texas, imposing costly and in some cases impossible compliance burdens; (2) to underscore the significant new liability S.B. 2420 would create for app developers

---

[3] State of the App Economy, ACT | The ACT (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

[4] Testimony of Morgan Reed, President ACT | The App Association, Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Commerce, Manufacturing, and Trade (2025), ("ACT Congressional Testimony"), *available at* https://actonline.org/wp-content/uploads/2025-03-24-ACT-SFR-EC-Online-Harms-FINAL.pdf.

[5] Tex. Bus. & Com. Code §§ 121.051-054.

and businesses with apps due to its interaction with the federal Children's Online Privacy Protection Act (COPPA); and (3) to provide voice to the many small app developers who rely on online marketplaces and have little capacity to absorb the new costs and uncertainty created by S.B. 2420.

## II.   Argument.

### A.   S.B. 2420 imposes substantial burdens on app stores and app developers.

Subchapter B of S.B. 2420[6] requires app store owners to verify the age of all Texans who create an account with the store and to designate every such account holder as a "child" (under 13), a "younger teenager" (between 13 and 15), an "older teenager" (between 16 and 18), or an "adult" (over 18).[7] The app store must "affiliate" every minor's account with a parent or legal guardian's account.[8] With few exceptions, the app store must obtain consent from the parental account each time the minor tries to download or buy an app, and each time the minor tries to make an in-app purchase.[9] If a parent "revokes consent through a parent account," the app store must "notify the developer of each applicable software application."[10] The app store must display either its own existing "age rating or other content notice" for every software app available for download or purchase, or create one that satisfies the statute.[11]

Subchapter C of S.B. 2420 imposes a set of duties on ACT's members — software developers and businesses who make their apps available for download or purchase on an app store

---

[6] Tex. Bus. & Com. Code § 121.051.

[7] Tex. Bus. & Com. Code § 121.021.

[8] Tex. Bus. & Com. Code § 121.022.

[9] Tex. Bus. & Com. Code § 121.022(d).

[10] Tex. Bus. & Com. Code § 121.022(e)(2).

[11] Tex. Bus. & Com. Code § 121.023.

in Texas.[12] Importantly, brick-and-mortar stores—in Texas and around the world—with apps on the app stores often outsource the development of those apps to third parties like ACT members. The app itself, along with the logo, belongs to the stores while the developer is responsible for their contractual obligations, including writing the code and creating the technical capabilities of the app. S.B. 2420 does not define "developer of a software application," so it is unclear whether the obligations apply to the publisher of the app—say, Mama's Pizza—or the third-party developer hired to create the app on Mama's Pizza's behalf. Given the lack of clarity here, caution dictates that Mama's Pizza ought to treat the obligations as applying to Mama's Pizza. Lacking their own software expertise, a significant percentage of app publishers—from retailers to restaurants—would have to hire or re-hire developers in order to comply with obligations like those in S.B. 2420. Thus, when this brief describes S.B. 2420's obligations on developers, we emphasize that the compliance burden likely falls on any firm, individual, non-profit, or even a school, with an app on the stores.

The obligations on developers and entities with apps on the stores are significant and problematic. First, app developers must assign an age rating based on the statute's categories, provide that rating to the app stores, and explain "the specific content or other elements that led to each" such rating.[13] Second, app developers must provide notice to the app store before making "any significant change" to the app's terms of service, privacy policy, or functionality.[14] Third, the app developers must create and implement their own age verification and parental consent systems to confirm that every download or purchase by a minor has been approved by the affiliated

---

[12] Tex. Bus. & Com. Code § 121.051.

[13] Tex. Bus. & Com. Code § 121.052.

[14] Tex. Bus. & Com. Code § 121.053.

parent account.[15]  App developers may use personal data to verify age and parental consent, but must delete that data after completing the required verification.[16]  Any violation of S.B. 2420 constitutes an actionable deceptive trade practice "in addition to any other action or remedy provided by law."[17] By making any violation of S.B. 2420 an actionable deceptive trade practice, S.B. 2420 provides a private right of action for a violation of its provisions,[18] introducing a risk that plaintiffs' attorneys will create sue-and-settle enforcement programs targeting small businesses subject to S.B. 2420. In scenarios like this, creative efforts to establish liability can worsen already-onerous compliance burdens that are a hallmark of ill-defined obligations like the ones in S.B. 2420.

These obligations—exacerbated by private enforcement—are significant, unclear, and encourage walling off general audience content completely from minors to avoid the law's opaque compliance mandates.

> **B.**    **S.B. 2420's interaction with federal COPPA creates unintended consequences and potential liability.**

Intentionally or not, S.B. 2420 puts app developers between a new rock and an existing hard place:  the federal Children's Online Privacy Protection Act of 1998 (COPPA)[19] and its regulations.  If implemented, besides immediately placing *all* Texas entities that have published apps on the app stores, of whatever size and regardless of audience, under a strict, costly compliance regime, S.B. 2420 would also put many of those businesses immediately and

---

[15] Tex. Bus. & Com. Code § 121.054.

[16] Tex. Bus. & Com. Code § 121.055.

[17] Tex. Bus. & Com. Code § 121.101.

[18] Tex. Bus. & Com. Code § 17.50.

[19] Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501-6505.

unknowingly out of compliance with COPPA, unless they decline to create an age verification system, which would put them out of compliance with S.B. 2420.

Enacted in 1998, COPPA imposes strict data-collection limitations on commercial websites and online services (including mobile apps) that are (1) directed to children under 13 or (2) directed to general audiences, but where the company has actual knowledge it is collecting, using, or disclosing personal information of children under 13.[20] Once covered by COPPA, operators must comply with a number of requirements, including providing a mechanism for verifiable parental consent ("VPC") for collecting and processing their child's data; creating a way for parents to access or delete their child's data and revoke VPC; restricting data sharing to third parties; and complying with data retention and security requirements.

COPPA does not apply to general audience apps that are not directed to children under 13 when they do not have actual knowledge of users under 13.[21] General audience apps therefore typically are not built with COPPA-compliant systems. S.B. 2420, however, would disrupt this status quo by requiring app stores to obtain parental consent for *any* minor downloading virtually *any* app and to notify the app developer when approval for a download is obtained. If the user is under 13, this S.B. 2420 notification could be construed as "actual knowledge" under COPPA that a minor is using an app. If the minor initiates the download, the app would necessarily begin collecting data on the minor, such as IP address and device ID, which is considered personally identifiable information under COPPA. If the app did not have COPPA compliance procedures already in place, including their own means of securing VPC, it could immediately be in violation

---

[20] Federal Trade Commission, Complying with COPPA: Frequently Asked Questions, www.ftc.gov, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

[21] *Id.*

of federal law. Notably, the consent flag in S.B. 2420 does not meet COPPA's VPC requirement, because it only signals parental consent to download an app, *not* consent to collect personal information about a child under 13.

If S.B. 2420 is implemented, because it does not grandfather in existing apps or exempt general audience apps, *all* Texas businesses with a mobile app will have to choose between two options:

1) Completely shut off children's access to their services by refusing to permit the download of their app, even with express parental consent, to avoid triggering COPPA; or

2) Expend considerable resources to modify (if possible) their app to meet COPPA's onerous compliance regime – even though, in the absence of S.B. 2420, COPPA would not apply.

COPPA compliance estimates range from $60,000 to $290,000.[22] In addition to the VPC compliance costs, the Act's interaction with COPPA would require the app developer to maintain a paper trail on parents' consent to simply download the app. Under S.B. 2420, the app store's initial parental consent notification only covers the initial download. But COPPA does not govern "downloads," it governs information collection—two separate, albeit related, actions. Parents often revoke consent, but under S.B. 2420, this revocation must be effectuated between the parent and the developer, because app stores cannot delete software from an individual's device. Under current law, parents revoke permission by simply deleting the app and declining permission for future downloads. But S.B. 2420 would turn the app developer into record-keeper for the entire

---

[22] American Action Forum, COPPA 2.0: The Costs of Layering on Liability, (May 18, 2023), *available at* https://www.americanactionforum.org/insight/coppa-2-0-the-costs-of-layering-on-liability/.

age verification-predicated parental consent mechanism, even though deleting the app is a far easier method, and even though S.B. 2420 and COPPA are designed to *limit* the gathering and storage of information on minors.

For example, a parent may want their 12-year-old to be able to download the delivery app Mama's Pizza, a restaurant chain with 17 locations in the Dallas and Houston areas, so they could order a pizza on their own.[23] The Mama's Pizza app must collect location data so the restaurant knows where to deliver a pizza. Today, that app is a general audience service not covered by COPPA. But because S.B. 2420 applies to *any* app a minor tries to download, whether directed at children under 13 or not, Mama's Pizza would be notified by the app store that a minor under 13 has (with parental permission) downloaded its app. This would give Mamma's Pizza "actual knowledge" that a minor was using its app, thus triggering COPPA's requirements. Although the parent may believe that their consent applies to both the download and use of the application, this is not the case. The S.B. 2420 consent would be only for the download. To comply with COPPA, Mama's Pizza would have to have its own system in place to get VPC before its app could be used, because COPPA requires VPC to collect personal information, while consent under S.B. 2420 covers only the download, not personal information collection. S.B. 2420 would, therefore, require *three* separate parental consents just to order a pizza: consent to download the app; consent to make a purchase using the app; and consent to collect the personal information necessary for the app to function. This redundant requirement would be frustrating and confusing for parents.

Further complicating matters, COPPA requires that businesses honor parents' requests to revoke consent, necessitating the retention of personal information about the child both identifying

---

[23] Mama's Pizza (TX), Apple.com, https://apps.apple.com/us/app/mamas-pizza-tx/id1113648322.

Amicus Curiae Brief of ACT | The App Association – Page 8

them as a child and associating them with their parent.[24] Therefore, in addition to the initial consent process, general audience apps that currently do not have to comply with COPPA would have to add systems for tracking known users under 13, in order to effectuate parents' revocation of consent. Paradoxically, because Mama's Pizza must comply with COPPA after receiving a flag under the requirements of S.B. 2420, the restaurant would have to keep track of any minors who have used their app. In this scenario, the only reason Mama's Pizza knows its user is a child is the age category flag required under S.B. 2420 – which S.B. 2420 further requires be deleted after Mama's Pizza has verified the child's age.[25] The deletion requirement appears to conflict directly with COPPA's requirement that the information identifying the person as a child and associating the person with a parent for purposes of honoring requests to revoke consent. This is not a trivial issue and developing a path to compliance with both requirements simultaneously likely would take significant resources if it is possible. Relevantly, hoping that the FTC will take a circumspect COPPA approach, even in investigating efforts to comply with a state kids' safety law, is likely wishful thinking. The FTC has been aggressive lately in its enforcement of COPPA and explicitly prioritizes kids' privacy, entering settlements targeting tangential COPPA violations.[26]

---

[24] Federal Trade Commission, Children's Online Privacy Protection Rule: A Six-Step Compliance Plan for Your Business, www.ftc.gov, https://www.ftc.gov/business-guidance/resources/childrens-online-privacy-protection-rule-six-step-compliance-plan-your-business ("If a parent asks, you must . . . give them a way to revoke their consent and refuse the further use or collection of personal information from their child").

[25] Tex. Bus. & Com. Code § 121.055(b).

[26] Cobun Zweifel-Keegan, "A view from DC: The FTC is serious about kids' privacy," Int'l Assoc. of Privacy Professionals, (Sept. 5, 2025), *available at* https://iapp.org/news/a/a-view-from-dc-the-ftc-is-serious-about-kids-privacy; Fed. Trade Comm'n, "Protecting children watching YouTube videos: Lessons learned from FTC's settlement with Disney," (Sept. 2, 2025), *available at* https://www.ftc.gov/business-guidance/blog/2025/09/protecting-children-watching-youtube-videos-lessons-learned-ftcs-settlement-disney.

Therefore, virtually all Texas entities that publish apps on the stores—from barber shops to pizza parlors and local gyms—would likely have to have them modified to comply with both S.B. 2420 and COPPA, regardless of their content or intended audience. All of this is well outside the expertise and usual course of business for a pizza restaurant, so many businesses will have to contract with third-party developers or face crushing civil liability. Indeed, many businesses with apps are not tech companies at all and must hire outside app developers to modify their apps. But even preexisting apps developed by third parties will not guarantee an easy transition. For example, the Mama's Pizza app was developed by Bloinka!, which appears to no longer be in business, making the upgrades necessary to comply with the new S.B. 2420/COPPA system more difficult, if not impossible; many small companies would likely be required to develop entirely new apps from scratch.[27]

Moreover, because Texas businesses would have to maintain records on both the users under 13 they allow to use their app and the ones they reject, the costs of compliance will not be a one-time expense. According to one estimate, developers expect that it would cost $20,000-$80,000 per app just in the first year to build new systems and come into compliance with developer obligations like those in S.B. 2420, not inclusive of the costs associated with creating COPPA-compliant systems. Add COPPA compliance to the already-significant cost associated with S.B. 2420's direct mandates and overall compliance is far more expensive and riskier than initially meets the eye for small businesses in Texas and other entities that may be subject to S.B. 2420's developer obligations. And all of this is compounded by the fact that compliance with S.B. 2420 must begin simultaneously for app stores and app developers, even though the app stores are only just beginning to introduce their compliance tools. Developers building products on a typical

---

[27] Bloinka!, Apple.com, https://apps.apple.com/us/developer/bloinka/id542674320.

6- to 9-month production cycle will be highly likely to fall out of compliance with S.B. 2420, COPPA, or both in 2026, if S.B. 2420 is not enjoined.

Unfortunately, the obligations S.B. 2420 imposes directly on developers, along with those obligations' interaction with federal law, make S.B. 2420 so difficult to comply with that it most likely will result in barring access to protected speech while also placing unacceptable and unintended burdens on small businesses and other entities that may be subject to S.B. 2420's developer obligations. Indeed, whether compliance with both S.B. 2420 and COPPA is even possible is an open question, given that S.B. 2420 appears to require app developers to *delete* personal information that COPPA requires them to *retain*. If S.B. 2420 goes into effect, the compliance burden on Texas businesses will be immense and ongoing. And given that the ultimate fate of the law depends on the outcome of these proceedings, the possibility that all this cost and effort will have to be changed or undone if this Court or higher courts overturn some or all requirements adds even more uncertainty and potential burden. It is therefore entirely appropriate for the Court to grant Plaintiff's motion for a preliminary injunction while the important constitutional questions raised by S.B. 2420 are fully litigated.

### III.  Conclusion.

For these reasons, and those in Plaintiff's motion, the Court should grant a preliminary injunction prohibiting Defendant's enforcement of S.B. 2420.

Respectfully submitted,

*/s/ Peter D. Kennedy*
Peter D. Kennedy
Texas Bar No. 11296650
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5764 (Phone)
(512) 536-9908 (Fax)
pkennedy@gdhm.com

Graham Dufault (Virginia 83840)
Brian Scarpelli (Virginia 77299)
Chapin Gregor (New York 5355011)
ACT | The App Association
1401 K St., NW
Suite 501
Washington, DC 20005
(503) 781-9037
(517) 507-1446
(917) 621-5465
gdufault@actonline.org
bscarpelli@actonline.org
cgregor@actonline.org

**ATTORNEYS FOR AMICUS CURIAE
ACT | THE APP ASSOCIATION**

## Certificate of Service

I certify that the foregoing was served on all counsel of record via eService on November 26, 2025.

*/s/ Peter D. Kennedy*
Peter D. Kennedy