# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION

                       **Plaintiff,**

v.

KEN PAXTON, *in his official capacity as the
Texas Attorney General*,

                       **Defendant.**

                                               Civil Action No. 25-cv-1660-RP

**BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR FREEDOM OF
THE PRESS, STUDENT PRESS LAW CENTER, ADVANCE PUBLICATIONS, INC.,
THE ASSOCIATED PRESS, AND THE NEW YORK TIMES COMPANY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Tesia Stanley Tx. Bar No. 24144698
BALLARD SPAHR LLP
201 S. Main Street, Suite 800
Salt Lake City, UT 84111-2221
Telephone: 801-531-3000
Facsimile: 801-531-3001
Email: stanleyt@ballardspahr.com

Paul Safier (*of counsel*)
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103-7599
Telephone: 215-665-8500
Facsimile: 215-864-8999
Email: safierp@ballardspahr.com

*Attorneys for Amici Curiae Reporters
Committee for Freedom of the Press, Student
Press Law Center, Advance Publications, Inc.,
The Associated Press, and The New York Times
Company*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................................... iv

SUMMARY OF THE ARGUMENT ............................................................................................1

ARGUMENT ...............................................................................................................................2

I.     THE FIRST AMENDMENT PROTECTS THE DISTRIBUTION OF NEWS
       AND COMMENTARY TO INTERESTED AUDIENCES, INCLUDING
       YOUNG PEOPLE ..............................................................................................................2

II.    THE ACT UNCONSTITUTIONALLY INTERFERES WITH THE
       DISTRIBUTION OF NEWS AND COMMENTARY TO THE PUBLIC ........................7

CONCLUSION ..........................................................................................................................11

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*American Amusement Machine Association v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) ...............................................................................6, 7

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)...............................................................................5, 9, 10, 11

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975)...............................................................................5

*Free Speech Coalition, Inc. v. Paxton*,
    606 U.S. 461 (2025)...............................................................................10

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936)...............................................................................4

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981)...............................................................................5

*Hill v. Colorado*,
    530 U.S. 703 (2000)...............................................................................5

*Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ...............................................................................7

*Hustler Mag. v. Falwell*,
    485 U.S. 46 (1988)...............................................................................3

*Lovell v. Griffin*,
    303 U.S. 444 (1938)...............................................................................4

*Mahanoy Area School District v. B.L.*,
    594 U.S. 180 (2021)...............................................................................6, 11

*Minneapolis Star & Trib. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)...............................................................................4

*Moore v. City of Kilgore*,
    877 F.2d 364 (5th Cir. 1989) ...............................................................................5

*NetChoice v. Carr*,
    789 F. Supp. 3d 1200 (N.D. Ga. 2025) ...............................................................................9

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ...............................................................................8, 9

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ............................................................. 7, 9

*Reno v. ACLU*,
    521 U.S. 844 (1997) ........................................................................................... 8, 9

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................................... 3

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ........................................................................................... 5, 6

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) ..................................................................................... 4, 5, 11

*Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ............................................................................................... 4

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ............................................................................................... 6

**Statutes**

Tex. Bus. & Com. Code § 121.022 ............................................................................. 8

Tex. Bus. & Com. Code § 121.053 ............................................................................. 8

Tex. Educ. Code § 28.002 ...................................................................................... 2, 3

U.S. Const. amend. I .................................................................................... *passim*

**Other Authorities**

2 Cooley's *Constitutional Limitations*, 8th ed. ....................................................... 4

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are a collection of news companies and professional organizations that support and advocate on behalf of journalists and free expression.  They have a fundamental interest in ensuring that willing readers, listeners, and viewers—including young people—are able to access news content and engage in public discourse.  They submit this brief in support of the motion of Plaintiff to preliminarily enjoin the Texas App Store Accountability Act, Tex. Bus. & Com. Code § 121.001 *et seq.* (the "Act").

*Amici* are:

**The Reporters Committee for Freedom of the Press** (the "RCFP") is an unincorporated nonprofit association.  The RCFP was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, *amicus curiae* support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

**Student Press Law Center** ("SPLC") is a national, non-profit, non-partisan organization established in 1974 that works to promote, support, and defend press freedom and freedom of information rights of high school and college journalists.

**Advance Publications, Inc.** is a diversified, privately held media company with interests across news, information, and technology. Its operating businesses include Condé Nast, whose brands include *The New Yorker*, *Vogue*, and *Wired*; Advance Local, which publishes local journalism through digital brands such as AL.com, *NJ.com*, and *Mlive.com*; and American City Business Journals, publisher of local business news in more than 40 cities, including 4 in Texas. These publishers distribute their reporting through mobile apps, websites, and print.

**The Associated Press** ("The AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York.  The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers.  The AP operates from 280 locations in more than 100 countries.  On any given day, AP's content can reach more than half of the world's population.

**The New York Times Company** ("The Times") publishes *The New York Times* and the website www.nytimes.com.  The Times also makes its content available through several apps. The Times is dedicated to helping people understand the world through on-the-ground, expert, and deeply reported journalism.

## SUMMARY OF THE ARGUMENT

The Act was enacted for a laudable purpose: to protect the online safety of children. There are means to achieve that purpose that are consistent with the First Amendment. The Act is not one of them. It is extraordinarily broad in its scope. If permitted to go into effect, it will substantially burden access to online speech on matters of central public importance and debate. As such, it goes well-beyond the government's limited authority to interfere with speech based on concerns about its impact on young people.

With respect to news organizations in particular, the Act interferes with the activity at the center of what they do: distributing information and commentary on matters of public interest, including to young people. That activity has always been understood to lie at the heart of the First Amendment's protections. Yet, the Act significantly burdens and restricts such distribution. It requires any potential user of a news app to submit to cumbersome and invasive age-verification procedures before accessing any news app content, no matter its nature. Even more significantly, the Act conditions youth access to news and information distributed via news apps on affirmative parental consent. That effectively renders news app content presumptively off limits to minors, even for core political speech on issues of critical importance and interest to young people.

The Act is the functional equivalent of a law requiring all readers to prove they are over 18 or have parental permission before they can even enter a bookstore or newsstand or purchase reading material from such an establishment. A requirement of that nature would be plainly unconstitutional and an affront to First Amendment values. The Act is no less unconstitutional by virtue of the fact that it governs digital, rather than physical, access to information and ideas. Because the Act violates the First Amendment, it should be enjoined.

**ARGUMENT**

**I.     THE FIRST AMENDMENT PROTECTS THE DISTRIBUTION OF NEWS AND COMMENTARY TO INTERESTED AUDIENCES, INCLUDING YOUNG PEOPLE.**

The core activity of news organizations is to publish and distribute news and commentary on issues of interest and importance to the public.  This encompasses news and commentary on a wide array of topics, including politics, culture, business, economics, education, entertainment, sports, science, and the arts.

Even for publications that are not geared exclusively or primarily towards youth, young people are an important audience.  Young people are not just future voters.  They are also participants in our public culture and our national debates.  Access to reliable, accurate news allows young people to be full participants in civic life—and to understand the world around them.  Indeed, access to such reliable news sources is more important now than ever, with young people being constantly exposed to A.I. and other sources of potential misinformation.  In addition, to the extent that young people are also present or future journalists, their access to news is critical.

Lawmakers have recognized the societal interest in young people engaging with the news, including digital news.  As of 2023, 19 states, including Texas, had laws requiring some form of news literacy education in schools.[1]  For Texas, this includes a law directing the State Board of Education to promulgate a rule requiring "each school district to incorporate instruction in digital citizenship into the district's curriculum," with such "digital citizenship" encompassing

---

[1] See *U.S. Media Literacy Policy Report 2023*, Media Literacy Now (Feb. 2024), https://medialiteracynow.org/wp-content/uploads/2024/02/MediaLiteracyNowPolicyReport2023_publishedFeb2024b.pdf.

the "ability to access [and] analyze . . . all forms of digital communication." Tex. Educ. Code § 28.002(z).

Today, the bulk of the distribution of news and commentary, both to adults and minors, takes place digitally. A recent study by the Pew Research Center found that the percentage of Americans who get their news from digital devices, such as phones and tablets, far outstrips those who get their news from television, radio, or print.[2] Further, news apps have become an increasingly important vehicle for delivering news digitally. Among other benefits, news apps enable users to more easily access content, increase user engagement with news content, and give users the option of keeping abreast of breaking news through push notifications. News apps are, accordingly, an essential distribution channel for many news organizations.

This activity—communicating information and opinions on issues of public importance to interested members of the public, including young people—has always been understood to lie at the core of what the First Amendment protects. Four basic principles underlie this.

**First**, "[s]peech on matters of public concern"—understood broadly to encompass speech on any "subject of general interest and of value and concern to the public"—"is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451-53 (2011) (cleaned up). That is because of the critical role such speech plays in facilitating wide-open public debate and an informed citizenry. *Id.* at 452-53; *see also Hustler Mag. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern."). It is no exaggeration

---

[2] *See News Platform Fact Sheet*, Pew Rsch. Ctr. (Nov. 25, 2025), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/ (detailing survey results showing that, as of 2025, 56% of adults said they "often" get their news from digital devices, while only 32%, 11%, and 7% said the same about, respectively, television, radio, and print).

to say that our "Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000).

**Second**, the First Amendment protects both the right to publish speech and the right to distribute that speech through chosen channels of distribution. That is because "[l]iberty of circulating is as essential to . . . freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Lovell v. Griffin*, 303 U.S. 444, 452 (1938); *see also Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 165-69 (2002) (striking down ordinance requiring permits to engage in door-to-door advocacy on ground that law unconstitutionally interfered with speakers' chosen means of distributing their messages). For instance, in *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936), the Supreme Court struck down a law that imposed a circulation tax on publications. The Court held that, while it is clearly permissible to tax news organizations like any other business, a law that burdened the distribution of news by taxing specifically that activity was unconstitutional. That is because, in enacting the First Amendment, "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Id.* at 249-50 (quoting 2 Cooley's *Constitutional Limitations*, 8th ed., p. 886); *see also Minneapolis Star & Trib. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585-93 (1983) (holding that tax levied specifically on newspapers' ink and paper products violated First Amendment because it burdened distribution of news).

**Third**, while speech that is unwanted by its recipient can, under certain circumstances, be subject to regulation, the same is not true of speech between willing speakers and willing

listeners.  As the Supreme Court has explained, "the First Amendment protects the right of every citizen to 'reach the minds of willing listeners.'"  *Hill v. Colorado*, 530 U.S. 703, 728 (2000) (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981)); *see also Moore v. City of Kilgore*, 877 F.2d 364, 370 (5th Cir. 1989) ("Freedom of speech presupposes both a willing speaker and a willing listener.  A listener's interest enjoys protection just as the speaker's interest finds refuge behind the shield of the First Amendment."). Accordingly, the First Amendment generally forbids interference with "communication between speakers and willing . . . listeners," even when that interference falls short of an outright prohibition.  *Playboy*, 529 U.S. at 812 ("The distinction between laws burdening and laws banning speech is but a matter of degree.").

**<u>Fourth</u>**, young people have substantially the same First Amendment rights as adults, except in narrow circumstances, such as involving pornographic material.  Thus, "[i]n most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (explaining that students do not "shed their constitutional rights to freedom of speech or expression," even "at the schoolhouse gate").  That means that the government's "legitimate power to protect children from harm . . . does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

Indeed, the First Amendment rights of young people—just like the First Amendment rights of adults—are rooted in the strong public interest in encouraging the free flow of information and ideas.  In striking down restrictions on speech by and to young people, the

Supreme Court has repeatedly emphasized the critical importance of young people being equipped with the tools to contribute to public life and as future voters. For instance, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637 (1943), the Supreme Court held that school children could not be constitutionally compelled to salute the flag in violation of their consciences, explaining that the fact that schools "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." In *Tinker*, the Supreme Court explained that the government's ability to police the speech of young people is limited even in the public-school setting because "the Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." 393 U.S. at 512 (cleaned up).

More recently, in *Mahanoy Area School District v. B.L.*, 594 U.S. 180 (2021), a case in which the Supreme Court limited the authority of public schools to restrict online student speech, the Court again emphasized that the First Amendment rights of young people are connected to the broader interest in facilitating wide-open debate and democratic self-government. There, the Court described "America's public schools" as "the nurseries of democracy," adding that: "Our representative democracy only works if we protect the 'marketplace of ideas.' This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will." *Id.* at 190.

These considerations were nicely crystalized in *American Amusement Machine Association v. Kendrick*, 244 F.3d 572 (7th Cir. 2001), where the Court struck down an Illinois law that prohibited access by minors to video games deemed unsuitable for them due to violent

or sexual content. *Id.* at 573, 580. In that case, the Court rejected the attempt, by government

fiat, to restrict young persons' access to non-obscene speech, explaining as follows:

> Children have First Amendment rights. . . . Now that eighteen-year-olds have the
> right to vote, it is obvious that they must be allowed the freedom to form their
> political views on the basis of uncensored speech before they turn eighteen, so
> that their minds are not a blank when they first exercise the franchise. And since
> an eighteen-year-old's right to vote is a right personal to him rather than a right to
> be exercised on his behalf by his parents, the right of parents to enlist the aid of
> the state to shield their children from ideas of which the parents disapprove
> cannot be plenary either. People are unlikely to become well-functioning,
> independent-minded adults and responsible citizens if they are raised in an
> intellectual bubble.

*Id.* at 576-77; *see also NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 932 (S.D. Ohio 2025)

("Minors' access to information is essential to their growth into productive members of our

democratic public sphere.").

Likewise, in *Hodgkins v. Peterson*, 355 F.3d 1048, 1063-65 (7th Cir. 2004), the Court

struck down a youth curfew law as unconstitutional because it substantially interfered with the

rights of young people to, for example, attend political rallies, vigils, protests, and religious

services. The Court explained that "[a] juvenile's ability to worship, associate, and speak freely

is . . . not simply a privilege that benefits her as an individual, but a necessary means of allowing

her to become a fully enfranchised member of democratic society." *Id.* at 1055.

## II.    THE ACT UNCONSTITUTIONALLY INTERFERES WITH THE DISTRIBUTION OF NEWS AND COMMENTARY TO THE PUBLIC.

The Act contravenes each of the First Amendment principles discussed above. However

laudable the law's purposes, its effect is to impede the distribution of news and commentary to

interested members of the public, especially young people, through a critical channel of

distribution (*i.e.*, news apps).

With respect to adult news consumers, the Act's requirement that they submit to age-

verification procedures will undoubtedly deter some from accessing content on news apps,

decreasing their overall consumption of news.  These procedures are not only cumbersome, but also require adult consumers to provide sensitive information to app stores.  As one court noted with respect to an Arkansas law that imposed a similar age-verification requirement on access to social-media platforms: "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourage[s] users from accessing [the regulated] sites.'"  *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *8 (W.D. Ark. Mar. 31, 2025) (quoting *Reno v. ACLU*, 521 U.S. 844, 856 (1997)).  That alone will interfere with the distribution of news content to willing readers and listeners.

With respect to minors, the interference is even more substantial and troubling.  The Act makes ***all*** news app content, no matter its nature, off limits to minors absent affirmative parental intervention.  *See* Tex. Bus. & Com. Code § 121.022(a)-(f).  Thus, a 17-year-old who wishes to access, via a news app, information on any subject—a recent local election, the war in Ukraine, Taylor Swift's recent album, or a Dallas Cowboys victory—cannot lawfully do so unless she, first, convinces a parent or guardian to go through the process of verifying that parent or guardian status and, second, convinces that parent or guardian to affirmatively approve downloading the news app.  Moreover, that cumbersome process must be repeated anytime the news app makes what the law deems a "significant change" to its terms of service or privacy policy.  *Id.* §§ 121.022(g), 121.053(a)-(b).  These restrictions will especially affect young people in unstable home situations, who may lack access to a parent or guardian legally capable of consenting to access.  Thus, the Act will not only significantly impede youth access to digital news content; in many cases, it will cut off such access completely, at least via news apps.

The law goes well beyond the legitimate powers of government to regulate speech out of concern for children. For instance, in *Brown*, the Supreme Court held that the First Amendment did not permit the State of California to outlaw the sale of violent video games to minors, even though that law, unlike this one, targeted a very narrow category of speech. 564 U.S. at 802-05. The Court explained that "[l]ike the protected books, plays, and movies that preceded them, video games communicate ideas—even social messages—through many familiar literary devices," and held that their distribution fell well within the category of "discourse on public matters" subject to maximum First Amendment protection. *Id.* at 790.

More recently, numerous courts have rejected imposition of age-verification/parental consent regimes on access to social media platforms (once again, a narrower category than all app content), notwithstanding concerns about the impact of social media on young people similar to those animating this law. *See, e.g.*, *Yost*, 778 F. Supp. 3d at 946-59 (permanently enjoining Ohio law that imposed such a regime on social media access on ground that "[f]oreclosing minors under sixteen from accessing all content on websites that the Act purports to cover, absent affirmative parental consent, is a breathtakingly blunt instrument for reducing social media's harm to children"); *Griffin*, 2025 WL 978607, at *7-17 (permanently enjoining Arkansas law that imposed such a regime on social media access on ground that the law "not only hinders adults' ability to speak, and receive protected speech online, it excludes minors whose parents do not consent (or cannot prove their consent) from 'the vast democratic forums of the internet'" (quoting *Reno*, 521 U.S. at 868)); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1223 (N.D. Ga. 2025) (preliminarily enjoining Georgia law that imposed such a regime on social media access where the law "would create a significant—and, for at least some young people, insurmountable—barrier to entry for online speech").

The Supreme Court's decision earlier this year in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), which sketched out the outer limit of the government's authority in this area, underscores how far beyond that authority this law goes. There, the Court upheld a Texas law that imposes an age-verification requirement on online access to pornographic content, doing so explicitly on the ground that the law targeted unprotected speech (the distribution to minors of content obscene as to minors) and only incidentally affected access to protected speech (the distribution of such speech to adults). *Id.* at 482, 499. Nothing in *Free Speech Coalition* even remotely permits age-verification/parental consent regimes aimed at the distribution of speech on matters of public concern, as the law at issue here does.

In essence, the requirements the Act imposes are equivalent to requiring IDs to be checked at bookstores or newsstands and forbidding entry or purchases by all patrons under 18 without explicit parental permission. Such a regime would clearly be unconstitutional. *See, e.g.*, *Brown*, 564 U.S. at 795 n.3 (noting the obvious unconstitutionality of a law making it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"). The same principles apply with full force here.

Finally, *amici* stress that they are not insensitive to the concerns of parents and lawmakers about online safety. However, courts have consistently held that the way to accommodate such concerns without running afoul of the First Amendment is not through government-mandated restrictions on speech that apply to everyone. It is through technology and other measures, such as widely available parental blocking tools, that assist parents in managing their children's access to material on a household-by-household basis. *See, e.g.*, *Brown*, 564 U.S. at 803 (voluntary rating system for video games provided tools for parents to

limit access to "seriously violent" games); *Playboy*, 529 U.S. at 824-26 (law facilitating parents' ability to block access to sexually-oriented cable programming was constitutional, whereas law restricting general access to such programming was not).

This point was well laid out by Justice Scalia in his majority opinion in *Brown*. There, he observed that laws that "prevent children from hearing or saying anything without their parents' prior consent . . . do not enforce parental authority over children's speech"; rather, "they impose *governmental* authority" over such speech, "subject only to a parental veto." 564 U.S. at 795 n.3 (emphasis in original); *see also Mahanoy*, 594 U.S. at 206-07 (Alito, J., concurring) ("[T]he student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protections against government regulation as all other members of the public.").

That is the crux of the matter. The Act renders wide swaths of speech at the very heart of the First Amendment's protection presumptively off limits to minors when accessed through apps—a critical channel of distribution for news organizations. That is an unconstitutional infringement of both the rights of news organizations to communicate information and ideas to young people and the corresponding rights of young people to access such lawful news content.

## **<u>CONCLUSION</u>**

*Amici* respectfully urge the Court to preliminarily enjoin the Act.

Respectfully submitted,

*/s/ Tesia Stanley*
Tesia Stanley Tx. Bar No. 24144698
BALLARD SPAHR LLP
201 S. Main Street, Suite 800
Salt Lake City, UT 84111-2221
Telephone:  801-531-3000
Facsimile:  801-531-3001
Email:  stanleyt@ballardspahr.com

11

Paul Safier (*of counsel*)
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103-7599
Telephone:  215-665-8500
Facsimile:  215-864-8999
Email:  safierp@ballardspahr.com

*Attorneys for Amici Curiae Reporters Committee for Freedom of the Press, Student Press Law Center, Advance Publications, Inc., The Associated Press, and The New York Times Company*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the attached *amicus curiae* brief complies with the typeface and type style requirements of Local Rule CV-10 because it has been prepared in a proportionally spaced Times New Roman typeface using Microsoft Word 12-point font.

Executed this 3rd day of December, 2025.


*/s/ Tesia Stanley*
Tesia Stanley