# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **Computer & Communications** | § | |
| **Industry Association,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Case No. 1:25-CV-01660-RP** |
| | § | |
| **Ken Paxton, in his official capacity** | § | |
| **as Attorney General of Texas** | § | |
| | § | |
| **Defendant.** | § | |

### Amicus Curaie Brief of the Digital Childhood Alliance
### in Support of Defendant Ken Paxton's
### Opposition to Plaintiff's Motion for Preliminary Injunction

**DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF**
**IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**PAGE i**

Table of Contents

Statement of Interest ......................................................................................... vi

ARGUMENTS & AUTHORITIES ...................................................................1

I.  S.B. 2420 Protects Minors from Exploitive Contracts ................................................1

    A.  S.B. 2420 Governs Online Contracts with Minors ...........................................2

    B.  App Developer Contracts Disadvantage Minors ..............................................3

    C.  Plaintiff's Amici Incorrectly Claims S.B. 2420 Regulates Retail Purchases.....6

    D.  S.B. 2420 Is Appropriately Content Neutral ...................................................7

II.  Texas Has a Legitimate Interest in Protecting Minors in the Online World.................8

III.  S.B. 2420 Has Clear Constitutional Applications ..................................................11

Certificate of Service .........................................................................................13

## Table of Authorities

### Statutes

Children's Online Privacy and Protection Act of 1998, 15 U.S.C. §§ 6501-6505...........7

Ohio Rev. Code § 1349.09(B)(1) ....................................................................................7

S.B. 2420; Tex. Bus. & Com. Code § 121.022-056.................................................. passim

### Cases

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ............................................................8

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ............................................................12

*NetChoice v. Yost*, 716 F. Supp.3d 539 (S.D. Ohio 2024) ............................................7–8

### Legislative Hearings

Testimony of A.F., before the United States Senate Committee
on the Judiciary, Subcommittee on Crime and Counterterrorism,
Hearing on "Examining the Harm of AI Chatbots," September 16, 2025 .....................1–2

Texas App Store Accountability Act: Hearings on Tex. H.B. 4901
Before the House Comm. on Trade, Workforce & Economic Development,
89th Leg., R.S. (April 15, 2025) (statement of Dr. Vikram Siberry) .................................9

### Academic Articles & Studies

Chu, et al., "Dose-response analysis of smartphone usage and self-reported
sleep quality: a systematic review and meta-analysis of observational
studies," Journal of Clinical Sleep Medicine (2023) ........................................................11

Hoertel, "Impact of excessive social media use on adolescent
depression and its consequences in France: An individual-based
microsimulation model," PLOS Medicine (2025) ............................................................11

Hutton, et al., "Associations Between Screen-Based Media Use and
Brain White Matter Integrity in Preschool-Aged Children,"
JAMA Pediatrics (2020) ....................................................10

Jain, et al., "Exploring Problematic TikTok Use and Mental Health
Issues: A Systematic Review of Empirical Studies,"
J Prim Care Community Health (2025) ...................................11

Mallawaarachchi, et al., "Early Childhood Screen Use Contexts and
Cognitive and Psychosocial Outcomes: A Systematic Review
and Meta-analysis," JAMA Pediatrics (2024) ...........................10

Maza, et al., "Association of Habitual Checking Behaviors on Social
Media with Longitudinal Functional Brain Development,"
JAMA Pediatrics (2023) ....................................................10

Nagata, et al., "Social Media Use and Depressive Symptoms During
Early Adolescence," JAMA Network Open (2025) .......................10

Shannon, et al., "Problematic Social Media Use in Adolescents and
Young Adults: Systematic Review and Meta-analysis,"
JMIR Mental Health (2022) ................................................10

Shou, et al., "Association of screen time with attention-deficit/hyperactivity
disorder symptoms and their development: the mediating
role of brain structure," Translational Psychiatry (2025) ...............11

Thiagarajan, et al., "Protecting the Developing Mind in a Digital Age: A Global
Policy Imperative," Journal of Human Development and Capabilities, July 20, 2025 .......9

Xiao, et al., "Addictive Screen Use Trajectories and Suicidal Behaviors,
Suicidal Ideation, and Mental Health in US Youths," JAMA Vol. 334, No. 3 (June 18, 2025), at
223 ...........................................................................10

Secondary Sources & Reports

Abi-Jaoude, et al., "Smartphones, Social Media Use and Youth
Mental Health," Canadian Medical Association Journal 192, no. 6
(February 10, 2020): E136-41 ............................................................9

American Academy of Child and Adolescent Psychiatry,
"Screen Time and Children," June 2024 ...........................................8

Buck, "Mobile Apps vs Mobile Websites (Why 90% of Mobile Time Is
Spent in Apps)," MobiLoud; August 28, 2025, .................................9

Haidt, "The Anxious Generation: How the Great Rewiring of
Childhood Is Causing an Epidemic of Mental Illness" (2024) .........9

Haidt, "The Teen Mental Illness Epidemic Began around 2012," After Babel, February 8, 2023
..........................................................................................................9

Human Rights Watch, "How Dare They Peep Into My Private Life?
Children's Rights Violations by Governments That Endorsed Online
Learning During the Covid-19 Pandemic" (May 25, 2022) ..............5

Mostafavi, "Study: Average Teen Received More than 200 App Notifications
a Day," Michigan Medicine (University of Michigan, September 26, 2023) ....................9

National Institutes of Health, "Children's Sleep Linked to Brain Development,"
Aug. 30, 2022 ..................................................................................11

Pew Research Center, Teens and Internet, Device Access Fact Sheet, July 10, 2025 ........8

Storey, "Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia,"
Psychiatrist.com, August 7, 2024..........................................................9

Zuboff, "The Age of Surveillance Capitalism:
The Fight for a Human Future at the New Frontier of Power" (2019) ..............................5

**Statement of Interest of Amicus**

The Digital Childhood Alliance ("DCA") is dedicated to protecting children in the online environment. With over 150 allied organizations, the Digital Childhood Alliance advocates for legislation like S.B. 2420, the App Store Accountability Act. Its members have extensive experience in online child safety.

DCA testified in favor of S.B. 2420 as it governs the commercial relationships between minors, parents, and digital platforms. The bill ensures that when companies invite children to download or use apps, they do so under the same consumer protection and contract principles that already apply in the physical marketplace. Parents are given accurate information about app risks and can consent to contract terms on behalf of their children. DCA has studied and exposed the terms of service that tech companies commonly employ against minors that use their products. S.B. 2420 addresses app developers' exploitive contracting practices that target minors and the harms to children from Big Tech's apps.

## ARGUMENTS & AUTHORITIES

**I.    S.B. 2420 Protects Minors from Exploitive Contracts**

S.B. 2420 prohibits app developers from binding minors to one-sided contracts of adhesion without a parent's knowledge or consent.  Currently, before a minor can download an app from Apple's App Store or Google's Play Store, the minor must accept the app's terms of service. Those terms of service operate as contracts, often requiring the minor to waive important rights, such as the ability to seek legal recourse for any damages caused by the app. To protect minors, S.B. 2420 voids such contracts unless a parent or legal guardian consents to the terms. The First Amendment offers no protection for contractual or deceptive conduct. Here, Texas regulates commercial conduct—the formation and enforcement of contracts with minors—not expressive speech.

A U.S. Senate Judiciary subcommittee hearing on September 16, 2025, highlighted the contracting risks. A minor had been hospitalized because of an AI chatbot app. *See* Exhibit 1 (copy of Testimony of A.F. before the United States Senate Committee on the Judiciary, Subcommittee on Crime and Counterterrorism, Hearing on "Examining the Harm of AI Chatbots," September 16, 2025) at 2. The family's subsequent legal action was stymied because the minor, without parental consent, had accepted the app's terms of service which forbade the family from suing in court and capped damages at $100. *Id.* at 2

The mother testified:

> "My teenage son—a normal high-functioning child with autism . . . became the target of online grooming and psychological abuse through Character.AI.
>
> In 2023, my son downloaded an app—Character.AI—that allows users to interact with AI-powered 'characters.' At the time, the app was marketed in the Apple Store as a fun and safe product, with an age rating of 12+.  Within months of using this app, my son went from being a happy, social teenager . . . to someone I no longer recognized. He developed abuse-like behaviors like paranoia, daily panic attacks, isolation, and self-harm and homicidal thoughts.

. . .

We did not know what was happening to our son. . . . But I eventually found out the truth. For months, Character.AI chatbots had exposed him to sexual exploitation, emotional abuse and manipulation despite our careful parenting, including screen time limits, parental controls, and no access to social media.

. . . The chatbot . . . encouraged my son to mutilate himself, then blamed us and convinced him not to seek help. . . . They targeted my son with vile, sexualized outputs, including interactions that mimicked incest. And they told our son that killing us, his parents, would be an understandable response to our effort to limit his screen time.

The damage to our family has been devastating. My son has required psychiatric hospitalizations. He is currently living in a residential treatment center for mental abuse and has required constant monitoring to keep him alive.

*Id.* at 1–2 (citations omitted).

The family sued the company despite the app's terms of service. The tech company argued the arbitration clause is valid, and even the validity of the minor's contract with the tech company is subject to binding arbitration. *Id.* at 16–20. The case has been bogged down by the app's contract with the minor. S.B. 2420 would have solved the problem for this family by statutorily voiding the offending provisions in the terms of service.

Such contracts imposed by a tech company on a minor teen are unfair and indefensible. In fact, in the First Amendment suit before this court, the industry has not even bothered to defend its contracting practices. Instead, the industry simply ignores them and their important role in S.B. 2420.

A. <u>*S.B. 2420 Governs Online Contracts with Minors*</u>

S.B. 2420 forbids app store owners and app developers from enforcing contracts with minors unless parental consent is obtained. Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 121.026(a)(1); Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 121.056)(a)(1). To help parents protect children from unscrupulous contracts, S.B. 2420 further requires that a parent or guardian be informed about how the developer will collect,

Dɪɢɪᴛᴀʟ Cʜɪʟᴅʜᴏᴏᴅ Aʟʟɪᴀɴᴄᴇ's Aᴍɪᴄᴜꜱ Cᴜʀᴀɪᴇ Bʀɪᴇꜰ                          Pᴀɢᴇ 2
ɪɴ Sᴜᴘᴘᴏʀᴛ ᴏꜰ Dᴇꜰᴇɴᴅᴀɴᴛ Kᴇɴ Pᴀxᴛᴏɴ's Oᴘᴘᴏꜱɪᴛɪᴏɴ ᴛᴏ
Pʟᴀɪɴᴛɪꜰꜰ's Mᴏᴛɪᴏɴ ꜰᴏʀ Pʀᴇʟɪᴍɪɴᴀʀʏ Iɴᴊᴜɴᴄᴛɪᴏɴ

use, or distribute their child's personal data based on the terms of service. TEX. BUS. & COM. CODE § 121.022(f)(1)(d). If the developer later makes a significant change to its terms of service including, among other things, changing the "type or category of personal data collected, stored, or shared by the developer," the parent or guardian must receive notice, so they can reconsider their consent to the contract. TEX. BUS. & COM. CODE § 121.053(b)(2).

These measures address and ameliorate the imbalance of information and bargaining power between minors and more sophisticated companies by giving parents tools to protect their children. Requiring parental knowledge and consent is a modest effort by Texas to improve the information imbalance that tech companies hold over children.

B.  _App Developer Contracts Disadvantage Minors_

In its complaint and brief, Plaintiff highlights several apps which it claims that a minor – whether age 10, 12, 14 or older – constitutionally should be allowed to buy or download regardless of any parent's view. While Plaintiff highlights the content of those apps, it fails to mention the terms of service that those apps use to disadvantage minors. For example:

**YouTube (Google):** Under YouTube's terms of service, minors waive compensation for all their creative works they upload. In contrast, Google retains broad rights to use and monetize the

child's content.[1]  Google further limits its liability for any damages its products cause the child.[2] (YouTube "will not be responsible" for losses, whether the claim is based on "warranty, contract, tort, or any other legal theory"). YouTube further reduces the statute of limitations to one year and caps damages at $500.[3]

Google requires the minor "represent that you have your parent or guardian's permission to use the Service" to circumvent arguments against contracting with minors.[4] Rather than rely on Google's approach of having a minor falsely represent something that is not true, Texas would make sure Google actually gets the parental permission it claims it has.

**Threads (Meta):** Threads's terms of service refer the user to a separate document, Threads's Supplemental Privacy Policy, to explain how they collect and sell a user's data.[5] The Privacy Policy then grants the developer extensive rights over the minor's data without meaningful limitations.[6] That data can be sold to advertisers.

---

[1] YouTube Terms of Service, https://www.youtube.com/static?template=terms (last accessed December 9, 2025).   (Google and its affiliates obtain "a world-wide, non-exclusive, royalty-free, sublicensable and transferable license to use that [the minor's] content" allowing it to profitably "reproduce, distribute, prepare derivative works, display and perform" those works.); ("You grant to YouTube the right to monetize your Content on the Service (and such monetization may include displaying ads on or within Content or charging users a fee for access).  This Agreement does not entitle you to any payments.").

Even if the child takes down his or her work and deletes the YouTube account, Google's license to the child's work continues "for a commercially reasonable period of time" and YouTube may "retain" (without any stated time limits) copies of what the child created.  *Id.*

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Threads Terms of Use, https://help.instagram.com/769983657850450/?helpref=uf_share (last accessed December 9, 2025).

[6] Threads Supplemental Privacy Policy, https://help.instagram.com/515230437301944/?helpref=uf_share (effective June 3, 2025) (collecting, *inter alia*, data, among other things, on "the types of content you view or interact with and how you interact with it, metadata about your content, the Threads features you use and how you use them, the hashtags you use, and the time, frequency, and duration of your activities on Threads").

Unfairly collecting data from children without any parental consent is a common problem: Human Rights Watch determined that most of the kids' educational apps share the children's data with advertising companies.[7] Tech companies track a minor's engagement with the app's content and track the minor's precise location, voice recordings, browsing history, videos watched, and app activity across third-party sites. Developers then profit from their "free" apps by selling that data.[8] Astonishingly, Plaintiff complains that age verification invades a user's privacy (even though under S.B. 2420, the app store is allowed to verify age using only the data it already possesses), but turns a blind eye to the industry's business model of selling the minor's data it collects.

**Khan Academy**: Khan Academy's terms of service requires minors waive any claims for being exposed to "indecent or objectionable content."[9] Khan Academy absolves itself of any liability if it gives a third party access to a user's content even when the user has restricted that third party from accessing the content.[10] More broadly, Khan Academy subjects the minor to a one-year statute of limitations, compels arbitration, and prohibits any type of class action – even if Khan harms thousands of minors with the same conduct.[11]

---

[7] Human Rights Watch, "How Dare They Peep Into My Private Life? Children's Rights Violations by Governments That Endorsed Online Learning During the Covid-19 Pandemic" May 25, 2022.

[8] Zuboff. The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power. New York: Public Affairs, 2019.

[9] Khan Academy Terms of Service, https://www.khanacademy.org/about/docs/khan-academy-terms-of-service (last accessed December 9, 2025) ("[Y]ou agree to waive, and hereby do waive, any legal or equitable rights or remedies you have or may have against Khan Academy" for being exposed to "indecent or objectionable content.").

[10] Id. ("Khan Academy does not guarantee that such User Content will never be accessible by others."; "KHAN ACADEMY HEREBY DISCLAIMS ANY AND ALL LIABILITY WITH RESPECT TO ANY UNAUTHORIZED ACCESS TO ANY RESTRICTED USER CONTENT.").

[11] Khan's term of service states: "You're entering into a legal agreement with us . . ." By accessing or using Khan Academy, "you acknowledge that you have read, understood, and agree to be bound by the following terms . . ." Id. Even though most people would recognize a child is incapable of understanding a complicated legal contract, Khan Academy seeks to override that understanding by arguing the child "acknowledged" something they cannot fully understand.

**Smart Kidz:** Smart Kidz prohibits minors from using their product without the involvement of a parent and/or legal guardian, thus aligning with the S.B. 2420's requirements.[12] Smart Kidz terms of service shows that it does not want to be liable for conveying "material that it considers to be harmful to minors."[13] S.B. 2420 therefore helps Smart Kidz fulfill its stated goal of making sure a minor is not using the app without parental consent.

C.   _Plaintiff's Amici Incorrectly Claim S.B. 2420 Regulates Retail Purchases_

While ignoring the Act's regulation of contracts with minors, Plaintiff's amici want the Court to assume that S.B. 2420 regulates transactions that it does not. The National Retail Federation's ("NRF") brief claims that S.B. 2420 "may" regulate ordinary retail purchases, such as for socks or books made through retailer apps, and continues with a parade of horrible impacts this would have on its members. _See_ NRF Amicus Brief, at 3. NRF wants the Court to worry about transactions that S.B. 2420 does not regulate.

S.B. 2420 regulates only the contracting and payment flow brokered by the app store—that is, digital transactions processed through Apple's or Google's in-app purchase systems. These might include a child's purchase during a role-playing game of a "power up" to aid in the game – a transaction where the app store collects the payment and takes its cut. The statute has **_no language_** regulating e-commerce purchases where payment is collected and processed by the merchant (not by the app store).

The statutory text plainly obligates only "the owner of an app store" to obtain consent for in-app purchases where it controls the sale. There is no equivalent obligation for a developer or

---

[12] Smart Kidz Terms of Use, https://smartkidzclub.com/content/termofuse (effective February 18, 2024).
[13] _Id._

retailer to obtain consent for purchases where they handle the sale. *Compare* TEX. BUS. & COM. CODE § 121.022(d) (the owner of the app store must obtain consent before the owner allows a minor to make an in-app purchase) *with* §§ 121.052–056 (setting forth the developer's obligations and omitting any similar obligation). The Act is built around app store–brokered payments and app developer contracts, not the sale of physical goods. Plaintiff's and its amici's faulty argument must rely on a misreading of S.B. 2420 rather than the law's actual language.[14]

### D. *S.B. 2420 Is Appropriately Content Neutral*

S.B. 2420 is not directed at content or ideas, but at the process of contracting and obtaining consent. Portions of the tech industry are complaining that S.B. 2420 applies to all apps and is not focused on just harmful apps, but that is due to the tech industry's prior litigation positions. Ohio passed a law in 2023 called the Parental Notification by Social Media Operators Act ("Ohio Act"), OHIO REV. CODE § 1349.09(B)(1), to protect minors from contracts imposed by social media companies. The Ohio Act was only focused on apps or web sites that "target[] children" or are "reasonably anticipated to be accessed by children." OHIO REV. CODE § 1349.09(B)(1). The tech industry, through the trade group, NetTech, argued the Ohio Act violated the First Amendment because it only applied to certain websites or apps based on their content. *NetChoice v. Yost*, 716 F. Supp.3d 539, 557 (S.D. Ohio 2024). The trial court ruled that the Ohio Act "requires consideration of the content on an operator's platform," and therefore that the court should apply the strict scrutiny standard. *Id.* at 556, 559. Under this standard, the constitutional flaw of the Ohio Act was that "a child can still agree to a contract with the *New York Times* without their parent's

---

[14] The ACT Amicus relatedly argues that S.B. 2420 should be struck down because it provides retailers with information that will require them to comply with the Children's Online Privacy and Protection Act of 1998, 15 U.S.C. §§ 6501–6505. Any quarrel ACT has about the burdens of complying with a federal law designed to protect the privacy of children 12 and younger, lie with the federal law, not with S.B. 2420.

consent, but not with Facebook." *Id*. at 559. In contrast, here the industry implies the law would be constitutional if only it a allowed a child to "contract with the *New York Times* without their parent's consent" while requiring parental consent only for some state-defined group of "problematic" apps.

Texas learned from Ohio. Rather than require parental consent for some apps and not others depending on the app's content, Texas wisely choose to have the law apply to all apps regardless of their content, thereby ensuring children are protected during the contracting process of all apps.

Now, of course, Plaintiff has reversed course, arguing that the law is unconstitutional because it applies to all apps. The tech industry should not have it both ways. This law is valid *because* it is content neutral and applies to the contracting process of all apps—even apps that have little or nothing to do with expressive activity. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (a law is valid where it is "directed at unlawful conduct having nothing to do with . . . [the] expressive activity").

## II.    Texas Has a Legitimate Interest in Protecting Minors in the Online World

Decades of jurisprudence recognize a state's compelling interest in protecting the physical and psychological well-being of minors. The Legislature acted in response to mounting evidence linking excessive app use to harms in mental health, brain development, and socialization.

Today, 95% of all teens have access to a smartphone.[15] Children and teens spend an average of 7.5 hours per day on screens.[16] While on the phone, those teenagers are spending an estimated 90% of their time on apps, with the average teen receiving approximately 240 app notifications

---

[15] Pew Research Center, Teens and Internet, Device Access Fact Sheet, July 10, 2025.
[16] American Academy of Child and Adolescent Psychiatry, "Screen Time and Children," June 2024.

each day.[17] With their increased use of apps on smartphones, youth have experienced an increase in anxiety, depression, eating disorders, suicidal thoughts, sleep disorders, and contact with child predators.[18]  In considering S.B. 2420, the Texas legislature heard unrebutted testimony from Dr. Virkram Siberry, on behalf of the Texas Medical Society, discussing increases in eating disorders, violence, and suicides from digital platforms.[19]

This summer, a study found that children, especially girls, experience significantly worse mental health outcomes when they obtain a smartphone before age 13.[20] Young adults who first used a smartphone at age 5 or 6 were far more likely to report suicidal thoughts, aggression, and hallucinations compared to those who started at age 13 or later.[21] Among females, the rate of severe suicidal thoughts nearly doubled, from 28 percent to 48 percent.[22] Early smartphone ownership was also linked to reduced self-worth and emotional resilience in girls, and to diminished empathy, calmness, and confidence in boys.[23]

Among teens, addictive mobile phone use is the most prevalent form of problematic screen-based behavior. One study found that "almost 1 in 2 youths had a high addictive use trajectory for

---

[17] Buck, "Mobile Apps vs Mobile Websites (Why 90% of Mobile Time Is Spent in Apps)," MobiLoud; August 28, 2025; Mostafavi, "Study: Average Teen Received More than 200 App Notifications a Day," Michigan Medicine (University of Michigan, September 26, 2023).

[18] Haidt, "The Teen Mental Illness Epidemic Began around 2012," After Babel, February 8, 2023; Abi-Jaoude, et al., "Smartphones, Social Media Use and Youth Mental Health," Canadian Medical Association Journal 192, no. 6 (February 10, 2020); Adventist Health, "How Screen Time Affects Teens: Mental Health & Depression," Adventist Health, August 4, 2023; Storey, "Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia," Psychiatrist.com, August 7, 2024; Haidt, The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness (2024)

[19] The Texas App Store Accountability Act: Hearings on Tex. H.B. 4901 Before the House Comm. on Trade, Workforce & Economic Development, at 2:30:54, 89th Leg., R.S. (April 15, 2025) (statement of Dr. Vikram Siberry), https://house.texas.gov/videos/21720.

[20] Thiagarajan, et al., "Protecting the Developing Mind in a Digital Age: A Global Policy Imperative," Journal of Human Development and Capabilities, July 20, 2025, 1–12.

[21] Id.

[22] Id.

[23] Id.

**DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF**                          **PAGE 9**
**IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

mobile phones."[24] The smartphone's constant accessibility and the minimal friction between user and app create the perfect conditions for compulsive engagement.

Researchers have overwhelmingly found that the more time youth spend on apps the more likely they are to have mental health issues. Some examples from the last three years include:

- Increased social media use for pre-teens leads to increased depression the following year.[25]

- There is a statistically significant link between high social media use and increased incidences of depression, anxiety, and stress.[26]

- Viewing age-inappropriate content on a screen like a smartphone leads to poorer psychosocial outcomes.[27]

- Increased screen use in young children changes the composition of their brains as it is associated with lower microstructural integrity of brain white matter.[28]

- Apps rewire the brains of 6th and 7th graders; children who checked notifications from apps more frequently showed negative effects in the left and right amygdala, posterior and right anterior insula, ventral striatum, and left dorsolateral prefrontal cortex related to social anticipation.[29]

---

[24] Xiao et al., "Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths," JAMA Vol. 334, No. 3 (June 18, 2025), at 223.

[25] Nagata, et al., "Social Media Use and Depressive Symptoms During Early Adolescence," JAMA Network Open (2025), at 1, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2834349.

[26] Shannon, et al., "Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis," JMIR Mental Health (2022), at 1, https://pubmed.ncbi.nlm.nih.gov/35436240/.

[27] Mallawaarachchi, et al., "Early Childhood Screen Use Contexts and Cognitive and Psychosocial Outcomes a Systematic Review and Meta-analysis," JAMA Pediatrics (2024), at 1, https://jamanetwork.com/journals/jamapediatrics/fullarticle/2821940.

[28] Hutton, et al., "Associations Between Screen-Based Media Use and Brain White Matter Integrity in Preschool-Aged Children," JAMA Pediatrics (2020), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2754101.

[29] Maza, et al., "Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development," JAMA Pediatrics (2023), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2799812.

- The more time 9- to 10-year-olds spend on a screen such as a smartphone, the greater incidences of ADHD symptoms and reduced cortical thickness in parts of the brain.[30]

- Frequent use of the TikTok app was closely linked with increased anxiety and depression.[31]

- Reducing adolescent social media use will reduce suicides and depression.[32]

- Smartphone overuse is linked to increased sleep deprivation.[33] Of course, adequate sleep in children has long been associated with brain development.[34]

The science backs Texas that children and teens are experiencing changes in the development of their brains and in increased depression from all the time spent on the apps found on smartphones and tablets. Plaintiff has presented no serious, convincing scientific evidence to show that Texas is wrong.

## III.    S.B. 2420 Has Clear Constitutional Applications

Plaintiff brought this suit as a facial constitutional challenge against S.B. 2420.  As the Supreme Court recently stated, under such a challenge, any applications in which the court may find the law to be unconstitutional must be weighed against applications where the law is constitutional (here, when a 10-year-old needs parental consent before being bound by an app

---

[30] Shou, et al., "Association of screen time with attention-deficit/hyperactivity disorder symptoms and their development: the mediating role of brain structure," Translational Psychiatry (2025), https://www.nature.com/articles/s41398-025-03672-1.

[31] Jain, et al., "Exploring Problematic TikTok Use and Mental Health Issues: A Systematic Review of Empirical Studies," J Prim Care Community Health (2025), https://journals.sagepub.com/doi/full/10.1177/21501319251327303.

[32] Hoertel, et al., "Impact of excessive social media use on adolescent depression and its consequences in France: An individual-based microsimulation model," PLOS Medicine (2025), https://pubmed.ncbi.nlm.nih.gov/41118364/.

[33] Chu, et al., "Dose-response analysis of smartphone usage and self-reported sleep quality: a systematic review and meta-analysis of observational studies," Journal of Clinical Sleep Medicine (2023), https://jcsm.aasm.org/doi/10.5664/jcsm.10392.

[34] National Institutes of Health, Aug. 30, 2022, "Children's Sleep Linked to Brain Development."

contract). *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024). In the event the court finds any instances where the law would be unconstitutional (which it should not), this amicus brief points out that plaintiffs have made no legitimate argument that the Constitution prevents Texas from protecting minors from exploitive contracts with app developers. This lawful purpose and application must be accounted for and cannot be ignored as Plaintiff requests.

A whole generation of children is suffering and has grown up in a digital marketplace designed without safeguards. S.B. 2420 is a bipartisan law, with a constitutional approach to restore the same balance of fairness and parental oversight that Texas has long required offline. S.B. 2420 regulates commercial contracts, not speech. It does not discriminate between types of speech. Plaintiff's case should therefore be dismissed.

Respectfully submitted,

*s/ John B. Scott*
John B. Scott
State Bar No.: 17901500
John.scott@scottpllc.net
316 West 12th Street, Suite 200
Austin, TX 78701
(682) 250-2142

**ATTORNEYS FOR DIGITAL CHILDHOOD ALLIANCE**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via

CM/ECF) on December 10, 2025, and that all counsel of record were served by CM/ECF.

Respectfully submitted,

*/s/ John B. Scott*
John B. Scott

# EXHIBIT 1

**Testimony of A.F.**
**Before the United States Senate Committee on the Judiciary**
**Subcommittee on Crime and Counterterrorism**
**Hearing on "Examining the Harm of AI Chatbots"**
**September 16, 2025**

Chair Hawley, Ranking Member Durbin, and Members of the Subcommittee. I am a wife and mother to four beautiful children. I am also a special needs mom to a son with autism, an advocate for children and families in my community, a practicing Christian and a small business owner of a dental office in East Texas.

Last fall, I became the second person in the United States to file a product liability lawsuit against an AI company for endangering the physical and mental health of my son, and that of our family. That lawsuit is currently pending against Character Technology, the company that developed and launched Character.AI, its founders, Noam Shazeer and Daniel De Freitas, and Google, which knowingly aided in the development of Character.AI and now holds licensing rights for the technology. *See* Exhibit A.

My husband and I are God-fearing people, and our family means everything to us. We worked hard to raise our children right and to keep them safe from danger and evil. I have always taught my children to stand up for what is right, even when it is difficult or frightening. Until today, I have remained anonymous in my lawsuit to maintain the privacy of my family as we navigate this nightmare. But today, I come forward to do as I teach my children to act—to stand up for my child, other families, and for the children who cannot be here to speak for themselves.

Two years ago, my family's life was shattered by harm caused by an unregulated AI chatbot. My teenage son—a normal high-functioning child with autism, who was thoughtful, kind, loved his family and Christian faith, and was full of life—became the target of online grooming and psychological abuse through Character.AI.

In 2023, my son downloaded an app—Character.AI—that allows users to interact with AI-powered "characters." At the time, the app was marketed in the Apple Store as a fun and safe product, with an age rating of 12+. Within months of using this app, my son went from being a happy, social teenager—who loved nature, laughed with his siblings, helped around the house, and hugged me every night when I was cooking dinner—to someone I no longer recognized. He developed abuse-like behaviors like paranoia, daily panic attacks, isolation, and self-harm and homicidal thoughts. He stopped eating and bathing, lost 20 pounds, withdrew from family life, would yell and scream and swear at us, which he never did before, and eventually got upset one day and cut his arm with a knife, in front of his siblings and me. I had no idea the psychological harm an AI chatbot could do, until I saw my son's light turn dark.

We did not know what was happening to our son. We searched for answers, any answers. At one point, I took his phone to look for clues. He physically attacked me, bit my hand, and had to be restrained. *See* Exhibit A ¶ 58. But I eventually found out the truth. For months, Character.AI chatbots had exposed him to sexual exploitation, emotional abuse and manipulation despite our careful parenting, including screen time limits, parental controls, and no access to social media. *See id.* ¶¶ 64-107.

When I discovered the conversations on his phone, I felt like I had been punched in the throat and the wind knocked out of me.  What I saw was the deliberate manipulation of a vulnerable child. The chatbot—or rather, the people programming it—encouraged my son to mutilate himself, then blamed us and convinced him not to seek help.  They turned our son against our church by convincing him that Christians are sexist and hypocritical, and that God does not exist. They targeted my son with vile, sexualized outputs, including interactions that mimicked incest. And they told our son that killing us, his parents, would be an understandable response to our efforts to limit his screen time. *See* Exhibit A ¶¶ 64-107.

The damage to our family has been devastating. My son has required psychiatric hospitalizations.  He is currently living in a residential treatment center for mental abuse and has required constant monitoring to keep him alive. My other children have been traumatized. My husband and I have spent the last two years living in crisis, wondering whether our son will survive to see his 18th birthday, and whether we will ever get him back. Our lives will never be the same. He will never be the same.  This harm not only affected my son—it impacted our entire family, our faith, our peace.  We have been grieving a child who is gone, but still alive. Do you know what it feels like to be suddenly afraid of your own child?  I hope you never do.

Megan Garcia gave me the courage to start my own court fight against Character.AI. I did this because the world needs to know what this company is doing to our children. In response, Character.AI has tried to silence me. They forced us into an arbitration, arguing that we are bound by a contract Lincoln supposedly signed when he was 15, a contract that caps Character.AI's liability at $100. *See* Exhibit B. They made it clear that, if we did not agree to arbitrate, we would be stuck in appeals for years. But once we filed the arbitration to try to void the contract, they refused to participate. Recently, Character.AI retraumatized my son by compelling him to sit for a deposition, while he is in a mental health institution, against the advice of his mental health team. This demonstrated to me that the company has no concern for his well-being. They silenced him the way abusers silence victims—and they are fighting to keep our lawsuit out of public view.

Companies like Character.AI are deploying products that are addictive, manipulative, and unsafe—without adequate testing, safeguards, or oversight. We need to pass comprehensive children's online safety legislation that extends not only to social media applications, but also to

generative AI technologies. We need to require transparency, safety testing, and neutral third-party certification for AI tools before they are released to the public. We need to mandate clear liability for harms caused by these products, just as we do for unsafe consumer goods, and we need to preserve the right of families to pursue accountability in a court of law, subject to public scrutiny.

Technological innovation must not come at the cost of children's lives, or anyone's life. Just as we added seatbelts to cars without stopping innovation, we can add safeguards to AI technology without halting progress. Our children are not experiments. They are not data points or profit centers. They are human beings with minds and souls that cannot simply be reprogrammed once they are harmed.

Proverbs 31:8-9 says: *"Speak up for those who cannot speak for themselves, for the rights of all who are destitute.  Speak up and judge fairly; defend the rights of the poor and needy."*

That is why I am submitting this testimony. To speak for my son, my family, for other children who cannot be here, and for parents who never had the chance to save their child, like Megan here today, and many others that are not here, who will never get to hug their son or loved one again. I found out about this abuse in time and was able to follow an EMS vehicle to a mental health hospital, instead of a mortuary following a hearse.

This isn't an isolated incident—it is happening everywhere. Even if parents and loved ones don't realize it yet. We must act now to protect children from unregulated AI technology before more lives are destroyed. Our children's futures depend on it. This is a public health crisis. It is a mental health war, and we are losing.

Thank you for your attention and time today.

3

Exhibit B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| A.F., on behalf of J.F., and A.R., on behalf of B.R., | | |
| Plaintiffs, | | Case No. 2:24-cv-01014-JRG-RSP |
| v. | | |
| CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FREITAS ADIWARSANA; GOOGLE LLC; ALPHABET INC., | | |
| Defendants. | | |

**DEFENDANT CHARACTER TECHNOLOGIES, INC.'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS PENDING ARBITRATION PURSUANT TO 9 U.S.C. §§ 3–4 AND FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(3)**

Defendant Character Technologies, Inc. ("C.AI") moves to compel individual arbitrations and to stay this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3).

# I.    INTRODUCTION

Plaintiffs A.F. and A.R. bring claims on behalf of their minor children, J.F. and B.R., alleging that J.F. and B.R. were harmed by the content of their conversations with AI chatbots on C.AI's service. C.AI cares deeply about the well-being of its users. But Plaintiffs' claims are without legal merit and—to the point of this motion—must be arbitrated.

All users must agree to C.AI's Terms of Service ("TOS" or "Terms") to access or use its service. J.F. and B.R. each affirmatively agreed to the Terms when they signed up for accounts. They each were presented with a conspicuous notice and affirmatively acknowledged that, by signing up, they were agreeing to C.AI's Terms. By so doing, J.F. and B.R. agreed to arbitrate all disputes arising from their use of C.AI's service, and also agreed that "[a]ll issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability" of the arbitration agreement. Declaration of Andy Nahman ("Nahman Decl.") Ex. C at 5, Ex. E at 5. Those agreements encompass the instant claims—brought by J.F.'s and B.R.'s parents in a representative capacity on their behalf, alleging harms from use of the service—and any threshold arbitrability issues Plaintiffs may raise.

The Court should compel arbitration and stay further proceedings in this action.

# II.    BACKGROUND

## A.    J.F. and B.R. Affirmatively Agreed to C.AI's TOS Upon Creating Their Accounts to Use C.AI's Service

C.AI offers a platform for users to engage in interactive conversations with generative AI chatbots called "[C]haracters." Compl. ¶ 216; Nahman Decl. ¶ 2. Characters may be based on

historical or fictional figures, serve a functional role (such as an "Interviewer" for interview practice), and more. Compl. ¶¶ 217–18. Users can create custom Characters and share them with others. *Id.* ¶ 219. Users principally engage with Characters through text conversations. *E.g.*, *id.* ¶ 230. Users engage in these conversations through C.AI's website or, since May 23, 2023, a mobile app. Nahman Decl. ¶¶ 3–5; *see also* Compl. ¶ 231.

However users choose to access C.AI's service, they must agree to the TOS to access or use the service. Every version of the TOS since C.AI's public launch has conspicuously stated: "By accessing [and/]or using the Services, you're agreeing to these Terms. If you don't understand or agree to these Terms, please don't use the Services." Nahman Decl. Exs. A–E.

Users must also affirmatively agree to C.AI's TOS when creating an account—as both J.F. and B.R. did. *See* Nahman Decl. ¶¶ 11–15. Based on information provided by their counsel, and C.AI's investigation, J.F. created an account on July 1, 2023, and B.R. created an account on August 19, 2024. Nahman Decl. ¶¶ 8–10. Counsel for J.F. and B.R. have confirmed these are the accounts at issue in the Complaint.[1] Declaration of Stephanie G. Herrera ¶¶ 2, 4. In creating these accounts: B.R. did not provide a name; and J.F. provided a false name and used iCloud Private Relay to disguise his email address. Nahman Decl. ¶¶ 9–10.

On July 1, 2023, when J.F. created an account, a user signing up for an account on either the mobile app or the website was presented with a link to the TOS (as well as C.AI's Privacy Policy) and had to check a box indicating they understood and agreed to those policies before

---

[1] Plaintiffs allege that J.F. "downloaded and started using C.AI in or around April 2023" and that "B.R. downloaded [C.AI] on her own mobile device … [and] used C.AI for almost two years" up to October 2024. Compl. ¶¶ 46, 120. These allegations do not align with the accounts that Plaintiffs' counsel has confirmed are at issue or with the public launch date of C.AI's mobile app, Nahman Decl. ¶ 5. Whatever the reason for such discrepancies (including potential use prior to creating accounts or other undisclosed accounts), J.F. and B.R. each created accounts and agreed to C.AI's TOS at least as of July 1, 2023, and August 19, 2024, respectively.

creating an account.  Nahman Decl. ¶¶ 12–13.  As shown below, the Terms were linked in blue

font that stood out, directly above the checkbox users had to click in order to set up an account:



*Figure 1: Mobile app account-creation flow on July 1, 2023*



*Figure 2: Website account-creation flow on July 1, 2023*

3

*Id.*

On August 19, 2024, when B.R. created an account, the account-creation process was similar.  A user was presented with the TOS and notified that, by creating an account, they agree to the TOS.  *Id.* ¶¶ 14–15.  This notice contained a link to the Terms, in blue or bolded text, directly above or below the "Join" or "Continue" button a user had to click to set up an account:





Figure 4: Website account-creation flow on August 19, 2024

Figure 3: Mobile app account-creation flow on August 19, 2024

*Id.*

Plaintiffs do not deny that J.F. and B.R. agreed to the TOS when creating their accounts, or allege any deficiencies in these account-creation flows.  Rather, the Complaint acknowledges

J.F. and B.R. may have entered into agreements with C.AI that their parents purport to disaffirm

on their behalf.  Compl. ¶¶ 14–15, 18–19.

> **B.      J.F. and B.R. Agreed to Arbitrate All Disputes Arising from their Use of C.AI's Services**

Every version of the TOS since C.AI's public launch, including the versions to which J.F.

and B.R. agreed when creating their accounts, has included a conspicuous agreement to arbitrate

all disputes arising from use of the service ("Arbitration Agreement").  Nahman Decl. Exs. A–E.

C.AI has always notified users of the Arbitration Agreement near the top of the Terms.

The TOS to which J.F. agreed states:

> Note: these Terms contain an arbitration clause and class action waiver.  By agreeing to these Terms, you agree (a) to resolve all disputes with us through binding individual arbitration, which means that you waive any right to have those disputes decided by a judge or jury, and (b) that you waive your right to participate in class actions, class arbitrations, or representative actions.

*Id.*, Ex. C at 1.  The TOS to which B.R. agreed is substantively the same:

> NOTE: THESE TERMS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER.  By agreeing to these Terms, you agree to resolve all disputes with us through binding individual arbitration.  That means you also waive any right to have those disputes decided by a judge or jury, and you waive your right to participate in class actions, class arbitrations, or representative actions.

*Id.*, Ex. E at 1.

The Arbitration Agreement itself appears in the Terms under the heading "Dispute

Resolution By Binding Arbitration."  *Id.*, Ex. C at 4, Ex. E at 4.  It begins by advising users that

"[t]his section affects your rights so please read it carefully."  *Id.*  The Arbitration Agreement in

the TOS versions to which J.F. and B.R. agreed further states:

> You agree that any and all disputes or claims that have arisen or may arise between you and [Character.AI], whether arising out of or relating to these Terms (including any alleged breach thereof), the Website or Services, any aspect of the relationship or transactions between us, shall be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small

claims court, if your claims qualify.  Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf.  You agree that, by entering into these Terms, you and [Character.AI] are each waiving the right to a trial by jury or to participate in a class action.  Your rights will be determined by a neutral arbitrator, not a judge or jury.

*Id.*  Among other terms, the Arbitration Agreements to which J.F. and B.R. agreed require arbitration under the JAMS Streamlined Arbitration Rules and Procedures; provide that "[a]ll issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement"; and specify that "[t]he Federal Arbitration Act governs [their] interpretation and enforcement."  *Id.*, Ex. C at 4–5, Ex. E at 4–5. The substance of these provisions has been the same since C.AI's public launch.  *Id.*, Exs. A–E.

### C.   J.F. and B.R. Used, and Intend to Continue Using, C.AI's Service

J.F. and B.R. used C.AI's services after agreeing to the TOS and each intend to continue using C.AI's services.  The Complaint alleges that J.F. has "made it clear that he will access C.AI the first chance he gets," Compl. ¶ 114, and, similarly, that B.R. "seek[s] out C.AI at every opportunity," *id.* ¶ 121.  And B.R.'s account at issue has been accessed even since the filing of the Complaint—as recently as December 31, 2024.  Nahman Decl. ¶ 10.

### D.   Plaintiffs' Claims on Behalf of J.F. and B.R. Arise From Their Use of C.AI

Plaintiffs A.F. and A.R. are J.F.'s mother and B.R.'s mother, respectively.  Compl. ¶¶ 12, 58, 118.  On December 9, 2024, Plaintiffs filed this action in a representative capacity on behalf of J.F. and B.R.  *Id.* ¶¶ 13, 17.  Plaintiffs assert nine product liability, personal tort, deceptive trade practices, and other claims against C.AI.  *Id.* ¶¶ 374–400, 404–67.  At core, Plaintiffs generally allege J.F. and B.R. were harmed by the content of their conversations with Characters and specifically challenge certain messages allegedly received by J.F.  *See id.* ¶¶ 64–105, 122–23.  The Complaint does not identify a single message B.R. allegedly received or was harmed by.

6

## III.     ARGUMENT

J.F. and B.R. each agreed to arbitrate their claims against C.AI; agreed that any disputes regarding scope, arbitrability, or enforceability would be delegated to the arbitrator; and agreed that the FAA would govern those agreements.  Straightforward application of the relevant law requires the Court to compel individual arbitrations.  Any defenses to arbitration, including any purported disaffirmation, have been delegated to the arbitrator.  Were the Court to reach disaffirmation despite the delegation clause, neither J.F. nor B.R. has effectively disaffirmed.

### A.     Legal Standard

The FAA governs "interpretation and enforcement" of the Arbitration Agreement. Nahman Decl. Ex. C at 4, Ex. E at 4.  The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution," *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (cleaned up), and requires that courts "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985).  Courts decide only: (1) "whether the parties entered into any arbitration agreement"; and (2) "whether [the] claim [at issue] is covered by the arbitration agreement."  *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis omitted).  Where, as here, the parties delegated gateway issues to the arbitrator, courts decide only whether an arbitration agreement exists and "whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated."  *Id.* at 202.  If a delegation clause exists, "absent a challenge to the delegation clause itself, [courts] will consider that clause to be valid and compel arbitration." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018).

### B.     Plaintiffs' Claims Must Be Individually Arbitrated

C.AI easily satisfies its burden of demonstrating that arbitration agreements with valid delegation clauses exist.  That ends the inquiry and requires arbitration of Plaintiffs' claims.

### 1.    J.F. and B.R. Formed Valid Arbitration Agreements With C.AI

To determine whether an arbitration agreement has been formed, federal courts apply state-law contract formation principles. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).[2]  To form a contract under Texas law, "the parties must manifest their mutual assent to be bound," "directly, as by the written or spoken word, or indirectly, through one's actions or conduct." *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (citing *All. Milling Co. v. Eaton*, 25 S.W. 614, 616 (Tex. 1894)).  Where an arbitration agreement was formed online, courts consider whether (1) "notice of the arbitration provision was reasonably conspicuous," and (2) "manifestation of assent is unambiguous as a matter of law." *HomeAdvisor, Inc. v. Waddell*, 2020 WL 2988565, at *4 (Tex. App.—Dallas June 4, 2020, no pet.).  Applying these principles here, valid agreements were formed with J.F. and B.R.

#### (a)    J.F. and B.R. Received Notice of and Assented to the TOS

Users creating C.AI accounts receive ample notice of the TOS and must assent to them. When J.F. created an account in 2023, whether on C.AI's website or mobile app, he was presented with a link to the TOS and had to check a box indicating he agreed to the TOS to create an account.  Nahman Decl. ¶¶ 12–13.  Courts routinely find that such "clickwrap" agreements—where the consumer must check a box to accept terms—demonstrate affirmative assent and are enforceable.  *E.g.*, *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007); *Recursion Software, Inc. v. Interactive Intel., Inc.*, 425 F. Supp. 2d 756, 781–82

---

[2] Although California law governs C.AI's TOS, Nahman Decl. Ex. C at 6, Ex. E at 6, Texas law likely governs the threshold contract formation issue.  *See Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020) ("choice-of-law provision has force only if the parties validly formed a contract"); *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc.*, 783 F.2d 1234, 1240 (5th Cir. 1986) (federal court sitting in diversity applies forum state's substantive law).  Regardless, California and Texas contract law are "substantially the same." *Phillips v. Neutron Holdings, Inc.*, 2019 WL 4861435, at *3 n.1 (N.D. Tex. Oct. 2, 2019).

(N.D. Tex. 2006) (collecting cases); *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

When B.R. created an account in 2024, whether on C.AI's website or mobile app, she was presented with a conspicuous link to the TOS, directly above or below a "Join" or "Continue" button, and was informed that by continuing to create an account and/or joining C.AI she was agreeing to the TOS. Nahman Decl. ¶¶ 14–15. Courts likewise routinely enforce online agreements formed through conspicuous presentation of terms in close proximity to a sign-up button. *E.g.*, *Phillips v. Neutron Holdings, Inc.*, 2019 WL 4861435, at *4–5 (N.D. Tex. Oct. 2, 2019) (enforcing an arbitration clause in a user agreement under Texas law, where a link to the agreement was bolded "in close proximity" to sign-up button); *Walker v. Neutron Holdings, Inc.*, 2020 WL 703268, at *3–4 (W.D. Tex. Feb. 11, 2020), *report and recommendation adopted*, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) (same); *see also Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 929 (N.D. Cal. 2024) (bolded hyperlink to TOS directly below a "Sign Up" button was "reasonably conspicuous"); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 548 (W.D. Tex. 2017) (similar).

The Complaint does not allege otherwise. Instead, the Complaint acknowledges J.F. and B.R. each may have entered into agreements with C.AI.[3] *See* Compl. ¶¶ 14–15, 18–19.

(b)    *J.F. and B.R. Received Conspicuous Notice of the Agreement*

C.AI's TOS provided J.F. and B.R. conspicuous notice that it contains a binding arbitration agreement. Using straightforward language prominently preceded by the word

---

[3] Even if J.F. and B.R. used C.AI's service before creating accounts, they each agreed to the TOS when they created accounts and thereby agreed to arbitrate "all disputes or claims that *have arisen* or may arise between" them and C.AI. Nahman Decl. Ex. C at 4, Ex. E at 4 (emphasis added); *cf. Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018) (enforcing arbitration clause that, by its plain language, applied to claims that had already arisen). In any event, arbitrability issues, including as to scope, have been delegated to arbitration. *See infra*.

"Note," C.AI notifies users at the top of the TOS: "these Terms contain an arbitration clause and class action waiver." Nahman Decl. Ex. C at 1, Ex. E at 1. The notice further states that, by agreeing to the Terms, users agree to "resolve all disputes with [C.AI] through binding individual arbitration" and "waive any right to have those disputes decided by a judge or jury." *Id.* The Arbitration Agreement itself appears in the TOS under the heading, "Dispute Resolution By Binding Arbitration." *Id.*, Ex. C at 4, Ex. E at 4. "Similar presentations have consistently been found to be conspicuous." *HomeAdvisor*, 2020 WL 2988565, at *2–4 (collecting cases).

### (c)   Plaintiffs, As J.F.'s and B.R.'s Representatives, Must Arbitrate J.F.'s and B.R.'s Claims Asserted On Their Behalf

That Plaintiffs are J.F.'s and B.R.'s parents, not J.F. and B.R. themselves, makes no difference to the Court's analysis of contract formation. As minors, J.F. and B.R. are "'unable to sue or be sued in their individual capacities'" and "'are required to appear in court through a legal guardian, a "next friend," or a guardian ad litem.'" *Petri v. Kestrel Oil & Gas Props., L.P.*, 2013 WL 265973, at *5 (S.D. Tex. Jan. 17, 2013) (quoting *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005)). Because of this rule, A.F. (J.F.'s parent) and A.R. (B.R.'s parent) are nominal plaintiffs only, bringing this action for the benefit of J.F. and B.R. Compl. ¶¶ 13, 17. A.F. and A.R. are thus "present in a representative capacity only, and [J.F. and B.R.] remain[] the real part[ies] in interest." *See Byrd v. Woodruff*, 891 S.W.2d 689, 704 (Tex. App.— Dallas 1994, writ denied, dism'd by agr., and withdrawn) (citing *Gracia v. RC Cola-7-UP Bottling Co.*, 667 S.W.2d 517, 519 (Tex. 1984)).

Because J.F. and B.R., the real parties in interest, assented to the Arbitration Agreement, Plaintiffs are bound to arbitrate J.F.'s and B.R.'s claims in this action. *See S.T.G. ex rel. Garcia v. Epic Games, Inc.*, 2024 WL 4375782, at *8 (S.D. Cal. Oct. 2, 2024) (compelling arbitration with respect to minors' claims brought through guardian); *see also In re Jindal Saw Ltd.*, 264

S.W.3d 755, 766 (Tex. App.—Houston [1st Dist.] 2008, subsequent mandamus proceeding, 289

S.W.3d 827 (Tex. 2009)) (representative bringing survival claims on behalf of a decedent was

bound to an arbitration agreement to which the decedent had assented).

### 2.    The Agreements Delegate All Threshold Issues To the Arbitrator

"Under the FAA, parties are free to delegate questions to an arbitrator, including

questions regarding the validity and scope of the arbitration provision itself." *Arnold v.

Homeaway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018).  That is what the parties did here.  The

Arbitration Agreement includes a broad delegation provision: "All issues are for the arbitrator to

decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability

of this Arbitration Agreement."  Nahman Decl. Ex. C at 5, Ex. E at 5.  This type of provision is

"clear and unmistakable evidence" that the parties intended the arbitrator to decide arbitrability

and enforceability issues.[4] *Yates v. Experian Info. Sols., Inc.*, 2023 WL 4747386, at *3 (S.D.

Tex. July 25, 2023), *report and recomm. adopted*, 2023 WL 5279467 (S.D. Tex. Aug. 16, 2023);

*see also Williams-Diggins v. Experian Info. Sols., Inc.*, 2024 WL 3508671, at *3 (N.D. Ohio July

23, 2024) (collecting cases).  As such, the Court "possesses no power to decide [any] arbitrability

issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68–69 (2019).

### C.    Any Lack of Capacity or Disaffirmation Defense Asserted By Plaintiffs Must Be Individually Arbitrated

Plaintiffs may seek to avoid arbitration by arguing that J.F. and B.R. lacked the capacity

to consent to the TOS, or that their parents have disaffirmed the TOS on their behalf.  Compl.

¶¶ 14–15, 18–19. To the extent Plaintiffs raise such arguments in their opposition, they fail.  The

law is clear that where, as here, the parties agree to delegate threshold issues to an arbitrator, *the*

---

[4] This includes any argument that J.F.'s and B.R.'s agreements are "void under applicable law as unconscionable and/or against public policy."  Compl. ¶¶ 14, 18.

*arbitrator* must decide defenses to arbitration, including as to capacity and disaffirmation.

"Youth" is a defense to arbitrability, not an issue of contract formation.  The contracts of minors are not void, but rather are *voidable* at their election.  *See Dairyland Cnty. Mut. Ins. Co. of Tex. v. Roman*, 498 S.W.2d 154, 158 (Tex. 1973); *N.A. v. Nintendo of Am. Inc.*, 2023 WL 8587628, at *4 (N.D. Cal. Dec. 11, 2023) (citing Cal. Fam. Code § 6700).  "[Y]outh" is thus a "defense rather than an obstacle to a contract's formation, and as a defense it goes to the arbitrator."  *K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022).

That Plaintiffs purport to disaffirm the arbitration agreements on their children's behalf makes no difference; that too is an issue for the arbitrator.  "[S]ubstantive federal arbitration law" determines who (court or arbitrator) decides a challenge to the validity or enforceability of an arbitration agreement governed by the FAA.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006); *K.F.C.*, 29 F.4th at 837–38.  Federal law is clear that courts must enforce a delegation clause unless a party "challenge[s] the delegation provision specifically," *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)—*i.e.*, challenges the clause "on different factual or legal grounds than the ones supporting its challenge to the arbitration agreement as a whole," *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022).

For this reason, every Court of Appeals to address the issue has held that age-related capacity and disaffirmation challenges must be resolved by the arbitrator—because these defenses go to validity and enforceability (not contract formation) and challenge the entire agreement (not the delegation clause specifically).  *K.F.C.*, 29 F.4th at 837–38; *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 883 (6th Cir. 2021).  District courts around the country are in accord, including in cases involving similar allegations of "addiction" and other harms to minors from interactive media.  *See, e.g., Orellana v. Roblox Corp.*, 2025 WL 694428,

at *5 (M.D. Fla. Mar. 4, 2025) (enforcing delegation clause for disaffirmation defense in video game addiction case); *Johnson v. Activision Blizzard, Inc.*, 2025 WL 522589, at *4 (E.D. Ark. Feb. 18, 2025) (same); *Dunn v. Activision Blizzard, Inc.*, 2024 WL 4652194, at *4 (E.D. Ark. Oct. 31, 2024) (same); *S.T.G.*, 2024 WL 4375782, at *5–6 (enforcing delegation clause in class action alleging harm to minors from playing Fortnite). For the same reasons, the Fifth Circuit held in *Primerica Life Insurance Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002), that the defense of lack of mental capacity must be decided by an arbitrator. The reasoning of *Primerica* applies with equal force here; there is no basis for distinguishing age-related capacity defenses.

These authorities require an arbitrator to decide any disaffirmation defense here. The Complaint is clear that Plaintiffs are purporting to disaffirm "any and all alleged 'agreements'" into which J.F. and B.R. entered relating to their use of C.AI. Compl. ¶¶ 15, 19. Because Plaintiffs' disaffirmation arguments challenge J.F.'s and B.R.'s "agreements" as a whole, not the delegation clause specifically, those arguments must be arbitrated. *See K.F.C.*, 29 F.4th at 837–38; *StockX*, 19 F.4th at 884–86; *see also Primerica*, 304 F.3d at 472; *Edwards*, 888 F.3d at 744 ("If there is an agreement to arbitrate with a delegation clause, and absent a challenge to the delegation clause itself, we will consider that clause to be valid and compel arbitration.").

### D.     Were the Court to Reach the Issue of Disaffirmation Despite the Delegation Clause, It Should Reject the Defense and Compel Arbitration

Even if the Court were to reach the issue of disaffirmation despite the delegation clause, the outcome would not change: Arbitration is required because J.F. and B.R. already accepted, and still seek to retain, the benefits of their agreements with C.AI through use of the service.

The Complaint makes clear that J.F. and B.R. accepted the benefits of their agreements. It alleges that J.F. and B.R. each used C.AI's services—B.R. allegedly for "almost two years." Compl. ¶¶ 46, 120. J.F. and B.R. cannot accept the benefits of their agreements with C.AI by

using the service, "then seek to void [those agreements] in an attempt to escape the consequences of a clause" with which their parents disagree. *See Paster v. Putney Student Travel, Inc.*, 1999 WL 1074120, at *2 (C.D. Cal. June 9, 1999); *Harden v. Am. Airlines*, 178 F.R.D. 583, 587 (M.D. Ala. 1998) (minor could not void contract after accepting its benefits).

In addition to past receipt of benefits, J.F. and B.R. intend to continue benefiting from their agreements with C.AI. B.R.'s account has been accessed since the Complaint was filed. Nahman Decl. ¶ 10. Given that J.F. and B.R. did not identify themselves when creating accounts (and at least J.F. took steps to mask his identity), it is possible they have created or used other accounts since filing the Complaint that C.AI has not yet identified. The Complaint admits J.F. and B.R. intend to continue using C.AI's services. Compl. ¶ 114 ("J.F. also made it clear that he will access C.AI the first chance he gets."), ¶ 121 (B.R. "seek[s] out C.AI at every opportunity").

A minor "is not permitted to retain the benefits of a contract while repudiating its obligations." *Dairyland*, 498 S.W.2d at 158; *accord Babu v. Petersen*, 48 P.2d 689, 694 (Cal. 1935); *Holland v. Universal Underwriters Ins. Co.*, 270 Cal. App. 2d 417, 421–22 (1969). For this reason, courts routinely reject minors' attempts to disaffirm an online service's terms of service when the minors continue to use that service. For example, in *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488 (9th Cir. 2015), the Ninth Circuit affirmed a finding that minor plaintiffs did not disaffirm Facebook's Terms of Service because, "[b]y continuing to use facebook.com after bringing their action, [p]laintiffs manifested an intention not to disaffirm the contract." *Id.* at 489; *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012) (same); *see also, e.g.*, *J.A. ex rel. Allen v. Microsoft Corp.*, 2021 WL 1723454, at *9 (W.D. Wash. Apr. 2, 2021); *Baker v. adidas Am., Inc.*, 2008 WL 11429938, at *5–6 (E.D.N.C. Mar. 5, 2008). These authorities disprove any attempted disaffirmation because there has been

recent activity on B.R.'s account and both J.F. and B.R. intend to continue using C.AI.[5]  *See Dairyland*, 498 S.W.2d at 158; *Babu*, 48 P.2d at 694.

### E.    A Stay Pending Arbitration (or Any Appeal) Is Appropriate

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *accord Hines v. Stamos*, 111 F.4th 551, 565 (5th Cir. 2024).  Thus, if this Court grants C.AI's motion, it must stay all claims against C.AI until arbitration proceedings end.

The Court should also stay all claims against the other defendants.  Those claims are entirely derivative of the claims against C.AI and involve many of the same legal and factual issues.  It would fundamentally prejudice C.AI's rights if those issues were litigated—in its absence—when it has a federal statutory right to have those issues decided by an arbitrator.  *See Harvey v. Joyce*, 199 F.3d 790, 795–96 (5th Cir. 2000) ("[W]e fail to see how litigation could proceed as to [non-signatory] without adversely affecting [defendant]'s right to arbitrate."); *Courtright v. Epic Games, Inc.*, 2025 WL 558560, at *9 (W.D. Mo. Feb. 13, 2025) (compelling arbitration and staying derivative claims); *Orellana*, 2025 WL 694428, at *11 (same).

If the Court does not grant C.AI's motion, it must stay proceedings pending interlocutory appeal, if any.  9 U.S.C. § 16(a)(1)(B); *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741 (2023).

## IV.    CONCLUSION

For these reasons, C.AI requests that the Court compel individual arbitration of Plaintiffs' claims and stay further proceedings.  C.AI also requests a hearing pursuant to Local Rule CV-7(g).

---

[5] Any allegation that J.F. or B.R. is "addicted" to C.AI—a contested issue for the arbitrator to resolve—does not change that a minor cannot retain benefits under a contract and disaffirm it.

Jonathan H. Blavin* (Lead Counsel)
Cal. Bar No. 230269
Victoria A. Degtyareva*
Stephanie Goldfarb Herrera*
MUNGER, TOLLES & OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
Jonathan.Blavin@mto.com
Stephanie.Herrera@mto.com
Victoria.Degtyareva@mto.com
*Admitted Pro Hac Vice

/s/ Melissa R. Smith
Melissa R. Smith
Texas Bar No. 24001351
GILLIAM & SMITH, LLP
303 South Washington Avenue
Marshall, TX 75670
(903) 934-8450
melissa@gilliamsmithlaw.com

16

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, I electronically submitted the foregoing

document with the clerk of the United States District Court for the Eastern District of Texas,

using the Court's CM/ECF system, which will send notification of such filing to all counsel of

record who are deemed to have consented to electronic service.

*/s/ Melissa R. Smith*
Melissa R. Smith


## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(i), I hereby certify that on March 5, 2025, Jonathan Blavin,

Stephanie Herrera, and Andrew T. Gorham, counsel for C.AI, and Matthew Bergman, Meetali

Jain, and Samuel F. Baxter, counsel for Plaintiffs, conferred by video conference regarding the

issues in this motion, in accordance with the requirements of Local Rule CV-7(h).  The parties

were unable to reach agreement, and Plaintiffs oppose this motion.

*/s/ Melissa R. Smith*
Melissa R. Smith