**FILED**
December 09, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY:_____PG_____
DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

---

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION,
        *Plaintiff*,

v.

KEN PAXTON, in his capacity as the
ATTORNEY GENERAL OF TEXAS,
        *Defendant*.

Case No.: 1:25-cv-1660

---

**BRIEF OF THE NATIONAL RETAIL FEDERATION AND THE TEXAS RETAILERS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION**

Stephanie Martz
  NATIONAL RETAIL FEDERATION
1101 New York Avenue, NW
Suite 1200
Washington, DC 20005
+1 (202) 626-8106

Counsel for National Retail Federation

Ashley Hoff
  *Counsel of Record*
MCDERMOTT WILL & SCHULTE LLP
845 Texas Avenue
Suite 4000
Houston, TX 77002
ahoff@mwe.com
+1 (512) 298-4664
J. Jonathan Hawk
  *Pending pro hac vice*
jhawk@mwe.com
+1 (310) 788-4181
Austin Mooney
  *Pending pro hac vice*
amooney@mwe.com
+1 (202) 756-8781
Katelyn N. Ringrose
  *Pending pro hac vice*
kringrose@mwe.com
+1 (202) 756-8176

Attorneys for Amici Curiae

**TABLE OF CONTENTS**

STATEMENT OF IDENTITY AND INTEREST ....................................................................V

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................1

    I.     THE ACT IMPOSES CONTENT-BASED RESTRICTIONS ...............................1

         A.     The First and Fourteenth Amendments Protect Against Content-Based Laws That Restrict the Distribution and Sale of Information ...........1

         B.     The Act Imposes Content-Based Restrictions on Retailers That Sell Goods Through Their Apps .......................................................................3

    II.    THE ACT INFRINGES FREE SPEECH RIGHTS.................................................4

         A.     The Act Cannot Satisfy Strict Scrutiny..........................................................4

         B.     The Act Is Also Void for Vagueness ..............................................................6

         C.     The Act Further Impermissibly Compels Speech ........................................7

   III.    THE ACT IMPOSES UNDUE BURDEN ON RETAILERS .................................7

         A.     The Act's Compliance Costs Are High .........................................................7

         B.     The Act's Requirements Are Unclear in Practice.........................................8

         C.     The Act's Compliance Timeline is Impracticable .....................................10

   IV.    CONCLUSION.......................................................................................................10

CERTIFICATE OF SERVICE .........................................................................................11

# TABLE OF AUTHORITIES

## CASES

*Am. Amusement Mach. Ass'n v. Kendrick*,
   244 F.3d 572 (7th Cir. 2001) ................................................................................................3

*Am. Booksellers Ass'n v. McAuliffe*,
   533 F. Supp. 50 (N.D. Ga. 1981) ........................................................................................2, 6

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ...............................................................................................................2

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ...............................................................................................6, 6

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) .............................................................................................................2

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) .............................................................................................................4

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) .............................................................................................................3

*F.C.C. v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .............................................................................................................2

*First Nat'l Bank of Bos. v. Bellotti*,
   435 U.S. 765 (1978) .............................................................................................................2

*Interstate Circuit, Inc. v. City of Dallas*,
   390 U.S. 676 (1968) .............................................................................................................2

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .............................................................................................................2

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .............................................................................................................2

*Nat'l Press Photographers Ass'n v. McCraw*,
   594 F. Supp. 3d 789 (W.D. Tex. 2022) .................................................................................3

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) .............................................................................................................1

*NetChoice, LLC v. Brown*,
   No. RDB-25-0322 (D. Md. Nov. 24, 2025) ..........................................................................5

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ..................................................................2

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..............................................................................................2

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ..............................................................................................4

*Smith v. California*,
    361 U.S. 147 (1959)...............................................................................................2

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..............................................................................................3

*Winters v. New York*,
    333 U.S. 507 (1948)...............................................................................................2

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ................................................................................2

## LAWS AND STATUSES

Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501–6506............................................8

Tex. Bus. & Com. Code § 121.001 *et seq.* ......................................................................4, 7, 7, 8

Texas Data Privacy and Security Act § 541 ...............................................................................10

## OTHER AUTHORITIES

*Children's Online Privacy Protection Rule*, 89 Fed. Reg. 2034, 2037 (2024),
available at https://www.govinfo.gov/content/pkg/FR-2024-01-11/pdf/2023-
28569.pdf ..............................................................................................................................8

*Tex. S.B. 2420, Bill Analysis, 89th Leg., Reg. Sess. (2025), available at
    https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02420I.pdf* .........................................3, 4

**STATEMENT OF IDENTITY AND INTEREST**

Pursuant to Supreme Court Rule 37, the National Retail Federation ("NRF") and the Texas Retailers Association ("TRA") respectfully submit this brief as amici curiae in the civil lawsuit filed by the Computer & Communications Industry Association ("CCIA").

The NRF is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 additional countries. NRF empowers the industry that powers the economy. Retailers represent the nation's largest private sector employer, contributing $5.3 trillion to the annual GDP and supporting more than one in four U.S. jobs for 55 million working Americans. For over a century, NRF has been a voice for every retailer and every retail job, communicating the powerful impact retail has on local communities and global economies.

The Texas Retailers Association ("TRA") is an association of global, national, state, and local retail businesses dedicated to improving the lives of the consumers who power the Texas economic engine. TRA supports industry through government advocacy and educational programs.

Amici regularly submit filings in cases raising significant legal issues for the retail community. NRF and TRA submit this brief in order to inform the Court of the myriad harms the Texas App Store Accountability Act, Tex. Bus. & Com. Code §§ 121.001 et seq. ("SB 2420" or the "Act"), would have on all app developers in Texas, which includes NRF and TRA members that provide apps and sell commercial items through those platforms.

**INTRODUCTION**

The Act attempts to impose the very types of content-based regulations that have been repeatedly and recently struck down by courts nationwide for violating the First and Fourteenth Amendments. It imposes restrictions on many developers who allow Texas residents to use their apps to make "purchases."[1] By not defining the term "purchases," the Act can be read to sweep in everyday goods sold through apps such as books, movies, and clothing. And within that scope—and under the Act's many requirements applicable to apps themselves—the Act would subject retailers to a host of content-based regulations, ranging from restricting their abilities to sell famous literature to minors to forcing retailers to devise and publish opinions on which goods and apps are appropriate for which ages.

In addition to these First and Fourteenth Amendment violations, the Texas legislature has placed onerous compliance burdens on retailers, including compelled data collection and vague, impractical age verification measures that will only burden commerce in the State. The Court should recognize both the unconstitutionality and impracticality of these rushed, unclear, and burdensome measures, and grant Plaintiff's Motion to preliminarily enjoin the Act.

**ARGUMENT**

**I.  THE ACT IMPOSES CONTENT-BASED RESTRICTIONS**

  **A.  The First and Fourteenth Amendments Protect Against Content-Based Laws That Restrict the Distribution and Sale of Information**

The First Amendment, applicable to States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."[2] Those protections broadly protect not only speech itself, but also the rights of people and entities who disseminate protected information, including by offering it for sale. "Because freedom of speech is 'the indispensable condition[] of nearly every other form of freedom,' the First Amendment 'bars the government from dictating what we see or read or speak or hear,' and protects 'the right to distribute, the right to receive, the right to read

---

[1] *E.g.*, TEX. BUS. & COM. CODE ANN. § 121.022(h)(2)(West 2025).
[2] U.S. CONST., amend I; *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931).

and freedom of thought.'"[3]

The Supreme Court, the Fifth Circuit, and federal courts nationwide have consistently applied free speech principles to strike down content-based regulations that restrict book retailers, film distributors, TV broadcasters, video game companies, and social media platforms[4] from selling and distributing protected information. Courts unwaveringly recognize "the basic principles" of free speech protections "do not vary" when speech is disseminated through "ever advancing technology" such as the internet.[5] And free speech protections do *not* fall away simply because the entity disseminating information seeks financial gain as part of a transaction.[6] To find otherwise—to allow content-based regulations that restrict the dissemination of protected speech regardless of channel—would interfere with protected access to that information.[7] It could coerce parties into not distributing information in the first instance,[8] and that effect is precisely what the First and Fourteenth Amendments guard against.[9]

These protections apply when a law seeks to restrict minors from accessing information, including via modern technology and commercial transactions. As the Supreme Court stated in *Brown v. Entertainment Merchants Association*, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may

---

[3] *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 947-48 (S.D. Ohio 2025) (finding Ohio law unconstitutional in requiring parental consent for minors to access social media) (citations omitted); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.").

[4] *See, e.g.*, *Winters v. New York*, 333 U.S. 507, 519-20 (1948) (books); *Smith v. California*, 361 U.S. 147, 149-50 (1959) (same); *Book People, Inc. v. Wong*, 91 F.4th 318, 338-41 (5th Cir. 2024) (same); *Book People, Inc. v. Wong*, No. 1:23-cv-00858, ECF No. 110, at 13-17 (W.D. Tex. Nov. 15, 2023) (Order) (Albright, J.) (same); *Am. Booksellers Ass'n v. McAuliffe*, 533 F. Supp. 50, 56-58 (N.D. Ga. 1981) (same); *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 688-89 (1968) (film); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 252-56 (2012) (broadcast); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794-95 n.3, 802-04 (2011) (videogames); *NetChoice, LLC*, 778 F. Supp. 3d at 947 (social media); *X Corp. v. Bonta*, 116 F.4th 888, 900-03 (9th Cir. 2024) (same).

[5] *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024).

[6] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964); *see also NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024) (citations omitted).

[7] *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68-69 (1963).

[8] *See, e.g.*, *Book People, Inc.*, 91 F.4th at 330.

[9] *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (finding that a core purpose of the First Amendment is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.").

government bar public dissemination of protected materials to them."[10] "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."[11] A law also cannot make a minor's access to information contingent upon parental consent. Such laws "impose *governmental* authority, subject only to a parental veto[,]" and are unconstitutional.[12]

All of these principles are implicated here, where the State's effort to regulate access by minors to information imposes content-based restrictions. Retailers selling goods (e.g., school supplies, shoes and socks, or expressive items such as books) through their apps, i.e., "purchases," may be covered by the law, and Constitutionally protected speech is thus implicated.[13]

B.  **The Act Could be Read to Apply Content-Based Restrictions on Retailers That Sell Goods Through Their Apps**

The Act is described as "protect[ing] the children of Texas" by "requiring app stores to gain consent from parents" before children can use and make purchases through apps.[14] But the Act is a content-based law that would materially restrict the ability of covered retailers to distribute protected information through their apps, including to minors.

On its face, the Act is *perforce* a content-based regulation, as it applies only to apps that distribute certain content.[15] As to retailers specifically, the Act is drafted such that it can be read to compel speech by covered parties that sell products in their apps (unless the party falls within a content-based statutory exemption).[16] Section 121.052 provides, "[t]he developer of a software

---

[10] *Brown*, 564 U.S. at 794.
[11] *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 213-14 (1975).
[12] *Id.* at 794-95 n.3, 802-04 (emphasis in original); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) (Posner, J.) (finding it unconstitutional to condition minor's access to information on parental consent); *NetChoice, LLC,* 778 F. Supp. 3d at 947.
[13] *See*, *e.g.*, *Winters*, 333 U.S. at 519-20; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507-10 (1969).
[14] Senate Research Center, Bill Analysis, Tex. S.B. 2420, 89th Leg., Reg. Sess. (2025), available at https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02420I.pdf .
[15] *Nat. Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 805 (W.D. Tex. 2022) (Pitman, J.); *Reed v. Town of Gilbert*, *Ariz.*, 576 U.S. 155, 171 (2015); Tex. Bus. & Com. Code Ann. § 121.052(a) (West 2025) (showing that the Act exempts apps from the law's parental-consent requirements if they are operated with nonprofit educational organizations that develop standardized tests for schooling, or if they, among other things, provide access to crisis hotlines. These provisions determine what speech is regulated based on subject matter.)
[16] *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

3

application shall assign to each software application *and to each purchase that can be made through the software application* an age rating based on the age categories it describes."[17] The breadth of that requirement is potentially staggering. It may apply to, for example, a big box retailer whose app offers for sale millions of unique items, including books, movies, clothing, toys, and even groceries. It would force the retailer to *make decisions and publish them*—without any guidance—as to which items are appropriate for use by someone who: is a "child" (under 13); a "younger teenager" (13 to 15); an "older teenager" (15 to 17); or an "adult" (18 and older).[18]

Retailers would be required to opine on the appropriate age for someone without parental consent to use, e.g., a copy of *The Catcher in the Rye*; a t-shirt with political messaging or expressions signaling membership in a group; or a bumper sticker with religious slogans. These are judgement calls that most, if not all, retailers would decide *not* to publish if left to their own volition. Such sensitive determinations could be seen as usurping the judgments of even adult customers. But the Act seeks to override that judgment. It seeks to dictate the content of a covered retailer's speech by compelling the business to decide and declare who can purchase which goods via their apps without parental consent, thus altering the marketplace of ideas. The Act is a content-based regulation, subject to strict scrutiny.[19]

## II.     THE ACT INFRINGES FREE SPEECH RIGHTS

### A.     The Act Cannot Satisfy Strict Scrutiny nor Immediate Scrutiny

Content-based laws such as the Act are subject to strict scrutiny, "the most demanding test known to constitutional law"[20] where a law is "presumptively unconstitutional." To save it, the State must identify a compelling government interest and demonstrate that the law is narrowly drawn to serve that interest.[21] The State here cannot do that; the Act is overinclusive and underinclusive.[22]

---

[17] TEX. BUS. & COM. CODE ANN. § 121.052(a) (West 2025).
[18] Bill Analysis, Tex. S.B. 2420 (2025), at 1 (Author's/Sponsor's Statement of Intent); TEX. BUS. & COM. CODE ANN. § 121.021(a), (b) (West 2025).
[19] *See Bonta*, 116 F.4th at 903 (quotations omitted).
[20] *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).
[21] *Brown*, 564 U.S. at 799; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015).
[22] *Brown*, 564 U.S. at 803-05.

4

On its face, the Act is seriously overinclusive, failing to define what types of products should be subject to sale restrictions. Instead, the Act's restrictions appear to be imposed on potential "purchases," including, e.g., goods for sale through an app. The Act's requirements for age classification could, for example, result in barring groups of minors from purchasing famous literature such as *Lord of the Flies* without parental consent. They could artificially prevent minors from purchasing other expressive materials—e.g., bumper stickers for someone not of legal driving age. Moreover, retailers could incorrectly bar a purchase by someone incorrectly deemed to be too young, or whose account could not be linked to that of a parent who would otherwise readily consent. The Act will inevitably force adults, who are perfectly entitled to make purchases themselves, to prove their age, including those without minor children. The law is tantamount to carding an adult when he or she walks into a grocery store, and then carding them again at the point of purchase—all while forcing retailers to age rate every item on the shelf, except that Texas is now only requiring retailers to do this for purchases made over an app. The Act is unclear as to how retailers should handle items made available by other sellers on their app, and it fails to explain why apps are treated differently than websites.

At the same time, the Act's restrictions are seriously underinclusive. Some parents may consent to a minor purchasing content others deem harmful. Other laws, like those limiting the sale of harmful products like tobacco or alcohol to minors, apply in both physical and digital contexts, restricting minors from buying goods that are harmful *no matter where those purchases take place*. But under the Act, a minor could walk into a retailer's brick-and-mortar store, or merely visit a retailer's website and purchase the same product that a minor would be prohibited from buying without parental consent via that same retailer's app.

Statutes such as the Act have been rightly struck down under the First and Fourteenth Amendments as nothing more than "breathtakingly blunt instrument[s] for reducing [purported] harm to children."[23] There is no reason to reach a different conclusion here, where the Act, a

---

[23] *NetChoice, LLC*, 778 F. Supp. 3d at 956.

content-based law, fails strict scrutiny considering the impact it would have on protected information that would otherwise be readily available for purchase from covered retailers.

B. **The Act Is Also Void for Vagueness**

The Act is also void for vagueness. A law is invalid when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications."[24] The vagueness test becomes even more stringent when a law "interferes with the right of free speech."[25]

Here, the Act provides no guidance on how a covered retailer should assign age classifications for the millions of goods it may sell. Retailers offer many goods for purchase and, for most, there are no agreed-upon guidelines around age-appropriateness. Such decisions are usually, and correctly, left to each family.[26] It is impossible for a retailer to make these decisions using objective criteria, universally agreed upon across families and communities. Any covered retailer attempting to engage in the exercise envisioned under the Act could find itself under attack from all sides—by either setting strict restrictions or being arbitrarily at fault for perceived leniency. A retailer could be left with no choice but to refrain from selling goods through its app in the first instance—a clear distortion of the marketplace of ideas.

Courts in other cases, including in this district just one month ago in *Book People, Inc., et al. v. Wong, et al.*, have found analogous statutes unconstitutionally vague where they purport to require retailers and distributors to assign ratings to books without any objective guidance.[27] The lack of guidance here as to how retailers should assign even more amorphous age classifications under the Act renders the statute entirely vague, leaving open the possibility for arbitrary interpretation and enforcement of the kind the Due Process Clause guards against.

//

---

[24] *Book People., Inc.*, ECF No. 110, at 15 (citations omitted).
[25] *Id.*
[26] *Brown* , 564 U.S. at 803 ("[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest.")
[27] *Book People., Inc.*, ECF 110, at 15-17 (citations omitted); *Am. Booksellers Ass'n*, 535 F. Supp. at 57.

6

### C. The Act Further Impermissibly Compels Speech

"When a state 'compel[s] individuals to speak [] particular messages' the state 'alter[s] the content of their speech,' and engages in content-based regulation."[28] The Act infringes the Constitution here, too. As explained, the Act can be interpreted to compel speech from covered retailers, requiring them to opine on and publish age ratings for goods offered via their apps, as well as the apps themselves.[29] That is unconstitutional, as retailers would otherwise not make those opinion-based statements. The law is not saved simply because the speech would be made in connection with a potential commercial transaction. As other courts have found, it is unconstitutional to force retailers to "opine whether and how certain [] categories" of goods should be age-gated.[30]

## III. THE ACT IMPOSES UNDUE BURDEN ON RETAILERS

### A. The Act's Compliance Costs Are High

Retailers seeking to comply with the Act face a daunting challenge. Retailers can have millions of stock-keeping units ("SKUs") per store, and just as many, if not many more, available for purchase in apps. The effort required to individually rate and detail the "elements that led to each rating"[31] will be incredibly time-consuming, imposing an immediate and direct financial cost for each SKU. That massive compliance undertaking will directly undermine the ability of retailers to do what makes them successful—quickly respond to changes in consumer demand.

The Act's parental consent requirements add to this compliance challenge. Under the Act, retailers will need to rework their in-app purchase flows to first confirm each user's "age category" and, in the case of minors, verify "whether consent has been obtained" for each purchase or app download.[32] Retailers, who are instructed under the Act to base their determinations at least in part on "information received from the owner of an app store,"[33] will need to develop software that

---

[28] *Book People., Inc., et al.*, ECF No. 110, at 15 (citations omitted); *Bonta*, 116 F.4th at 899-903.
[29] TEX. BUS. & COM. CODE ANN. § 121.502 (West 2025).
[30] *Bonta*, 116 F.4th at 899-903.
[31] TEX. BUS. & COM. CODE ANN. § 121.052(b)(2) (West 2025).
[32] *Id.* at § 121.024(2).
[33] *Id.* at § 121.054(b).

interacts with app store programming interfaces to receive and process such information before allowing purchases. Even the most seamless implementations will still cause delays in the purchase process. In retail, purchase delays become purchase abandonments, leading to lost revenue and the erosion of customer trust. Some delays may be outside of retailers' control entirely. What if the app store's system is delayed in communicating the purchaser's age data or consent status? How is a retailer meant to age rate goods that are meant for mixed aged buyers, such as groceries?

The fallout for retailers is not limited to the Act's requirements. Other laws such as the federal Children's Online Privacy Protection Act ("COPPA") may be implicated.[34] Such laws create a pro-privacy structure, whereby businesses are incentivized to minimize the data they collect about users to avoid collecting minors' data. The Act appears to upend such incentives, forcing retailers, who have not historically been covered by such laws, [35] to collect and process information about their customers' age they have no interest in collecting.[36] As a result, retailers may need to build compliance programs not just for the Act but also for COPPA and similar laws with "actual knowledge"[37] requirements that may be triggered by the Act. Such compelled data collection and associated compliance efforts are costly and unnecessary for most retailers. This week, a Maryland district court allowed a challenge against Maryland's Age-Appropriate Design Code Act to move forward, finding that the plaintiff plausibly raised First Amendment concerns and conflicts with federal privacy and content liability protections.[38]

B.   **The Act's Requirements Are Unclear in Practice and Warrant an Injunction**

The Act's lack of clarity poses an additional burden on retailers that weighs in favor of an injunction. The Act requires retailers to "create and implement a system to use information received [from app stores] to verify" the age category and parental consent status of app users.[39]

---

[34] Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501–6506.
[35] *See, e.g.*, Children's Online Privacy Protection Rule, 89 Fed. Reg. 2034, 2037 (Jan. 11, 2024), available at https://www.govinfo.gov/content/pkg/FR-2024-01-11/pdf/2023-28569.pdf (rejecting a broad application of COPPA to general audience businesses, citing legislative history).
[36] TEX. BUS. & COM. CODE ANN. § 121.024(1)(A-C) (West 2025).
[37] *See* Children's Online Privacy Protection Act, 15 U.S.C. § 6501(4)(b).
[38] *NetChoice, LLC v. Brown*, No. RDB-25-0322 (D. Md. Nov. 24, 2025) ("First Amendment protections apply even where the government seeks to protect the interests of children").
[39] *Id.* at § 121.054.

8

While the Act requires developers to "use information received from the owner of an app store" to perform this verification, it fails to clarify whether developers may use *only* this information, or if the retailer must base its decision on other relevant information in the retailer's possession. What if a retailer has information that conflicts with the app store's information? If the retailer previously collected a user's government ID, and linked it to an in-app account, does the ID override a differing age category from an app store? Either way, retailers are at risk—if they go off their own knowledge of a user's age, have they violated the Act because they did not rely on the app store's information? If they instead use information from the app store they know to be inaccurate, will that be used to show they knowingly violated the Act's consent and age verification requirements?

In another ambiguity, the Act requires app stores to verify age when a user "creates an account with an app store."[40] Existing users are thus grandfathered in, and are not subject to app store age verification requirements. But app developers are nonetheless required to confirm an age category "for each user," with no distinction between new and existing users.[41] This results in a gap between app store and developer obligations—there will be a large number of Texans for whom only developers are required to verify age. Do retailers need to develop an independent age verification system to fill in this gap? Or will they be required to turn these users away entirely until they create a new account? How are retailers to handle users who frequent brick-and-mortar and app stores? How are retailers to handle already complex purchases, such as those for a user who made a purchase on a website, returned the item in-person for store credit, and wants to use resulting credit on an app? These are just some of the difficult compliance issues posing significant risk to retailers (not of their own doing) as they seek to comply with the Act's ambiguities.

The Act also imposes significant operational disruptions through its notice requirements, which compel developers to inform app stores of any "significant change" to an app's terms of service or privacy policy.[42] Ambiguity around what constitutes a "significant change"—which

---

[40] *Id.* at § 121.021(a).
[41] *See id.* at § 121.054(1).
[42] *See id.* at § 121.053(a).

may include offering a new product or updating an existing app's services—will, when coupled with the need for retailers to constantly update privacy policies to reflect current practices, lead to a ceaseless cycle of notifications, causing confusion and frustrating the Texas legislature's goal of providing "reasonably accessible and clear privacy notice," as required by the Texas Data Privacy and Security Act.[43] Further, instead of allowing minors the freedom to budget and make independent purchases on approved apps using allowances or "pocket money" from parents, parents will be forced to manually reconsent to every transaction, undermining the ease of digital commerce and guaranteeing constant disruption to the daily lives of both parents and children.

### C. The Act's Compliance Timeline is Impracticable

Retailers have little more than one month before the Act takes effect on January 1, 2026.[44] This is an unreasonable and impracticable timeline for businesses of all sizes, especially small and midsized businesses, to prepare for these burdensome compliance and development costs, not to mention the revenue impacts from potential loss in sales. Some retailers may choose to pull apps out of Texas while they work towards compliance, or even forgo offering services in Texas entirely. This only risks exacerbating the unconstitutional effects of the Act.

## IV. CONCLUSION

For the reasons set forth above regarding the Act's unconstitutional and unduly burdensome impacts, we respectfully ask the Court to grant Plaintiff's Motion and preliminarily enjoin the Act.

Respectfully submitted,

DATED: November 26, 2025

MCDERMOTT WILL & SCHULTE LLP
/s/ Ashley Hoff
/s/ J. Jonathan Hawk
/s/ Austin Mooney
/s/ Katelyn N. Ringrose

Counsel to Amici Curiae

---

[43] TEX. BUS. & COM. CODE ANN. § 541 (West 2025).
[44] TEX. BUS. & COM. CODE ANN. § 121.102(3) (West 2025).

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of same on all counsel of record.

DATED: November 26, 2025

        Respectfully submitted,

        /s/ Ashley Hoff
        Ashley Hoff

        Counsel to Amici Curiae

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,<br>    *Plaintiff*,<br><br>v.<br><br>KEN PAXTON, in his capacity as the ATTORNEY GENERAL OF TEXAS,<br>    *Defendant*. | Case No.: 1:25-cv-1660 |

**[PROPOSED] ORDER GRANTING MOTION OF THE NATIONAL RETAIL FEDERATION AND THE TEXAS RETAILERS ASSOCIATION FOR LEAVE TO FILE AN AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION'S MOTION FOR PRELIMINARY INJUNCTION**

  This Cause came before the Court for review on the Motion of the National Retail Federation and Texas Retailers Association Leave to File Brief as *Amici Curiae* in Support to Plaintiffs' Motion for Preliminary Injunction. The Court has reviewed the file and the applicable law, and being fully advised in the premises, GRANTS the motion.

  SIGNED this _____ day of _____,_____ 2025.

                         _____
                               JUDGE PRESIDING