**FILED**

December 09, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ pg

DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,**<br>*Plaintiff,*<br><br>v.<br><br>**KEN PAXTON, in his capacity as the ATTORNEY GENERAL OF TEXAS,**<br>*Defendant.* | Case No.: 1:25-cv-1660 |

## AMICI CURIAE BRIEF OF
## THE NATIONAL CENTER ON SEXUAL EXPLOITATION
## AND THE DIGITAL CHILDHOOD INSTITUTE
## IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Annie McAdams
*Counsel of Record*
*Texas Bar No. 24051014*
Annie McAdams PC
2900 North Loop West, Suite 1130
Houston, TX 77092
annie@mcadamspc.com
(713)785-6262

Attorney for Amici Curiae

# TABLE OF CONTENTS

**STATEMENT OF IDENTITY AND INTEREST** ............................................................................................1

**INTRODUCTION** ...........................................................................................................................................2

     A. The Legislative Record Establishes a Decade of Documented Commercial Harms to Children and App Stores' Unique Gatekeeping Role.........................................................................................................4

     B. App Stores Occupy a Distinctive and Influential Position in the Technology Ecosystem……………………..…..…6

     C.  Industry Opposition During the Legislative Process and the Shift to Constitutional Claims…………………..…….7

     D. Documented Commercial Harms Underscore the State's Interest……………………………..…………………….…...9

**SUMMARY OF ARGUMENT** .....................................................................................................................11

**ARGUMENT**................................................................................................................................................12

    **I. SB 2420 REGULATES APP STORE CONDUCT, NOT SPEECH, AND APPLE v. PEPPER CONTROLS** .........12

     A. App Stores' Commercial Functions Fall Within State Regulatory Authority .............................12

     B. The Statute Does Not Restrict or Alter Expressive Content and Therefore Does Not Trigger Heightened Scrutiny……………………………………………..…..……………………………………………………………………13

    **II. THE ACT ENFORCES TEXAS'S FUNDAMENTAL DOCTRINE OF CONTRACTUAL CAPACITY** .............14

     A. Regulating Contract Capacity Is a Core Sovereign Function……………………..……………………14

     B. Parental Consent Obligations Align with Federal Obligations……………………………………...……………...16

    **III. AGE RATING PROVISIONS ARE VALID COMMERCIAL DISCLOSURES UNDER ZAUDERER** ..............18

     A. The Act Requires Only Truthful Labeling of Commercial Information the App Stores Have Already Chosen to Provide .............................................................................................................................18

**IV. SEVERABILITY………………………….…………………..……………………………………….…………..20**

**CONCLUSION** ............................................................................................................................................20

**REQUESTED RELIEF** ...............................................................................................................................22

**CERTIFICATE OF SERVICE**....................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Pepper*, 587 U.S. 237 (2019)..................................................................................11, 12, 19

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) ........................................5, 6, 13

*Computer & Communications Industry Ass'n v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025) ...................14

*NetChoice v. Bonta*, 91 F.4th 1142 (9th Cir. 2024)..................................................................................8

*NetChoice v. Griffin*, 72 F.4th 667 (8th Cir. 2023) ...........................................................................5, 8

*NetChoice, LLC v. City of Little Rock*, 646 F. Supp. 3d 961, 964 (E.D. Ark. 2023)…………………….………….5

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651, 105 S.Ct. 2265 (1985) ............................12, 17, 19

**Other Authorities**

H.B. 302, 136th Gen. Assemb., Reg. Sess. (Ohio 2025) ............................................................................8

**STATEMENT OF IDENTITY AND INTEREST**

Pursuant to Local Rule CV-7, the National Center on Sexual Exploitation ("NCOSE") and the Digital Childhood Institute ("DCI") respectfully submit this brief as amici curiae in the civil lawsuit filed by the Computer & Communications Industry Association ("CCIA").

The National Center on Sexual Exploitation ("NCOSE") and the Digital Childhood Institute ("DCI") are nonprofit organizations dedicated to improving children's safety, privacy, and well-being in the digital environment. Both organizations conduct research, provide policy analysis, and engage with federal and state regulators on issues related to minors' exposure to online risks.

NCOSE brings more than six decades of experience addressing sexual exploitation, including child sexual abuse and the distribution of abuse material, and has participated in precedent-setting litigation and legislative initiatives involving digital platforms.

DCI conducts empirical research and technical analysis on platform practices affecting children and has submitted extensive information to the Federal Trade Commission[1] and other regulators regarding app store age ratings, data practices, and contractual flows. DCI leadership also coordinated with a coalition of child-safety organizations, including Protect Young Eyes, the Institute for Family Studies, the Ethics and Public Policy Center, the Digital Progress Institute, and the National Center on Sexual Exploitation, to develop model app store accountability provisions over a multi-year process that informed the structure of SB 2420.

Together, amici offer specialized expertise on the commercial systems governing minors' interactions with app stores, as well as the regulatory mechanisms necessary to protect children in the digital marketplace. Their insight will assist the Court in evaluating the factual and commercial context relevant to SB 2420.

---

[1] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Apple's Deceptive and Unfair App Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Aug. 19, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple-25.pdf

**INTRODUCTION**

Plaintiff Computer and Communications Industry Association (CCIA) seeks a preliminary injunction by mischaracterizing SB 2420 as regulating speech rather than commercial conduct. In doing so, Plaintiff attempts to elevate the commercial contracting, deceptive labeling, and retail distribution practices of app stores to the level of constitutionally protected editorial discretion. This framing contradicts controlling precedents and obscures the proprietary, commercial functions that app stores perform. The argument also ignores that SB 2420 responds directly to repeated patterns of conduct by app stores and developers who have disregarded existing legal requirements and engaged in practices that expose minors to significant, predictable harm.

SB 2420 reinforces longstanding requirements concerning truthful commercial representations, valid contract formation, and parental authorization in adhesion contracts involving minors. These practices fall within Texas's core police powers in three distinct areas: (1) consumer protection, (2) contract capacity, and (3) child protection statutes, which regulate commercial entities' interactions with children. With SB 2420, the Texas Legislature addressed an app store business model that allows minors to download applications and make in-app purchases without giving parents accurate content information or obtaining informed parental consent—conduct that would plainly violate Texas law if carried out by physical retailers.

The Federal Trade Commission complaints and public records document clear, recurring failures by app stores.[2] These include app stores approving child-directed apps with obviously inaccurate age ratings,[3] allowing minors to accept lengthy, complex terms of service,[4] permitting in-app purchases

---

[2] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Google's and IARC's Deceptive Age Ratings and Google's Unfair Play Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Oct. 14, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/10/Request-for-FTC-Investigation-into-Google-Play-Store-10-14-2025.pdf (last visited Dec. 1, 2025)

[3] Protect Children Coalition, App Age Ratings Report, *App Age Ratings Report*, https://protectchildren.ca/en/resources-research/app-age-ratings-report/

[4] Apple, Privacy Policy — Parent Disclosure, https://www.apple.com/legal/privacy/en-ww/parent-disclosure/ (last visited Dec. 1, 2025)

without meaningful parental involvement,[5] and distributing apps that collect sensitive data in violation of COPPA because app developers are unaware the end user is a child, even though the app store is fully aware.[6]

Because app stores collect age or age-range data for their users, this creates a significant information imbalance that exposes minors to substantial risk by allowing the platform to withhold material facts and lead developers to treat every user as an adult. As a result, children may be subjected to data-collection practices that can violate COPPA and commercial manipulation that would be impermissible if directed at known minors by physical retailers. Children can also access apps that would voluntarily restrict minors, including dating platforms and sexualized chatbots, because developers are not informed the user downloading and using the app is a child. Consumer protection law treats this kind of deliberate concealment as deceptive because it predictably subjects the vulnerable party to concrete harm the concealed information was meant to prevent.[7]

App stores have received repeated notice about serious harms to minors on specific apps,[8] yet they continue to rate and promote those apps as safe for young users.[9] The evidentiary record demonstrates that SB 2420 addresses concrete, documented harms to Texas children, rather than the hypothetical burdens Plaintiff imagines.

Parents cannot make informed decisions when they lack reliable app content information or timely notice that their children are entering binding contracts. SB 2420 provides what the industry has declined

---

[5] Ofcom, Children's Online Spending and Potential Financial Harm: Quantitative Research (2025), https://www.ofcom.org.uk/siteassets/resources/documents/online-safety/research-statistics-and-data/online-services-research/childrens-online-spending-and-potential-financial-harm-quantitative-research.pdf?v=400633

[6] Meg Leta Jones, Abby Rochman & Celeste Valentino, Breaking Down the Complaint to the FTC Alleging Apple Misled Parents, TechPolicyPress (Sept. 15, 2025), https://www.techpolicy.press/breaking-down-the-complaint-to-the-ftc-alleging-apple-misled-parents/ (last visited Dec. 1, 2025)

[7] Federal Trade Commission, FTC Policy Statement on Deception (Oct. 14, 1983), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf

[8] End Sexual Exploitation, Apple https://endsexualexploitation.org/apple/ (last visited December 1, 2025)

[9] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Apple's Deceptive and Unfair App Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Aug. 19, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple-25.pdf

to provide: age verification at account creation, accountability for existing age-rating systems, timely notice before minors download apps and thereby enter complex terms-of-service agreements, and the transmission of the user's verified age range to apps so they can comply with applicable laws, including COPPA, and activate pre-existing safeguards. These protections support parents' fundamental right to direct their children's upbringing. SB 2420 simply holds digital retailers to the same age-verification standards that have long been required of physical stores, financial institutions, and other regulated commercial actors.

### A. The Legislative Record Establishes a Decade of Documented Commercial Harms to Children and App Stores' Unique Gatekeeping Role

For many years, the conduct of the major app stores created conditions that made regulation unavoidable. Companies assured parents and lawmakers that their age ratings were accurate,[10] their parental tools were effective,[11] and that minors were not being charged without consent.[12] Yet congressional investigations, congressional hearings, and repeated enforcement actions told a very different story.

The Federal Trade Commission found that families were billed for in-app purchases without parental authorization,[13] state attorneys general documented child-directed apps collecting sensitive data in violation of COPPA,[14] and developers continued to misrepresent content and privacy practices because the app stores imposed no meaningful verification of disclosures.[15]

---

[10] *App Store Age Ratings Process Isn't Enough, Say Child Safety Organizations*, AppleInsider (Dec. 23, 2024), https://appleinsider.com/articles/24/12/23/app-store-age-ratings-process-isnt-enough-say-child-safety-organizations (last visited Dec. 1, 2025)

[11] Apple Inc., Families, https://www.apple.com/families/ (last visited Dec. 1, 2025)

[12] *Apple Agrees to FTC Consent Decree on Kids' In-App Purchases*, CNBC (Jan. 15, 2014), https://www.cnbc.com/2014/01/15/apple-in-consent-decree-with-federal-trade-commission.html

[13] Federal Trade Commission, Apple Inc. Will Provide Full Consumer Refunds of at Least $32.5 Million to Settle FTC Complaint It Charged Kids Without Parental Consent (Jan. 15, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/01/apple-inc-will-provide-full-consumer-refunds-least-325-million-settle-ftc-complaint-it-charged-kids

[14] Federal Trade Commission, Google, YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law (Sept. 4, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations-childrens-privacy-law (last visited Dec. 1, 2025)

[15] Lorenzo Bagnoli et al., Digital Footprints and Children's Privacy: Age Restrictions Cannot Resolve All Risk (Mar. 16, 2023), https://arxiv.org/abs/2303.09008 (last visited Dec. 1, 2025)

Despite repeated promises of reform by these companies, the same violations persisted, even after a federal consent decree and public commitments to improve safety. No amount of public pressure, news coverage, direct negotiation, or formal correspondence by advocates produced the necessary changes.[16]

SB 2420 responds directly to this documented pattern of commercial misconduct. The statute regulates app stores' business practices—how they contract with minors, label products, and conduct retail transactions —not what they say. Any incidental burden on speech results from the necessary regulation of commercial activities that have caused demonstrated harm to Texas children.

The resulting model app store accountability legislation was crafted over a multi-year period with input from dozens of advocacy organizations, legal experts, and child safety researchers. The bill was designed to be narrowly tailored, constitutional, and focused exclusively on the most harmful and well-documented forms of app store misconduct. Texas possesses inherent police power to regulate commercial conduct within its borders, and digital retailers have no constitutional exemption from regulations long applied to brick-and-mortar stores. The State's authority to govern how businesses contract with minors, label products, and engage in retail transactions applies equally whether the storefront is physical or virtual.

SB 2420 also avoids the content-based pitfalls that have slowed other state efforts. The Act regulates the commercial conduct of the dominant app stores, not the expressive content of any app or the suitability of messages for minors. This distinction matters. The Arkansas statute at issue in *NetChoice v. Griffin*[17] targeted specific categories of apps based on their perceived content and purpose, while the law in *Brown v. Entertainment Merchants Association* singled out violent video games for their expressive content.[18] SB 2420 does neither.

---

[16] Federal Trade Commission, Complaint Against Apple (Aug. 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple_25.pdf

[17] *NetChoice, LLC v. City of Little Rock*, 646 F. Supp. 3d 961, 964 (E.D. Ark. 2023), aff'd in part, appeal docketed, No. 23-1874 (8th Cir. filed Aug. 31, 2023)

[18] *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011)

Although a broader bill would have been justified given the scope and persistence of the harm documented over the past decade, the Texas Legislature chose to target the most immediately addressable commercial failures for this model legislation. The industry's resistance to even carefully limited protections is both revealing and troubling.

### B. App Stores Occupy a Distinctive and Influential Position in the Technology Ecosystem

First, as the exclusive distributors of mobile applications, app stores possess unparalleled gatekeeping authority. App stores alone determine which apps may enter the marketplace,[19] how quickly safety concerns are addressed, and whether dangerous features remain accessible to minors on apps rated safe for minors.[20] When app stores choose to act, they can do so decisively.

Developers respond. App developers routinely correct serious safety failures as soon as app store removal becomes a real possibility. The temporary removal of Tumblr in 2018, after the discovery of significant CSAM,[21] resulted in immediate internal changes that eliminated the offending content within weeks.[22] These events demonstrate that app stores can rapidly prevent or mitigate harm when they choose to exercise their supervisory power. What takes child advocates, attorneys general, and legislators years or decades to address can be corrected by app stores in a matter of days or weeks when they choose to act.

The second role involves the commercial practices that app stores perform themselves. They determine which app age rating systems parents rely on,[23] set the rules for how apps disclose their data practices, determine whether minors may accept contractual terms, and structure the flows for authorizing downloads and in-app purchases.[24] These are commercial decisions, not expressive judgments, and they

---

[19] Apple, Submit your apps and games today, Apple Developer, https://developer.apple.com/app-store/submitting (last visited Dec. 1, 2025).
[20] Apple, App Review – App Store, https://developer.apple.com/distribute/app-review/ (last visited Dec. 1, 2025)
[21] Tumblr Dropped From Apple Store After Child Pornography Detected, Fortune (Nov. 20, 2018), available at https://fortune.com/2018/11/20/tumblr-apple-app-child-abuse/ (last visited Dec. 1, 2025)
[22] Tumblr Staff, A Better, More Positive Tumblr (Dec. 3, 2018), https://staff.tumblr.com/post/180758987165/a-better-more-positive-tumblr (last visited Dec. 1, 2025)
[23] Apple, App Review – App Store, https://developer.apple.com/distribute/app-review/ (last visited Dec. 1, 2025)
[24] Apple, App Store Review Guidelines, https://developer.apple.com/app-store/review/guidelines/ (last visited Dec. 1, 2025)

contribute directly to the harmful experiences children may encounter. Because app stores benefit from every download and in-app purchase, they have incentives to prioritize frictionless onboarding and rapid distribution over accuracy, legality, and child protection.

Without enforceable accountability for both categories of conduct, the same pattern persists. App stores receive direct notice of harms, pledge improvements, and continue the practices that create foreseeable legal and personal risks to minors, even after congressional inquiries and state investigations have made clear that reforms are both necessary and feasible. SB 2420 corrects this structural failure by closing loopholes and aligning app store operations with longstanding legal obligations concerning truthful labeling, contractual capacity, and parental authorization.

### C. Industry Opposition During the Legislative Process and the Shift to Constitutional Claims

During the 2025 state legislative sessions, including in Texas, major technology companies and their lobbying groups repeatedly opposed similar app store accountability legislation, yet their objections did not relate to First Amendment concerns. Their public proposals reflect a willingness to support age-assurance requirements and limitations affecting minors' access to content that content developers deem as "adult."

Just nine days after the first app store accountability legislation passed in Utah, Google, a major CCIA member, published a legislative proposal for "keeping kids safe online,"[25] and later endorsed an Ohio bill that relies on platform and parent-controlled age signals rather than verified age or enforceable obligations.[26] Notably, the Google-supported Ohio bill directs developers to "make a reasonable effort, proportionate to the risks, to ensure that account holders who are minors cannot engage in any activity

---

[25] Google, Google's Legislative Proposal for Keeping Kids Safe Online (Mar. 12, 2025), https://blog.google/outreach-initiatives/public-policy/google-legislative-proposal-for-keeping-kids-safe-online/ (last visited Dec. 1, 2025)

[26] Chrissa Loukas, Google Executive Testifies on Ohio's Bill of Parental Consent, Spectrum News 1 (Oct. 8, 2025), https://spectrumnews1.com/oh/columbus/news/2025/10/08/google-s-executive-testifies-on-ohio-s-bill-of-parental-consent (last visited Dec. 1, 2025)

that is restricted for adults only."[27] That provision demonstrates limited concern for the constitutional constraints the First Amendment places on restricting potentially lawful speech and highlights the gap between the First Amendment theory advanced in this litigation and the positions the industry has taken in its own policy proposals.

Likewise, Google and Meta publicly supported California's Digital Age Assurance Act, which relies on self-reported age categories and contains broad operational safe harbors.[28] Industry-promoted alternatives in multiple states followed the same pattern, replacing verified age with self-reported age, removing protections against underage contracting, converting mandatory requirements into voluntary opt-in features, and adding immunity provisions that shield app stores from liability for erroneous age signals or failures to deliver age signals. It also indemnifies app stores from all developer misconduct tied to those signals, while also relieving them of any obligation to verify whether developers have truthfully identified covered applications.[29] CCIA's decision not to challenge the California bill underscores that the industry pursues litigation only when a regulatory approach meaningfully affects its commercial model, even as it supports legislative frameworks in other states that incorporate similar mechanisms it contests here.[30]

Industry groups representing the same major companies took the opposite position in *NetChoice v. Bonta*[31] and *NetChoice v. Griffin*,[32] arguing the laws were unconstitutional because they turned on the subject matter or expressive content of certain apps. Legislatures are increasingly drafting content-neutral laws, such as SB 2420, that regulate only the commercial conduct of app stores and do not depend on the

---

[27] H.B. 302, 136th Gen. Assemb., Reg. Sess. (Ohio 2025)
[28] Assemblymember Buffy Wicks, Google and Meta Among Tech Leaders and Child Advocates Voicing Support for Wicks' Digital Age Assurance Act (Sept. 9, 2025), https://a14.asmdc.org/press-releases/20250909-google-meta-among-tech-leaders-and-child-advocates-voicing-support-wicks (last visited Dec. 1, 2025)
[29] H.B. 302, 136th Gen. Assemb., Reg. Sess. (Ohio 2025)
[30] Kelley Drye & Warren LLP, "California Takes Action on Youth Online Safety: FAQs on the Digital Age Assurance Act" (Oct. 21, 2025), available at https://www.kelleydrye.com/viewpoints/blogs/ad-law-access/faq-digital-age-assurance-act-california-youth-safety-on-the-internet (last visited Dec. 1, 2025)
[31] *NetChoice, LLC v. Bonta*, 91 F.4th 1142, 1158–60 (9th Cir. 2024)
[32] *NetChoice, LLC v. Griffin*, 72 F.4th 667, 675–78 (8th Cir. 2023)

content of any application. Plaintiffs now claim that even this content-neutral approach is impermissible, a position inconsistent with their own prior arguments. The First Amendment does not bar regulation of commercial conduct simply because a company distributes expressive content, and the record shows that the objections here largely center on avoiding accountability, not on protecting speech.

### D. Documented Commercial Harms Underscore the State's Interest

The industry's conduct shows why regulatory intervention is necessary. For years, app stores and developers have violated existing consumer protection and child privacy laws, entered a federal consent decree, promised reform, and then continued the same practices that expose minors to serious harm.[33] The consequences are substantial. As documented in public reports, thousands of children have been sextorted,[34] targeted with illegal drugs,[35] contacted by traffickers,[36] exposed to dangerous viral challenges,[37] or encouraged toward self-harm by chatbots,[38] often inside apps that app stores present as appropriate and safe for young teenagers.[39]

App stores receive direct notice of these harms from parents, researchers, and law enforcement.[40] In some cases, executives inside the companies have reported that their own children were harmed and

---

[33] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Google's and IARC's Deceptive Age Ratings and Google's Unfair Play Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Oct. 14, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/10/Request-for-FTC-Investigation-into-Google-Play-Store-10-14-2025.pdf

[34] National Center for Missing & Exploited Children, NCMEC Releases New Sextortion Data (2024), https://www.missingkids.org/blog/2024/ncmec-releases-new-sextortion-data (last visited Dec. 1, 2025)

[35] Senate Judiciary Committee, Recap: Senate Judiciary Committee Presses Big Tech CEOs on Failures to Protect Kids Online During Landmark Hearing (July 30, 2024), https://www.judiciary.senate.gov/press/releases/recap-senate-judiciary-committee-presses-big-tech-ceos-on-failures-to-protect-kids-online-during-landmark-hearing (last visited Dec. 1, 2025)

[36] Maricopa County Attorney's Office, Cyber Predators, Real Risks, https://maricopacountyattorney.org/545/Cyber-Predators-Real-Risks (last visited Dec. 1, 2025)

[37] Office of the Attorney General of New York, Children's Online Safety, https://ag.ny.gov/child-online-safety (last visited Dec. 1, 2025)

[38] US Senate Judiciary Committee, Transcript: US Senate Hearing on Examining the Harm of AI Chatbots (Feb. 13, 2024), https://www.techpolicy.press/transcript-us-senate-hearing-on-examining-the-harm-of-ai-chatbots/

[39] FairPlay for Kids, Apps Which Google Rates "Safe for Kids" Violate Their Privacy and Expose Them to Other Harms, https://fairplayforkids.org/apps-which-google-rates-safe-kids-violate-their-privacy-and-expose-them-other-harms/

[40] Senate Judiciary Committee, Protecting Innocence in a Digital World (hearing), https://www.judiciary.senate.gov/committee-activity/hearings/protecting-innocence-in-a-digital-world (last visited Dec. 1, 2025)

sexually exploited by apps rated safe for preteens.[41] Despite having this information, companies typically fail to correct age ratings, update safety disclosures, or remove mislabeled apps from distribution. The pattern reflects commercial priorities rather than expressive concerns.

Congressional testimony demonstrates how these practices affect families. An anonymous parent, identified as Jane Doe, testified before the Senate Judiciary Committee about the harm suffered by her fifteen-year-old son after using Character AI, an app advertised as safe for children twelve and older. According to her testimony, the chatbot engaged her son in harmful and manipulative conversations that caused a rapid decline in his mental health, which led to self-harm and inpatient treatment.[42] When she sought help, the company directed her to arbitration, offered a $100 payment, and pointed to a terms-of-service agreement her minor child had clicked through as the basis for denying further relief.[43] The platform treated a child's acceptance of a lengthy contract as binding, even though minors lack the legal capacity to consent. This is a commercial practice, not a content decision.

Additionally, there have been dozens of congressional hearings documenting the severe harms associated with social media, yet major platforms continue to rate themselves as safe for thirteen-year-olds while claiming harmful content is only "infrequent." These same platforms are often promoted to children in app stores under labels such as "Must-Have Apps," further signaling to families that they are appropriate for children.[44]

Beyond being misleading, these inaccurate age ratings destroy the limited effectiveness of parental controls. Parents rely on app age ratings as a primary benchmark when deciding which apps their children

---

[41] Barbara Ortutay, Court documents underscore Meta's "historical reluctance" to protect children on Instagram, AP News (Jan. 17, 2024), https://apnews.com/article/meta-new-mexico-instagram-lawsuit-children-75f8d147c03234d3098fdd765598c047

[42] Examining the Harm of AI Chatbots: Heading Before the Subcomm. on Crime and Counterterrorism, S. Comm. on the Judiciary, 119th Cong. (2025),(Statement of Jane Doe Parent).

[43] Senate Judiciary Committee, Examining the Harm of AI Chatbots (hearing), https://www.judiciary.senate.gov/committee-activity/hearings/examining-the-harm-of-ai-chatbots (last visited Dec. 1, 2025)

[44] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Apple's Deceptive and Unfair App Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Aug. 19, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple-25.pdf

may access and which safety settings to enable. Most parental-control tools use the app's age rating as the cutoff point for granting access protections. When the rating is false, the entire safety framework collapses.[45]

The privacy implications are equally serious. Studies show a substantial portion of the top 150 apps transmit a child's exact location and can access photos, contacts, and other highly sensitive information stored on their devices.[46] Many popular social media apps rated safe for young teens broadcast a child's real-time location to other users, including strangers, a practice that has directly contributed to cases of sexual assault.[47] No state is required to tolerate these practices without imposing basic requirements of accuracy, contractual capacity, and parental authorization.

SB 2420 responds directly to these harms by ensuring that parents receive truthful information about the products their children use and that platforms cannot hide behind deceptive labels or exploit minors through contracts they have no legal capacity to enter.

## SUMMARY OF ARGUMENT

SB 2420 is a constitutional regulation of commercial conduct. It governs how app stores act as digital retailers, product labelers, and issuers of adhesion contracts to minors. It does not restrict any ideas or viewpoints and falls squarely within Texas's authority over truthful labeling, contract capacity, and child protection. Under *Apple v. Pepper*, app stores are direct sellers and are subject to ordinary consumer protection laws, even when the products they sell contain expressive material.

Extensive federal and state investigations, consent decrees, and congressional hearings show that major app stores have repeatedly misrepresented age ratings, enrolled minors in binding contracts without

---

[45] Ethics & Public Policy Center, Making Smartphones and App Stores Safe for Kids: Federal, State, and Industry Measures, https://eppc.org/publication/making-smartphones-and-app-stores-safe-for-kids-federal-state-and-industry-measures
[46] Jill Duffy, Your Children Are Likely Being Tracked by Some of Their Favorite Apps, Lifewire (Mar. 3, 2021), https://www.lifewire.com/your-children-are-likely-being-tracked-by-some-of-their-favorite-apps-6501791
[47] M Ruiz, Snap Inc. Under Fire in New Mexico's Unredacted Lawsuit; Reveals Need for Kids' Safety Legislation, TechPolicy.Press (Oct. 8, 2024), https://www.techpolicy.press/snap-inc-under-fire-in-new-mexicos-unredacted-lawsuit-reveals-need-for-kids-safety-legislation/

parental consent, permitted unlawful data collection from children, and distributed harmful applications they actively promote as safe for children. Voluntary measures have not corrected these failures.

SB 2420 addresses these documented problems in a narrow and targeted way. It requires age verification, parental authorization before minors enter digital contracts, and accurate disclosure of content information that platforms already claim to provide. These provisions are classic commercial disclosure obligations. Under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), the State may require factual, noncontroversial information necessary to prevent misleading representations, which is precisely what SB 2420 does.

Because SB 2420 regulates commercial conduct within Texas's core police powers, requires only factual and noncontroversial disclosures, and addresses harms documented in the record, Plaintiffs have not met the requirements for preliminary relief.

## ARGUMENT

### I. SB 2420 REGULATES APP STORE CONDUCT, NOT SPEECH, AND APPLE v. PEPPER CONTROLS

#### A. App Stores' Commercial Functions Fall Within State Regulatory Authority

App stores function as retailers that sell digital goods directly to consumers. This is firmly established by the Supreme Court's decision in *Apple v. Pepper*,[48] which held that Apple engages as the direct seller when users purchase apps. That holding forecloses Plaintiffs' attempt to recast the app store as a passive intermediary engaged in expressive activity rather than a commercial retailer subject to ordinary regulation. Retailers are subject to longstanding state regulations concerning honest labeling, contract formation, parental authorization for minor transactions, and the integrity of commercial representations. These obligations do not disappear merely because the retailer's products are digital rather than physical.

---

[48] *Apple Inc. v. Pepper*, 587 U.S. 237 (2019)

SB 2420 regulates these commercial practices of the app stores themselves. The Act does not regulate the expressive content of third-party apps and imposes no restrictions on the ideas, messages, or viewpoints that may appear in those products. It governs only the retailer's conduct in selling digital goods to consumers, including minors, and therefore falls well within the State's police powers over commerce and child protection.

**B. The Statute Does Not Restrict or Alter Expressive Content and Therefore Does Not Trigger Heightened Scrutiny.**

Plaintiffs' analogy of app stores to bookstores, museums, or shopping malls is fundamentally flawed. These institutions do not operate closed, vertically structured marketplaces in which every participant profits when products are deceptively advertised as safe. They do not set and enforce mandatory developer contracts, standardize payment systems, retain a thirty percent commission on every sale, or require consumers to enter binding terms-of-service agreements governed by the retailer. Unlike app stores, museums and shopping venues are not responsible for ensuring the objects visitors encounter do not collect data from minors, trigger privacy obligations under laws like the COPPA, or enroll children in hidden commercial relationships. App stores do all these things.

Plaintiffs also contend that any system of age verification or parental consent necessarily restricts minors' access to protected speech. That misstates the statute. SB 2420 does not bar minors from any category of expressive content, nor does it authorize the State to decide what ideas are appropriate for them. The Act governs the commercial steps required before a transaction, much like the requirement that a parent approve a minor's enrollment in a phone plan or a gym membership subscription.

The Supreme Court's decision in *Brown* concerned a law that directly prohibited minors from accessing certain expressive content based on the State's assessment of that content. SB 2420 does not restrict content in any way. It requires app stores to know when a user is a minor so they can comply with existing duties regarding parental consent, data use, contract capacity, applicable legal obligations, and any voluntary age-based restrictions that developers choose to impose at the application level. Any effect

on speech is incidental to the regulation of commercial practices in a vertically integrated retail system.

Retail conduct may be regulated even when the products sold contain expressive material. Nothing in First Amendment doctrine transforms a retailer into an editor simply because the items it sells include speech. Plaintiffs cannot recast basic consumer protection requirements as content-based regulation by asserting that knowing whether a user is a minor might influence downstream access to certain apps.

The recent Eleventh Circuit decision upholding Florida's HB 3[49] underscores why a preliminary injunction is improper here. In reviewing Florida's social media law, the court allowed the statute to take effect while litigation proceeds and recognized that a state may impose content-neutral requirements on platforms, including age verification, parental consent, and account limits, in a manner consistent with the First Amendment. If a statute that governs minors' ability to create and maintain social media accounts can remain in force during litigation because it regulates platform operations rather than expressive content, there is even less basis to enjoin SB 2420.

## II. THE ACT ENFORCES TEXAS' FUNDAMENTAL DOCTRINE OF CONTRACTUAL CAPACITY

### A. Regulating Contract Capacity Is a Core Sovereign Function.

Texas law has long recognized that minors lack the capacity to enter binding contracts. Agreements with minors are voidable at the minor's election, a doctrine grounded in the State's commitment to prevent children from being bound to obligations they cannot understand or negotiate. This rule applies equally to digital agreements, which are no different in legal effect from any other form of contract.

Digital marketplaces, however, routinely disregard this principle. With each app download, app stores enroll minors in lengthy, non-negotiable terms-of-service contracts containing arbitration clauses, liability waivers, recurring payment terms, and sweeping data-collection permissions. These agreements often authorize permissions far more intrusive than this in ordinary online contracts such as continual

---

[49] *Computer & Communications Industry Ass'n v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025) (order granting stay of preliminary injunction)

access to a child's exact location, contacts, photos, microphone, camera, and device identifiers.[50] Despite the minor's legal incapacity to consent, platforms nonetheless treat these agreements as binding the moment a child clicks "accept." The design of app-store contracting flows makes parental involvement essential. These agreements are presented during fast, uninterrupted onboarding sequences that encourage immediate acceptance, often before a parent realizes a transaction is taking place. When a child over twelve uses an account that has never been linked to a parent, a situation that is widespread under current platform practices,[51] or when a younger child uses an account without parental consent controls engaged, the platform treats the minor as an adult for contracting purposes once the child clicks "accept," even though minors lack the legal capacity to enter binding agreements under Texas law.

That acceptance can authorize continuing access to device functions and sensitive information, even though no parent has reviewed or approved the terms. SB 2420 responds directly to this commercial conduct by regulating the formation of app store contracts and the handling of minors' data, matters that fall squarely within the State's authority. The statute ensures that the protections Texas law has long provided to minors apply with equal force in the digital marketplace, where contractual terms are more complex, and the resulting risks are significantly greater. It accomplishes this without restricting any expressive content or limiting what minors may access, while preserving parents' ability to make informed decisions for their own children.

Parental controls do not fill this gap. Extensive reporting and independent testing have shown that

---

[50] Mayank Sharma, Your Children Are Likely Being Tracked by Some of Their Favorite Apps, Lifewire (Aug. 22, 2022), https://www.lifewire.com/your-children-are-likely-being-tracked-by-some-of-their-favorite-apps-6501791
[51] Family Online Safety Institute, Parental Controls for Online Safety Are Underutilized, New Study Finds (May 28, 2025), https://fosi.org/parental-controls-for-online-safety-are-underutilized-new-study-finds/

many parental control tools are ineffective,[52] easily bypassed,[53] or illusory in real-world use.[54] These tools do not establish legal capacity, prevent unlawful contract formation, or ensure that parents even know a contract has been formed. They also fail as a practical safeguard.

### B. Parental Consent Obligations Align with Federal Obligations

The Act's parental authorization requirement conforms to both Texas contract law and federal requirements. The Federal Trade Commission's 2014 Consent Decree on unlawful in-app purchases made by minors imposed a binding federal obligation on Apple and Google to provide effective notice and obtain verifiable parental consent before billing children for digital goods. The decree was issued after the FTC found these platforms had systematically charged minors without parental knowledge or authorization. Age verification is a prerequisite to fulfilling that obligation, because a platform cannot obtain valid parental consent unless it first determines which users are minors and which are adults.

Although the consent decree does not prescribe a specific method for distinguishing minors from adults, it presumes platforms will maintain systems capable of doing so. A company cannot obtain verifiable parental consent or provide effective notice if it lacks a reliable way to determine whether the user is a child and to identify the parent responsible for the account. Because verifiable parental consent is possible only when a platform can differentiate minors from adults, the decree necessarily presupposes a functional age-determination system.

Apple's own disclosures acknowledge this principle by requiring parents to verify their identity using a confirmed payment method before Apple treats consent as valid.[55] SB 2420 reflects the same

---

[52] Apple's App Store Puts Kids a Click Away From a Slew of Inappropriate Apps," Wall Street Journal, Dec. 22, 2024, https://www.wsj.com/tech/apples-app-store-puts-kids-a-click-away-from-a-slew-of-inappropriate-apps-dfde01d5

[53] Geoffrey A. Fowler, We Tested Apple's iOS 12 Screen Time Parental Controls. First Came Tears Then Frustration, Washington Post, Aug. 23, 2018, https://www.washingtonpost.com/technology/2018/08/23/we-tested-apples-new-screen-time-parental-controls-first-came-tears-then-frustration/

[54] Fairplay for Kids, Teen Accounts, Broken Promises: How Instagram Is Failing to Protect Minors, (Sept. 9, 2025), https://fairplayforkids.org/wp-content/uploads/2025/09/Teen-Accounts-Broken-Promises-How-Instagram-is-failing-to-protect-minors.pdf

[55] Apple, Apple Privacy Disclosure for Parents and Guardians, https://www.apple.com/legal/privacy/en-ww/parent-disclosure/ (accessed Nov. 29, 2025)

baseline assumption. It requires app stores to implement an age-determination process sufficient to identify child users and route consent and notice to a verified parent, thereby allowing the existing federal obligations to function as intended. The Federal Trade Commission consent decree for in-app purchases has been in effect for a decade and has never been challenged. Yet app stores have engaged in practices that undermine the purpose of the consent requirements. They allow, and even prompt, parents to disable parental consent protections,[56] and they fail to require parent-child account linking for anyone over twelve,[57] despite knowing that minors continue to enter binding commercial transactions without legal capacity or parental involvement. This ongoing disregard for a federal mandate underscores the necessity of state intervention.

Plaintiffs' argument that verification imposes an undue burden is contradicted by app stores' own public statements, which acknowledge the necessary technical tools have long existed and that any additional tools required for compliance have already been developed and will be deployed for Texas residents beginning in January 2026.[58] The same companies have endorsed a similar age-signaling framework in California,[59] likely because it relies on self-reported ages, preserves profitable loopholes, and provides broad immunity. Their shifting positions confirm the objection here is not feasibility or legality but rather the commercial consequences of eliminating unenforceable minor contracting and replacing stated ages with a verifiable system that prevents platforms from treating children as competent contracting parties.

---

[56] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Google's and IARC's Deceptive Age Ratings and Google's Unfair Play Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Oct. 14, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/10/Request-for-FTC-Investigation-into-Google-Play-Store-10-14-2025.pdf

[57] Google, Family Link Help — Account & Privacy: See what apps your child is using (support page), https://support.google.com/families/answer/7106787?hl=en (accessed Nov. 29, 2025)

[58] Apple Inc., News — developer.apple.com, "id=btkirlj8", https://developer.apple.com/news/?id=btkirlj8 (accessed Nov. 29, 2025)

[59] Google, Meta Among Tech Leaders and Child Advocates Voicing Support for Wicks' Digital Age Assurance Act," Press Release, California State Assembly – District 14, Sept. 9, 2025, https://a14.asmdc.org/press-releases/20250909-google-meta-among-tech-leaders-and-child-advocates-voicing-support-wicks

### III. AGE RATING PROVISIONS ARE VALID COMMERCIAL DISCLOSURES UNDER *ZAUDERER*

### A. The Act Requires Only Truthful Labeling of Commercial Information the App Stores Have Already Chosen to Provide

The age rating requirements comfortably fall within the *Zauderer* doctrine because they compel only factual, noncontroversial commercial information. In all major app stores, developers currently complete brief disclosure forms and receive age ratings automatically, a process documented extensively in the DCI's Federal Trade Commission complaints. Google relies on the IARC questionnaire system, advertised as "quick and easy," with which developers self-report content in minutes and receive instant ratings without meaningful verification.[60] According to the complaint, this system produces wildly inaccurate results, with roughly 90 percent of all apps on Google Play rated as safe for "Everyone," despite the presence of violence, adult themes, and other risks.[61]

Apple uses a similar self-reported rating structure that suffers from the same deficiencies. The DCI Federal Trade Commission complaint documents many instances in which apps advertised as safe for children include adult, violent, or sexually explicit content. Because Apple approves approximately 100,000 apps per week with a review staff of about 500 moderators, each app receives an estimated 12 minutes of review time,[62] a process that is plainly insufficient to verify accuracy. Although nothing prevents these companies from using AI or routine monitoring to verify the accuracy of the safety labels they profit from, the persistent and well-documented inaccuracies show that ensuring accuracy has not been a priority.[63]

---

[60] International Age Rating Coalition (IARC), For Developers, https://www.globalratings.com/for-developers.aspx (accessed Nov. 29, 2025)

[61] 42matters, Google Play App Content Rating Statistics 2025, https://42matters.com/google-play-app-content-rating-statistics

[62] Filipe Espósito, App Store Review Process Has over 500 Human Experts; Less Than 1% of Rejections Are Appealed, 9to5Mac, May 7, 2021, https://9to5mac.com/2021/05/07/app-store-review-process-has-over-500-human-experts-less-than-1-of-rejections-are-appealed/

[63] Digital Childhood Institute, Request by Child Safety Advocates for the FTC to Investigate Apple's Deceptive and Unfair App Store Practices, Violations of COPPA, and the 2014 FTC Consent Decree (Aug. 19, 2025), https://www.digitalchildhoodinstitute.org/wp-content/uploads/2025/08/FTC-Complaint-Against-Apple-25.pdf

DCI's FTC complaints against both Apple and Google demonstrate these platforms design and promote their own rating systems, profit directly from child-directed apps, and have access to user age data. On those facts, they cannot plausibly claim passive distribution. As *Apple v. Pepper* confirms, app stores act as direct sellers in these transactions.

Even if the court were to view the requirement to clearly display age ratings or content notices as touching speech, it would still be commercial speech under *Zauderer* because the statute requires only the disclosure of factual information the stores already choose to provide. Separately, the current labels are so inaccurate that they amount to misleading commercial speech, and SB 2420 simply requires the factual corrections necessary to prevent deception. Preventing false or deceptive commercial representations fits squarely within *Zauderer*.

Under Section 5 of the FTC Act, platforms can be liable for unfair or deceptive practices when they present misleading ratings or safety claims to families. SB 2420 does not require platforms to adopt any specific rating system or dictate how a voluntary system must operate. It simply requires that if a platform chooses to display an age or safety rating, that rating must be truthful, clear, and conspicuous. This creates a clear and enforceable standard that addresses the failures of voluntary systems like IARC and the Apple App Store while protecting children and families from deceptive safety claims.

The verified age categories mandated in this bill, defined as child, younger teenager, older teenager, and adult, are intended to communicate the verified age information necessary for compliance with existing laws and to allow apps to activate appropriate safety defaults. These same categories were used in the California bill supported by approximately 20 major technology companies, including Google, OpenAI, and Meta, reflecting broad industry agreement on the importance of these age-category cutoffs.[64]

The age distinctions align with the legal and operational thresholds that already govern how

---

[64] Google, Meta Among Tech Leaders and Child Advocates Voicing Support for Wicks' Digital Age Assurance Act," Press Release, Office of Buffy Wicks (Cal. Assembly Dist. 14), Sept. 9, 2025, https://a14.asmdc.org/press-releases/20250909-google-meta-among-tech-leaders-and-child-advocates-voicing-support-wicks

minors are treated in the digital marketplace, including COPPA's treatment of children under 13 and platforms' use of different default settings for teenagers at 13 and 16.

The Court should not conflate verified age categories with voluntary app safety ratings in the bill, because the former identifies the user's legal status for purposes of existing obligations, while the latter describes the app's content as a commercial product. The bill does not mandate any particular safety rating, any specific rating framework, or any change to how a platform classifies apps. It simply requires that when a platform elects to display an age or safety rating, the rating must be truthful, clear, and clearly visible to the families who depend on it.

## IV. SEVERABILITY

SB 2420 includes an express severability clause, reflecting the Legislature's intent that the statute's core protections remain in force even if any individual subsection is found unconstitutional. The Act contains a narrow exemption for 911 and emergency communication applications. This exemption is fully consistent with both federal and state law. COPPA expressly permits the collection and use of a child's information without parental consent when necessary to protect the safety of the child, including in emergencies. Likewise, traditional contract law allows minors to obtain necessaries, including emergency services, without parental approval. The exemption ensures that nothing in SB 2420 can be construed to impede access to lifesaving communications and does not undermine the statute's structure or neutrality.

The Act also includes an exemption for education applications. Although this exemption was adopted during the legislative process, amici do not support it. The exemption is not integral to the broader regulatory scheme and is therefore fully severable should the Court determine that it is inconsistent with the Act's purposes or constitutional structure.

## CONCLUSION

SB 2420 is a constitutional and necessary regulation of commercial conduct within the State's longstanding authority to ensure honest labeling, valid contract formation, and meaningful parental

involvement in transactions involving minors. The Act responds to well-documented commercial harms affecting children and regulates the conduct of app stores in their role as digital retailers. Plaintiffs' effort to reframe these commercial requirements as restrictions on expressive activity has no support in precedent and contradicts the app stores' own descriptions of their operations. Plaintiffs cannot demonstrate a likelihood of success on the merits, cannot show irreparable harm, and cannot overcome the State's compelling interest in protecting children from documented commercial abuse.

The Act also closes major loopholes in existing law by clarifying responsibility for inaccurate age labeling and misleading safety disclosures. Under the current unregulated system, developers routinely blame app stores for assigning inaccurate ratings, while app stores blame developers for supplying incomplete or misleading information. This cycle allows both parties to avoid accountability while children remain exposed to mislabeled and deceptively advertised products.

SB 2420 resolves this by assigning primary responsibility to the app store for verifying age before an app is downloaded, as it controls user onboarding and is the only entity capable of verifying age before the transaction. Developers retain responsibility for using verified age information to comply with existing laws, such as COPPA, and for implementing the safety defaults they already include in their products. Both app stores and developers are responsible for misrepresented app safety disclosures, and the statute aligns accountability with each party's actual role in creating, presenting, and relying on those disclosures.

## REQUESTED RELIEF

For the reasons set forth above, we respectfully ask the Court to deny the motion for preliminary injunction.

**DATED: December 1, 2025**

Respectfully submitted,

*/s/ Annie McAdams*
Annie McAdams
*Counsel of Record*
Texas Bar No. 24051014
Annie McAdams PC
2900 North Loop West, Suite 1130
Houston, TX 77092
annie@mcadamspc.com
(713)785-6262

Attorney for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of same on all counsel of record.

**DATED: December 2, 2025**

Respectfully submitted,

*/s/ Annie McAdams*
Annie McAdams

COMPUTER &
COMMUNICATIONS INDUSTRY
ASSOCIATION,
*Plaintiff*,

Case No.: 1:25-cv-1660

v.

KEN PAXTON, in his capacity as the
ATTORNEY GENERAL OF TEXAS,
*Defendant*.

**[PROPOSED] ORDER GRANTING MOTION OF THE NATIONAL CENTER ON
SEXUAL EXPLOITATION AND THE DIGITAL CHILDHOOD INSTITUTE FOR
LEAVE TO FILE AN AMICI CURIAE BRIEF IN OPPOSITION OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

This Cause came before the Court for review on the Motion of the National Center on Sexual Exploitation and the Digital Childhood Institute Leave to File Brief as *Amici Curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction. The Court has reviewed the file and the applicable law, and being fully advised in the premises, GRANTS the motion.

SIGNED this _____day of _____,_____2025.

_____
JUDGE PRESIDING