# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Civ. Action No. 1:25-CV-01660-RP |
| KEN PAXTON, in his official capacity as the Attorney General of Texas, | ) ) ) | |
| *Defendant*. | ) ) | |

**AMICUS CURIAE BRIEF OF BIPARTISAN TECHNOLOGY SCHOLARS
PROFESSOR MEG LETA JONES & JOEL THAYER
IN OPPOSITION TO CCIA'S MOTION FOR PRELIMINARY INJUNCTION
<u>AND REGARDING THE BALANCE OF THE EQUITIES</u>**

Conor R. Harvey
Tex. Bar No. 24120883
WRIGHT CLOSE BARGER
  & GUZMAN, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Tel: (713) 572-4321
Fax: (713) 572-4320
harvey@wrightclosebarger.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 1

TABLE OF AUTHORITIES ......................................................................................... 2

STATEMENT OF IDENTITY AND INTEREST ......................................................... 5

SUMMARY OF ARGUMENT ...................................................................................... 5

ARGUMENT ................................................................................................................. 6

I.      Mobile apps cause children significant and ongoing documented harms ......................... 7

        A.      App stores have created a youth public-health emergency. ................................... 8

        B.      AI Chatbots on app stores present acute and novel dangers. ............................... 11

        C.      Gaming apps expose children to exploitation and gambling-like
                mechanics ................................................................................................................. 12

        D.      App developers are well-aware of the harms ........................................................ 13

        E.      The harms faced by children are immediate and irreversible. ............................. 15

II.     CCIA's overstated and self-inflicted compliance burdens do not outweigh the
        immediate and irreversible harms faced by children. ........................................................ 16

III.    The public interest favors allowing S.B. 2420 to take effect ............................................. 17

IV.     Recent decisions from the Supreme Court and Eleventh Circuit confirm that the
        balance tips against injunctive relief. ................................................................................... 18

CONCLUSION .............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) .................................................................................................. 17

*City of Austin v. Reagan National Advertising of Austin, LLC*,
   596 U.S. 61 (2022) ................................................................................................... 20

*Comput. & Commc'ns. Indus. Ass'n v. Uthmeier*,
   No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) ...................................... 6, 17, 19

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023). ...................................................................................... 17

*NetChoice v. Yost*,
   716 F. Supp. 3d 539 (S.D. Ohio 2024). .................................................................... 20

*NetChoice, LLC v. Fitch*,
   145 S. Ct. 2658, 606 U.S. ___ (2025) ...................................................... 6, 15, 18, 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................... 6

*Sable Commc'ns. of Cal., Inc. v. F.C.C.*,
   492 U.S. 115 (1989) ................................................................................................. 17

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) ...................................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................................... 6

**Pending Cases**

*Garcia v. Character Techs., Inc.*,
   No. 6:24-CV-01903-ACC-DJK (M.D. Fla.) (filed Oct. 22, 2024) .......................... 11

*Kentucky v. TikTok, Inc.*,
   No. 24-CI-00824 (Ky. Cir. Ct., Franklin County) (filed Oct. 8, 2024)….. ........... 14

*Louisiana v. Roblox Corp.*,
   No. 188950 (21st La. Dist. Ct., Livingston Parish) (filed Aug. 14, 2025) .............. 12

*Neville v. Snap, Inc.*,
   No. 22STCV33500 (Sup. Ct. Cal., Los Angeles) (filed Jan. 2, 2024)..................... 14

*New Mexico v. Snap, Inc.*,
   No. D-101-CV-2024-02131 (N.M. 1st Dist., Santa Fe County) (filed Sept. 4, 2024)............. 15

*Texas v. Roblox Corp.*,
   No. 2025-707 (50th Tex. Dist. Ct., King County) (filed Nov. 6, 2025) ................... 12

**Statutes**

OHIO REV. CODE § 1349.09(B)(1) .................................................................................. 20

**Enacted Legislation**

H.B. 3, 2024 Fla. Laws ch. 2024-42 (2024) ............................................................ 18

S.B. 142, 2025 Utah Laws ch. 446 (2024) ............................................................... 18

**Legislative Materials**

*Examining the Harm of AI Chatbots*,
 S. Subcomm. on Crime and Counterterrorism, 119th Cong. (Sept. 16, 2025) ........................ 11

*Protecting Kids Online: Testimony from a Facebook Whistleblower*,
 S. Subcomm. on Consum. Prot., Prod. Safety, & Data Sec. (Oct. 5, 2021) ........................... 14

**Other Authorities**

@BrendanCarrFCC,
 X (Feb. 12, 2024, 3:53 PM) ......................................................................... 7

Aaron Tilley,
 *Apple's App Store Puts Kids a Click Away from a Slew of Inappropriate Apps*,
 Wall St. J. (Dec. 22, 2024) ........................................................................ 19

Alexandra Dane & Karima Bhatia,
 *The Social Media Diet: A Scoping Review to Investigate the Association Between Social
 Media, Body Image and Eating Disorders Amongst Young People*, 3 PLOS Global
 Public Health e0001091 (2023) .................................................................... 11

Am. Psych. Ass'n,
 *Health Advisory on Social Media Use in Adolescence* (May 9, 2023) ................................ 10

Amnesty Int'l,
 *Driven Into Darkness: How TikTok's For You Feed Encourages Self-Harm and Suicidal
 Content* (2023). ..................................................................................... 15

City of N.Y. Dep't of Health & Mental Hygiene,
 *Advisory from the Commissioner of Health and Mental Hygiene: Social Media* (June
 2023).. .............................................................................................. 18

Common Sense Media,
 *Teen and Young Adult Perspectives on Generative AI* (2024) ....................................... 12

Ctr. for Countering Digital Hate,
 *Deadly by Design: TikTok Pushes Harmful Content Promoting Eating Disorders and
 Self-Harm* (2022). .................................................................................. 15

David Zendle *et al.*,
 *Adolescents and Loot Boxes: Links with Problem Gambling and Motivations for
 Purchase*, 6 Royal Soc'y Open Sci. 190049 (2019) ................................................. 13

Georgia Wells, Jeff Horwitz & Deepa Seetharaman,
 *Facebook Knows Instagram Is Toxic for Teens Girls, Company Documents Show*, Wall
 St. J. (Sep. 14, 2021) .............................................................................. 14

Holly Shannon *et al.*,
  *Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis*, 9 JMIR MENTAL HEALTH e33450 (2022)............................................................. 9

Ivan Montiel *et al.*,
  *Loot Box Engagement: A Scoping Review of Primary Studies on Prevalence and Association with Problematic Gaming and Gambling*, 17 PLOS ONE e0263177 (2022) ........ 13

J.V. Verlenden *et al.*,
  *Mental Health and Suicide Risk Among High School Students and Protective Factors —Youth Risk Behavior Survey*, MORBIDITY AND MORTALITY WEEKLY (Supp. No. 4) (2024)......................................................................................................................................... 8

Jean M. Twenge,
  *Increases in Depression, Self-Harm, and Suicide Among U.S. Adolescents After 2012 and Links to Technology Use: Possible Mechanisms*, 2 PSYCHIATRIC RESEARCH & CLINICAL PRACTICE 19 (2020) ............................................................................................. 9

Joanna Stern,
  *How Broken Are Apple's Parental Controls? It Took 3 Years to Fix an X-Rated Loophole*, WALL ST. J. (Jun. 5, 2024). ..................................................................................... 19

Jonathan Haidt,
  *The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness* (2024)............................................................................................................ 9

Jonathan Haidt,
  *Collaborative Review Docs*, The Anxious Generation (Feb. 20, 2024) .................................... 9

Jonathan Haidt, Zach Rausch & Jean Twenge,
  *Social Media and Mental Health: A Collaborative Review* (ongoing)...................................... 9

Luisa Fassi *et al.*,
  *Social Media Use and Internalizing Symptoms in Clinical and Community Adolescent Samples: A Systematic Review and Meta-Analysis*, 178 JAMA PEDIATRICS 814 (2024)........... 9

Maria T. Maza *et al.*,
  *Association of Habitual Checking Behaviors on Social Media With Longitudinal Functional Brain Development*, 177 JAMA PEDIATRICS 160 (2023)...................................... 10

Martin P. Paulus *et al.*,
  *Screen Media Activity and Brain Structure in Youth: Evidence for Diverse Structural Correlation Networks from the ABCD Study*, 185 NEUROIMAGE 140 (2019) .......................... 11

Nerilee Hing *et al.*,
  *Loot Box Purchasing Is Linked to Problem Gambling in Adolescents When Controlling for Monetary Gambling Participation*, 11 J. BEHAV. ADDICT. 396 (2022) .............................. 13

U.S. Dep't of Health & Hum. Servs.,
  *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* (2023) ..... 8, 18

## STATEMENT OF IDENTITY AND INTEREST

Professor Meg Leta Jones is a leading scholar of family technology policy. She is a Provost's Distinguished Associate Professor in the Communication, Culture, and Technology Department, a founding faculty member of the Center for Digital Ethics, and a faculty fellow in the Institute for Technology Law & Policy at Georgetown University. In addition to her academic and popular press articles on technology governance issues impacting families, she is the author of *Ctrl+Z: The Right to Be Forgotten*, which examines the social, legal, and technical dynamics of digital oblivion, and *The Character of Consent*, which traces the transatlantic history of digital consent through the evolution of the internet "cookie." Professor Jones earned her Ph.D. from the ATLAS Institute in the University of Colorado College of Engineering and Applied Science, and a J.D. from the University of Illinois College of Law.

Joel Thayer is a practicing attorney and an expert on technology policy who helped develop the legal and policy framework for S.B. 2420. He serves as President of the Digital Progress Institute. His works have been featured in the *American University Intellectual Property Brief*, *Harvard Journal of Law and Public Policy*, *Stanford Technology Law Journal*, *Journal of American Affairs*, *The Wall Street Journal*, *Newsweek*, *The Hill*, *National Review*, and *The Federalist Society Blog*. As a leading scholar in technology policy, Thayer has testified before the U.S. Senate Committee on the Judiciary and the U.S. House Committee on Energy and Commerce about advancing national privacy and online child safety, respectively.

## SUMMARY OF ARGUMENT

Every moment without protective measures, such as those in S.B. 2420, leaves Texas children exposed to harms that are concrete, documented, and, in many cases, catastrophic: suicides following chatbot interactions, sexual exploitation on "child-safe" platforms, algorithmic

spirals into self-harm content, and gaming environments designed to mimic addictive gambling for minors. These harms accumulate daily and cannot be undone. They are occurring now, in real time, to real families. The compliance costs CCIA alleges, by contrast, are overstated and self-inflicted by companies' use of business models that profit from children and, in any event, are vastly outweighed by the Texas's compelling interest in protecting minors.

Recent developments confirm that courts are increasingly reluctant to block online child-protection laws at the preliminary injunction stage. The Eleventh Circuit stayed a preliminary injunction against Florida's social media law in November 2025. *See Comput. & Commc'ns. Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025). Similarly, the Supreme Court upheld the Fifth Circuit's determination, declining to block Mississippi's comprehensive age-verification law, even while Justice Kavanaugh acknowledged that the plaintiffs were likely to prevail on the merits but determined the industry plaintiffs had "not sufficiently demonstrated that the balance of harms and equities favor[ed] [relief reinstating the injunction]." *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658, 606 U.S. ___, ___ (2025) (Kavanaugh, J., concurring in denial of application to vacate stay). These decisions reflect a growing judicial recognition that the balance of harms must account for the ongoing damage to children that injunctions permit to continue.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish, among other things, "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the opposing party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Even if a plaintiff establishes likelihood of success on the merits and irreparable harm, a preliminary injunction is inappropriate if the

balance of the equities and public interest outweigh the plaintiff's irreparable injury. *Winter*, 555 U.S. at 23. Plaintiffs must demonstrate that "their substantial injury outweighs the threatened harm to the party whom they seek to enjoin" and that "granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). This calculus must account for documented harms to third parties, particularly vulnerable children, which will continue unabated if injunctive relief is granted.

In this posture, the balance of equities and the public interest turn on weighing CCIA's asserted compliance burdens against the concrete harms that will continue if S.B. 2420 is enjoined. Part I explains that mobile apps accessed through Apple's and Google's app stores cause significant, ongoing, and well-documented harms to children. Part II shows that CCIA's claimed burdens are overstated, largely self-inflicted by business models designed to maximize child engagement, and in any event outweighed by Texas's compelling interest in protecting minors. Part III explains that the public interest favors allowing a democratically enacted child-protection statute to take effect while the courts resolve the merits. And Part IV shows that recent decisions from the Supreme Court and the Eleventh Circuit confirm that, in this context, the balance of harms tips decisively against preliminary injunctive relief.

## I.    Mobile apps cause children significant and ongoing documented harms.

More kids are accessing harmful apps via Apple's and Google's app stores. S.B. 2420 places much the age verification and consent requirements on the app stores because they are better positioned to do so than app developers. As Federal Communications Commission Commissioner Brendan Carr put, app stores are "the single choking point" of the mobile ecosystem. @BrendanCarrFCC, X (Feb. 12, 2024, 3:53 PM).[1]  Essentially every service goes through one of

---

[1] *Available at* https://x.com/BrendanCarrFCC/status/1757145971295695226?s=20.

two app stores—Apple's App Store and Google's Play Store. That is why this S.B. 2420 addresses app stores; they provide the front door to nearly every addictive and harmful digital product to kids. And by requiring age verification and parental consent at the app store level, S.B. 2420 puts parents in the best position to review and determine what apps are appropriate for their children.

A.    **App stores have created a youth public-health emergency.**

In May 2023, U.S. Surgeon General Dr. Vivek Murthy issued a formal advisory, warning that social media poses a "profound risk of harm to the mental health and well-being of children and adolescents." U.S. Dep't of Health & Hum. Servs., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* (2023).[2] According to the Surgeon General, up to 95% of youth ages 13–17 use social media apps, with more than a third using them "almost constantly." He warned that "there are ample indicators that social media can also have a profound risk of harm to the mental health and well being of children and adolescents." *Id.*

Recent CDC data confirms the crisis has not abated. According to the 2023 Youth Risk Behavior Survey, "39.7% of high school students experienced persistent feelings of sadness and hopelessness, 28.5% experienced poor mental health, 20.4% seriously considered attempting suicide, and 9.5% had attempted suicide" in the past year. J.V. Verlenden *et al.*, *Mental Health and Suicide Risk Among High School Students and Protective Factors — Youth Risk Behavior Survey*, MORBIDITY AND MORTALITY WEEKLY (Supp. No. 4) at 79 (2024). Female students are about twice as likely as male students to experience mental health and suicide risk indicator. *Id.*

Longitudinal research demonstrates that these trends accelerated precisely when smartphone use became ubiquitous. Dr. Jean Twenge's analysis of nationally representative surveys of over 500,000 U.S. adolescents found that major depressive episodes among 12- to 17-

---

[2] *Available at* https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf.

year-old girls increased 52%, from 13.1% in 2005 to 19.9% in 2017; hospital admissions for self-harm tripled among 10- to 14-year-old girls; and suicide among 10- to 14-year-old girls doubled. Jean M. Twenge, *Increases in Depression, Self-Harm, and Suicide Among U.S. Adolescents After 2012 and Links to Technology Use: Possible Mechanisms*, 2 PSYCHIATRIC RESEARCH & CLINICAL PRACTICE 19 (2020). Because these trends included increases in objectively measured behaviors (self-harm, suicide attempts, and suicides), they "cannot be dismissed as stemming from greater help-seeking, awareness of mental health conditions, or willingness to admit problems." *Id.* at 20.[3]

Social media apps are one well-researched culprit. In a meta-analysis of 143 studies encompassing over one million adolescents, researchers found a statistically significant positive association between social media use and internalizing symptoms (depression and anxiety) both for time spent on social media and for user engagement measures. Luisa Fassi *et al.*, *Social Media Use and Internalizing Symptoms in Clinical and Community Adolescent Samples: A Systematic Review and Meta-Analysis*, 178 JAMA PEDIATRICS 814, 817 (2024). A separate meta-analysis found statistically significant correlations between problematic social media use and depression, anxiety, and stress among adolescents and young adults. Holly Shannon *et al.*, *Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis*, 9 JMIR MENTAL HEALTH e33450 (2022). As a result of these and other studies, the American Psychological Association issued a Health Advisory warning that social media use causes specific harms in certain contexts, particularly for adolescent girls and those with pre-existing mental health vulnerabilities. Am. Psych. Ass'n, *Health Advisory on Social Media Use in Adolescence*

---

[3] Dr. Jonathan Haidt synthesizes the evidence showing why "adolescent mental health collapsed at the same time and in the same way across so many countries in the early 2010s." Jonathan Haidt, *The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness* 4 (2024); *see also* Jonathan Haidt, Zach Rausch & Jean Twenge, *Social Media and Mental Health: A Collaborative Review* (ongoing) (compiling studies about social media and childhood health); Jonathan Haidt, *Collaborative Review Docs*, The Anxious Generation (Feb. 20, 2024) (same). *Available at* https://www.anxiousgeneration.com/research/collaborative-review-docs.

(May 9, 2023). The APA specifically recommended that "social media platforms should be developmentally appropriate" and that parents should limit and monitor adolescent use. *Id.* Taken together, this body of evidence establishes a clear and consistent association between adolescent social-media use and increased risks of depression, anxiety, and related internalizing harms.

Moreover, evidence shows that social media exposure does not merely correlate with body dissatisfaction but perpetuates a reinforcing cycle of psychological harm. A review of 39 studies on the relationship between social media, body image, and eating disorders among young people aged 10–24 found that Instagram was the most often studied platform (fifteen studies) and identified a "self-perpetuating cycle of risk" in which social media exposure to idealized body images promotes body dissatisfaction, which in turn drives increased social media use and exposure to eating disorder content. Alexandra Dane & Karima Bhatia, *The Social Media Diet: A Scoping Review to Investigate the Association Between Social Media, Body Image and Eating Disorders Amongst Young People*, 3 PLOS GLOBAL PUBLIC HEALTH e0001091, at 12 (2023).

Neuroimaging research has further documented that habitual digital media use is associated with measurable changes in adolescent brain development. In a three-year study, researchers tracked 169 sixth- and seventh-grade students using functional MRI. Maria T. Maza *et al.*, *Association of Habitual Checking Behaviors on Social Media With Longitudinal Functional Brain Development*, 177 JAMA PEDIATRICS 160 (2023). Participants who habitually checked social media (fifteen or more times per day) showed increases in neural sensitivity to social anticipation in the amygdala, anterior insula, and dorsolateral prefrontal cortex, the brain regions involved in emotional processing, salience detection, and cognitive control. *Id.* at 163–64. The researchers concluded that "social media checking behaviors in early adolescence may be associated with changes in the brain's sensitivity to social rewards and punishments," and that habitual checking

"may be longitudinally associated with changes in neural sensitivity to anticipation of social rewards and punishments, which could have implications for psychological adjustment." *Id.* at 165. Large-scale national neuroimaging data independently corroborate these findings, with one National Institute of Health study of nearly 12,000 children having found associations between higher digital media use and differences in brain structure, including lower cortical thickness and sulcal depth in regions supporting visual processing, executive function, memory, and attention. Martin P. Paulus *et al.*, *Screen Media Activity and Brain Structure in Youth: Evidence for Diverse Structural Correlation Networks from the ABCD Study*, 185 NEUROIMAGE 140 (2019).

**B.    AI Chatbots on app stores present acute and novel dangers.**

The dangers extend beyond traditional apps to AI-powered applications accessible through app stores. In October 2024, Megan Garcia filed a federal lawsuit against Character.AI after her 14-year-old son, Sewell Setzer III, died by suicide following months of interactions with an AI chatbot. *See* No. 6:24-CV-01903-ACC-DJK, *Garcia v. Character Techs., Inc.* (M.D. Fla.) (filed Oct. 22, 2024). According to the complaint, the chatbot engaged the minor in sexually explicit conversations, failed to redirect him when he expressed suicidal ideation, and when he said he was "coming home," responded "please do, my sweet king." Minutes later, he was dead. *Id.*, Am. Compl., ¶ 220 (ECF No. 11); *see also id.*, 2d Am. Compl., ¶ 218 (ECF No. 157).

Sewell's case is not isolated. In September 2025, Matthew Raine testified before the Senate Judiciary Committee that in conversations with his 16-year-old son Adam, ChatGPT mentioned suicide over 1,275 times in six months, six times more frequently than Adam himself mentioned it. *Examining the Harm of AI Chatbots*, S. Subcomm. on Crime and Counterterrorism, 119th Cong. (Sept. 16, 2025) (testimony of Matthew Raine, father of Adam Raine and co-founder of the Adam Raine Foundation). The chatbot provided technical specifications on noose construction, coached Adam on stealing liquor to "dull his body's instinct to survive," and offered to write his suicide

note. *Id.* In November 2025, seven additional families filed lawsuits against OpenAI involving four deaths and three surviving children. *Common Sense Media* reports that three in four teenagers have used AI companion chatbots, but only 37% of parents are aware of this use. Common Sense Media, *Teen and Young Adult Perspectives on Generative AI* (2024).

These cases show that apps offering AI companions now pose risks to minors comparable to—if not exceeding—those of social media or other digital media. This combination of widespread use, low parental awareness, and unmonitored, emotionally adaptive interactions substantially increases minors' exposure to harmful content that, in turn, can cause self-harm. The emerging evidence thus confirms that platform-driven psychological harms are not confined to social media but are rapidly appearing in AI environments used daily by minors.

### C.    Gaming apps expose children to exploitation and gambling-like mechanics.

The harms extend to gaming platforms accessible through app stores. Roblox, the largest online gaming platform for children with over 80 million daily active users, 20% of whom are under age nine, has become the subject of coordinated enforcement actions by state attorneys general. In August 2025, Louisiana Attorney General Liz Murrill sued Roblox, alleging the platform is "the perfect place for pedophiles" and has become "overrun with harmful content and child predators because it prioritizes user growth, revenue, and profits over child safety." No. 188950, *Louisiana v. Roblox Corp.* (21st La. Dist. Ct., Livingston Parish) (filed Aug. 14, 2025). The complaint alleges that user-generated content included games named "Escape to Epstein Island" and "Public Bathroom Simulator Vibe" featuring simulated sexual activity. In November 2025, Texas Attorney General Ken Paxton filed a similar lawsuit, alleging Roblox "flagrantly ignored" online safety laws while misleading parents about the platform's dangers. No. 2025-707, *Texas v. Roblox Corp.* (50th Tex. Dist. Ct., King County) (filed Nov. 6, 2025). That lawsuit follows similar actions by Kentucky and Florida, making Roblox the latest target of multi-

state enforcement against platforms that market themselves as child-safe while failing to implement adequate protections. These coordinated enforcement actions reflect growing recognition that major games marketed as child-safe have failed to implement meaningful safeguards.

Gaming platforms also expose children to gambling mechanics through "loot boxes"— virtual items, which can purchased with real money, that contain randomized rewards. A large-scale study of 16- to 18-year-olds found that the link between loot box spending and problem gambling among adolescents is stronger than relationships previously observed in adults. David Zendle *et al.*, *Adolescents and Loot Boxes: Links with Problem Gambling and Motivations for Purchase*, 6 ROYAL SOC'Y OPEN SCI. 190049 (2019). The researchers found that loot boxes share "important structural and psychological similarities with gambling" and that "100% allow for (if not actively encourage) underage players to engage with these systems." *Id.*; *see also* Nerilee Hing *et al.*, *Loot Box Purchasing Is Linked to Problem Gambling in Adolescents When Controlling for Monetary Gambling Participation*, 11 J. BEHAV. ADDICT. 396 (2022) (confirming association with at-risk and problem gambling). And a scoping review found that 56% of mobile games containing loot boxes are rated suitable for children aged seven or older, and 93% are rated suitable for children at least twelve years old. Ivan Montiel *et al.*, *Loot Box Engagement: A Scoping Review of Primary Studies on Prevalence and Association with Problematic Gaming and Gambling*, 17 PLOS ONE e0263177 (2022). These gambling-like mechanics are thus embedded in the very apps that S.B. 2420 seeks to regulate by requiring age verification and parental consent before a minor makes an in-app purchase.

**D.     App developers are well-aware of the harms.**

The harms that digital media and apps can have on America's children are well-known and well-documented—often by the app developers themselves. Meta's own internal research, leaked

to the *Wall Street Journal* in September 2021, confirms the harms to youths of social media usage. *See The Facebook Files: A Wall Street Journal Investigation*, The Wall Street J. (Oct. 1, 2021, 10:02 ET).[4] Internal presentations stated that Instagram "make[s] body image issues worse for one in three teen girls" and that "[t]eens blame Instagram for increases in the rate of anxiety and depression." *See* Georgia Wells, Jeff Horwitz & Deepa Seetharaman, *Facebook Knows Instagram Is Toxic for Teens Girls, Company Documents Show*, WALL ST. J. (Sep. 14, 2021). The internal research found that 13% of U.K. teens and 6% of U.S. teens who experienced suicidal thoughts traced those thoughts to Instagram. *Protecting Kids Online: Testimony from a Facebook Whistleblower*, S. Subcomm. on Consum. Prot., Prod. Safety, & Data Sec. (Oct. 5, 2021) (statement of Frances Haugen, former Facebook employee).

Internal TikTok documents, unredacted in October 2024, reveal that ByteDance knew its algorithm pushes users into "filter bubbles" of harmful content. *See* No. 24-CI-00824, *Kentucky v. TikTok, Inc.* (Ky. Cir. Ct., Franklin County) (filed Oct. 8, 2024). The documents show that employees found users could be placed into negative mental health content bubbles after as little as twenty minutes of use, and that 260 videos (approximately thirty-five minutes of use) creates addiction. The documents also state that "[c]ompulsive usage correlates with [a] slew of negative mental health effects" and that "[m]inors do not have executive function to control their screen time." *Id.* ¶ 10. Internal Snap documents produced in litigation show the platform facilitates 700,000 daily exposures to drug content, and a 2019 security presentation acknowledged that it "takes under a minute to use Snapchat to purchase illegal substances." No. 22STCV33500, *Neville v. Snap, Inc.* (Sup. Ct. Cal., Los Angeles) (filed Jan. 2, 2024).

---

[4] *Available at* https://www.wsj.com/articles/the-facebook-files-11631713039.

Independent research and enforcement actions confirm that these platforms are harming kids. The Center for Countering Digital Hate found that TikTok's algorithm recommended suicide content to new accounts within 2.6 minutes. Ctr. for Countering Digital Hate, *Deadly by Design: TikTok Pushes Harmful Content Promoting Eating Disorders and Self-Harm* (2022). Amnesty International's investigation found that after five to six hours of use, nearly one in two videos recommended to teenage accounts on TikTok were harmful mental health content. Amnesty Int'l, *Driven Into Darkness: How TikTok's For You Feed Encourages Self-Harm and Suicidal Content* (2023). The New Mexico Attorney General's lawsuit against Snapchat alleges that the company receives 10,000 sextortion reports per month but ignores 90% of them. No. D-101-CV-2024-02131, *New Mexico v. Snap, Inc.* (N.M. 1st Dist., Santa Fe County) (filed Sept. 4, 2024). An undercover investigation found that a fictitious 14-year-old account attracted contacts from users with handles like "child.rape" and "pedo_lover10." And more than sixty-three families have filed wrongful death lawsuits alleging their children purchased fentanyl-laced pills through Snapchat.

### E.    The harms faced by children are immediate and irreversible.

Unlike the compliance burdens CCIA alleges, which are speculative, recoverable, and largely self-inflicted, the harms to children are immediate and often permanent. A child who develops a social media addiction suffers neurological changes. A teenager who experiences online sexual exploitation or sextortion carries lifelong trauma. A young person who takes their own life after interactions with a poorly designed AI chatbot cannot be brought back. As Justice Kavanaugh observed in declining to block Mississippi's social media law, the question is whether the plaintiff has "sufficiently demonstrated that the balance of harms and equities favors it at this time." *Fitch*, 145 S. Ct. at 2658 (Kavanaugh, J., concurring in denial of application to vacate stay). Here too, the ongoing, documented harms to children tip that balance decisively against injunctive relief.

## II.     CCIA's overstated and self-inflicted compliance burdens do not outweigh the immediate and irreversible harms faced by children.

Even if CCIA could demonstrate some compliance burden, those alleged costs cannot outweigh the immediate and irreversible harms faced by children. CCIA dramatically overstates the burdens of compliance for some of the most sophisticated and well-resourced technology companies in the world. Whatever costs do exist are the direct and foreseeable consequence of business models deliberately engineered to maximize child engagement through addictive design features. Texas's compelling interest in protecting children's physical and psychological well-being decisively outweighs any compliance costs associated with implementing reasonable age-verification and parental-consent mechanisms.

CCIA's members, which include Apple and Google, are among the most well-resourced technology companies in history. They already implement age ratings, parental controls, and content moderation systems on their platforms. As Texas has noted, "[t]he Apple and Google app stores already issue age ratings" and "provide tools which enable parents to limit what apps children are able to download or make purchases." Paxton, Resp. to Mot. for Prelim. Injunc. at 25 (ECF No. 17). The incremental burden of complying with S.B. 2420's requirements is minimal for companies that generate billions of dollars annually. Moreover, CCIA's members have repeatedly argued that they *already* provide robust parental controls. If that is true, then S.B. 2420 merely codifies best practices. If it is not true, if current industry practices are inadequate to protect children, then that only strengthens the case for allowing the law to take effect.

To the extent CCIA's members face compliance costs, those costs flow from business decisions to market products to children without adequate safeguards. Companies that designed "addictive features" to maximize engagement, such as infinite scroll, push notifications, autoplay video, and algorithmic content curation, now complain about the cost of mitigating the harms those

features cause. This Court should not reward that calculus. As the Eleventh Circuit noted in staying the injunction against Florida's H.B. 3, platforms on the app store "leverage" personal data collected from users "to maximize the [addictive] features' effectiveness." *Uthmeier*, 2025 WL 3458571, at *8. The compliance costs CCIA alleges are the natural consequence of building business models that profit from children's attention at the expense of their wellbeing.

Even accepting CCIA's compliance cost estimates at face value, those costs cannot outweigh Texas's compelling interest in protecting children and families. The Supreme Court has "recognized that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns. of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). Indeed, a state's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421–22 (6th Cir. 2023). Here, no amount of compliance costs—particularly costs that amount to using their existing tools and infrastructure to implement reasonable parental notification and consent mechanisms—can justify allowing the ongoing harm to millions of children.

### III. The public interest favors allowing S.B. 2420 to take effect.

The public interest strongly supports denying the injunction request. As the Supreme Court has recognized, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). S.B. 2420 was enacted through the democratic process after extensive deliberation. It reflects the Texas Legislature's considered judgment that existing industry practices are inadequate to protect children from online harms. The public interest lies in allowing that democratically enacted law to take effect while the courts resolve the underlying constitutional questions, not in preserving the status quo that has produced a youth mental health crisis.

The public interest in protecting children is not merely a Texas interest. The Surgeon General has declared youth mental health a national crisis. U.S. Dep't of Health & Hum. Servs., *Social Media and Youth Mental Health*. New York City has classified social media as a public-health threat. City of N.Y. Dep't of Health & Mental Hygiene, *Advisory from the Commissioner of Health and Mental Hygiene: Social Media* (June 2023). State legislatures across the country have enacted similar measures. *E.g.*, S.B. 142, 2025 Utah Laws ch. 446 (2024); H.B. 3, 2024 Fla. Laws ch. 2024-42 (2024). The public interest in allowing Texas to join this effort is substantial.

## IV.   Recent decisions from the Supreme Court and Eleventh Circuit confirm that the balance tips against injunctive relief.

Recent decisions confirm that courts are increasingly reluctant to block online child-protection laws at the preliminary-injunction stage. In *NetChoice, LLC v. Fitch*, the Supreme Court declined to block Mississippi's House Bill 1126, an age-verification and parental-consent law for minors' access to social media. 145 S. Ct. 2658. Justice Kavanaugh, concurring, explained that even though he believed NetChoice had "demonstrated that it is likely to succeed on the merits," the plaintiffs had "not sufficiently demonstrated that the balance of harms and equities favors [them] at this time." *Id.* at 2658 (Kavanaugh, J., concurring in denial of application to vacate stay). Justice Kavanaugh's analysis in *Fitch* confirms that even where plaintiffs show likely success on the merits, the balance of harms can weigh against injunctions when ongoing risks to children otweght speculative compliance costs—precisely the posture of this case.

The Supreme Court's recent decision in *Free Speech Coalition v. Paxton* further reinforces Justice Kavanaugh's conclusion. There, the Court upheld Texas's age-verification requirements for pornographic websites and rejected the argument that such requirements automatically trigger strict scrutiny, holding instead that they impose only a "modest burden" on adult speech. 606 U.S. 461, 487 (2025). The Court emphasized that "[w]ith the rise of the smartphone and instant

streaming, many adolescents can now access vast libraries of video content—both benign and obscene—at almost any time and place, with an ease that would have been unimaginable at the time of *Reno* and *Ashcroft II*." *Id.* at 478. The Texas Legislature, like the Florida Legislature, likewise found that existing parental controls "were not working." *Uthmeier*, 2025 WL 3458571, at *20. And experience confirms that both app-store providers' and developers' parental controls remain insufficient to protect children, with Apple's in particular drawing sustained criticism for ineffectiveness. *E.g.*, Aaron Tilley, *Apple's App Store Puts Kids a Click Away from a Slew of Inappropriate Apps*, WALL ST. J. (Dec. 22, 2024); Joanna Stern, *How Broken Are Apple's Parental Controls? It Took 3 Years to Fix an X-Rated Loophole*, WALL ST. J. (Jun. 5, 2024).

The Eleventh Circuit adopted the same approach in staying a preliminary injunction against Florida's H.B. 3, a law that, like S.B. 2420, uses age verification and parental involvement to protect minors online. *Uthmeier*, 2025 WL 3458571. Citing Justice Kavanaugh's concurrence, the court held that the plaintiffs had "not shown that the injuries they face outweigh the harm to the State," explaining that unrecoverable compliance costs and asserted speech burdens did "not outweigh the State's interest in enforcing its lawful regulation," and emphasizing that "the public also has an interest in the protection of children and the enforcement of the State's law that seeks to do just that." *Id.* at *8. The court also rejected the argument that H.B. 3 was a content-based regulation, noting that the statute regulated platforms' ability to contract with minors and their use of "addictive features," not any particular type of content. *Id.* at *11. The same is true of S.B. 2420. It regulates the conduct of app stores and covered apps in contracting with and collecting data from children, requiring age verification and parental consent regardless of whether a child seeks to download a game, a social-media app, or an educational tool. And the law is a conduct regulation; it regulates all contracts, not just that "target children" or are "reasonably anticipated to be accessed

by children," as in other laws that target contracts regarding social media alone. *E.g.*, OHIO REV. CODE § 1349.09(B)(1); *NetChoice v. Yost*, 716 F. Supp. 3d 539, 547 (S.D. Ohio 2024). Indeed, S.B. 2420 is indifferent to whether a minor tries to download a Bible app or TikTok. As in *City of Austin v. Reagan National Advertising of Austin, LLC*, S.B. 2420 does not "single out any topic or subject matter for differential treatment," but instead regulates the conditions under which covered entities may do business with minors. 596 U.S. 61, 71 (2022).

Taken together, *Fitch* and *Uthmeier* underscore that even where serious First Amendment questions are raised, courts should not reflexively enjoin child-protection laws when the State's interest in protecting minors and the ongoing harms to children outweigh plaintiffs' alleged compliance costs. For the same reasons, the balance of equities here aligns with those decisions and counsels strongly against preliminary injunctive relief.

## CONCLUSION

For these reasons, amici respectfully urge the Court to deny CCIA's motion for a preliminary injunction. The balance of equities tips decisively against injunctive relief. Every day that S.B. 2420 remains unenforced, Texas children suffer documented, serious, and often irreversible harms from unregulated digital platforms. The speculative compliance costs alleged by some of the world's wealthiest technology companies cannot outweigh those harms.

Respectfully submitted,

 */s/ Conor R. Harvey*
Conor R. Harvey (TXBN 24120883)
WRIGHT CLOSE BARGER
  & GUZMAN, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Tel: (713) 572-4321
Fax: (713) 572-4320
harvey@wrightclosebarger.com

*Counsel for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I certify that on December 11, 2025, a true and correct copy of the above document was filed electronically with the Court's CM/ECF system and served by electronic mail on all counsel of record.

*/s/ Conor R. Harvey*
Conor R. Harvey
