IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
December 15, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____pg_____
DEPUTY

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) Civ. Action No. 1:25-CV-01660-RP ) |
| KEN PAXTON, in his official capacity as the Attorney General of Texas, | ) ) ) ) |
| *Defendant*. | ) ) |

# AMICUS CURIAE BRIEF OF COALITION FOR A COMPETITIVE MOBILE EXPERIENCE IN OPPOSITION TO CCIA'S MOTION FOR PRELIMINARY INJUNCTION

C. Eric Vickers
Tex. Bar No. 24118577
VICKERS LAW FIRM, PLLC
One Sugar Creek Center Blvd., Suite 820
Sugar Land, Texas 77478
Tel: (806) 414-0966
Fax: (806) 414-0966
info@vickersfirm.com

*Counsel for Amicus Curiae*

26

# Table of Contents

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE ........................ 1

INTRODUCTION ........................................................................................................... 2

    I.    ASAA'S CORE OBLIGATIONS TRACK EXISTING INDUSTRY PRACTICE AND ARE TECHNICALLY STRAIGHTFORWARD............................................................. 4

        A.    App stores already maintain age-aware accounts, family linkages, and parental-approval mechanisms..................................................................................................... 5

        B.    Developers already consume age and consent signals and tailor experiences accordingly. 6

        C.    Similar obligations exist in other jurisdictions, and large app stores and developers have demonstrated their ability to comply at scale............................................... 7

    II. CCIA HAS NOT SHOWN IRREPARABLE HARM; THE HARM IT ALLEGES IS SPECULATIVE, PARTLY SELF-INFLICTED, AND DISPUTED BY OTHER INDUSTRY STAKEHOLDERS. ................................................................................................. 7

        A.    Compliance with a regulatory statute, standing alone, does not constitute irreparable harm. .................................................................................................... 8

        B.    CCME's members' experience demonstrates that the Act's technical obligations are manageable and reversible. .................................................................................. 8

        C.    CCIA does not speak for all affected industry participants, and its own allegations confirm that many mechanisms ASAA requires already exist. ............................ 9

    III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR ALLOWING ASAA TO TAKE EFFECT. ....................................................................................... 10

        A.    ASAA addresses longstanding problems with age ratings, parental awareness, and minor contracting at the app-store level. ......................................................... 10

        B.    The public interest in youth safety and contractual capacity is strong, and ASAA advances that interest without making the State a content regulator. ......................... 11

EVEN IF THE COURT WERE INCLINED TO GRANT SOME RELIEF, PLAINTIFF HAS NOT JUSTIFIED A FACIAL, STATEWIDE INJUNCTION............................................... 12

CONCLUSION ........................................................................................... 13

**STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE**

The Coalition for a Competitive Mobile Experience ("CCME") is a trade association of app developers and mobile-ecosystem companies whose products reach hundreds of millions of users worldwide. CCME's members include Meta Platforms, Inc., Match Group, Spotify, Digital Turbine, and Garmin.

CCME's mission is to promote a more open, competitive, and consumer-oriented mobile ecosystem. Our members depend on app stores for distribution of their digital services to users. CCME therefore champions policies that curb anti-competitive conduct at the app-store level, expand consumer choice, and give developers of digital services a fair opportunity to reach users on reasonable and predictable terms.

CCME has a particular interest in policies that empower parents to oversee their children's online activities. Our members already invest heavily in youth-safety tools—including age-aware experiences, parental controls, and safer defaults for teens—and many of them have long asked app stores to assume more of the front-end burden for app store account-level age verification and parental consent.

From CCME's perspective, the Texas App Store Accountability Act ("ASAA" or "the Act") is a workable, commercially reasonable approach that standardizes obligations at the app-store level and clarifies the respective responsibilities of app stores and developers. CCME's members either already comply with similar age-assurance requirements elsewhere or have built the systems necessary to do so. CCME does not view ASAA's technical requirements as novel, untested, or unmanageable.

CCME believes its perspective will assist the Court in evaluating the practical, technical, and market-structure implications of ASAA and in assessing Plaintiff's request for the extraordinary remedy of a preliminary injunction.

1

# INTRODUCTION

CCIA portrays ASAA as an unworkable "censorship regime" that will upend the app ecosystem, force developers to rewrite their products, and irreparably chill protected speech the moment the Act takes effect. *See Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:25-cv-1660 (W.D. Tex. filed Oct. 16, 2025), Compl. at 1. From the perspective of the app developers in CCME, that picture is overstated and incomplete.

ASAA does not require app stores or developers to invent new technologies or adopt unfamiliar operational paradigms. It formalizes practices that already exist in the market—age-aware accounts, parental approval flows, app age-ratings, and app-store-to-developer signaling of user age and consent status. Many of these features are already required under federal consent decrees or implemented voluntarily at scale. *See Federal Trade Commission v. Apple, Inc.,* Docket No. C-4444 (FTC Mar. 25, 2014); *see also Age Ratings Values and Definitions,* App Store Connect Documentation.

The Act's "commercially reasonable" standard, safe harbors for widely adopted industry practices, and reliance on age categories the app stores themselves promoted in other jurisdictions further confirm that this is an incremental compliance project, not a ground-up re-architecting of the mobile ecosystem. *See* Tex. Bus. & Com. Code §§ 121.021–121.022 (2025).

CCME's members are prepared to comply with ASAA's requirements. They have built and deployed similar systems to meet obligations in other jurisdictions and to satisfy app-store rules and federal law (including COPPA-related duties and the in-app-purchase consent decrees). They already ingest age-category signals from app stores, honor parental approvals for purchases, and tailor features to minors. From their vantage point, ASAA's core obligations are technically straightforward and cost-justified. They do not foresee shuttering apps, withdrawing services from Texas, or drastically curtailing speech on their digital services to be compliant.

2

Those on-the-ground facts matter for the preliminary-injunction inquiry. To obtain a preliminary injunction that halts enforcement of a duly enacted state statute, CCIA must show a clear likelihood of success on the merits, irreparable harm absent an injunction, and that the balance of equities and public interest strongly favor pre-enforcement relief. The Supreme Court has cautioned that "a preliminary injunction is an extraordinary remedy never awarded as of right," and that courts must "pay particular regard for the public consequences" of enjoining state laws. *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

The purpose of this amicus is not to take a position on the ultimate resolution of the First Amendment questions the parties have briefed. Rather, this letter is intended to draw the court's attention to three points:

1. **The Act's requirements are technically feasible and commercially reasonable.** App stores and developers already operate age-aware account systems, parental controls, and content-rating regimes, and they already transmit and consume age-related signals from app store to app developer in other contexts. The Act principally standardizes and hardens those existing practices.

2. **Plaintiff has not demonstrated irreparable harm.** The compliance steps CCIA describes—building or refining age-verification flows, wiring parental-consent signals, and mapping existing ratings into four statutory age buckets—are routine engineering projects for companies that run global platforms. Most of these systems already exist within existing app stores.

3. The balance of equities and public interest favor allowing ASAA to take effect while the Court adjudicates the constitutional claims. App stores have known for years about significant problems with inaccurate age ratings, unenforced parental controls, and minors

3

being bound to complex contracts without meaningful parental participation — all of which are the current status quo.

Texas has chosen an, app-store-level remedy that gives parents clearer information and more effective tools without authorizing the State to police content. Halting that framework before it is tried would perpetuate a status quo that has proven inadequate for families and developers alike.

Because CCIA has not made the "clear showing" required for the extraordinary relief it seeks, the Court should deny the motion for preliminary injunction.

## ARGUMENT

### I. ASAA'S CORE OBLIGATIONS TRACK EXISTING INDUSTRY PRACTICE AND ARE TECHNICALLY STRAIGHTFORWARD.

ASAA imposes four principal duties on app stores and a parallel set of duties on developers.

For app stores, the Act requires them to:

- verify each user's age category—child, younger teenager, older teenager, or adult—using a "commercially reasonable" method;

- affiliate minor accounts to a parent or guardian whose adulthood and authority the store has verified;

- obtain parental consent for each app download or in-app purchase by a minor (subject to narrow statutory exceptions); and,

- provide developers with current information about each user's age category and consent status via a "commercially available method."

For developers, the Act requires them to:

- assign age ratings to each app and in-app purchase using those same four age categories and provide the ratings and an explanation of content drivers to app stores;

- use app-store-provided age and consent data to verify user age category and parental consent status; and

- use that information to enforce age-based restrictions, legal obligations, and safety defaults, deleting the data once verification is complete.

4

None of these functions are novel or unduly burdensome for either app stores or developers operating in the modern mobile ecosystem.

### A. App stores already maintain age-aware accounts, family linkages, and parental-approval mechanisms.

As CCIA's own complaint acknowledges, major app stores already support robust parental-control features. *Computer & Commc'ns Indus. Ass'n v. Paxton*, No. 1:24-cv-849, Compl. at 8 (W.D. Tex. July 30, 2024) Google's Family Link allows parents to link their accounts to their children's accounts, limit downloads based on content ratings, approve or deny specific app installations, and require approval for purchases. Apple's Screen Time and Family Sharing features provide a similar suite of controls, including age-based content limits and per-purchase approval for app downloads and in-app purchases. Amazon likewise offers a Parent Dashboard that lets parents manage children's profiles and restrict access to apps and purchases.

In other words, app stores already:

- maintain age-aware accounts for minors and adults;
- affiliate minor accounts to parent or guardian;
- share anonymous signals with app developers;
- provide the capability for parents to consent to app downloads in advance; and
- execute transactional logic that blocks or permits downloads and purchases based on parental decisions.

ASAA does not ask app stores to do something categorically different. It requires them to *use* these existing paradigms for all Texas users, standardize age buckets, ensure that a verified adult with legal authority stands behind each minor's account, and ensure parental approval for minors to download *all* apps — not just the ones you have to buy The "commercially reasonable" standard and the safe harbor for "widely adopted industry standards" recognize that app stores can

satisfy these duties using the same classes of methods they already use to comply with federal law and their own product commitments.

> B. Developers already consume age and consent signals and tailor experiences accordingly.

Developers likewise are not starting from zero. As the NCOSE/DCI amicus details, app stores already require developers to provide age ratings and to implement age-appropriate experiences under store policies and COPPA-related obligations. Popular apps provide different defaults and feature sets for teens than for adults—for example, stricter messaging controls, more limited discoverability, and limited contact recommendations. These practices necessarily depend on receiving and acting on age-related data from account providers.

ASAA's requirements can be implemented using the same design pattern: the app store exposes a simple age-category and consent status signal through an API, and each developer's backend or client logic routes users to the appropriate experience for their age range. For many CCME members, that pattern is already in production to meet store rules or other legal obligations. Social and communications apps already treat under-13 users differently in markets where they operate supervised experiences or prohibit accounts for children altogether. Media and entertainment apps already respond to by-platform "kid mode" or "teen profile" signals by constraining content catalogs. And many apps already disable or limit in-app purchases and advertising for child accounts.

From a technical standpoint, ASAA would require developers to allocate minimal engineering resources to wire up a mandatory signal that they either already consume in other contexts or can readily support using their existing user-segmentation frameworks. That is a routine form of compliance work that imposes no undue burden.

6

    C. Similar obligations exist in other jurisdictions, and large app stores and developers have demonstrated their ability to comply at scale.

CCME's members already operate under age-verification and youth-safety rules in other markets that are at least as demanding as ASAA. Several jurisdictions require app stores and developers to verify age with a degree of certainty higher than "self-attested," particularly for access to adult content or certain data-processing practices. Both large and small app providers have built and deployed age-assurance systems in response to those laws and have announced new architectures (such as age-estimation technologies, identity-document verification, or trusted third-party age-assurance services) to meet obligations under recent youth-safety statutes in Europe, East Asia, and the United States.

The experience in these jurisdictions undercuts the notion that ASAA is "unprecedented" or technically infeasible. The same families of technologies that platforms deploy elsewhere—combined with already-existing family-account structures and parental approvals—are sufficient to satisfy the Act's "commercially reasonable" standard.

In short, CCME views ASAA's requirements as within the ordinary bandwidth of what developers do when laws or app-store rules evolve. CCME does not view compliance as an existential threat to their members' ability to operate in Texas.

## II. CCIA HAS NOT SHOWN IRREPARABLE HARM; THE HARM IT ALLEGES IS SPECULATIVE, PARTLY SELF-INFLICTED, AND DISPUTED BY OTHER INDUSTRY STAKEHOLDERS.

To obtain a preliminary injunction, CCIA must do more than raise colorable constitutional questions. It must show that, absent immediate relief, its members will suffer irreparable harm that cannot be remedied after final judgment. *Winter*, 555 U.S. at 22. On this record, that showing is lacking.

> A. Compliance with a regulatory statute, standing alone, does not constitute irreparable harm.

CCIA's complaint focuses on the cost and complexity of building age-verification, parental-linkage, and per-transaction consent flows. But "the cost of compliance, even substantial compliance costs, are part of the social burden of living under government. They are not 'irreparable' in the relevant sense." *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). Businesses routinely adjust their systems and user interfaces to comply with new consumer-protection statutes and data-privacy laws. Those expenditures are not the kind of immediate, non-compensable injury that justifies enjoining a democratically enacted law before it takes effect.

> B. CCME's members' experience demonstrates that the Act's technical obligations are manageable and reversible.

When courts assess irreparable harm from a new regulatory framework, they look for evidence that compliance will force irreversible choices: shutting down lines of business, altering infrastructure, or giving up constitutional rights in ways that cannot be unwound. *See Texas v. United States Envt'l Prot. Agency*, 829 F.3d 405, 434 (5th Cir. 2016) (affirming preliminary injunction where the challenged regulation would cause "plant closures" and "threaten the very existence of … businesses"); *see also Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020) (holding that denying parishioners the right to congregate constitutes irreparable harm and warrants injunctive relief). CCME's members see nothing of the kind here.

For an app developer, the core implementation tasks are:

1. Accepting and storing an anonymous small age/consent signal from the app store for Texas users.

2. Mapping that signal into existing user-segmentation logic (e.g., existing "child," "teen," and "adult" pathways).

8

3. **Surfacing or adjusting in-app UX for minors** when necessary—for example, barring in-app purchases absent a consent signal, or tuning default settings to existing teen experiences; and

4. **Mirror-mapping existing app age-ratings** into ASAA's four buckets, with explanatory text that can be derived from existing rating rationales.

These are reversible configuration and code changes. *See Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.*, 864 F. Supp. 2d 316, 328 (E.D. Pa. 2012) (denying preliminary injunction because plaintiffs failed to show they will suffer "irreparable injury"); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") If this Court or a higher court ultimately narrows or invalidates the Act, developers can roll back or adjust the code paths serving Texas users. CCME's members would not be forced to abandon speech, shutter apps, or redesign their core mission.

Indeed, to the extent app stores choose to implement ASAA compliance globally, that decision will reflect their own assessment that a harmonized global experience is preferable, not a statutory compulsion. Courts do not treat such voluntary business choices as irreparable harm attributable to the statute.

    C. CCIA does not speak for all affected industry participants, and its own allegations confirm that many mechanisms ASAA requires already exist.

CCIA seeks facial relief that would halt the statute's application to all app stores and developers in Texas, including those who disagree with CCIA's litigation position.

9

CCME's members will suffer concrete harms if the statute is enjoined at this late stage, including:

- **Technical uncertainty.** If ASAA is put on hold, developers will not know what signals app stores will expose for Texas users, which complicates their ability to design consistent experiences and may force them to maintain divergent codepaths.

- **Competitive harm.** Developers who have invested in robust age-assurance and teen-safety features will continue to unfairly comply while less responsible actors benefit from lax gatekeeping and misleading age labels.

- **Reputational and trust costs.** Parents who have been told that app-store-level parental consent and accurate age ratings are coming will see yet another delay, undermining trust in both platforms and responsible app developers.

Further, CCIA's complaint further undercuts its own claim of irreparable harm by acknowledging the breadth of existing age-rating processes and parental controls. Those allegations show that ASAA builds atop a mature ecosystem of tools, rather than requiring CCIA's members to construct an entirely new infrastructure on short notice.

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR ALLOWING ASAA TO TAKE EFFECT.

Even if the Court concludes that CCIA has raised serious constitutional questions, it must still weigh the competing equities and the public interest. Here, those factors weigh heavily against preliminary injunctive relief.

#### A. ASAA addresses longstanding problems with age ratings, parental awareness, and minor contracting at the app-store level.

The legislative record and public materials collected in related proceedings document a decade's worth of shortcomings to better protect teens within app-store ecosystem. Age ratings are frequently inaccurate, labeling apps as appropriate for young teens despite well-documented risks

10

or adult-oriented experiences. App store "Parental controls" often exist only on paper; in practice they are difficult to discover, cumbersome to configure, or easily bypassed. Minors routinely enter terms-of-service and in-app-purchase agreements that authorize ongoing data collection and recurring charges, without parents ever receiving meaningful notice or a genuine opportunity to consent. These are commercial practices—how app stores structure onboarding flows, how they label and market products, and how they treat minors for contracting and billing purposes.

ASAA targets those practices directly. It requires app stores to know whether a user is a child, younger teen, older teen, or adult when the app store account is created. It requires app stores to affiliate minor accounts with verified parents or guardians, so that someone with legal authority stands behind each child's use of the store. It mandates per-transaction parental consent before minors download apps or make in-app purchases, therefore preventing minors from being bound by contracts and charged for digital goods without parental knowledge. And it holds both app stores and developers accountable for accurate age ratings, aligning disclosure duties with each actor's role in creating and presenting those labels. From CCME's vantage point, these are modest but important corrections to a commercial system that has, for years, placed the entire burden of youth safety on individual apps on parents while allowing app-store gatekeepers to benefit from frictionless onboarding and optimistic age ratings.

> B. The public interest in youth safety and contractual capacity is strong, and ASAA advances that interest without making the State a content regulator.

ASAA's design deserves emphasis. The statute does not empower the Attorney General to decide which apps are appropriate for which minors. It does not impose age-specific content bans, and it does not condition access to speech on a government-run rating board or on the State's substantive assessment of the apps' expressive content. Instead, the Act locates obligations at the app-store level, where account-creation, contractual consent, and payment flows are already

11

centralized. It aims to ensure that parents, not developers, decide whether their minor children may access particular apps and digital services. It requires app stores and app developers to accurately describe their own digital services using age-rating systems they already purport to operate, and it ensures parental participation when minors agree to be bound by contracts.

Those are classic state interests in consumer protection, contractual capacity, and child welfare. The Supreme Court has long recognized states' authority to regulate commercial transactions involving minors, even where those transactions involve expressive goods, and ASAA fits comfortably within that tradition. *See* Prince v. Massachusetts, 321 U.S. 158 (1944) *(*Upholding a state law prohibiting children from selling religious materials and holding that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults."*)*. From the developer's perspective, there is also a competition-related public interest. When app stores present apps as appropriate for "Everyone" or "12+" while quietly routing minors into experiences that expose them to sophisticated engagement loops or aggressive monetization, developers that invest in more responsible designs are competitively disadvantaged. By raising the floor on age assurance and parental visibility, ASAA helps align commercial incentives with safer, more transparent practices.

### EVEN IF THE COURT WERE INCLINED TO GRANT SOME RELIEF, PLAINTIFF HAS NOT JUSTIFIED A FACIAL, STATEWIDE INJUNCTION.

Finally, CCIA requests relief that sweeps far beyond the interests of its own members and far beyond any harms grounded in the record. It asks this Court to enjoin enforcement of ASAA as to all app stores and all app developers in Texas, including those who are not CCIA members.

That breadth raises two concerns. First, an injunction would punish developers that have already invested in compliance and welcome the Act's structure. A blanket injunction would

override their considered judgments and prolong a status quo they regard as unsatisfactory for parents and developers. Their interests deserve weight in the equitable calculus.

## CONCLUSION

ASAA represents a reasonable attempt by Texas to update longstanding principles of consumer protection, contractual capacity, and youth safety for the mobile app ecosystem. It does so by placing primary gatekeeping responsibilities on app stores—the digital marketplaces that already control app access, including app store account creation, billing, and app discovery—while preserving parents' authority to decide what apps their children may download.

For app developers that operate at a global scale, the Act's technical requirements are manageable and largely aligned with existing practice. CCME views ASAA not as an existential threat to speech or innovation, but as a predictable framework that clarifies responsibilities between app stores and app developers and supports both competition and parental oversight.

CCIA has not shown that compliance with that framework will cause irreparable harm, nor that the balance of equities and public interest favor halting the statute before it takes effect. On this record, the extraordinary step of preliminarily enjoining a duly enacted state law is unwarranted.

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

C. Eric Vickers
State Bar No. 24118577
info@vickersfirm.com
Vickers Law Firm
One Sugar Creek Center Blvd. | Suite 820
Sugar Land, TX 77478
Telephone: (806) 414-0966
Facsimile:  (806) 414-0966
*Counsel for Amicus Curiae*

13

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, I electronically filed the foregoing document with the Clerk of the Court for the Western District of Texas by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 12, 2025                     By: _C. Eric Vickers_
                                                  C. Eric Vickers

                                             *Counsel for Amicus Curiae*

14

# Table of Authorities

**Cases**

*Grant Heilman Photography, Inc. v. John Wiley & Sons, Inc.,*
   864 F. Supp. 2 U.S. 629 (1968) ................................................................ 9

*Prince v. Massachusetts*
   321 U.S. 158 (1944) ................................................................................ 12

*Roman Cath. Diocese of Brooklyn v. Cuomo*
   592 U.S. 14 (2020) .................................................................................. 8

*Texas v. United States Envt'l Prot. Agency*
   829 F.3d 405 (5th Circ. 2016) ................................................................. 8

*Va. Petroleum Jobbers Ass'n v. FPC*
   259 F.3d 405 (D.C. Cir. 1958) ................................................................ 8

*Weinberger v. Romero-Barcelo*
   456 U.S. 305 (1982) ................................................................................ 9

*Winter v. NRDC*
   555 U.S. 7 (2008) .................................................................................... 3, 8

**Statutes**

Texas Business & Commercial Code §§ 121.021-121.022………………..2

**Other Authorities**

*Age Ratings Values and Definitions,* App Store Connect Documentation (last updated July 24, 2025)......................................................................................2

*Computer & Communications Indus. Ass'n v. Paxton,* No. 1:24-cv-849, Compl. (W.D. Tex. July 30, 2024) .................................................................................5

*Computer & Communications Indus. Ass'n v. Paxton,* No. 1:25-cv-1660, Compl. (W.D. Tex. Oct. 16, 2025)..................................................................................1

*Federal Trade Commission v. Apple, Inc.,* Docket No. C-4444 (FTC Mar. 25, 2014).................................................................................................................2